**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
(212) 237-1000
Charles E. Simpson (csimpson@windelsmarx.com)

Proposed Attorneys for North General Service Corporation,
North General Hospital and North General Diagnostic and
Treatment Center, Debtors-in-Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

In re                           :

NORTH GENERAL SERVICE CORPORATION,   :      Chapter 11
                                  :      Case No. 10-

               Debtor            :

                                  :

-------------------------------------------------------------x

In re                           :

                                  :      Chapter 11
NORTH GENERAL HOSPITAL,               :      Case No. 10-

               Debtor.          :

-------------------------------------------------------------x

In re                           :

                                  :      Chapter 11
NORTH GENERAL DIAGNOSTIC AND       :      Case No. 10-
TREATMENT CENTER,

                                  :

               Debtor.          :

-------------------------------------------------------------x

## AFFIDAVIT OF DR. SAMUEL J. DANIEL, M.D. (A) PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2, AND (B) IN SUPPORT OF FIRST DAY MOTIONS

STATE OF NEW YORK     )
                        )ss.:
COUNTY OF NEW YORK   )

       1.      Dr. Samuel J. Daniel, M.D., hereby affirms, under penalty of perjury, as follows:

2. I am the President and Chief Executive Officer of North General Hospital ("North General" or the "Hospital"), and have served in this position since 2001. I am familiar with the business and affairs of North General and its debtor affiliates (each a "Debtor" and collectively with North General, the "Debtors"), as Chapter 11 debtors and debtors-in-possession (the "Chapter 11 Cases").

3. I submit this affidavit (this "Affidavit") pursuant to Rule 1007 of the Local Bankruptcy Rules for the Southern District of New York ("Local Rules") to support the Debtors' petitions for relief under Chapter 11, title 11, United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") and the relief, in the motions, that the Debtors' have simultaneously requested of this Court.

4. Except as otherwise indicated, all facts set forth in this Affidavit are based on my personal knowledge of, upon information supplied to me by the Debtors' officers, employees, accountants and other professional advisors, upon information learned from my review of relevant documents, or upon my opinion based upon my experience and knowledge of the Debtors' operations and financial conditions. If called as a witness, I would testify to the facts set forth in this Affidavit. Unless otherwise indicated, all financial information contained herein is presented on an unaudited basis. I am authorized to submit this Affidavit.

## GENERAL BACKGROUND

5. On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under the Bankruptcy Code. The Debtors have requested that the cases be jointly administered for procedural purposes only.

6.     The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108. No trustee, examiner, or official committee of unsecured creditors has been appointed.

## HISTORY AND BUSINESS

**THE DEBTORS**

7.     North General was incorporated in 1977 and began as a stand-alone operation on November 1, 1979. As a result of amendments to its bylaws in 1991, North General became an operating subsidiary of Corporation, its parent company.

8.     As a not-for-profit organized under the State of New York (the "State"), North General is exempt from federal income taxation under § 501(c)(3) of the Internal Revenue Code. Corporation, which is similarly a New York not-for-profit corporation, is also exempt from federal income taxation under §501(c)(3) of the Internal Revenue Code.

9.     North General was established in response to and as a result of the Orthopedic Institute Hospital for Joint Diseases, of which North General's facilities were a part, moving to downtown Manhattan and the closure of several other Harlem neighborhood hospitals, including Sydenham Hospital. Today, North General is the only remaining minority-run private hospital in the State. North General operates 200 licensed acute care beds at 1879 Madison Avenue (the "Main Facility"), located between 121st and 122nd Streets in upper Manhattan.

10.     Since its foundation in January 1977, North General has been providing medical services to the communities of East and Central Harlem. More specifically, North General provides a broad range of adult inpatient services, as well as ambulatory and emergency care services. The communities of East and Central Harlem are economically underprivileged-working class communities populated primarily by Latinos and African-Americans. Relative to

the rest of New York City, East and Central Harlem are inhabited by traditionally underserved populations living at higher levels of poverty who suffer disproportionately from increased rates of mortality due to common illnesses and treatable diseases. Residents in these communities rank among the bottom ten New York City neighborhoods and have below average scores in areas such as general health, maternal and child health, infectious disease (including pneumonia, influenza and HIV/AIDS) and chronic disease (including heart disease, diabetes and lung diseases). The Debtors' existence has been vital to providing the residents of East and Central Harlem with the health services they critically require.

11. Corporation, a holding company incorporated on February 8, 1991, has no assets or liabilities, operations or employees. Corporation's shares are held by Livingston S. Francis, Eugene Giscombe and Dr. Samuel Daniel M.D.

12. D&TC, incorporated on May 4, 2004, is a not-for-profit, tax-exempt entity, wholly dependent on and supported by North General. D&TC operates at North General. It was established to deliver enhanced outpatient primary care services for adults and children, as well as programs and services specializing in diabetes treatment, pediatric weight management, cardiovascular services, women's health, a school-based health and addiction treatment.

**THE NON-DEBTORS**

13. The Debtors also have certain non-debtor affiliates:

14. North General Home Attendant Corporation (the "Home Attendant Program") is wholly owned by Corporation, was incorporated on March 11, 1980. The Home Attendant Program employs 625 home attendants and provides home care services to approximately 390 individuals in Manhattan. At all times, the Home Attendant Program has retained its own

employees and receives compensation through a grant from the New York City Human Resources Administration (HRA).

15. North General Foundation, Inc. (the "Foundation") is wholly-owned by Corporation and raises funds to support the capital and operational needs of North General. It was incorporated on January 7, 1993

16. PhyService, Inc. ("PhyService") is wholly owned by Corporation. While currently inactive, Physervice is a management service organization (MSO), and is a not-for-profit, taxable corporation organized to provide management services to affiliate and community based physician practices as well as non-physician organizations. PhyService was incorporated on May 24, 1996.

17. North General AIDS Housing Development Fund Corporation ("AIDS Housing Development Fund") is wholly owned by North General and is primarily a supportive housing development corporation, which sponsored the development and construction of a 28-unit AIDS supportive housing development and services individuals referred by the New York City Housing Authority (NYCHA).

18. North General also controlled the Helene Fuld College of Nursing ("Helene Fuld"), a separate not-for-profit corporation, through majority Board membership through October 25, 2007. As of October 25, 2007, North General owed over $1 million to Helene Fuld, which was extinguished through a settlement under which the hospital must make monthly payments of $30,000, which commenced on November 1, 2007. The outstanding balance due to Helene Fuld was $ 207,327, as of May 31, 2010 and is included in North General's accounts payable.

19.     North General is affiliated with the following entities:  (i) the Ralph Lauren Center for Cancer and Prevention: In conjunction with Memorial Sloan Kettering Cancer Center and the Polo Ralph Lauren Corporation, North General created a separately incorporated diagnostic and treatment center at 1919 Madison Avenue in Harlem, New York City.  The center provides full service primary and cancer care to the surrounding community with a focus on its underserved population and (ii) General Physician Services, PLLC, which is affiliated with North General through common board membership

20.     The Debtors are also affiliated with the following dissolved or dissolving corporations that have not filed for bankruptcy relief in these Chapter 11 cases: (i) Community Health Alliance (PHO), (ii) Harlem Community Physician Practice; (iii) North General Housing Development Corporation, Inc. and (iv) NGSC Insurance Ltd. (a/k/a Captive), which is currently involved in a foreign liquidation proceeding in Bermuda.

