**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
(212) 237-1000
Charles E. Simpson (csimpson@windelsmarx.com)

Proposed Attorneys for North General Service Corporation,
North General Hospital and North General Diagnostic and Treatment Center
Debtors-in-Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | |
| | : | |
| NORTH GENERAL SERVICE CORPORATION, | : | Chapter 11 |
| | : | Case No. 10-13558( ) |
| Debtor | : | |
| | : | |
| | : | |

----------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | |
| | : | Chapter 11 |
| NORTH GENERAL HOSPITAL, | : | Case No. 10-13553 (SCC) |
| | : | |
| Debtor. | : | |

----------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | |
| | : | Chapter 11 |
| NORTH GENERAL DIAGNOSTIC AND | : | Case No. 10-13559 ( ) |
| TREATMENT CENTER, | : | |
| | : | |
| Debtor. | : | |

----------------------------------------------------------------x

**MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO INCUR POSTPETITION INDEBTEDNESS; (II) GRANTING SENIOR SECURITY INTERESTS AND SUPERPRIORITY CLAIMS; (III) AUTHORIZING DEBTORS USE OF CASH COLLATERAL; (IV) GRANTING ADEQUATE PROTECTION AND RELATED RELIEF; AND (V) SCHEDULING AN INTERIM & FINAL HEARING**

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE**

North General Hospital, Debtor-in-Possession, a New York not-for-profit corporation, as

borrower ("**North General**"); North General Service Corporation, Debtor-in-Possession, a New

York not-for-profit corporation as guarantor ("**Corporation**") and North General Diagnostic and Treatment Center, Debtor-in-Possession, a New York not-for-profit corporation, as guarantor ("**D&TC**" and together with Corporation, the "**Guarantors**", (each a **Debtor** and collectively, as the "**Debtors**"); by their proposed Bankruptcy counsel, Windels Marx Lane & Mittendorf, LLP, in each of the above-referenced chapter 11 cases (the "**Chapter 11 cases**"), hereby move for the entry of an interim order, in substantially the form annexed as <u>Exhibit "A"</u> hereto, (the "**Interim Order**"), authorizing the Debtors to (i) incur postpetition indebtedness; (ii) grant senior security interests and superpriority claims pursuant to §§ 105(a), 364 (c)(1), 364(c)(2), 363(c)(3) and 364(d) of Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§101 *et seq.* (as amended, the "**Bankruptcy Code**"), and rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"); (iii) use Cash Collateral (as defined below) pursuant to Bankruptcy Rule 4001(b) and §363(c) of the Bankruptcy Code, and (iv) provide adequate protection in accordance with §§ 364(d), 363(c)(2) and 361 of the Bankruptcy Code; (v) grant other related relief; and (iv) schedule a final hearing ("**Final Hearing**") for entry of a Final Order (the "**Final Order**" and, together with the Interim Order, collectively, the "**DIP Orders**") providing for similar relief on a final basis. In support of the Motion, the Debtor rely on the Affidavit of Dr. Samuel J. Daniel, M.D. the Debtors' Chief Executive Officer, submitted pursuant to Local Rule 1007-2 (the "**Daniel Affidavit**"), which the Debtors filed concurrently with this Motion. In further support of this Motion, the Debtors respectfully represents as follows:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter of this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This mater is a core proceeding under 28 U.S.C. §157(b)(2)(A).

2.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The predicates for relief requested herein are §§ 105(a), 361, 362, 363, 364, 503 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014 and Local Rule 4001-2.

## CONCISE STATEMENT PURSUANT TO BANKRUTCY RULE 4001 AND LOCAL RULE 4001-2

4.     In accordance with Bankruptcy Rule 4001(b), (c) and (d) and Local Rule 4001-2, the following is a summary of the material terms of the proposed debtor-in-possession credit facility (as further described below, the "**DIP Facility**"), as set forth in the Interim Order and the DIP Credit Agreement (as defined below), by and among the Dormitory Authority of the State of New York ("**DASNY**"), and in such capacity, the "DIP Lender" or the "Prepetition Lender" and the Debtors in substantially the form annexed hereto as Exhibit B.[1]

## MATERIAL TERMS OF THE DIP FACILITY

| Required Disclosure | Terms of the DIP Facility |
|---|---|
| Borrower | North General Hospital ("North General") |
| Guarantors | North General Service Corporation ("Corporation"), and North General Diagnostic or Treatment Center ("D&TC") |
| DIP Lender | DASNY in such capacity as DIP Lender |
| Interim Amount of the DIP Facility<br><br>Maximum Amount of DIP Facility | On an interim basis the amount of [Three-and-One-Half] Million Dollars ($[3,500,000.00) (the "**Interim Amount**");<br><br>Subject to the entry of the Final Order, to borrow and guarantee, as applicable, on a final basis the amount of [Fourteen] Million Dollars ($[14,000,000.00]) (the "**Maximum Permitted Loan Balance**"), in accordance with the DIP Budget, the DIP Loan Documents and the Final Order; |
| DIP Budget | The amount of the DIP Facility and Cash Collateral (as defined below) |

---

[1] This summary of the DIP Facility is intended only to assist the Court in understanding the material terms of the arrangement and is qualified in its entirety by reference to the DIP Facility, as it may be modified by the DIP Orders. All capitalized terms not otherwise defined in this Section have the meaning given to them in the Interim Order and the DIP Agreement

| | |
|---|---|
| | authorized to be used are not to exceed the amounts reflected in the initial budget prepared by the Debtors, which will be in form and substance satisfactory to the DIP Lender (as amended, supplemented, extended or otherwise modified from time to time, the "**DIP Budget**") for the time period set forth therein, but in no event beyond the Termination Date (as defined below). <br><br> The DIP Budget may be amended, supplemented, extended or otherwise modified from time to time in any manner as to which Debtors and the DIP Lender mutually agree without further order of this Court or advance notice to any Person. The Debtors will promptly provide any modified DIP Budget to the U.S. Trustee and counsel for DASNY, in its capacity as prepetition lender (the "**Prepetition Lender**"), and counsel for the Committee; provided, however, the Debtors may take appropriate actions with respect to confidentiality of any portion of the DIP Budget. |
| Use of Cash Collateral & Prepetition Collateral | The Debtors are authorized to use Cash Collateral and Prepetition Collateral, subject to and as set forth in the DIP Budget, the Interim Order and the DIP Loan Documents (for purposes of this Motion and the Interim Order, the term "**Cash Collateral**" shall mean and include all "cash collateral" as defined by §363(a) of the Bankruptcy Code), provided, however, that the Prepetition Lender is granted Adequate Protection (as defined below) as set forth in the Interim Order. <br><br> Without limiting the generality of the foregoing, Cash Collateral will specifically include all of the cash proceeds of Prepetition Collateral in which the Prepetition Lender has an interest, whether such interest existed as of the Petition Date or arises thereafter pursuant to the Interim Order, any other order of this Court, applicable law or otherwise; provided, however, Cash Collateral of the Prepetition Lender will not include loan proceeds of the DIP Facility. In no event are the Debtors authorized to use Cash Collateral and Prepetition Collateral for any purpose or under any terms other than those set forth in the DIP Budget, the Interim Order or the DIP Loan Documents. |
| Use of Proceeds of the DIP Facility & Cash Collateral | The loans under the DIP Credit Agreement (the "**DIP Loans**") will be available: (a) to fund the working capital requirements of the Borrower and the Guarantors, including operating expenses and other expenses associated with the implementation of the closure plan for North General and D&TC (the "**Closure Plan**") and implementation of the Memorandum of Understanding between North General and DASNY (the "**MOU**"), capital expenditures, and other line items in accordance with the terms of the DIP Budget; (b) to fund postpetition allowed fees and expenses incurred by Retained Professionals (defined below) and provided for in the DIP Budget during the administration of the Chapter 11 cases (the "**Professional Fees**"); (c) to fund the payment of cash-pay interest accrued on the DIP Loans; and (d) to pay reasonable fees and expenses of the DIP Lender relating to the DIP Facility and these Chapter 11 cases, including without limitation, attorneys' fees and fees of professional advisors. |

| | |
|---|---|
| Borrowing Authorization under the DIP Facility | The Debtors are authorized to enter into and perform the transactions contemplated in the Interim Order and the DIP Loan Documents and to borrow and guarantee, as applicable, under the DIP Credit Agreement on an interim basis up to the Interim Amount, subject to the terms and conditions of the DIP Budget, the Interim Order and the DIP Loan Documents. The DIP Credit Agreement and the other DIP Loan Documents constitute and are deemed to be the legal, valid and binding obligations of each Debtor party thereto and each of their respective Estates, enforceable against each such Debtor and its respective Estate in accordance with the terms hereof and the DIP Loan Documents and any successor of each such Debtor or any representative of the Estates (including a trustee, responsible person, or examiner with expanded powers). The Debtors are authorized to obtain financial accommodations pursuant to the terms of the DIP Budget, this Interim Order, the DIP Credit Agreement, and the other DIP Loan Documents; |
| | The DIP Obligations will include and the DIP Liens and the DIP Superpriority Claims will apply with equal respect to (i) the $1,200,000 in emergency no-interest loan proceeds provided by DASNY to North General immediately prior to the Petition Date pursuant to that certain Prepetition Loan Document known as the "Nineteenth Amendment of Amended and Restated Reimbursement Agreement, dated on or about June 30, 2010 (the "**19th Amendment**"), and (ii) the assignment by the Debtors of their interests in that certain Transition Fund payment approved by the DOH in the amount of One Million, Two Hundred Thousand Dollars ($1,200,000), which the Debtors, in accordance with the terms of the 19th Amendment, have directed DOH to pay over to DASNY in repayment of the amounts due under the 19th Amendment; |
| | Subject to the entry of the Interim Order, the Debtors have obtained all authorizations, consents and approvals necessary from, and have made all filings with and given all notices to, all federal, state and local governmental agencies, authorities and instrumentalities required to be obtained, made or given by the Debtors in connection with the execution, delivery, performance, validity and enforceability of the DIP Loan Documents; |
| | In entering into the DIP Loan Documents and obtaining the use of Cash Collateral, the Debtors agree that until such time as all of the DIP Obligations are indefeasibly paid in final in full in cash and the DIP Credit Agreement and DIP Loan Documents are terminated in accordance with the terms thereof, the Debtors will not in any way prime or seek to prime the DIP Obligations, the DIP Liens or the DIP Superpriority Claims (as defined below) provided to the DIP Lender under the Interim Order by offering a subsequent lender or a party in interest a superior or *pari passu* lien or administrative expense pursuant to §§ 105(a), 326, 328, 330, 331, 364(c), 364(d), 503, 506, 507, 546(c), 552(b), 726 or 1114 of the Bankruptcy Code or otherwise acquiescing thereto. |