## DESCRIPTION OF PREPETITION SECURED INDEBTEDNESS

21.     As of the Petition Date, the Debtors have at least $213 million of outstanding secured indebtedness (principal, interest & fees) owing to the various prepetition secured parties. The overwhelming majority of North General's secured debt is held by DASNY pursuant to (i) the DASNY Mortgage; and (ii) the DASNY Loan.

**THE DASNY MORTGAGE**

22.     In 1991, North General completed a major portion of a facility modernization program.  To finance this project, North General entered into a mortgage loan agreement on July 1, 1989 with DASNY (formerly the New York State Medical Care Facilities Finance Agency). This loan agreement provided for proceeds of $150,000,000.00, which were funded by DASNY from the sale of Secured Hospital Revenue Bonds ("1989 Series A").

23.     Thereafter, North General and DASNY entered into a new loan agreement, dated January 28, 1998, and a mortgage, dated February 26, 1998, with North General in connection with the issuance of $144,610,000.00 of the Secured Hospital Revenue Refunding Bonds, Series 1998G (the "Series 1998G Bonds") through the New York State Secured Hospital Program ("Secured Hospital Program"). The proceeds were used to refund the outstanding principal amount of the existing mortgage agreement with DASNY relating to the Secured Hospital Revenue Bonds, 1989 Series A.

24.     Finally, DASNY signed a new loan agreement, dated January 3, 2003, and a mortgage, dated January 23, 2003, with North General in connection with the issuance of $138,135,000.00 of Secured Hospital Revenue Refunding Bonds, Series 2003 (the "Series 2003 Bonds") through the Secured Hospital Program. The proceeds were used to refund the outstanding principal amount of the existing mortgage agreement with DASNY relating to the Series 1998G Bonds. Initially North General made payments to DASNY of principal and interest however; as time went by these the hospital ceased making any payments under the DASNY Mortgage.

25.     The bonds are special revenue obligations of DASNY and are collateralized by a first mortgage lien on North General's property. In addition, pursuant to the Secured Hospital Program, DASNY and the State, acting through the State's Director of the Budget, entered into a service contract to provide additional protection for the bonds.

26.     Under the DASNY Mortgage, North General is required to maintain certain covenant obligations, however, as of December 31, 2005, North General has not met its debt coverage ratio covenant requirement. A waiver for failing to meet this required financial covenant is not in place and the required payments still have not been made. The DASNY

Mortgage also requires North General to pay health assessment fees of $450,000 annually to the Department of Health ("DOH") and DASNY over the term of the DASNY Mortgage. Interest on late payments is assessed at approximately 7.5%. As of May 31, 2010, North General owed $3,453,557, in outstanding fees and interest.

27.     As of December 31, 2007, the DASNY Mortgage was reclassified as a short-term liability because of North General's failure to obtain the required waivers for its failure to meet its debt coverage ratio covenant and certain other covenants.

**THE DASNY LOAN**

28.     On July 25, 2002, August 6, 2001 and March 25, 1999, North General entered into loan agreements with DASNY in the amounts of $1,300,000, $2,000,000 and $500,000, respectively. These obligations were funded from the Restructuring Pool for the purpose of providing vendor settlements and implementing a turnaround plan. On July 21, 2003, North General entered into a supplemental reimbursement agreement with DASNY, in which DASNY agreed to loan North General an additional $4,000,000 from the Restructuring Pool, of which $3,600,000 was held by DASNY to be applied to North General's debt service obligations under the Series 2003 Bonds loan agreement and $400,000 was disbursed to North General to meet working capital needs. In 2004 and 2005, North General received $2,400,000 and $500,000 respectively, to assist with certain debt service requirements. Through May 31, 2010, additional borrowings were made by North General to aid with the payment of certain employee benefits that were past due, debt service requirements, and operational and equipment needs.

29.     As of May 31, 2010, these supplementary borrowings increased the outstanding principal balance on the DASNY Loan to $55,243,537. The DASNY Loan is secured by substantially all of North General's patient receivables.

## OTHER COMMITMENTS AND CONTINGENCIES

### Operating Leases and Rental Expenses

30.     North General has entered into various operating lease agreements.  In 2008 and 2009 rental expenses under the operating leases were $518,041 and $450,507 respectively.  Future minimum rental expense commitments to be paid under these operating leases are as follows: 2010: $754,743; 2011: 378,442; 2012: $386,116; 2013: $309,219; 2014: $185,734; and thereafter: $1,051,730.

### Union & Pension Obligations

31.     Union employees are generally included in the pension and welfare plans of their collective bargaining units.    Under these plans, North General is required to make payments based on contractual amounts.  Expenses under these plans were approximately $9,078,322 and $10,333,313 for the years ending December 31, 2008 and 2009 respectively. As of May 31, 2010, the Debtors have accrued pension liability of over $11 million.

## CIRCUMSTANCES LEADING TO CHAPTER 11

### Systemic Undercapitalization from its Inception

32.     With the assistance of the State, but grossly undercapitalized, North General was established to operate a 200-bed community hospital in the building formerly occupied by the Hospital for Joint Diseases, which had relocated to new facilities in downtown Manhattan. North General entered 1980, its first full year of operation, with a negative fund balance of $824,987.  North General lost nearly $3 million for the year.

33.     During the early years of operations, it became apparent that North General was suffering the ill effects of its systemic problem of undercapitalization.  Facing bankruptcy almost immediately, North General appealed to the State for relief and was afforded special State aid by

being approved for participation in the Emergency Hospital Reimbursement Program effective September 25, 1980. Thus began a long series of financial "bail outs" that have frustrated both State regulators and North General.

34.     In 1989, despite its poor balance sheet position, but again with the full support of the State, North General embarked on a program to rebuild the entire hospital at a new location. It was the view of the State that the public need for the facility trumped the hospital's notable financial shortcomings. A special State financing program had been developed for distressed hospitals that allowed refinancing of prior bad debt (in effect, over-mortgaging). In 1989, North General obtained financing from the Medical Care Facilities Finance Agency (MCFFA), which issued $150 million of tax-exempt 1989 Series "A" Bonds. The proceeds from the 1989 Series A Bonds were used to (i) acquire the site of the Debtors' original premises at 1919 Madison Avenue in Harlem, New York (ii) build and equip the Main Facility, (iii) demolish the original premises and (iv) repay certain indebtedness. This loan agreement with the MCFFA was supported by a service contract with the Director of the Budget of the State of New York. The "new" North General, located two blocks south of the old building, opened on December 12, 1991 at which time the original premises was conveyed to the City of New York.

35.     After the Main Facility was completed, a second building, the North General Annex, located at 1824 Madison Avenue, Harlem, New York (the "Annex") was constructed with unexpected proceeds from the 1989 Series A Bonds. Construction of the Annex was completed in 1993. Currently the Annex provides space for financial administration and, information systems, and outpatient services for HIV/AIDS, and the DTC-operated Addiction Treatment Center.

36.     With a $150 million mortgage in place, North General began 1992 with less than $7,000 in unrestricted cash, virtually no working capital, and a negative fund balance of $10.4 million. Unfortunately, and despite North General's best efforts, this trend continued throughout the hospital's history.