| | |
|---|---|
| Superpriority Claims & DIP Liens | In respect of the DIP Obligations under the DIP Credit Agreement, the other DIP Loan Documents and the Interim Order, the DIP Lender is granted the following with respect to the Debtors, their Estates and all DIP Collateral:<br><br>Superpriority Administrative Expense Claim: pursuant to Bankruptcy Code §364(c)(1) with priority over all other administrative expenses pursuant to the Bankruptcy Code (including the kinds specified in or arising or ordered pursuant to Bankruptcy Code §§ 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 552(b), 726 and 1114 thereof or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment), which superpriority expenses of the DIP Lender shall be subordinate only to the Carve-Out (the "**DIP Superpriority Claims**");<br><br>Priming Security Interest: a first priority, priming security interest in and lien pursuant to Bankruptcy Code§ 364(d)(1) on all encumbered property of the Debtors and the Estates (the "**Section 364(d)(1) Liens**"), which Section 364(d)(1) Liens shall be senior to any existing liens or claims, subject only to (i) the Carve-Out, and (ii) liens on property of a Debtor (including the proceeds of such property) that are in existence on the Petition Date but only, if applicable, (A) to the extent a lien on any property is valid, perfected, and not avoidable, and (B) the lien on such property (or the proceeds of such property, as applicable) on the Petition Date was senior in priority to the Prepetition Liens (as hereinafter defined) of the Prepetition Agent on such property, and (iii) the Prepetition Liens of the Prepetition Lender (the items referenced in the foregoing clauses (ii) and (iii) being referred to collectively as the "**Permitted Prior Senior Liens**");<br><br>Section 364(c)(2) Liens: A first priority security interest and lien pursuant to § 364(c)(2) of the Bankruptcy Code on all unencumbered property of the Debtors and the Estates subject only to the Carve-Out; and<br><br>Section 364(c)(3) Liens: A junior security interest and lien pursuant to Bankruptcy Code § 364(c)(3) on all property of the Debtors and the Estates that is subject to a Permitted Prior Senior Lien (the "**Section 364(c)(3) Liens**" and, collectively with the § 364(d)(1) Liens, § 364(c)(2) Liens, the "**DIP Liens**"), which Section 364(c)(3) Liens are also subject to the Carve-Out.<br><br>DIP Collateral. The DIP Liens of the DIP Lender, as approved and perfected by the Interim Order include, inter alia, liens upon and security interests in (i) all of those items and types of collateral in which security interests may be created under Article 9 of the Uniform Commercial Code, (ii) all of those items and types of collateral not governed by Article 9 of the Uniform Commercial Code, including, without limitation, licenses issued by any federal or state regulatory authority (if appropriate), any leasehold or other real property interests, and commercial tort claims of the Debtors, (iii) any and all other DIP Collateral of any nature or form, and (iv) the products, rents, offspring, profits, and proceeds of any of the foregoing.<br><br>None of the DIP Obligations, DIP Liens or DIP Superpriority Claims will (a) be subject to or *pari passu* with any lien or security interest that is avoided |

| | |
|---|---|
| | and preserved for the benefit of the Estates under § 551 of the Bankruptcy Code, (b) be subject to or *pari passu* with any inter-company claim, whether secured or unsecured, of any Debtor or any domestic or foreign subsidiary or affiliate of any Debtor, (c) be subject to §§ 510, 549, or 550 of the Bankruptcy Code, or (d) hereafter be subordinated to or made *pari passu* with any other lien or security interest under §§ 361, 363 or 364 of the Bankruptcy Code or otherwise, except as expressly provided in the Interim Order. |
| Limitation on the Use of Proceeds of the DIP Facility | The proceeds of the DIP Facility, the DIP Collateral, the Prepetition Collateral, the Cash Collateral, or the Carve-Out, and no disbursements in the DIP Budget will be used for the payment of professional fees, disbursements, costs or expenses incurred in connection with: (a) objecting, contesting or raising any defense to the validity, perfection, priority, or enforceability of, or any amount due under, the DIP Loan Documents or the Prepetition Loan Documents or any security interests, liens or claims granted under the Interim Order, the DIP Loan Documents, or the Prepetition Loan Documents (defined below) to secure such amounts; (b) asserting any Challenges (defined below), claims, actions or causes of action against any of the DIP Lender or the Prepetition Lender or any of their respective affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors; (c) preventing, hindering or otherwise delaying enforcement or realization on the DIP Collateral or the Prepetition Collateral or (d) seeking to amend or modify any of the rights granted to the DIP Lender or the Prepetition Lender under the Interim Order, the DIP Loan Documents or the Prepetition Loan Documents , including seeking to use Cash Collateral and/or DIP Collateral on a contested basis; provided, however, that no more than $15,000 in the aggregate of the proceeds of the DIP Facility, the DIP Collateral, the Prepetition Collateral, the Cash Collateral, and the Carve-Out may be used by the Committee to investigate (but not prosecute or Challenge) Prepetition Lien and Claim Matters. |
| Scheduled Maturity Date | The earliest of the following: (a) 120 days from the Petition Date; (b) the earlier of (i) the date upon which the Interim Order expires or (ii) thirty-five (35) days after the entry of the Interim Order, in either case, if the Final Order has not been entered prior to the expiration of such period; (c) if a plan of reorganization has been confirmed by order of the Bankruptcy Court, the earlier of (i) the effective date of such plan of reorganization or (ii) the 30th day after the date of entry of the confirmation order; (d) the closing of a sale of substantially all of the equity or assets of the Borrower and the Guarantors; (e) the date of indefeasible prepayment in full by Borrower and the Guarantors of all Obligations under the DIP Credit Agreement in accordance with the terms hereof; or (f) upon acceleration of the Obligations under the DIP Credit Agreement |
| Interest Rates | Interest on Loans:  The DIP Loans will bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days calculated from and including the date of such borrowing to but excluding the date of repayment) at a fixed rate *per annum* equal to one (1%) percent.  Interest on the DIP Loan is payable on the Interest Payment Dates applicable to such Loan except as otherwise provided in the DIP Credit Agreement, shall be determined by the DIP Lender, and such determination is conclusive absent manifest error. |

| | |
|---|---|
| | Default Interest. If (i) a Borrower defaults in the payment of any principal of or interest on any Loan or any other amount due hereunder or under any other DIP Loan Document, by acceleration or otherwise, or (ii) if any Event of Default under Article 7 of the DIP Credit Agreement occurs and is continuing and the DIP Lender so elects, then, in the case of clause (i) above, until such defaulted amount is paid in full or, in the case of clause (ii) above, from the date on which such Event of Default arose and for so long as such Event of Default is continuing, to the extent permitted by law, all amounts outstanding under the DIP Credit Agreement and the other DIP Loan Documents will bear interest (after as well as before judgment), payable on demand, (a) in the case of principal, at the rate otherwise applicable to such DIP Loan plus 2.00% per annum and (b) in all other cases, at a rate *per annum* (computed on the basis of the actual number of days elapsed over a year of 360 days) equal to the rate that would be applicable to such Loan plus 2.00% *per annum*. |
| **Waiver of Section 506(c) Surcharge Right and Section 522(b) "Equities of the Case" Claims** | In light of the consent of the DIP Lender to the current payment of administrative expenses of the Debtors' Estates in accordance with the DIP Budget and (i) the agreement of the DIP Lender to subordinate their Superpriority Claims to the Carve-Out, (ii) the agreement of the DIP Lender to subordinate their DIP Liens to the Carve-Out and Permitted Prior Senior Liens, the DIP Lender and Prepetition Lender are each entitled to a waiver of (a) the provisions of § 506(c) of the Bankruptcy Code and (b) any "equities of the case" claims or other claims under §§ 105(a) or 552(b) of the Bankruptcy Code. Accordingly, subject to entry of the Final Order, no costs or expenses of administration or other charge, lien, assessment or claim incurred at any time (including, without limitation, any expenses set forth in the DIP Budget) by any Debtor or any other person or entity will be imposed or charged against any or all of the DIP Collateral, the DIP Lender, the Prepetition Collateral, the Prepetition Lender or their respective claims under the Bankruptcy Code, including §§ 105(a), 506(c), 552(b) thereof, or otherwise, and the Debtors, on behalf of their Estates, waive any such rights. |
| **Treatment of Lenders Expenses** | The Debtors will pay the reasonable fees and expenses of the attorneys and advisors for the DIP Lender on the Closing Date and thereafter as provided under the DIP Loan Documents. Invoices supporting such fees and expenses are to be submitted to Windels Marx Lane & Mittendorf, LLP, attn: Charles E. Simpson, Esq., counsel for the Debtors, with copies to the U.S. Trustee, counsel for the Prepetition Lender and counsel for the Committee (invoices may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine). No attorney or advisor to the DIP Lender is required to file an application seeking compensation for services or reimbursement of expenses with the Court. The U.S. Trustee, the Debtor, and Committee will have ten (10) business days in which to raise an objection to the fees and expenses of such attorneys and advisors. Any fees, costs and expenses of the DIP Lender prior to the Petition Date in connection with or with respect to the DIP Facility, DIP Credit Agreement or other DIP Loan Documents are hereby approved in full. |