37.     In this regard, according to the Debtors' interim financial statements dated as of May 31, 2010, North General had a deficiency in unrestricted net assets of $226,101,294 and a working capital deficiency of $193,790,566. In its comments to the Debtors' Consolidated Statements, the auditors noted that these factors raise substantial doubt about North General's ability to continue as a going concern (*See* North General Hospital and Affiliates Consolidated Financial Statements Year Ended December 31, 2009).

38.     As of May 31, 2010, North General's total assets equal approximately $67 million of which approximately $22 million is current, $12 million is limited noncurrent, $2 million is other long term and $31 million is property, plant and equipment-net.

39.     Moreover, as of May 31, 2010, North General's obligations include $135 million of mortgage debt, which is categorized as a current liability, $55 million in restructuring loans and $103 million of other obligations which includes $19 million of interest on capital indebtedness. Total outstanding liabilities at May 31, 2010 are approximately $293 million. The Debtors' net asset deficiency at May 31, 2010 is approximately $226 million.

40.     Facing insurmountable financial obstacles from its inception, North General mobilized all its resources to try and keep its head above water however, and as has been clearly demonstrated herein, North General has, since its first day of operation, been burdened with a debt-load vastly disproportionate to its ability to service such debt. North General has and

remains simply too small and its inpatient volumes too low for it to carry the financial obligations it has incurred.

**Changes in Reimbursement Rates, Lack of Revenue Generating Programs & Services & Volume Decline**

41.     In addition to its problem of systemic undercapitalization, between 1979 and 1983, profound changes took place in hospital Medicare and Medicaid reimbursement rates, which had a disproportionately negative impact on North General and similar safety net hospitals.     Payment rates to hospitals, once based on "cost-based" reimbursement, were terminated and a fixed price or Diagnosis Related Group (DRG)-based payment for inpatient hospital services was implemented.     Since that federal legislation was passed in 1982, and the beginning of the DRG era in 1983, some 1,200 American hospitals have closed.     This change in the Medicare reimbursement system and other changes to the New York Medicaid system resulted in a continuing reduction in payments received by North General and as a consequence, dramatically and adversely affected the hospital's financial stability.

42.     Moreover, because North General is a small, independent hospital and not a member of a health care network, it has been unable to benefit from the more favorable managed care rates provided to the larger health care networks.     North General, due to its size has paid higher prices for supplies and it is unable to benefit from bulk purchasing opportunities.     Lastly, patient care volumes continue to decline while the competition from other health care networks has increased. Since 2007 through 2009, the hospital's admissions have declined nearly 17%. Unfortunately for North General, the combined impact of Medicare and other regulatory changes added $83 million to the hospital's negative fund balance over the intervening years.

43.     To combat the aforementioned negative circumstances in which it found itself, North General tried implementing a number of specialty programs over the past few years in an

attempt to bring in more patients and build business. These programs, however, were unsuccessful, and despite North General's operational expense improvements, investments in clinical leadership, programs and equipment, North General still faces severe liquidity issues. North General has also been unable to neither achieve financial stability nor increase its market share.

**Proposals Considered By North General**

44.     As its operating losses deepened, the Debtors concluded that the only way to preserve the hospital's mission was to enter into agreements with other providers of care, however, potential alternatives to ensure continued operations proposed by North General were rejected by the DOH.  As a result of the failed contractual relationship with Mt. Sinai, North General undertook an analysis of potential alternatives that could ensure its continued operation, including the following: (i) pursuing a plan for interim financing, outside of DASNY, to support a plan for clinical reorganization, which presumes a "significant" contractual relationship with Mt. Sinai or another partner, (North General approached several other academic health care institutions regarding such an alignment, but were turned down by such institutions), (ii) recreating North General as a niche provider of comprehensive services to the growing geriatric population, building and expanding upon relationships with nursing homes and other programs serving the elderly, (iii) recreating North General as a full service, standard-setting ambulatory care facility, offering high quality medical care and technology, (iv) re-missioning North General along the lines of the Medical Home Model (an "MHM") or (v) closing North General.

45.     Initially the most viable of the foregoing options was to re-mission North General into a comprehensive ambulatory health services provider based on the MHM.  The State is engaged in a program to fundamentally reform its health care system and in connection therewith

unprecedented financial resources have been assembled by the State to assist the reform effort. The State's Fiscal Year 2009-10 Health Budget ("Budget") provides certain incentives for the adoption of "medical home" standards and the revision of the Medicaid reimbursement system for hospital inpatient services.

46.    Under the MHM, healthcare provided by North General would have been managed and coordinated by personal physicians and North General would have positioned itself as the "Medical Home" for patients in its service area in the Central and East Harlem Community. North General would have (a) formulated new practices and policies to rationalize service use, improve health outcomes and reduce Medicaid costs and (b) developed health care models to service its high risk population, which models would incorporate intensive case management, integrated delivery of services collaboration with community-based social service organizations and enhanced communication and data sharing. These services would be supported by fully integrated electronic health records and state-of-the-art information technology. North General also explored leasing certain of its beds to Mt. Sinai, involving community doctors in the services provided by North General, adding more programs and services regarding ambulatory and primary care and offering doctors an economic ownership incentive to become engaged with North General.

47.    In addition to the State's financial support of MHMs, North General envisioned receiving the benefit of new Medicaid payment methods. On December 1, 2008, Medicaid implemented a new Ambulatory Patient Groups (APGs) payment method, for hospital outpatient services. Effective December 1, 2009, Medicaid implemented a new inpatient payment method which (i) updates costs from 1981 to 2005, (ii) bases payments only on the costs of Medicaid patients, (iii) uses a statewide base price with adjustments for hospital-specific wage and

teaching costs, (iv) adopted an updated case mix system (APGs and DRGs) that more accurately measures and reimburses for patient acuity, (iv) updates and implements a new prospective payment system for inpatient psychiatric services, (v) authorizes hospital-based physicians to bill Medicaid outside the facility fee effective February 1, 2010 and (vi) provides for updates to the cost basis at least every three years. In addition, the Budget reduces inpatient rates by $225 million annually as part of a multi-year effort to bring inpatient rates more in line with inpatient costs and provides funding opportunities to assist hospitals in adapting to the new reimbursement system, creating efficiencies in their operations and re-aligning their business models to, among other things, effectively integrate primary care and chronic care management.

48. North General, in seeking to re-mission itself as a MHM with the financial assistance through the foregoing programs and revised Medicaid reimbursement systems, approached the DOH for its approval; however, the DOH indicated that a MHM would only work with a full-service, functioning hospital. As a result, operating solely as an MHM is not a viable option for North General. With expenses rising and revenues falling, North General is currently unable to meet its debt obligations. The decreased reimbursement rates received by North General coupled with its heavy debt burden, decreases the likelihood of a sufficient financial capital restructuring for North General to remain solvent and viable. Overall, North General has a serious liquidity crisis and finds itself in a very tenuous financial position, with limited cash, an inability to service its debt or make necessary capital improvements or otherwise sustain operations in their current form.

49. Unfortunately and despite their best efforts, North General and its affiliates were faced with numerous insurmountable hurdles, which individually and together sabotaged their

ability to successfully complete a strategic third-party transaction. In the end none of the proposals considered by the Debtors proved to be viable.