| | |
|---|---|
| Carve-Out | Generally. Upon the occurrence of the Carve-Out Trigger Date (as defined below), the DIP Liens, the DIP Superpriority Claims, the Prepetition Adequate Protection Liens, § 507(b) Claims of the Prepetition Lender, and Prepetition Liens of the Prepetition Lender will be subject to the payment, without duplication, of the following fees and expenses (the amounts set forth below, together with the limitations set forth therein, collectively, the "Carve-Out") from either Cash Collateral or proceeds resulting from liquidation of DIP Collateral or Prepetition Collateral:<br><br>(i) the reasonable fee and expense claims of (A) the respective retained professionals of the Debtors, Committee, any appointed ombudsman (collectively, the "**Ombudsmen**") that have been approved by this Court during the Chapter 11 Cases pursuant to §§ 327, 328, and 1103 of the Bankruptcy Code or otherwise (the retained professionals of the Debtors, the Committee and the Ombudsmen are collectively referred to as the "**Retained Professionals**"), (B) the reasonable expenses of members of the Committee ("**Committee Member Expenses**"), and (C) the reasonable fees and expenses of the Ombudsmen for unpaid fees and expenses which were incurred (1) on and after the Petition Date and before the Carve-Out Trigger Date in amounts not in excess of the amounts set forth in the DIP Budget, and (2) on and after the Carve-Out Trigger Date in an aggregate amount not exceeding [One-Hundred-Thousand] Dollars ($[100,000]), for all Retained Professionals, Committee Member Expenses and Ombudsmen; provided that, in each case, such fees and expenses of the Retained Professionals, Committee Member Expenses and Ombudsmen are in accordance with the DIP Budget and are ultimately allowed on a final basis by this Court pursuant to §§ 330 and 331 of the Bankruptcy Code or otherwise and are not excluded from the Carve-Out under Paragraph 18 of the Interim Order; and, provided further, that the Carve-Out will not include any bonus, transaction, success or completion fees or any other fees of similar import for Retained Professionals without the prior written approval of the DIP Lender;<br><br>(ii) the unpaid fees payable to the U. S. Trustee and Clerk of the Bankruptcy Court pursuant to section 1930 of Title 28 of the United States Code. For the avoidance of doubt, there is no limitation on the obligations of the Debtors and their Estates with respect to unpaid fees payable to the U. S. Trustee and Clerk of the Bankruptcy Court pursuant to section 1930 of Title 28 of the United States Code.<br><br>Carve-Out Trigger Date. means the date on which the DIP Lender provides written notice to the Debtors, the U.S. Trustee and counsel to the Committee that the Carve-Out is invoked, which notice may be delivered only on or after the occurrence of an Event of Default under the DIP Loan Documents or upon the Termination Date. |
| Liens on Proceeds & Avoidance Actions | Subject to entry of the Final Order: (i) Avoidance Action Proceeds will be DIP Collateral and subject to the DIP Liens and DIP Superpriority Claims, and, (ii) subject and subordinate to the DIP Liens and DIP Superpriority Claims, Avoidance Action Proceeds shall be subject to the Adequate |

| | |
|---|---|
| | Protection Liens and §507(b) Claims of the Prepetition Lender. |
| Superpriority Admin Status | The DIP Lender will have a superpriority administrative expense claim pursuant to § 364(c)(1) of the Bankruptcy Code with priority over all other administrative expenses pursuant to the Bankruptcy Code (including the kinds specified in or arising or ordered pursuant to §§ 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 552(b), 726 and 1114 thereof or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment), which superpriority expenses of the DIP Lender shall be subordinate only to the Carve-Out. |
| Adequate Protection | <u>Adequate Protection Liens.</u> As adequate protection of the Prepetition Liens of the Prepetition Lender under the applicable Prepetition Loan Documents, in accordance with §§ 361, 363(e) and 364(d) of the Bankruptcy Code, each of the Prepetition Lender will be granted valid, binding, enforceable and perfected security interests and replacement liens (the "**Adequate Protection Liens**") on all property of the Debtors whether arising prepetition or postpetition of any nature whatsoever, wherever located, in each case to secure the Prepetition Indebtedness (the "**Adequate Protection Obligations**") of, without duplication, the aggregate diminution, if any, subsequent to the Petition Date, in the value of the Prepetition Collateral by: (i) the reduction in Prepetition Collateral available to satisfy Prepetition Indebtedness as a consequence of the priming of the Prepetition Indebtedness by the DIP Obligations; (ii) depreciation, use, sale, loss, decline in market price or otherwise of the Prepetition Collateral; and (iii) the sum of the aggregate amount of all Cash Collateral and the aggregate value of all non-cash Prepetition Collateral which is applied in payment of the DIP Obligations or any other obligations or expenses of the Debtors other than Prepetition Indebtedness, but only to the extent of any decrease in the value of the Prepetition Collateral on account of subsections (i), (ii) and (iii) above.<br><br>The Adequate Protection Liens are subject and subordinate to (A) the Carve-Out, (B) the DIP Obligations, DIP Liens and DIP Superpriority Claims, and (C) the Permitted Prior Senior Liens. None of the Adequate Protection Liens or Adequate Protection Obligations will (x) be subject to any lien or security interest that is avoided and preserved for the benefit of the Estates under §551 of the Bankruptcy Code, (y) subject to any inter-company claim, whether secured or unsecured, of any Debtor or any domestic or foreign subsidiary or affiliate of any Debtor, or (z) hereafter be subordinated to or made *pari passu* with any other lien or security interest under §§ 361, 363 or 364 of the Bankruptcy Code or otherwise except as expressly provided in this Interim Order and the DIP Loan Documents, including, without limitation, with respect to the Carve-Out, Permitted Prior Senior Liens, DIP Obligations, DIP Liens and DIP Superpriority Claims.<br><br><u>Section 507(b) Claims.</u> To the extent the Prepetition Lender shall hold claims allowable under §§ 503(b) and 507(a)(2) of the Bankruptcy Code, notwithstanding the provision of Adequate Protection hereunder, the Prepetition Lender is hereby granted an administrative expense claim pursuant to Bankruptcy Code §§ 507(b) (each, a "**Section 507(b) Claim**") with priority over all other administrative expenses, but in all cases subject and subordinate |

| | to the Carve-Out, Permitted Prior Senior Liens, DIP Obligations, DIP Liens and DIP Superpriority Claims. |
|---|---|
| | Adequate Protection Payments. Subject to Bankruptcy Code § 506(b) and to any party's (other than the Debtors') right to request recharacterization of such payments as payments of principal, the Debtors will, in accordance with the DIP Budget, with respect to the Prepetition Lender: (i) promptly pay all reasonable fees and expenses under the Prepetition Loan Documents incurred by the Prepetition Lender, whether incurred prior to or following the Petition Date, and (ii) pay all other payments payable when and as due under the Prepetition Loan Documents, including all payments of principal, interest, fees and charges. These payments will be referred to collectively as the **"Adequate Protection Payments."** For the avoidance of doubt, the Prepetition Lender is entitled to receive Adequate Protection Payments, but may not necessarily receive any such payments, as such payments may be made only to the extent that provision is made therefor in the DIP Budget or otherwise available to be paid by the Debtors. |
| Perfection of the DIP Lien & Adequate Protection Replacement Lien | The DIP Liens granted to the DIP Lender pursuant to the Interim Order and the DIP Loan Documents, and the Adequate Protection Liens granted pursuant to the Interim Order to the Prepetition Lender are valid, enforceable, and perfected by operation of law upon entry of the Interim Order by the Court without any further action by any party. |
| Modification of the Automatic Stay to Exercise Remedies | Upon an Event of Default under the DIP Loan Documents or upon the Termination Date, and in each case without further notice, motion or application to, order of, or hearing before, this Court, the DIP Lender is granted leave to cease making financial accommodations to the Debtors, accelerate any or all of the DIP Obligations and declare such DIP Obligations to be immediately due and payable in full, in cash, and the Debtors shall use Cash Collateral only with the written consent of the DIP Lender and only to the extent required to avoid irreparable damage to the Debtors and their Estates. In addition, upon the Termination Date, and after providing 7 days prior notice to this Court, U.S. Trustee, counsel for the Debtors, counsel for the Committee, any holder of a Permitted Prior Senior Lien or counsel to any holder of a Permitted Prior Senior Lien and the list of parties maintained by the Debtors pursuant to Bankruptcy Rule 2002, then the DIP Lender will be entitled to exercise all of its rights and remedies under the Interim Order and the DIP Loan Documents, including, without limitation, foreclose upon the DIP Collateral or otherwise enforce the DIP Obligations, DIP Liens and DIP Superpriority Claims on any or all of the DIP Collateral and/or to exercise any other default-related remedies under the DIP Loan Documents, the Interim Order or applicable law in seeking to recover payment of the DIP Obligations. |
| | With respect to Permitted Prior Senior Liens, any exercise of such rights and remedies shall be in accordance with applicable non-bankruptcy law in respect of Permitted Prior Senior Liens. During the 7 day notice period, the Debtors, the Committee or any other party-in-interest may seek an order of this Court staying the DIP Lender's exercise of such remedies against the DIP |

| | |
|---|---|
| | Collateral and, if no such stay is obtained, then the DIP Lender may exercise any and all such rights and remedies without further order of the Court or notice to any party and the Debtors' authority to use Cash Collateral under the Interim Order will terminate. |
| Debtors' Stipulations as to Prepetition Credit Facilities | **Prepetition Loans.** Pursuant to the Prepetition Loan Documents, the Prepetition Lender were granted liens on, and security interests in (collectively, the "**Prepetition Liens**"), substantially all property of North General under the Prepetition Loan Documents, whether now owned or existing or hereafter acquired or arising regardless of where located, including all accounts, all chattel paper, certain commercial tort claims, all deposit accounts, all documents, all equipment, all general intangibles, all instruments, all inventory, all investment property, all letter-of-credit rights, all books and records, and all proceeds of the foregoing (all as more fully set forth in the Prepetition Loan Documents, the "**Prepetition Collateral**"). All indebtedness and other obligations in respect of the Prepetition Loan Documents will be referred to as the "**Prepetition Obligations.**"

**Prepetition Indebtedness.** (a) the Debtors were indebted and liable to the Prepetition Lender without defense, counterclaim or offset of any kind, in the aggregate amount of approximately $[210,695,167] in respect of loans and other financial accommodations provided by the Prepetition Lender pursuant to the Prepetition Loan Documents, plus accrued but unpaid interest, costs, fees and expenses as provided in the Prepetition Loan Documents;

(b) the Prepetition Liens are (x) valid, binding, perfected, enforceable, first priority liens on and security interests in the Prepetition Collateral, (y) not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law and (z) subject only to (A) after giving effect to this Interim Order, the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, and the Carve-Out, and (B) Permitted Prior Senior Liens;

(c) the Prepetition Obligations constitute the legal, valid and binding obligations of the Debtors, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising under §362 of the Bankruptcy Code) and no portion of the Prepetition Indebtedness is subject to avoidance, recharacterization, disgorgement, recovery or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law;

(d) the Debtors do not have, and hereby forever release and waive, any claims, objections, challenges, counterclaims, causes of action, defenses or setoff rights, whether arising under the Bankruptcy Code or applicable non-bankruptcy law, against the Prepetition Lender or any of its respective affiliates, attorneys, advisors, professionals, officers, directors, and employees from the beginning of time.