## EVENTS SURROUNDING THE DECISION TO CLOSE
## THE HOSPITAL & FILE FOR CHAPTER 11

Lacking sufficient funds to continue operating the hospital on a standalone basis and without a viable and qualified third-party partner or sponsor for the hospital, the Debtors determined that there was no alternative than to commence these Chapter 11 cases.

50. Given the Debtors financial circumstances, on June 28, 2010, the Board of Directors of North General voted to approve the closure of the hospital and the transfer or closure of the outpatient programs and clinics associated with and operated by the hospital (together with the services provided by North General, the "Hospital Services").

51. In accordance with 10 NYCRR § 401.3, North General submitted a closure plan to the DOH. This closure plan encompasses both the Hospital and the North General Diagnostic and Treatment Center, Inc. Pursuant to 14 NYCRR § 551, North General has also submitted an additional closure plan to the New York State Office Mental Health (OMH) for review and approval to close the following North General services certified by the OMH: Psychiatric Inpatient Services, Mentally Ill Chemical Addicted Inpatient Services, and Outpatient Mental Health Services. Finally, in accordance with 14 NYCRR § 810.16, the Hospital will submit an additional closure plan to the New York State Office of Alcoholism and Substance Abuse Services (OASAS) for review and approval to close the following Hospital services certified by OASAS: the inpatient Substance Abuse Services and the outpatient Addiction Treatment Center (collectively, the closure plans submitted to the DOH, the OMH and OASAS, the "Closure Plan")

52.     While the DOH, OMH and OASAS have not yet approved the Closure Plan, the Debtors have already begun the closure process and are working closely with the above-mentioned State agencies to successfully implement the Closure Plan.

53.     By filing for Chapter 11 protection, the Debtors expect to: (i) obtain the financing necessary to implement their Closure Plan; (ii) obtain protection from creditor action in an effort to preserve and maximize the value of their assets for the benefit of all their stakeholders; (iii) complete and orderly wind-down of their operations while safeguarding the welfare of their patients until such time as their patients can be transferred to another facility or otherwise discharged.

## THE DEBTORS' CLOSURE PLAN

54.     Very recently, the Board of Directors of NGH directed management to develop and implement a plan for the closure of its acute inpatient services and the transfer of its outpatient services to alternative providers, or if such transfer could not be arranged, the orderly closure of such outpatient services.

**Discontinuation of Emergency Services**

55.     It is anticipated that, on July 6, 2010, the Hospital will cease accepting inpatient admissions and the North General Hospital Emergency Department (ED), in collaboration with FDNY EMS and the Regional Emergency Medical Services Council of New York City (REMSCO), will begin an orderly transition to permanent diversion status, during which time the ED will continue to care for all emergency patients.

56.     The Hospital is the operator of two (2) ambulances within the NYC 911 system. FDNY 911 ambulance service will be advised of the Emergency Department closure and permanent diversion status. FDNY will then be responsible for routing all emergencies to other

area Emergency Departments. REMSCO will be advised of the Emergency Department closure and permanent diversion status.

57.     North General will post signs in English and Spanish at the Emergency Department entrance and other locations in the Hospital and off-site clinics, informing the public of our plan to close the Emergency Department on July 9, 2010.

58.     When the Emergency Department is placed on permanent diversion status, Hospital emergency services will transition to "treat and release or transfer" status, and continue as such at least until July 12, 2010 all inpatients have been discharged or transferred but in no event later than July 15, 2010. Upon closure of the Emergency Department, care and disposition of all emergency patients currently under treatment will be completed, after which time the Emergency Department will be closed, and all patients transferred or discharged, as appropriate.

59.     In order to expedite any necessary patient transfers, the Hospital will maintain an ambulance stationed at the Emergency Department until Hospital closure. Following ED closure, the Hospital will arrange with a telecomm provider to locate a public telephone with free 911 access (with bilingual English and Spanish support) to an area outside the Emergency Department, for an appropriate period following closure of the ED.   Also, the Hospital will provide signs in English and Spanish with Emergency 911 contacts in the event an individual uninformed about the Hospital Emergency Department closure arrives in need of emergency medical care.  Such signs will remain in place for as long as feasible following closure, pending future disposition of the physical plant. Signs will be posted outside the Emergency Department and the main entrance.

60.     Signage directing the public to the Hospital or its emergency department will be removed or covered.  The NYS Department of Transportation (DOT) will be notified to remove

all blue "H" hospital signs directing the public to the Hospital from lampposts and street signs as of the closure. The Hospital will cover or remove all hospital signs on the Hospital property except for those needed to direct patients to emergency 911 contacts.

61.    All facilities with active transfer agreements will be notified when the Emergency Department is placed on permanent diversion status that their patients should be directed to other facilities for care.

62.    The Hospital will send a DOH-approved press release to local newspapers when the Hospital Emergency Department is placed on permanent diversion status, and again when the Emergency Department and Hospital are closed.

63.    A security department staff member will remain in the Emergency Department for a thirty (30) day period following the closure to provide information to persons who may arrive at the Emergency Department seeking care.

64.    The Hospital has been informed that the IFH, which it is anticipated will operate a site-extension FQHC at the Hospital's current outpatient facility location at 1879 Madison Avenue, New York, NY 10035, and other authorized locations, will be seeking DOH approval to operate an urgi-care center at the Hospital's main site. Operation of an urgi-care center at this site will aid in the transition of the community from an emergency department to outpatient services.

65.    The Hospital will cease accepting new admissions as of midnight on July 6, 2010 The Hospital will continue to provide care, and will enlist the assistance of DOH in finding a suitable transfer facility for patients not readily transferred or discharged in the ordinary course.

66.     Upon implementation of the Closure Plan, North General will immediately begin closing its one-hundred ninety (190) inpatient beds, and will provide for the orderly transfer or discharge of all inpatients.

67.     All direct and ancillary inpatient services necessary to support patient care for remaining patients will be continued until all inpatients are transferred or discharged.

68.     North General staff will follow a procedure to transfer patients to alternate acute care hospitals, when necessary.   An assessment will be made of each individual's current presenting clinical condition and needs to determine the most appropriate, safe and efficient and specific individualized plan for placement or transfer, subject to patient choice.

69.     Each inpatient will receive notification of the planned closure as well as a recommendation for transfer to an alternate hospital location for treatment.   Each patient's attending physician will be given notification of the closure, and informed of the arrangements made to transfer their patients to other providers, as necessary.   Patients will be transferred to hospitals capable of providing the services they are currently receiving at North General Hospital, i.e. ICU, psychiatry, mentally ill chemical addicted, and detoxification.   All transfers will be made with the informed consent of patients or their legal representatives.   Existing Hospital forms will be used to document each patient's consent to transfer.   North General Hospital staff members will contact the receiving provider hospital to discuss the patient's transfer and treatment.

70.     Effort will be made to transfer those patients requiring continued acute medical care to one of the nine (9) hospitals serving the North General Hospital Primary Service Area, unless otherwise requested by the patient. The North General Hospital Primary Service Area is

represented by the following six (6) contiguous Zip Codes in upper Manhattan: 10026, 10027, 10029, 10030, 10035 and 10037.

71.     To ensure continuity of care, each patient's medical record will document the transfer of the patient to the receiving hospital. Each patient's medical record will be completed up to the time of transfer. The receiving hospital will be sent copies of the patient's medical record and insurance/source of payment information.