(e) All of the Debtors' cash existing as of the Petition Date, except for proceeds of the DIP Facility, including without limitation, all cash and other amounts on deposit or all maintained by the Debtors in any account or accounts with any Prepetition Lender, constitutes Cash Collateral of the |

| | |
|---|---|
| | Prepetition Lender; and<br><br>(f) the Debtors are in default with respect to their Prepetition Indebtedness and an Event of Default has occurred under the Prepetition Loan Documents. |
| Effect of Stipulations to Third Parties | The admissions, stipulations, agreements, releases, and waivers set forth in the Interim Order are and will be binding on the Debtors, any subsequent trustee, responsible person, examiner with expanded powers, any other Estate representative and all parties-in-interest and all of their successors-in-interest and assigns, including, without limitation, the Committee, <u>unless</u>, and solely to the extent that, (i) the Committee or another party-in-interest with standing and requisite authority, has timely filed the appropriate pleadings, and timely commenced the appropriate proceeding required under the Bankruptcy Code and Bankruptcy Rules, including, without limitation, as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set challenging the Prepetition Lien and Claim Matters (each such proceeding or appropriate pleading commencing a proceeding or other contested matter, a "Challenge") by no later than 60 days from the date of entry of the Final Order (as such applicable date may be extended from time to time in the sole discretion of the Prepetition Lender or by this Court for good cause shown pursuant to an application filed by the Committee or any other party in interest prior to the expiration of such period, the "**Challenge Deadline**"), and (ii) this Court rules in favor of the plaintiff or movant in any such timely and properly commenced Challenge proceeding and any such ruling is not subject to any further review or appeal. |
| Indemnity | The Debtors shall indemnify the DIP Lender and its respective affiliates, successors and assigns and the officers, directors, employees, advisors, controlling persons and members of each of the foregoing (each, an "**Indemnified Person**") and hold each of them harmless from and against all costs, expenses (including reasonable fees, disbursements and other charges of counsel) and liabilities of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Debtors or any of their affiliates or shareholders) that relates to the DIP Facility or the Interim Order, including the financing contemplated hereby, the Chapter 11 cases, or any transactions in connection therewith, provided that no Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such Person's gross negligence or willful misconduct. |
| Releases | The Debtors do not have, and forever release and waive, any claims, objections, challenges, counterclaims, causes of action, defenses or setoff rights, whether arising under the Bankruptcy Code or applicable non-bankruptcy law, against the Prepetition Lender or any of its respective affiliates, attorneys, advisors, professionals, officers, directors, and employees from the beginning of time. |

| | |
|---|---|
| | In no event will the DIP Lender, whether in connection with the exercise of any rights or remedies under the DIP Credit Agreement, under the Interim Order or otherwise, be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors, so long as the actions of the DIP Lender do not constitute, within the meaning of 42 U.S.C. § 9601(20)(F), actual participation in the management or operational affairs of a vessel or facility owned or operated by a Debtor, or otherwise cause liability to arise to the federal or state government or the status of responsible person or managing agent to exist under applicable law (as such terms, or any similar terms, are used in the Comprehensive Environmental Response, Compensation and Liability Act, sections 9601 et seq. of title 42, United States Code, as amended, or any similar federal or state statute). |
| Debtors Jointly & Severally Liable / Discharge | Each Debtor is jointly and severally liable for, absolutely and unconditionally guarantees to the DIP Lender and its respective successors and assigns, the full and prompt payment when due (whether at maturity or earlier, by reason of acceleration or otherwise, and at all times thereafter) and performance of, all DIP Obligations owed or hereafter owing to DIP Lender by each other Debtor.  Each Debtor agrees that (i) its guarantee obligation hereunder shall be, and is, absolute and unconditional for all purposes in these Chapter 11 Cases and is a present and continuing guaranty of payment and performance and not of collection, and (ii) its obligations under this Interim Order and any DIP Loan Document  will not be discharged until the indefeasible payment and performance, in full, in cash of the DIP Obligations, and the termination of the lending commitments under the DIP Loan Documents. |
| Governing Law & Forum | New York, except as governed by the Bankruptcy Code |

## GENERAL BACKGROUND

5.  On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtors have requested that the cases be jointly administered for procedural purposes only.

6.  The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. No trustee, examiner, or official committee of unsecured creditors has been appointed.

## THE DEBTORS' HISTORY AND BUSINESS

7.  North General was incorporated in 1977 and began as a stand alone operation on November 1, 1979. As a result of amendments to its bylaws in 1991, North General became an operating subsidiary of Corporation, its parent company. Corporation is also the parent company of the following entities: (i) **North General Home Attendant Corporation** (the "Home Attendant Program"), which employs over 625 home attendants and provides home care services to approximately 390 individuals in Manhattan (and formerly in the Bronx) (ii) **North General Foundation, Inc.** (the "Foundation"), which raises funds to support capital and operational needs of North General, and (iii) **PhyService, Inc.** ("PhyService") while currently inactive, PhyService is a management service organization (MSO) that is a not-for-profit, taxable corporation organized to provide management services to affiliate and community based physician practices as well as non-physician organizations. Corporation was also the parent company of the **North General Housing Development Corporation, Inc.** and **NGSC Insurance Ltd.** (a/k/a Captive), both of which have been or are in the process of dissolving.

8.  North General is the parent company of the following entities: (i) **North General AIDS Housing Development Fund Corporation** ("AIDS Housing Development Fund"), is

primarily a supportive housing development corporation, which sponsored the development and construction of a 28-unit AIDS supportive housing development and services individuals referred by the New York City Housing Authority (NYCHA); (ii) **D&TC,** is a not-for-profit, tax-exempt entity, wholly dependent on and supported by North General. D&TC was established to deliver enhanced outpatient primary care services for adults and children, as well as programs and services specializing in diabetes treatment, pediatric weight management, cardiovascular services, a women's health center, a school-based health program and an addiction treatment center.

9.      North General also controlled the **Helene Fuld College of Nursing** ("Helene Fuld"), a separate not-for-profit corporation, through majority Board membership through October 25, 2007. As of October 25, 2007, North General owed over $1 million to Helene Fuld, which was extinguished through settlement, whereas the hospital must make monthly payments of $30,000, which commenced on November 1, 2007. The outstanding balance due to Helene Fuld was $207,327.00 as of May 31, 2010 and is included in North General's account payable.

10.      As a not-for-profit organized under the State of New York (the "State"), North General is exempt from federal income taxation under § 501(c)(3) of the Internal Revenue Code. North General's sole member is Corporation, which is similarly a New York not-for-profit corporation that is also exempt from federal income taxation under §501(c)(3) of the Internal Revenue Code.

11.      North General provides a broad range of adult inpatient services, as well as ambulatory and emergency care services. North General was established in response to and as a result of the Orthopedic Institute Hospital for Joint Diseases, of which North General's facilities were a part, moving to downtown Manhattan and the closure of several other Harlem

neighborhood hospitals, including Sydenham Hospital. Today, North General is the only remaining minority-run private hospital in the State. North General operates 200 licensed acute care beds at 1879 Madison Avenue (the "Main Facility"), located between 121st and 122nd Streets in upper Manhattan.

## PREPETITION SECURED INDEBTEDNESS

12.     As of the Petition Date, the Debtors have at least $213 million of outstanding secured indebtedness (principal, interest & fees) owing to the various prepetition secured parties. The overwhelming majority of North General's secured debt is held by DANSY pursuant to (i) the DASNY Mortgage; and (ii) the DASNY Loan.

## THE DASNY MORTGAGE

13.     In 1991, North General completed a major portion of a facility modernization program. To finance this project, North General entered into a mortgage loan agreement (the "DASNY Mortgage") on July 1, 1989 with DASNY (formerly the New York State Medical Care Facilities Finance Agency). This loan agreement provided for proceeds of $150,000,000.00, which were funded by DASNY from the sale of Secured Hospital Revenue Bonds ("1989 Series A").

14.     Thereafter, DASNY entered into a new loan agreement with North General, dated January 28, 1998, and a mortgage, dated February 26, 1998, in connection with the issuance of $144,610,000.00 of the Secured Hospital Revenue Refunding Bonds, Series 1998G (the "Series 1998G Bonds") through the New York State Secured Hospital Program ("Secured Hospital Program"). These proceeds were used to refund the outstanding principal amount of the existing mortgage agreement with DASNY relating to the Secured Hospital Revenue Bonds, 1989 Series A.

15.     On January 3, 2003, DASNY signed another loan agreement and mortgage, dated January 23, 2003, with North General in connection with the issuance of $138,135,000.00 of Secured Hospital Revenue Refunding Bonds, Series 2003 (the "Series 2003 Bonds") through the Secured Hospital Program. These proceeds were used to refund the outstanding principal amount of the existing mortgage agreement with DASNY relating to the Series 1998G Bonds.

16.     North General has made few, if any, principal payments under the DASNY Mortgage.

17.     The bonds are special revenue obligations of DASNY and are collateralized by a first mortgage lien on North General's property. In addition, pursuant to the Secured Hospital Program, DASNY and the State, acting through the State's Director of the Budget, entered into a service contract to provide additional protection for the bonds.

18.     Under the DASNY Mortgage, North General is required to maintain certain covenant obligations however, as of December 31, 2005; North General has not met its debt coverage ratio covenant requirement. A waiver for failing to meet this required financial covenant is not in place and the required payments still have not been made. The DASNY Mortgage also requires North General to pay health assessment fees $ 450,000 annually to the Department of Health ("DOH") and DASNY over the term of the DASNY Mortgage. Interest on late payments is assessed at approximately 7.5%. As of May 31, 2010, North General owed $3,453,557, in outstanding fees and interest.