72.     A Master List of Transferred Patients will be maintained to document that each inpatient is properly transferred, and the ultimate disposition.

73.     Communicating with and providing continuity of care for North General patients will be a priority during the closure process and after closure. The post-closure plan includes continuation of North General's main telephone number, which will be maintained 24/7 with bilingual (English and Spanish) support for patients and members of the community requiring information regarding post-closure access to medical records. The Hospital will maintain this telephone line for 12 months after Hospital closure.

**Surgical Services**

74.     Elective surgeries will be discontinued as of July 9, 2010. All surgeries scheduled after that date will be cancelled or transferred. Patients will be immediately notified of cancelled procedures. Physicians utilizing Hospital surgical services will be notified by email, fax, and in writing of the closure date of this service. North General will assist patients in finding and contacting alternate physicians to perform procedures when appropriate. The Hospital will work closely with physicians to assist them in finding available facilities and times to reschedule patient procedures.

**Substance Abuse Services**

75.     The medically supervised inpatient detoxification unit provides medically supervised withdrawal from alcohol and other substances. The Hospital operates a total of twenty-four (24) inpatient detoxification beds on two (2) units. The Hospital ceased accepting new admissions on midnight on June 30, 2010.

76.     As discussed herein, North General will submit an additional closure plan to the OASAS for review and approval to close the Substance Abuse Service.

77.     North General will continue to provide patient care during the transition period prior to closure. Each patient being treated in the unit will receive prompt notification of the planned closure, and their options for continued treatment.

78.     The majority of patients will be discharged to outpatient care within the ordinary course of their treatment.   As necessary, the Hospital will assess the clinical needs of each patient, as well legal requirements (such as notifications to Probation or Parole Departments), and will work closely with OASAS to arrange transfer or referral to another certified provider prior to service closing.

79.     North General will document each patient's consent to transfer and to the transfer of their medical record, as required by law. North General will provide OASAS with a list of all patients transferred or referred following the date of cessation of admissions, including the identity of the receiving OASAS certified provider, and OASAS certification number, a contact person, and contact information.

80.     Patient medical records will be maintained and/or disposed of in accordance with OASAS, State and Federal regulations. OASAS will be provided with the identity of all

community contacts, referral sources and government agencies that have been notified of the Hospital closure.

**Mentally Ill Chemical Addicted ("MICA") Inpatient Services**

81.     The Hospital operates a nineteen (19) bed MICA unit for the treatment of patients who have a DSM IV diagnosable mental disorder and a co-occurring substance related disorder. The Hospital plans to cease accepting new admissions as of midnight on July 6, 2010.

82.     North General will submit an additional closure plan to the New York State Office of Mental Health (OMH) for review and approval to close the MICA service.

83.     North General will continue to provide patient care during the transition period prior to closure. Each patient being treated in the unit will receive prompt notification of the planned closure, and their options for continued treatment.

84.     The majority of patients will be discharged within the ordinary course of their treatment. As necessary, the Hospital will assess the clinical needs of each patient and will work closely with the OMH to arrange transfer or referral to another certified provider prior to service closing. The Hospital will document each patient's consent to transfer and to the transfer of their medical record, as required by law. North General will provide OMH with a list of all patients transferred or referred following the date of cessation of inpatient admissions, including the identity of the receiving OMH certified provider, a contact person, contact information, and OASAS certification number.

85.     Patient medical records will be maintained and/or disposed in accordance with OMH, State and Federal regulations. OMH will be provided with the identity of all community contacts, referral sources and government agencies that have been notified of the Hospital closure.

**Psychiatric Inpatient Services**

86.     The Hospital operates a twenty-three (23) bed inpatient psychiatric unit which serves patients eighteen years and older who have a DSM IV diagnosable mental disorder. The Hospital will cease accepting new admissions as of midnight on July 6, 2010.

87.     As noted above, North General will submit an additional closure plan to the New York State Office of Mental Health (OMH) for review and approval to close the inpatient psychiatric service.

88.     The Hospital will continue to provide patient care during the transition period prior to closure. Each patient being treated in the unit will receive prompt notification of the planned closure, and their options for continued treatment.

89.     The majority of patients will be discharged within the ordinary course of their treatment.  As necessary, North General will assess the clinical needs of each patient and will work closely with OMH to arrange transfer or referral to another certified provider prior to service closing.

90.     The Hospital will document each patient's consent to transfer and to the transfer of their medical record, as required by law. North General will provide OMH with a list of all patients transferred or referred following the date of cessation of inpatient admissions, including the identity of the receiving OMH certified provider, a contact person, contact information, and OMH certification number. Patient medical records will be maintained and/or disposed in accordance with OMH, State and Federal regulations.

91.     OMH will be provided with the identity of all community contacts, referral sources and government agencies that have been notified of the Hospital closure.

**Outpatient Services**

92.    North General and the D&TC currently plan to transfer most of their outpatient services to the IFH, which will operate a site-extension FQHC at the Main Facility and other authorized locations, for the following outpatient services: Audiology, Family planning, Primary medical care, Special Services Clinic, Women's Health Center, Mental Health Center, the Ralph Lauren Center for Cancer Care & Prevention, and the Addiction Treatment Center.

93.    If the anticipated transfer does not take place, the program will be closed as of July 2, 2010. All active patients will be referred to other area providers. All patients will be notified of the closure and will be referred to alternate providers for continued care and treatment, subject to patient choice.

94.    The following outpatient services have no alternate sponsor and are scheduled to terminate clinical operations as part of the Closure Plan: outpatient general surgery, outpatient plastic surgery service, and the Community Outreach Education Program.

## CONTINUING OUTPATIENT SERVICES

**Diagnosis and Treatment Center**

95.    The D&TC operates an Article 28 freestanding Health Center for the provision of primary care, medical, surgical, dental and subspecialty services for adults and children. The D&TC anticipates that it will transfer operation to the IFH as of July 6, 2010. The IFH will continue to operate the D&TC as a site-extension FQHC without interruption. All active patients will be notified of the transfer of D&TC program operations to the new provider prior to the transfer. If the anticipated transfer does not take place, the program will be closed as of July 6, 2010. All active patients will be referred to other area providers. All patients will be notified of

the closure and will be referred to alternate providers for continued care and treatment, subject to patient choice.

**Comprehensive School Based Health Center**

96.     The D&TC operates a Comprehensive School Based Health Center (SBHC) at PS 57, located at 176 East 115th Street, New York, NY 10029. The D&TC anticipates that it will transfer sponsorship of the SBHC to the IFH as of July 6, 2010 The IFH will continue to operate the SBHC as part of the site-extension FQHC without interruption. All active patients will be notified of the transfer of sponsorship prior to its effective date.

**Department of Special Services**

97.     The Hospital operates an outpatient Department of Special Services (formerly HIV/AIDS) in the Hospital Annex. It is anticipated that the Hospital will transfer operation of the Special Services Program to IFH as of July 6, 2010. The Hospital also anticipates that the IFH will continue to operate the Special Services Clinic as part of the site-extension FQHC without interruption. All active patients will be notified of the clinic transfer of sponsorship and their choices for ongoing treatment in advance of the transfer. If the anticipated transfer does not take place, the program will be closed as of July 6, 2010. All active patients will be referred to other area providers. All patients will be notified of the closure and will be referred to alternate providers for continued care and treatment, subject to patient choice.