19.     As of December 31, 2007, the DASNY Mortgage was reclassified as a short-term liability because of North General's failure to obtain the required waivers for its failure to meet its debt coverage ratio covenant and certain other covenants.

## THE DASNY LOAN

20.     On July 25, 2002, August 6, 2001 and March 25, 1999, North General entered into loan agreements with DASNY in the amounts of $1,300,000, $2,000,000 and $500,000, respectively (the "DASNY Loan").  These obligations were funded from a restructuring pool for the purpose of providing vendor settlements and implementing a turnaround plan.  On July 21, 2003, North General entered into a supplemental reimbursement agreement with DASNY, in which DASNY agreed to loan North General an additional $4,000,000 from the Restructuring Pool, of which $3,600,000 was held by DASNY to be applied to North General's debt service obligations under the Series 2003 Bonds loan agreement and $400,000 was disbursed to North General to meet working capital needs.  In 2004 and 2005, North General received $2,400,000 and $500,000 respectively, to assist with certain debt service requirements.  Through May 31, 2010, additional borrowings were made by North General to aid with the payment of certain employee benefits that were past due, debt service requirements, and operational and equipment needs.

21.     These additional borrowing have increased the outstanding principal balance on the DASNY Loan to $55,243,537.00 as of May 31, 2010.  The DASNY Loan is secured by substantially all of North General's patient receivables.

## B.     OTHER COMMITMENTS AND CONTINGENCIES

### Operating Leases and Rental Expenses:

22.     North General has entered into various operating lease agreements.  In 2008 and 2009, rental expenses under these agreements were $518,041 and $450,507 respectively. Future minimum rental expense commitments to be paid under these operating leases are as follows:

2010: $471,105; 2011: 378,082; 2012: $386,116; 2013: $309,219, 2014: $185,734 and

thereafter: $1,051,730.

**Union & Pension Obligations**

23.     Union employees are generally included in the pension and welfare plans of their

collective bargaining units.   Under these plans, North General is required to make payments

based on contractual amounts.   Expenses under these plans were approximately $9,078,322 and

$10,333,313 for the years ending December 31, 2008 and 2009 respectively.   As of May 31,

2010, the Debtors have accrued pension liability of over $11 million.

## CIRCUMSTANCES LEADING TO CHAPTER 11

### a.     Systemic Undercapitalization from its Inception

24.     With the assistance of the State, but grossly undercapitalized, North General was

established to operate a 200-bed community hospital in the building formerly occupied by the

Hospital for Joint Diseases, which had relocated to new facilities in downtown Manhattan.

North General entered 1980, its first full year of operation, with a negative fund balance of

$824,987.  North General lost nearly $3 million for the year.

25.     During the early years of operations, it became apparent that North General was

suffering the ill effects of its systemic problem of undercapitalization.  Facing bankruptcy almost

immediately, North General appealed to the State for relief and was afforded special State aid by

being approved for participation in the Emergency Hospital Reimbursement Program effective

September 25, 1980.  Thus began a long series of financial "bail outs" that has frustrated both

State regulators and North General.

26.     In 1989, despite its poor balance sheet position, but again with the full support of

the State, North General embarked on a program to rebuild the entire hospital at a new location.

It was the view of the State that the public need for the facility trumped the hospital's notable

financial shortcomings. A special State financing program had been developed for distressed hospitals that allowed refinancing of prior bad debt (in effect, over-mortgaging). In 1989, North General obtained financing from the Medical Care Facilities Finance Agency (MCFFA), which issued $150 million of tax-exempt 1989 Series "A" Bonds. The proceeds from the 1989 Series A Bonds were used to (i) acquire the site of the Debtors' original premises at 1919 Madison Avenue in Harlem, New York (ii) build and equip the Main Facility, (iii) demolish the original premises and (iv) repay certain indebtedness. This loan agreement with the MCFFA was supported by a service contract with the State Director of the Budget. The "new" North General, located two blocks south of the old building, opened on December 12, 1991 at which time the original premises was conveyed to the City of New York.

27.     After the Main Facility was completed, a second building, the North General Annex, located at 1824 Madison Avenue, Harlem, New York (the "Annex") was constructed with unexpected proceeds from the 1989 Series A Bonds. Construction of the Annex was completed in 1993. Currently the Annex provides space for financial administration and physicians' offices, information systems and the Alcohol Treatment Center operated by North General.

28.     With a $150,000,000 mortgage in place, North General began 1992 with less than $7,000 in unrestricted cash, virtually no working capital, and a negative fund balance of $10, 400,000 million. Unfortunately, and despite North General's best efforts, this trend has continued throughout the hospital's history.

29.     As of May 31, 2010, North General's total assets equal approximately $67,000,000 of which $22,000,000 is current, $12,000,000 is limited non-current, $2,000,000 is other long-term and $31,000,000 is property, plant and equipment-net.

30. Moreover, as of May 31, 2010, North General's obligations include $135,000,000 of mortgage debt, which is categorized as a current liability, $55,000,000 in secured restructuring loans and $103 million of other obligations, which includes $19 million of unpaid interest on secured capital indebtedness for a total of $293 million.

31. In this regard, according to the Debtors' financial statements dated as of May 31, 2010, North General had a deficiency in unrestricted net assets of approximately $226,000,000 and a working capital deficiency of approximately $194,000,000. In its comments to the Debtors' Consolidated Statements, the auditors noted that these factors raise substantial doubt about North General's ability to continue as a going concern (*See* North General Hospital and Affiliates Consolidated Financial Statements Year Ended December 31, 2009). Audited Financial Statements for the year ending December 31, 2009 are not available.

32. Facing insurmountable financial obstacles from its inception, North General mobilized all its resources to try and keep its head above water however, and as has been clearly demonstrated herein, the hospital has, since its first day of operation, been burdened with a debt-load vastly disproportionate to its ability to service such debt. Simply stated, North General has and remains too small and its inpatient volumes too low for it to carry the financial obligations it has incurred.

**b.    Change in Reimbursement Rates, Lack of Revenue-Generating Programs and Services and Volume Decline**

33. In addition to its problem of systemic undercapitalization, between 1979 and 1983, profound changes took place in hospital reimbursement rates, which had a disproportionately negative impact on North General and similar safety net hospitals. Payment rates to hospitals, once determined on cost-based reimbursement, were terminated and a fixed price or Diagnosis Related Group (DRG)-based payment for inpatient hospital services was

implemented. Since that legislation was passed in 1982, some 1,200 American hospitals have closed. This change in the reimbursement system resulted in a continuing reduction in Medicare and Medicaid payments received by North General and as a consequence, dramatically and adversely affected the hospital's financial stability.

34.     Moreover, because North General is a small and independent hospital and not a member of a health care network, it has been unable to benefit from the more favorable managed care rates provided to the larger networks. Due to its size, North General also pays higher prices for supplies because it is unable to benefit from bulk purchasing opportunities. Lastly, patient care volumes continue to decline while the competition from other health care networks has increased. Since 2007 through 2009, the hospital's admissions have declined nearly 17%.

35.     Over the past few years, to combat the aforementioned negative circumstances, North General tried implementing a number of specialty programs in an attempt to bring in more patients and build business. These programs, however, were unsuccessful, and despite North General's operational expense improvements and investments in clinical leadership, programs and equipment, it continues to face overwhelming liquidity issues. North General has also been unable to neither achieve financial stability nor increase its market share.

**c.     Pre-Petition Proposals Fielded By North General**

36.     As its operating losses deepened, the Debtors concluded that the only way to preserve the hospital's mission was to enter into agreements with other providers of care however, potential alternatives to ensure continued operations proposed by North General were rejected by the DOH. As a result of the failed contractual relationship with Mt. Sinai, North General undertook an analysis of potential alternatives that could ensure its continued operation, including the following: (i) pursuing a plan for interim financing, outside of DASNY, to support a plan for clinical reorganization, which presumes a "significant" contractual relationship with

Mt. Sinai or another partner, (North General approached several other academic health care institutions regarding such an alignment, but were turned down by such institutions), (ii) recreating North General as a niche provider of comprehensive services to the growing geriatric population, building and expanding upon relationships with nursing homes and other programs serving the elderly, (iii) recreating North General as a full service, standard-setting ambulatory care facility, offering high quality medical care and technology, (iv) re-missioning North General along the lines of the Medical Home Model (an "**MHM**") or (v) closing North General.

37. Initially the most viable of the foregoing options was to re-mission North General into a comprehensive ambulatory health services provider based on the MHM. The State is engaged in a program to fundamentally reform its health care system and in connection therewith unprecedented financial resources have been assembled by the State to assist the reform effort. The State's Fiscal Year 2009-10 Health Budget ("**Budget**") provides certain incentives for the adoption of "medical home" standards and the revision of the Medicaid reimbursement system for hospital inpatient services.

38. Under the MHM, healthcare provided by North General would have been managed and coordinated by personal physicians and North General would have positioned itself as the "Medical Home" for patients in its service area in the Central and East Harlem Community. North General would have (a) formulated new practices and policies to rationalize service use, improve health outcomes and reduce Medicaid costs and (b) developed health care models to service its high risk population, which models would incorporate intensive case management, integrated delivery of services collaboration with community-based social service organizations and enhanced communication and data sharing. These services would be supported by fully integrated electronic health records and state-of-the-art information

technology. North General also explored leasing certain of its beds to Mt. Sinai, involving community doctors in the services provided by North General, adding more programs and services regarding ambulatory and primary care and offering doctors an economic ownership incentive to become engaged with North General.