**Special Supplemental Nutrition Program for Women, Infants & Children**

98.     North General operates a Special Supplemental Nutrition Program for Women, Infants & Children (WIC) in the main Hospital building. It is anticipated that the sponsorship of the WIC program will be transferred to IFH as of July 6, 2010, and services will continue without interruption of outpatient obstetrical and gynecological services for women and

adolescents. The Hospital anticipates that it will transfer sponsorship of the Center to the IFH as of July 6, 2010. The IFH will continue to operate the WIC without interruption through the transition period. All active patients will be notified of the transfer of operations sponsorship and their options for continuing care. If the anticipated transfer does not take place, the program will be closed as of July 6, 2010. All active patients will be referred to other area providers. All patients will be notified of the closure and will be referred to alternate providers for continued care and treatment, subject to patient choice.

**Outpatient Mental Health Center**

99. The Hospital operates an outpatient service providing mental health treatment for children, adolescents, and adults who are in need of outpatient mental health services. The Hospital anticipates that it will transfer operation of the Mental Health Center to the IFH as of July 6, 2010. The IFH will continue to operate the Mental Health Center as part of a site-extension FQHC without interruption through the transition period. All active patients will be notified of the transfer of operations in advance, and their options for continuing care. If the anticipated transfer does not take place, the program will be closed as of July 6, 2010. All active patients will be referred to other area providers. All patients will be notified of the closure and will be referred to alternate providers for continued care and treatment, subject to patient choice.

**Addiction Treatment Center**

100. The D&TC operates an outpatient structured environment as an alternative to inpatient rehabilitation for individuals who seek to recover from alcohol and/or other chemical dependencies. The D&TC anticipates that it will transfer operation of the Addiction Treatment Center to the IFH as of July 2, 2010. All active patients will be referred to other area providers for continued care and treatment, subject to patient choice. North General has prepared draft

letter to patients of the Addiction Treatment Center and a list of alternative providers in the event that the anticipated transfer does not take place.

**Dental Services**

101.    The D&TC operates a dental service. The D&TC anticipates that it will transfer sponsorship of its outpatient dental services to the IFH as of July 6, 2010. The IFH will continue to provide dental services without interruption through the transition period. All active patients will be notified of the transfer of sponsorship and their options for continuing care. If the anticipated transfer does not take place, the program will be closed as of July 2, 2010. All active patients will be referred to other area providers. All patients will be notified of the closure and will be referred to alternate providers for continued care and treatment, subject to patient choice.

## <u>DISCONTINUED OUTPATIENT SERVICES</u>

**Community Outreach Education**

102.    North General operates a community-based mental health outreach program. The Hospital will cease providing Community Outreach Education Services as of July 6, 2010. All active enrollees will be notified of the service closure and referred to local alternative provider sites within the Hospital Primary Service Area.

**Access-A-Ride.**

103.    Under contract, the Hospital operates an Access-a-Ride evaluation service for the City of New York, MTA. The evaluation service is provided to residents of the borough of Manhattan. The Hospital anticipates that it will transfer the operation of this service to IFH as of July 6, 2010. The IFH will continue to operate the service as part of its FQHC without interruption during the transition period. The Hospital will work with IFH and the City of New York, MTA to effectuate a transfer of this agreement to IFH, if possible. If such a transfer

cannot be arranged, the Hospital will work with the NYC MTA to transition the service to an alternate site.

**Records Management and Retention**

104.    Management and retention of medical records, imaging radiology files, and other records after the closure date will ensure confidentiality of patient medical records, continuity of patient care, and future access by patients and subsequent treating providers, as well as the Hospital.  Records will be retained in accordance with all State and Federal laws.

105.    Inpatient medical records, emergency department records, outpatient records for services designated for closure, and appropriate administrative, laboratory, medical equipment testing results, and pharmacy records will be maintained following the closure consistent with applicable laws and regulations, by a records management firm. The Hospital currently uses Iron Mountain for long-term records storage.

106.    Record maintenance will be provided pursuant to a written agreement.   The agreement will provide for future access by patients, regulatory agencies, physicians and the Hospital, as appropriate.  The agreement will also include a business associate addendum to be in compliance with HIPAA regulations.

107.    Public notice of the transfer and location of medical records will be done through patient notices, publication in print, on the Hospital website, and by continuation of the Hospital main telephone number, which will direct callers on how they may contact the designated custodian for access to medical records.

108.    In connection with the anticipated transfer of the operation of outpatient programs to IFH, original medical records will be transfer to IFH (subject to applicable confidentiality laws), and IFH will enter into a medical record custody agreement which will provide for the

retention of such original medical records for the period required by applicable law, and for future access by patients, regulatory agencies, physicians and the Hospital, as appropriate. It is anticipated that active medical records will remain on-site at each respective outpatient program following transfer to IFH, to facilitate continuity of care. Patient notification of the transfer of sponsorship from the Hospital to the FQHC will include information about the storage and maintenance of current facility medical records.

**Notifications**

109.    The orderly closure of inpatient services will begin with the filing of this notification to DOH. North General shall notify each current Hospital inpatient and outpatient (and that person's next of kin, or designated health guardian, and physician, where appropriate) of the impending closure of the Hospital and outpatient services designated for closure, and the transfer to IFH, when such transfer is definitively scheduled. All Hospital-based private practices, including physician and licensed providers will receive closure notification.

## ADDITIONAL INFORMATION REQUIRED BY LOCAL RULE 1007-2

**Unsecured Creditors**

110.    The names, addresses, other contact information and claim information for the fifty (50) largest unsecured creditors of the Debtors, on a consolidated basis, are provided on the list of fifty (50) largest unsecured creditors filed with these Chapter 11 cases pursuant to Bankruptcy Rule 1007(d). The list is attached hereto as Exhibit "A"

**Secured Creditors**

The holders of the largest secured claims against the Debtors, on a consolidated basis, are:

(a)    DASNY, 515 Broadway, Albany, New York 12207-2964, Attn.: Portia Lee, Managing Director. The Debtors are obligated to DASNY as follows:

(i)     January 3, 2003 loan agreement and mortgage on the Hospital Premises in connection with the issuance of $138,135,000 of Secured Hospital Revenue Refunding Bonds, Series 2003 (the "Series 2003 Bonds"). Due to North General's inability to obtain waivers for certain covenant defaults, the DASNY mortgage was reclassified as a short-term liability as of December 31, 2008. In April 2010, the payable current portion of the bonds was over $135 million. The value of the collateral securing the Bonds is unknown.

(ii)     Pursuant to loan agreements dated March 25, 1999, August 6, 2001, July 25, 2002 and July 21, 2003, as amended, the Hospital is obligated to DASNY in the approximate aggregate sum of over $55 million (of which $3.5 million is characterized as a current liability. The DASNY Loans are secured by a mortgage on North General's premises at 1879 Madison Avenue, New York, New York. The value of the collateral securing the loans is unknown.

(b)     New York State Department of Health ("DOH"), 433 River Street, 6th Floor, Troy, New York 12180, Attn.: Robert G. Schmidt. The Debtors are obligated to DOH for over $3.4 million in outstanding annual fees and interest under the mortgage securing the Series 2003 Bonds. It is unknown whether there is collateral securing this obligation.