39.     In addition to the State's financial support of MHMs, North General envisioned receiving the benefit of new Medicaid payment methods. On December 1, 2008, Medicaid implemented a new Ambulatory Patient Groups (APGs) payment method, for hospital outpatient services. Effective December 1, 2009, Medicaid implemented a new inpatient payment method which (i) updates costs from 1981 to 2005, (ii) bases payments only on the costs of Medicaid patients, (iii) uses a statewide base price with adjustments for hospital-specific wage and teaching costs, (iv) adopted an updated case mix system (APGs and DRGs) that more accurately measures and reimburses for patient acuity, (iv) updates and implements a new prospective payment system for inpatient psychiatric services, (v) authorizes hospital-based physicians to bill Medicaid outside the facility fee effective February 1, 2010 and (vi) provides for updates to the cost basis at least every three years. In addition, the Budget reduces inpatient rates by $225,000,000 annually as part of a multi-year effort to bring inpatient rates more in line with inpatient costs and provides funding opportunities to assist hospitals in adapting to the new reimbursement system, creating efficiencies in their operations and re-aligning their business models to, among other things, effectively integrate primary care and chronic care management.

40.     North General, in seeking to re-mission itself as a MHM with the financial assistance through the foregoing programs and revised Medicaid reimbursement systems, approached the DOH for its approval, however, the DOH indicated that a MHM would only work with a full-service, functioning hospital. As a result, operating solely as an MHM is not a

viable option for North General. As previously mentioned herein, with expenses rising and revenues falling, North General has and is currently unable to meet its debt obligations. The decreased reimbursement rates received by North General coupled with its heavy debt burden, has made the likelihood of obtaining sufficient financial capital restructuring for North General to remain solvent and viable all but an impossibility. Overall, North General finds itself in a very tenuous financial position, with limited cash, an inability to service its debt or make necessary capital improvements or otherwise sustain operations in their current form.

## THE DECISION TO FILE FOR CHAPTER 11

41. Lacking sufficient funds to continue operating the hospital on a standalone basis and without a viable and qualified third-party partner or sponsor for the hospital, the Debtors determined that there was no alternative than to commence these Chapter 11 cases.

42. By filing for Chapter 11 protection, the Debtors hope to obtain the financing necessary to implement their Closure Plan (defined below) and to obtain protection from creditor action in an effort to preserve and maximize the value of their assets for the benefit of all their stakeholders, while at the same time safeguarding the welfare of their patients until such time as their patients can be transferred to another facility or otherwise discharged.

43. Given the Debtors financial circumstances, on June 26, 2010, the Board of Directors of North General voted to approve the closure of the hospital and the transfer or closure of the outpatient programs and clinics associated with and operated by the hospital (together with the services provided by North General, the "Hospital Services"). In accordance with State law, the Debtors submitted a proposed plan of closure of the Hospital Services (the "Closure Plan") to the DOH. While the DOH has not yet approved the Closure Plan, the Debtors

have already begun the closure process and are working closely with the DOH to implement the Closure Plan.

## EFFORTS TO OBTAIN ALTERNATIVE FINANCING

44.     Prior to the Petition Date, the Debtors' advisors engaged in discussions with several lenders other than the Prepetition Lender regarding the provision of postpetition financing. Although certain lenders initially expressed interest in providing postpetition financing, none of them were willing to extend credit on an unsecured basis as an administrative expense under § 503(b) of the Bankruptcy Code. Further, upon learning that the Debtors had no significant unencumbered assets, these lenders were also not interested in extending credit on a secured basis pursuant to §§ 364(c)(2) or (3) of the Bankruptcy Code. Finally, in light of the high cost and the uncertainty of a potential priming fight with the Prepetition Lenders, the Debtors, in consultation with their professionals, determined that it was most prudent to pursue discussions and negotiations of the postpetition financing with DASNY, their Prepetition Lender.

## RELIEF REQUESTED

45.     Authorize the Debtors, pursuant to the Bankruptcy Code, including §§105(a), 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 503 and 507 thereof , Rules 2002, 4001 and 9014 of the Bankruptcy Rules and , and Local Rule 4001-2, to obtain financial accommodations consisting of the "DIP Facility, under which borrowings may be the Debtors respectfully request the relief set forth in the Interim Order and the Final Order, including the following:

- Authorize the Debtors, pursuant to the Bankruptcy Code, including §§105(a), 361, 362, 364(c)(1), 364(c)(2), 364(c)(3) and 364(d) thereof, Rules 2002, 4001, and 9014 of the Bankruptcy Rules, and Rule 4001-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), the Debtors to obtain financial accommodations consisting of a delayed-draw term loan (the "DIP Facility") under which borrowings may be made from time to time pursuant to that certain Senior Secured Priming and Superpriority Debtor-In-Possession Credit

Agreement (together with all schedules and exhibits thereto, and as it may be amended, restated, supplemented, or otherwise modified from time to time, (the "DIP Credit Agreement," and together with all security, pledge, guaranty, and other lien and loan documents entered into in connection therewith and as further amended, restated, supplemented or otherwise modified from time to time, the "DIP Loan Documents") by and among (i) the Debtors, and (ii) The Dormitory Authority of the State of New York, a public benefits corporation organized pursuant to the provisions of Title 4 and 4-B of Article 8 of the Public Authorities Law of the State of New York, as amended (the "Authority" or the "DIP Lender") in respect of the obligations set forth in the DIP Budget (as defined below), DIP Loan Documents and this Interim Order (the "DIP Obligations");

- authorize the Debtors to execute and deliver to the DIP Lender the DIP Loan Documents;

- authorize the Debtors to borrow and guarantee, as applicable, on an interim basis the amount of [Three-and-One-Half] Million Dollars ($[3,500,000] (the "Interim Amount");

- authorize the Debtors, subject to the entry of the Final Order, to borrow and guarantee, as applicable, on a final basis the amount of [Fourteen] Million Dollars ($[14,000,000]) (the "Maximum Permitted Loan Balance"), in accordance with the DIP Budget, the DIP Loan Documents and the Final Order;

- authorize the Debtors, pursuant to the Bankruptcy Code, including section 363(c) thereof, to use Cash Collateral (as defined below) in which the Prepetition Lender (as defined below) has an interest in accordance with the DIP Budget, the DIP Loan Documents and this Interim Order, along with proceeds of the DIP Facility to, *inter alia*:

  (i) fund the orderly wind down and closure of the Debtors' businesses (the "Closure Plan"), as approved from time to time by the NYS Department of Health (the "DOH"), and to fund the operating expenses and orderly disposition of the Debtors' assets during these Chapter 11 Cases,

  (ii) fund postpetition allowed fees and expenses incurred by the Debtors' Retained Professionals, any statutory committee including any committee appointed pursuant to § 1102 of the Bankruptcy Code (collectively, the "Committee") and other Retained Professionals, including, without limitation, any appointed Healthcare Ombudsmen and their professionals

  (iii) pay interest and fees on the DIP Facility

(iv)     pay fees and expenses of the DIP Lender related to the DIP Facility and these Chapter 11 Cases, including, without limitation, attorneys' fees and fees of professional advisors on the terms set forth in the DIP Loan Documents and this Interim Order;

(v)      pay Adequate Protection Payments (as defined below); and

(vi)     fund the other items covered by the terms of the DIP Budget, this Interim Order, and the DIP Loan Documents;

- authorize the DIP Lender, pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, to receive DIP Superpriority Claims and DIP Liens with respect to all assets of the Debtors, of any nature whatsoever and wherever located, whether first arising prior to or following the Petition Date), now owned or hereafter acquired, including all accounts, all chattel paper, all commercial tort claims, all deposit accounts, all documents, all equipment, all general intangibles, all goods, all instruments, all inventory, all investment property, all letter-of-credit rights, all books and records, and all proceeds, rents, profits, and offspring of the foregoing (including Cash Collateral, as defined below), and all Avoidance Action Proceeds (all of the foregoing, and as more fully set forth in the DIP Loan Documents, the "DIP Collateral"), subject and subordinate in each case to the Carve-Out and Permitted Prior Senior Liens;

- authorize adequate protection (collectively, the "Adequate Protection"), pursuant to sections 361, 503(b) and 507(b) of the Bankruptcy Code, and the terms of this Interim Order, with respect to North General's prepetition senior secured obligations (collectively, the "Prepetition Indebtedness") in respect of certain prepetition loans to North General by the Authority (in such capacity, the "Prepetition Lender") (as they may be amended, restated, modified or supplemented from time to time, collectively, the "Prepetition Loans," and together with all security, pledge, guaranty, and other lien and loan documents entered into in connection therewith and as further amended, restated, supplemented or otherwise modified from time to time, "Prepetition Loan Documents"), and whose liens and security interests are being primed by the DIP Obligations, DIP Liens and DIP Superpriority Claims under the DIP Credit Agreement and other DIP Loan Documents, and whose Prepetition Collateral (as defined below) may be used, sold or leased by the Debtors, and grant the following as adequate protection of such interests with the same relative priority of the liens and claims owing to the Prepetition Lender: (i) Adequate Protection Liens (as defined below), subject only to the Permitted Prior Senior Liens, DIP Obligations, DIP Liens, DIP Superpriority Claims, and the Carve-Out, (ii) Section 507(b) Claims (as defined below), subject and subordinate only to the Permitted Prior Senior Liens, DIP Obligations, DIP Liens, DIP Superpriority Claims, Adequate Protection Liens and the Carve-Out, and

(iii) Adequate Protection Payments (as defined below), all on the terms set forth herein;

- modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the DIP Orders and satisfy the Adequate Protection Obligations (as defined below);

- waive any stay of effectiveness under the Bankruptcy Code and Bankruptcy Rules, including under Bankruptcy Rule 4001(a)(3), and under the Local Rules and, provide for the immediate effectiveness of this Interim Order; and

- schedule the Final Hearing, pursuant to Bankruptcy Rule 4001, for this Court to consider entry of the Final Order approving the Motion.

## **BASIS FOR RELIEF**

46.     Without the proposed DIP Facility and the use of the Cash Collateral, the Debtors do not have sufficient cash collateral or other available sources of working capital and financing to implement their Closure Plan.  Accordingly, the Debtors urgently need access to the DIP Facility and use of the Cash Collateral to continue to provide adequate care to the remaining hospital patients and facilitate their transfer to other facilities, to pay their employees, utilities, and other short-term costs attendant to the closure of the Hospital Services, and to otherwise execute the Closure Plan.

47.     The proposed DIP Facility and the use of the Cash Collateral (all pursuant to the DIP Budget) will provide the Debtors with sufficient funds to accomplish all of the tasks described above. The Debtors expect that the proposed DIP Facility will be sufficient to fund the winding-down of their operations and to satisfy all administrative expense obligations that the Debtors reasonably expect to incur during the pendency of these Chapter 11 cases.