111.    The most recent available summary of the Debtors' assets and liabilities is their Balance Sheet for the period ending May 31, 2010is attached hereto as Exhibit "B".

**Classes of Securities:**

112.    The Corporation is the sole member of North General and there are no additional classes of shares of stock, debentures, or other securities of the Debtors that are either publicly held or held by any of the Debtor's other officers or directors (trustees).

**Custodial Property**

113.    No property of the Debtors is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditor, or agent for any such entity.

114.    The Debtors own the following properties from which they operate their businesses:

(a)     1879 Madison Avenue, New York, New York 10035 (North General Hospital).

(b)     1824 Madison Avenue, New York, New York 10035 (the "Annex") (North General); and (c) 1995-1997 Lexington Avenue, New York, New York (AHDC).

115.    Additionally, the Debtors lease the following properties: (i) 1735 Park Avenue, 2nd Floor, New York, New York 10035 (legal services, human resources, purchasing/materials, management, community outreach, research, accounts payable/finance); (ii) 1787 Madison Avenue, New York, New York 10035 (North General,; and (iii) 1665 Lexington Avenue, Storefront 104-105, New York, New York (WIC Program site).

116.    The Debtors' substantial assets and books and records are located at the Premises and at the other premises listed above.

117.    The Debtors' books and records are also located at the offices of its independent auditors and accountants, BDO Seidman, LLP, 330 Madison Avenue, New York, New York 10017.

**Litigation**

118.    Attached as Exhibit "C" hereto is a schedule of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of its property may be imminent.

**Senior Management**

119.    Attached as Exhibit "D" hereto are the names of the individuals who comprise the Debtors' senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

**Estimated Amount of Weekly Payroll**

120.     The estimated amount of the weekly payroll to employees (inclusive of officers and directors-directors are not paid,) for the 30 day period following the Petition Date, is $1,047,000.

121.     The amounts paid and proposed to be paid for services for the 30-day period following the Petition Date to:

      (a)     Board Officers, stockholders and directors is $0; and

      (b)     Retained financial or business consultants, is approximately $300,000.

**Cash Receipts & Disbursements**

122.     Attached as Exhibit "E" hereto, is a schedule for the four (4) following the Petition Date, of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, and any other information relevant to an understanding of the foregoing.

## FURTHER STATEMENTS IN SUPPORT OF FIRST DAY ORDERS

123.     To enable the Debtors to operate during the pendency of these Chapter 11 cases, the Debtors have requested various forms of relief in "first-day" motions (the "First Day Motions") filed contemporaneously herewith. In general, the First Day Motions seek to provide the Debtors with relief necessary to implement their Closure Plan with minimal disruption while safeguarding patient welfare and complying with the necessary protections afforded to the Debtors' key constituencies under the Bankruptcy Code.  I believe that such relief is crucial to the Debtors' prospects for successfully implementing the Closure Plan.

124.     I have reviewed each of the First Day Motions and Applications and I believe that the relief sought in such motions (a) is necessary to enable the Debtors to operate within the

parameters of Chapter 11 with a minimum of disruption while preserving and protecting the value of the Debtors' estates and (b) constitutes a critical element in implementing the Closure Plan.

## The First Day Motions and Applications Consist of the Following:

- Motion of Debtors pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedures for joint administration and procedural consolidation of cases (the "Joint Administration Motion");

- Motion to Approve Certain Notice, Case Management and Administrative Procedures (the "Case Management Motion")

- Motion of the Debtors for Entry of Interim Order (i) Authorizing the Debtors to Continue the Implementation, in accordance with New York State Law, of a Plan of Closure for the Debtors' Hospital and Certain Affiliated Outpatient Clinics and Practices; and Scheduling a final Hearing (the "Closure Motion");

- Motion of Debtors for an order (i) maintaining cash management system and existing bank accounts, (ii) authorizing the Debtors to use the existing business forms, (iii) granting a limited waiver of section 345 investment and deposit requirements and (iv) granting related relief (the "Bank Accounts and Cash Management Motion");

- Motion of Debtors for entry of an order (i) authorizing, but not requiring, Debtors to pay pre and post-petition wages, salaries and other compensation, (ii) maintain benefits programs, (iii) authorizing and directing financial institutions to honor all related checks and electronic payment requests and (iv) authorizing payment of obligations relating to medical providers (the "Employee Wage Motion");

- Motion of Debtors pursuant to Bankruptcy Rule 1007 for an order granting an extension of time to file a statement of financial affairs and schedules of (i) assets and liabilities, (ii) current income and expenditures and (iii) executory contracts and unexpired leases (the "Schedules Extension Motion") and

## Bank Accounts & Cash Management Motion

125. Like most health care providers, in the ordinary course of their operations, the Debtors maintain an integrated network of bank accounts that facilitate the timely and efficient collection, concentration, management and disbursement of funds (the "Cash Management System"). This network is comprised of approximately 20 bank accounts (the "Bank Accounts")

maintained at TD Bank (the "Cash Management Bank"), through which the Debtors collect, transfer and disburse, funds generated through their operations and facilities. The Debtors also maintain a system designed to accurately record such collections, transfers and disbursements as they are made.

126.    The Debtors' Cash Management System is similar to those commonly employed by health care providers of comparable size and complexity. The continued use of the Debtors' Cash Management System allows for, among other things, the efficient tracking and control of funds, while at the same time reducing administrative costs. Moreover, the Debtors' pre-petition secured lenders are intimately familiar with the Debtors' cash management system, which is likely to help facilitate the transition into the Chapter 11 process.

127.    The Debtors' ability to continue and maintain their Cash Management System, existing Bank Accounts and existing business forms is critically intertwined with the efficient administration of these Chapter 11 cases and is essential to the Debtors' ability to effectuate their Closure Plan. Indeed, any disruption in the means by which the Debtors manage their financial affairs and satisfy their ordinary course post-petition obligations (and certain prepetition obligations for which separate approval is being sought) would severely hamper their operations, thereby jeopardizing the Debtors' Chapter 11 cases at the outset. Given the size and complexity of the Debtors' operations, and more significantly, the brevity of the time within which the Debtors expect to complete the Closure Plan, the Debtors simply cannot efficiently facilitate their Chapter 11 efforts if there is substantial disruption in the Debtors' Cash Management System.

128.    Additionally, to comply with the Operating Guidelines, the Debtors would need to, among other things, create a new system for manually issuing checks and paying postpetition

obligations. It is highly unlikely that the Debtors would even be able to meet such requirements (e.g. by opening new accounts, revising cash management procedures and instructing various parties to redirect payments) prior to the anticipated shut-down date, making implementation of a new system futile and causing the Debtors to suffer from operational paralysis in the meanwhile. Therefore, the Debtors believe it is in the best interests of their estates, creditors and other parties in interest that the Debtors be authorized to maintain their prepetition bank accounts.

129. Moreover, the continued use of existing checks, correspondence and other business forms relating to the Bank Accounts will allow the Debtors to continue operations while implementing a closure plan without the delay that would be expected to occur if the Debtors were required to suspend essential business functions pending the production of and transition to new forms. Therefore the Debtors believe it to be in the best interests of their estates, creditors and other parties in interest that they continue to use all correspondence and business forms, as such forms were in existence immediately prior to the Petition Date, provided, however, that upon depletion of the Debtors' business forms stock, the Debtors will obtain new business forms reflecting their status as debtors-in-possession.