48.     Finally, the DIP Facility is the only source of financing available to the Debtors at this time. As described in greater detail below, despite their efforts, the Debtors have been unable

to obtain financing (i) in the form of unsecured credit allowable under § 503(b)(1) of the Bankruptcy Code, (ii) solely as an administrative expense under § 364(a)-(b) of the Bankruptcy Code, or (iii) solely in exchange for the grant of a superpriority administrative expense claim pursuant to § 364(c)(1) of the Bankruptcy Code. Indeed, the proposed financing under the DIP Facility was the only viable postpetition financing option available to the Debtors.

49.     Thus, based on the foregoing and for the reasons set forth below, the Debtors submit that they have satisfied the requirements to access postpetition financing on a superpriority, secured basis pursuant to § 364(c) and (d) of the Bankruptcy Code as well as the requirements for use of the Cash Collateral pursuant to § 363(c) of the Bankruptcy Code.

**The Debtors Satisfy the Requirement for Obtaining Postpetition Credit on a Secured and Superpriority Basis Pursuant to § 364(c) and (d) of the Bankruptcy Code**

50.     Section 364 of the Bankruptcy Code governs requests for approval of postpetition financing. If a debtor cannot obtain postpetition credit on an unsecured, administrative expense basis, § 364(c) of the Bankruptcy Code authorizes a debtor to incur debt that is entitled to superpriority administrative expense status, secured by a lien on otherwise unencumbered property, or secured by a junior lien on encumbered property. 11 U.S.C. §364(c); see In re 495 Cent. Park Ave Corp., 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992) (discussing financing options under §364). Similarly, if a debtor is unable to obtain credit under § 364(c), § 364(d) of the Bankruptcy Code authorizes a debtor to incur debt that is secured by a senior or equal lien on encumbered property. 11 U.S.C. § 364(d); see 495 Cent. Park Ave, 136 B.R. at 630.

51.     Courts review a variety of factors to determine whether a debtor has satisfied the requirements of § 364(c) and (d) of the Bankruptcy Code. Such factors include whether: (i) alternative financing is available on any other basis; (ii) the financing is necessary to preserve the assets of the estate and is necessary, essential and appropriate for continued operation of the

debtors' business; (iii) the financing is in the best interests of the debtors' creditors and estates; (iv) entry into the financing constitutes an exercise of the debtor's sound and reasonable business judgment; (v) the terms of the financing are fair, reasonable and adequate; and (vi) the financing was negotiated in good faith and at arm's length between the debtor, on the one hand, and the agents and the lenders on the other. See In re Farmland Indus., Inc., 294 B.R. 855, 879-81 (Bankr. W.D. Mo. 2003); Transcript of 29 Record at 733, In re Lyondell Chem. Co., Case No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009) (citing Farmland factors); In re Mid-State Raceway, Inc., 323 B.R. 40, 60 (Bankr. N.D.N.Y. 2005) (citing Farmland factors); see also In re Barbara K. Enters., Inc., No. 08- 11474, 2008 WL 2439649, *10 (Bankr. S.D.N.Y. June 16, 2008) (applying a subset of the above listed factors in reliance on In re Crouse Group, Inc., 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987)).

52.     Further, to the extent that financing is sought pursuant to § 364(d), a debtor must also demonstrate that the interests of holders of existing liens are adequately protected. 11 U.S.C. § 364(d)(1)(B); see 495 Cent. Park Ave, 136 B.R. at 631.

53.     Here, the Debtors propose to incur senior indebtedness as a superpriority administrative expense, which is secured by (i) a first priority senior lien on all of the Debtors' assets subordinate to Permitted Prior Senior Liens (if any); (ii) a senior lien on the Debtors' unencumbered assets, and (iii) a junior lien on the Debtors' encumbered assets. For the reasons set forth below, the DIP Facility satisfies each of the relevant factors for obtaining credit pursuant to §364(c) and (d) of the Bankruptcy Code.

**The DIP Facility is the only and Best Source of
Postpetition Financing Under the Circumstances**

54.     To obtain secured financing pursuant to §364(c) and (d) of the Bankruptcy Code, a debtor must show that unsecured financing was not available. 11U.S.C. §§ 364(c), (d)(1)(A).

However, a debtor is not required to seek alternative financing from every conceivable source. See Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990); 495 Central Park Avenue, 136 B.R. at 630-31. Instead, a debtor must show that it has made a "reasonable" or "good faith" effort to seek other sources of credit on more favorable terms. *See* Ames Dep't Stores, 115 B.R. at 40.

55.     The sufficiency of a debtor's efforts to obtain alternative financing will be informed by the likelihood that other lenders would be willing to extend financing on more favorable terms. See, e.g., In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (noting it would be "unrealistic and unnecessary" to require debtor to conduct an exhaustive search for financing where, due to debtor's geographical location, financial stress, and lack of unencumbered property, only existing secured lenders or lenders with a tie to the community would be likely to provide financing); Ames Dep't Stores, 115 B.R. at 40 (discussions with four lenders sufficient where the "existence of additional lending institutions with the ability to loan $250 million to financially troubled companies is doubtful"). Courts will also consider such factors as current market conditions and the immediacy of the debtor's needs. See, e.g., Transcript of Record at 734-35, 740, In re Lyondell Chem. Co., Case No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009) (discussing relevance of market conditions); Mid-State Raceway, 323 B.R. at 60 (taking into consideration fact that while Board was considering offers, "the Debtors were in dire financial straits and had serious concerns whether they would be able to make payroll in another week").

56.     Here, the Debtors' ability to obtain postpetition financing on more favorable terms from an alternative lender was complicated by the Debtors' ultimate decision to shut down

the Hospital Services. Indeed, in light of the Debtors' financial condition, substantial secured debt, limited prospect of significant future cash flow from operations, and lack of any material unencumbered assets, the likelihood of obtaining unsecured financing or financing secured only by junior liens was remote at best. In addition, the Debtors determined that DASNY, their prepetition lender would not consent to third-party postpetition financing secured by liens that were senior to its liens.

57. In spite of these challenges, the Debtors explored the possibility of obtaining postpetition financing from alternative lenders by engaging in discussions with a number of lenders other than DASNY, its prepetition lender. Although certain lenders initially expressed interest in providing postpetition financing, none of them were willing to extend credit on an unsecured basis as an administrative expense. In addition, in light of the lack of material unencumbered assets, none were willing to extend credit on a secured basis pursuant to §364(c)(2) or (3) of the Bankruptcy Code.

58. Having made good-faith efforts to explore other options, the Debtors and their advisors focused their efforts on negotiating a postpetition financing package with DASNY, the Debtors' prepetition lender on terms most favorable to the Debtors.

**Entry into the DIP Facility is in the Best Interests**
**of the Debtors' Patients and Creditors**

59. The Debtors' decision to enter into the proposed DIP Facility is manifestly in the best interests of their patients and creditors. The Debtors urgently need access to postpetition financing to implement their Closure Plan, to continue to provide adequate care to the hospital's patients in advance of their transfer to other facilities or ultimate discharge from the hospital, to satisfy the costs attendant to an orderly shut-down of the Hospital Services.

**The Debtors Have Exercised Their Sound Business**
**Judgment in Entering into the DIP Facility**

60.     A debtor's decision to enter into a postpetition lending facility under §364 of the

Bankruptcy Code is governed by the business judgment standard. See Ames Dep't Stores, 115

B.R. at 40 (noting that courts defer to a debtor's business judgment "so long as the financing

agreement does not contain term that leverage the bankruptcy process and powers or its purpose

is not so much to benefit the estate as it is to benefit a party-in-interest"). The business judgment

standard is a deferential one. In particular, in the context of postpetition financing, courts have

held that it is appropriate to interfere with a debtor's management of its affairs only if a decision

the debtor's decision is clearly erroneous or is made arbitrarily, in bad faith, with fraudulent

intent, on the basis of inadequate information, in violation of fiduciary duties, or in violation of

the Bankruptcy Code. See, e.g., Mid-State Raceway, 323 B.R. at 58; Farmland Indus., 294 B.R.

at 881. In addition, courts look to whether the debtor and its professionals have made efforts to

negotiate the best terms that they could. See Transcript of Record at 734, In re Lyondell Chem.

Co., Case No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009).

61.     Here, the Debtors' decision to obtain the DIP Facility is an exercise of their sound

business judgment that this Court should approve. Before the Petition Date, the Debtors and their

advisors undertook a detailed investigation as to the Debtors' projected financing needs during a

potential bankruptcy as well as the costs associated with closing the Hospital Services, the results

of this investigation are reflected in the DIP Budget, which the Debtors and their advisors have

independently determined should be sufficient to support the closure of the Hospital Services.

The Debtors, in consultation with their advisors, have determined that the proposed DIP Facility

to be provided by the DIP Lender pursuant to the terms of the DIP Credit Agreement is the most

favorable available under the circumstances and will allow the Debtors to fund closing requirements.

62.     Specifically, as noted above, the DIP Lender in accordance with the DIP Loan Documents and the DIP Budget, will provide the Debtors with a multiple draw term loan in an aggregate principal amount equal to $[14,000,000] comprised of: (a) $[3,500,000] to be available upon entry of the Interim DIP Order, provided that the DIP Order shall be in form and substance satisfactory to the DIP Lender; and (b) subject to the prior satisfaction of the conditions set forth in DIP Credit Agreement (a) $[10,500,000] available as a delayed draw or multiple draws set forth in the DIP Budget after entry of the Final DIP Order, provided that the Final DIP Order shall be in form and substance satisfactory to the DIP Lender.

63.     The DIP Budget consists of a detailed weekly budget which includes projections through October 31, 2010. The DIP Budget contemplates that the proceeds of the DIP Loans (including the $[14,000,000] of new postpetition advances during the Interim Period) and the Cash Collateral would provide the Debtors with sufficient funds to consummate an orderly shut-down of the Hospital Services, to operate, and to pay the administrative expenses that the Debtors reasonably anticipate to incur during the course of these Chapter 11 cases.

64.     In light of all factors outlined above, entering into the DIP Facility and obtaining the use of the Cash Collateral constitute an exercise of the Debtors' sound business judgment that should be approved by this Court.