130. The Debtors' funds are held in accounts with an Authorized Depository listed by the Office of the U.S. Trustee for the Southern District of New York. Thus, the Debtors submit that their funds will not be sufficiently at risk to necessitate strict adherence to the requirements of § 345(b) of the Bankruptcy Code. Moreover, if granted an interim waiver from such section, the Debtors will not be required to incur the significant administrative difficulty and expense relating to opening new accounts to ensure that all of their funds are fully insured or invested strictly in accordance with the restrictions established by § 345(b) of the Bankruptcy Code.

131.    In addition, if the relief requested the Motion is granted, the Debtors will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by it prior to the Petition Date, other than those authorized by separate Order of this Court. To prevent the possible inadvertent unauthorized payment of pre-petition claims, the Debtors will work closely with the Cash Management Bank to ensure that appropriate procedures are in place to prevent checks issued pre-petition from being honored without this Court's approval. The Debtors therefore submit that the foregoing relief sought with respect to the Cash Management System is in the best interests of their estates, creditors and other parties in interest.

**Employee Wages Motion**

132.    The Debtors' ability to continue providing competent medical care as they navigate the Chapter 11 process and implement their Closure Plan depends upon the maintenance of the Debtors' approximately 1,000 employees, comprised of approximately 916 full-time and 84 part-time workers  and the independent contractors that provide medical, security and other services to the Debtors' patients.

133.    As a result of the bankruptcy filing, a portion of the wages, salary, benefits and other payments owed to or in respect of such employees and independent contractors (the "Pre-Petition Employee Obligations") have become pre-petition obligations which, absent authorization from this Court, the Debtors would be unable to satisfy.

134.    The decline in employee morale that accompanies a bankruptcy filing and cessation of operations would be compounded by the Debtors' failure to provide their employees with fundamental benefits of employment. This would undoubtedly jeopardize the Debtors'

ability to maintain their remaining workforce and provide adequate patient care, and would likely have a negative effect on the value of the Debtors' assets.

135.    In addition, in the ordinary course of their businesses, the Debtors contribute to several benefit funds that provide benefits to the Debtors' union employees in addition to providing direct benefits to non-union employees (collectively, the "Employee Benefits"). The Employee Benefits to non-union employees include, but are not limited to, health insurance, COBRA coverage vacation pay, sick pay, holiday pay, workers' compensation, disability, 401(k) and related programs. The estimated monthly cost to the Debtors of offering the Employee Benefits to both union and nonunion employees is approximately $1,100,000.

136.    The payroll and Employee Benefits for the employees for the above-mentioned periods is less than $10,950.00 for each employee in nearly all circumstances. In the event that certain of the Debtors' employees seek payment of salary or Employee Benefits in excess of the $10,950 statutory cap, the Debtors' will address such requests with an additional motion after consultation with the Office of the United States Trustee and counsel to the committee of unsecured creditors, if any.

137.    The Debtors further request that this Court authorize the Cash Management Bank to process, honor and pay all prepetition checks issued by, and fund transfer requests made from, the Debtors with respect to employee wages and Employee Benefits that were not processed, honored or paid as of the Petition Date, provided, however, that the Bank will not honor checks: (a) for services rendered more than 180 days prior to the Petition Date, or (b) if payment of same would cause the employee to exceed the $10,950 maximum priority allowance under Bankruptcy Code § 507(a)(4).

138. The obligations for which the Debtors seek authorization to honor are wages to employees earned by individuals employed by the Debtors, and contractual obligations to certain physicians, and are for services rendered within 180 days before the commencement of the Debtors' cases. The obligations are for wages, including vacation and sick leave pay, and payroll taxes based on such wages, and for the other Employee Benefits mentioned above.

139. The Debtors believe that authorization to pay the Pre-Petition Employee Obligations is required in order to insure that there is no disruption in the Debtors' workforce. Moreover, absent an order granting this relief, the Cash Management Bank may not be certain of the Debtors' rights and obligations, causing both confusion and delay in the payment of the Debtors' Pre-Petition Employee Obligations.

140. Any interruption in payment of wages, salaries, related benefits and other obligations could undermine confidence in future payment and could therefore have a host of negative implications on the Debtors' staffing and operations.

141. Accordingly, the Debtors believe that the relief requested in the Motion is in the best interests of their estates, creditors and other parties-in-interest.

**Schedules Extension Motion**

142. The Debtors and their professional advisors are working diligently to prepare the Schedules of Assets and Liabilities, the Statement of Financial Affairs and list of executory contracts (collectively, the "Schedules") to reflect accurately the financial circumstances of the Debtors as of the Petition Date. However, prior to the filing of these cases, the Debtors were unable to direct the resources necessary to complete the Schedules due to the fact that their management and other personnel spent a significant amount of time preparing for the Chapter 11 filing, including designing the Closure Plan, seeking approval of such plan from the DOH,

addressing issues related to obtaining approval of post-petition financing arrangements and attending to their usual demanding daily duties.

143.    Furthermore, the Debtors have thousands of creditors and other parties- in-interest. The Debtors are also parties to numerous executory contracts. Accordingly, to complete the Schedules, the Debtors will be required, among other things, to organize and review their books and records as of the Petition Date so as to compile and present all of the foregoing information, review their records to determine their liabilities to each individual creditor as of such date, identify all potential claimants to whom a bar date notice must be sent, as well as identify all payments that were made to creditors within the 90 day period prior to filing (or one year period with respect to insiders).

144.    Based on the foregoing, and due to the other pressing activities in which the Debtors are engaged at this time, the Debtors will require additional time to finalize their Schedules. Notwithstanding the requested extension, the Debtors hope to file their Schedules well in advance of such extended date.

**Joint Administration Motion**

145.    The Debtors are affiliates of each other as that term is defined in Bankruptcy Code §101(2) and as that term is used in Bankruptcy Rule 1015(b). In light of the multiple financial and operational interrelationships among the Debtors, joint administration of the Debtors' cases is appropriate. Moreover, the joint administration of the Debtors' Chapter 11 cases will permit the Clerk of the Court to use a single general docket for each of the Debtors' cases and will further the interests of judicial economy and administrative expediency for a variety of other reasons. The rights of the respective creditors of each of the Debtors will not be

adversely affected by joint administration of these cases inasmuch as the relief sought is purely procedural and is in no way intended to affect substantive rights.

146.    Therefore, the Debtors believe it to be in the best interests of their estates, creditors and other parties in interest that an immediate order be entered providing for the joint administration of the Debtors' Chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

## CONCLUSION

147.    The Debtors' objective in these bankruptcy cases is to carry out the closure plan while minimizing loss to their estates and safeguarding the welfare of their patients. I believe that, if this Court approves the First Day Motions, which are designed to allow the Debtors to implement the closure plan in an orderly fashion and in a manner consistent with the terms and objectives of the Bankruptcy Code, the prospect for achieving these objectives, to the maximum benefit of creditors, will be substantially enhanced.

_____
Dr. Samuel Daniel, M.D.

Sworn to before me this
_1st_ day of July 2010

_Derek Etheridge_
Notary Public

DEREK ETHERIDGE
Notary Public, State of New York
No. 02-ET6118250
Qualified in New York County
My Commission Expires 11/01/2012