**The Terms of the DIP Facility are Fair, Reasonable and Appropriate**

65.     As outlined in detail herein, the Debtors have been unable to obtain financing on an unsecured basis or on terms that were more advantageous. In the Debtors' business judgment,

the postpetition financing offered by the DIP Lender, is the best financing option available under the circumstances of these Chapter 11 cases.

66.     The proposed terms of the DIP Facility were negotiated in good faith and at arms' length among the parties. They are fair, reasonable, and adequate in that the terms do not prejudice the powers and rights that the Bankruptcy Code confers for the benefit of all creditors, and they do not abridge the rights of other parties-in-interest. As contemplated by the policies underlying the Bankruptcy Code, the purpose of the postpetition financing is to enable the debtor to maintain the value of its estate while formulating a confirmable plan of reorganization (or in these Chapter 11 cases, a plan of liquidation). See generally, In re First S. Sav. Assn, 820 F.2d 700, 710-15 (5th Cir. 1987).

67.     Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money. In re Lifeguard Indus., Inc., 37 B.R. 3. 17 (Bankr. S.D. Ohio 1983) (Business judgments should be left to the board room and not to this Court.). See also In re Curlew Valley Assocs., 14 BR. 506, 511-14 (Bankr.D. Utah 1981) (In general, a bankruptcy court should defer to a debtor-in-possession's business judgment regarding the need for and proposed use of funds, unless such decision is arbitrary and capricious). Courts generally will not second-guess a debtor in possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." Curlew Valley, 14 BR. at 513-14 (footnotes omitted).

68.     The Debtors submit that it has exercised its sound and prudent business judgment in determining the merits and necessity of the DIP Facility and has further satisfied the legal prerequisites for incurring debt. The Debtors additionally submits that it aptly demonstrated that the terms of the DIP Facility are fair and reasonable and are in the best interests of the Debtors'

estates. Accordingly, the Debtors should be granted the requested relief to borrow funds from

DASNY, as DIP Lender on a secured and superpriority basis, pursuant to § 364(c) of the

Bankruptcy Code.

69.     The DIP Credit Agreement contains certain provisions that are or may be

considered "extraordinary provisions" under Bankruptcy Rule 4001(c) and Local Rule 4001,

including the following provisions (which are described more fully in the "Material Terms of the

DIP Facility" chart of this Motion):

- Carve-Out;

- DIP Liens and DIP Superpriority Claims for $1,200,000 in
  emergency funding provided one day prior to the Petition Date;

- Proceeds of Avoidance Actions;

- Waiver of Section 506(c) Surcharge Right and Section 552(b)
  "Equities of the Case" Claims;

- Modification of Automatic Stay to Exercise Remedies; and

- Payment of Fees and Expenses of DIP Agent and DIP Lenders.

**The DIP Facility Was Negotiated in Good Faith and at Arm's
Length and the DIP Lenders Should Therefore be Afforded the
Protections of Section 364(e) of the Bankruptcy Code**

70.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to

collect on loans extended to a debtor, and its right in any lien securing those loans, even if the

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on

appeal. See 11 U.S.C. § 364(e). The Bankruptcy Code does not define "good faith" as used in §

364(e). However, courts have held that the forms of misconduct that would defeat good faith

status include "fraud, collusion, or an attempt to take grossly unfair advantage of others." Keltic

Fin. Partners, LP v. Foreside Mgmt. Co. (In re Foreside Mgmt. Co.), 402 B.R. 446, 452-53 (1st

Cir. B.A.P. 2009); see also, Evergreen Int'l Airlines, Inc. v. Pan Am Corp. (In re Pan Am Corp.), Case No. 91 Civ. 8319, 1992 WL 154200, *4 (S.D.N.Y. June 18, 1992).

71.     Here, the terms of the DIP Facility were negotiated in good faith and at arm's length between the Debtors and the DIP Lender. As explained above, the DIP Loan Documents are the result of the Debtors' sound business determination that the terms and conditions of the DIP Loan Documents are fair and reasonable and inure for the benefit of their estates and all parties in interest. Moreover, the proceeds of the DIP Facility will be extended by the DIP Lender in good faith and will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to the DIP Lender other than as described herein.

72.     Accordingly, the DIP Lender is a "good faith" lenders within the meaning of § 364(e) of the Bankruptcy Code, and is entitled to all of the protections afforded by that section to the extent any of the provision of the DIP Facility, the Interim Order, or the Final Order are hereafter modified reversed or modified on appeal.

**The Debtors Should be Authorized to Use the Cash Collateral**

73.     A debtor's use of estate property is governed by § 363 of the Bankruptcy Code. Specifically, § 363(c) of the Bankruptcy Code restricts a debtor's use of a secured creditor's cash collateral as follows: "The trustee may not use, sell, or lease cash collateral . . . unless – (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363]." 11 U.S.C. § 363(c)(2). Further, § 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the

trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."

74. For the reasons outlined below, the Debtors have satisfied the requirements of § 363(c)(2) and (e) of the Bankruptcy Code. Use of the Cash Collateral (in addition to the DIP Loans) will help to stave off an immediate and disorganized liquidation of the Debtors operations, provide the Debtors with access to much-needed liquidity, enable the Debtors' to complete the transfer of the Hospital's patients to other providers or discharge them, and otherwise successfully implement their Closure Plan. In addition, the use of Cash Collateral will permit the Debtors. Further, providing the Debtors with an immediate right to use the Cash Collateral will relieve the Debtors of the cost of borrowing additional amounts to replace that cash under the DIP Facility

## The Debtors Require Immediate Access to the DIP Loans and the Cash Collateral

75. Pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2), this Court may grant interim relief in respect of a motion filed pursuant to either §363(c) or §364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." In examining requests for interim relief under this rule, courts generally apply the same business judgment standard applicable to the debtors' other business decisions. See, e.g., Ames Dep't Stores, 115 B.R. at 36.

76. In the case at hand, the Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Debtors to use the Cash Collateral and to borrow the Interim DIP Loan in the amount of $[3,500,000] million, is not granted promptly after the Petition Date. As described above, the Debtors have an immediate need for access to liquidity to, among other things, implement their Closure Plan, continue to

provide adequate care to the North General's patients in advance of their transfer to other facilities or discharge, pay remaining employees, utilities, and other short-term costs pending the shut-down of the Hospital Services, and preserve the value of the Debtors' assets for the benefit of all creditors and other parties in interest.

77.     The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this district in similar circumstances. See, e.g., In re Tronox Inc., Case No. 09-10156 [Docket No. 46] (Bankr. S.D.N.Y. Jan. 13, 2009) (order approving postpetition financing on an interim basis); In re Lyondell Chem. Co., Case No. 09-10023 [Docket No. 79] (Bankr. S.D.N.Y. Jan. 8, 2009) (same); In re Lenox Sales, Inc., Case No. 08-14679 [Docket No. 34] (S.D.N.Y. Nov. 25, 2008) (same); In re Wellman, Inc., Case No. 08-10595 [Docket No. 60] (S.D.N.Y. Feb. 27, 2008) (same). Accordingly, for all of the reasons set forth above, prompt entry and effectiveness of the Interim Order is necessary to avert immediate and irreparable harm to the Debtors' estates and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2).

**The Debtors Request Scheduling of the Final Hearing**

78.     Bankruptcy Rule 4001 (c) permits a court to approve a debtor's request to incur postpetition financing during the 15-day period following the filing of a motion requesting such authorization the extent "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2) and (c)(2).

79.     In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. See, e.g., Simasko, 47 BR. at 449. After the 15-day period, a debtor is entitled to borrow those amounts that it believes prudent in the operation of its business. See, e.g., Simasko, 47 BR. at 449.

80.    Pursuant to Bankruptcy Rule 4001(b)(2) and 4001(c)(2), the Debtors request that this Court set a date, which is no sooner than 15 days after the date of this Motion and no later than 30 days after the entry of the Interim Order, to hold a hearing to consider entry of the Final Order. The Debtors also request authority to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, to entry of the Final Order, by first class mail upon the notice parties listed below, and further request that the Court deem service thereof sufficient notice of the hearing on the Final Order under Bankruptcy Rule 4001(c)(2).

## NOTICE

81.    Notice of this Motion has been given via facsimile, hand delivery, electronic mail, or overnight mail to: (a) the Office of the United States Trustee; (b) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (c) the Debtors' secured creditors on a consolidated basis; (d) counsel for the Debtors' proposed post-petition lender; (e) the Office of the United States Attorney; (f) the Dormitory Authority of the State of New York; (g) the Office of New York State Attorney General; (h) the New York State Department of Health; (i) the Internal Revenue Service, (j) the Department of Law, City of New York, and (k) all those who have entered an appearance in this case pursuant to Bankruptcy Rule 2002.

82.    No prior request for the relief sought in this Motion has been made to this or any other court in connection with these Chapter 11 cases.

83.    With the exception of the entities acknowledged herein, the Debtors are not aware of any entities holding liens against the Debtor's real property which is the subject of the Real Property Collateral or accounts receivable or other personal property.

## II.    CONCLUSION

**WHEREFORE**, the Debtors respectfully requests that the Court (a) enter an interim Order, substantially in the form annexed hereto as Exhibit A, and after a Final Hearing, the Final Order, which will be in substantially the form of the Interim Order, (i) authorizing the Debtors to incur Postpetition Financing on a secured basis and with administrative superpriority pursuant to the terms and conditions of the DIP Loan Documents and the Financing Orders; (ii) authorizing the Debtors to satisfy all Prepetition Debt by paying in full all amounts due with respect thereto on the Initial Funding Date; (iii) granting the Priming Lien, other Liens and a Superpriority Claims, (iv) modifying the automatic stay to allow certain actions with respect to the Debtors postpetition indebtedness, and (v) granting such other and further relief as the Court may deem just and proper.

Dated: New York, New York
      July 2, 2010

 

                  **WINDELS MARX LANE & MITTENDORF, LLP**

By: _____

            **Charles E. Simpson (CES 2130**
            **A Member of the Firm**

            156 West 56th Street
            New York, New York 10019
            (212) 237-1000

            Attorneys for North General Service Corporation,
            North General Hospital and General Diagnostic and
            Treatment Center, Debtors-in-Possession