**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
(212) 237-1000
Charles E. Simpson (csimpson@windelsmarx.com)

*Attorneys for North General Hospital, et al.,*
  *Debtors-in-Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re                          :

                           :          Chapter 11 Case

NORTH GENERAL HOSPITAL, *et al.*,   :          No. 10-13553 (SCC)

                           :

                Debtors.     :          **Jointly Administered**
-------------------------------------------------------------x

**RESPONSE OF
WINDELS MARX LANE & MITTENDORF LLP
<u>TO THE EXAMINER'S REPORT</u>**

TO:   **HONORABLE SHELLY C. CHAPMAN,
       UNITED STATES BANKRUPTCY JUDGE**

     Windels Marx Lane & Mittendorf, LLP (**"Windels Marx"** or **"Debtors' Counsel"**) respectfully submits the following response (the **"Response"**) to the Examiner's report (the **"Examiner's Report"**) filed by Richard Stern, Esq., as the "Examiner", and Hughes Hubbard & Reed, LLP (**"Hughes Hubbard"**), as the Examiner's counsel, in above-captioned chapter 11 cases (**"Chapter 11 cases"**).

**<u>PRELIMENARY STATEMENT</u>**

     The Examiner's Report, contains numerous factual inaccuracies, misstatements and incorrect assumptions therein that together form the basis of the conclusions reached by the Examiner.

     In fact, and contrary to the Examiner's conclusions:

(i)       Windels Marx did advise Mr. Maher as to which payments he was authorized to pay;

(ii)      Mr. Maher was informed of changes made to the Wages Motion (as defined herein), which changes excluded the payment of vacation benefits from the list of benefits the Debtors' were seeking authority to pay;

(iii)     Mr. Maher was aware that Debtors' Counsel did not file a Critical Vendor Motion (as defined herein) or an Insurance Motion (as defined herein);

(iv)     Mr. Maher represented to North General's management, the Board of Trustees and Debtors' Counsel that he had extensive experience in hospital bankruptcies and insolvencies; and

(v)      Windels Marx did not know nor could it have known that Mr. Maher was making unauthorized payments.

## RELEVANT BACKGROUND[1]

### A.    The Appointment of an Examiner

On January 4, 2011, the United States Trustee for Region 2 (the "**U.S. Trustee**") moved to have this Court appoint an Examiner in the Jointly Administered *North General Hospital, et al.*, Chapter 11 cases ("**Motion to Appoint an Examiner**") (Docket No. 419). The U.S. Trustee requested the appointment of an Examiner pursuant to §1104(c) of the Bankruptcy Code to investigate and to report on the following issues: (i) the amount and reason for the Unauthorized Payments, (ii) whether any causes of action arise from the Unauthorized Payments and (iii) whether the Debtors and their management are complying with all the requirements imposed upon debtors-in-possession. (Motion to Appoint an Examiner at ¶19).

While the Motion to Appoint an Examiner was not scheduled to be heard by the Court until January 20, 2011, at a hearing on January 4, 2011, Debtors' Counsel indicated its support

---

[1] Debtors' Counsel assumes general familiarity with the facts of these Chapter 11 cases, the alleged unauthorized payments (the "**Unauthorized Payments**") made by the Debtors' current management and the circumstances surrounding the appointment of the Examiner.

for and consented to the appointment of an Examiner. As such, the Court entered an Order on January 6, 2011 directing the appointment of an Examiner (the "**Appointment Order**") (Docket No.427) in these Chapter 11 cases.[2]

The Appointment Order directs among other things that:

> ...the Examiner shall conduct an investigation (the "Investigation") of: (i) the amounts, extent of, and rationale for the Debtors' post-petition payments on account of pre petition obligations (the "Payments"), (ii) whether the Payments were authorized pursuant to the Bankruptcy Code or any order entered in these cases, (iii) the role, including, without limitation the level of knowledge of (a) individual professionals of the Debtors, (b) members of the Debtors' current and former senior management and (c) members of the Debtors' Board of Directors, with respect to the payments, (vi) whether the Debtors' estates have any claims against any person or entity relating to the Payments, (v) the extent to which the Payments may be recoverable by the Debtors' estates, and (vi) other violations, if any, by the Debtors, the Debtors' management, the Debtors' Board of Directors, or the Debtors' professionals of their fiduciary duties in these cases.

(Appointment Order at 2).

On January 10, 2011, this Court entered an Order directing the Debtors to provide NHB and the U.S. Trustee with advance notice of all payments and prohibiting the Debtors from making any payments to any of its professionals without further Order of the Court (the "**NHB/U.S.T. Firewall**") (Docket No. 433).

The Court ordered that the Examiner conduct his investigation and prepare and file his preliminary Report no later than February 10, 2011, unless such deadline was extended by Order of the Court.

---

[2] On January 10, 2011, the Court entered an Order appointing Richard Stern, Esq. ("**Mr. Stern**" or the "**Examiner**") as the examiner to act in the Debtors' Chapter 11 cases (Docket No. 432).

On January 11, 2011, the Examiner filed an application seeking an order approving the retention and employment of Hughes Hubbard as his counsel *nunc pro tunc* as of January 10, 2011 (Docket No. 440). On January 31, 2011, the Examiner filed his Report (Docket No. 488).

On February 1, 2011, the Court entered an order approving the retention and employment of Hughes Hubbard as counsel to the Examiner *nunc pro tunc* as of January 10, 2011 (the "**Retention Order**"), (Docket No. 492); and

On February 10, 2011, the Examiner filed a letter that modified and supplemented the Report (Docket No. 522).

On February 14, 2010, Debtors' Counsel sent a letter (the "**February 14th Letter**") (Docket No. 533), to the Examiner indicating that the Examiner's Report was based primarily on the unsupported statements of a certain employee or employees of the Debtors. In the February 14th Letter, Debtors' Counsel stated that it was preparing a Response to the Examiner's Report wherein it would provide documentary evidence and sworn affidavits refuting the Examiner's findings and his assumptions and conclusions. Debtors' Counsel also specified that with the permission of the Debtors' Board of Trustees (the "**Board**"), it had retrieved all of the pertinent time entries, email communications and other documentary evidence that exists, and which corroborates the information contained in its Response. The February 14th Letter also indicated that the sworn statements from the Board Chairman and corporate officers of the Debtors, which it would be submitting also contradicts the Examiner's findings and conclusions. Most crucially, in this letter, Debtors' Counsel extended an invitation to the Examiner and his counsel to meet at Windels Marx's offices to review the above-mentioned documents and sworn statements. Regrettably, however, the Examiner did not take advantage of the opportunity to meet with Debtors' Counsel. A copy of the February 14th Letter is annexed hereto as <u>Exhibit 1</u>.

At a hearing on February 15, 2010 (the **"February 15th Hearing"**), the Court determined that the Examiner had fulfilled his responsibilities under the Appointment Order and should therefore be dismissed. A copy of the transcript of the February 15th Hearing is annexed hereto as Exhibit 2.

On February 16, 2011, the Court entered an Order terminating the appointment of and discharging the Examiner (the **"Discharge Order"**) (Docket No. 540). A copy of the Discharge Order is annexed hereto as Exhibit 3. Pursuant to the Discharge Order, the appointment of the Examiner was terminated and the Examiner and his attorneys were discharged from any further obligations, duties or responsibilities. The Order additionally provides that the Examiner and his attorneys were absolved from any "liability with respect to any act or omission, statement, or representation arising out of, relating to, or involving in any way, the Examiner's investigation, the Report, the supplement to the Report or other writing filed by the Examiner in connection with these cases, except in the case of gross negligence or willful misconduct". (Discharge Order at 2-3). Finally, the Discharge Order states that the Examiner and his attorneys are relieved from any formal or informal discovery process and no party-in-interest in these cases shall issue or serve any discovery request upon the Examiner or his professionals, except as authorized by the Court upon notice of motion to, and an opportunity to object by, the Examiner, the Debtors, the Creditors' Committee, the United States Trustee and other parties-in-interest. Id.

**B.      The Examiner's Purported Investigation**

Pursuant to the Appointment Order, Mr. Stern was given one (1) month to complete his investigation and submit his preliminary Report to the Court. On January 11, 2011, Debtors' Counsel (Charles E. Simpson, Derek Etheridge and Erin Zavalkoff- Babej) met with Mr. Stern and his associate, Christopher Gartman, Esq. (**"Mr. Gartman"**) at their offices for

approximately two (2) hours.[3]  During the course of this meeting, Debtors' Counsel (i) shared its views on the general relationship and exchange of information between Debtors' Counsel and Debtors' management, specifically, Mr. John P. Maher, MPH. ("**Mr. Maher**"),  North General Hospital's ("**North General**" or the "**Hospital**") current President and Chief Restructuring Officer, and discussed; (ii) the preparation of the first-day motions (the "**First-Day Pleadings**") filed in these Chapter 11 cases; (iii) the nature and extent of Mr. Maher's involvement in preparing the First-Day Pleadings; (iv) the decision not to file certain First-Day Pleadings on the advice of the U.S. Trustee and the content of discussions Debtors' Counsel had with Mr. Maher about its conversations with the U.S. Trustee, and the changes made to certain First-Day Pleadings as a result of such conversations; (v) Mr. Maher's general understanding of the limitations imposed on the Hospital as a result of the Hospital's status as a Debtor-in-Possession in these Chapter 11 cases; (vi) the circumstances surrounding the decision to exclude from the Employee Wage Motion (the "**Wages Motion**") payment of pre-petition vacation benefits; (vii) the circumstances surrounding the decision not to file a critical vendor motion ("**Critical Vendor Motion**"); (viii) the circumstances surrounding the Committee's discovery of the Unauthorized Payments; and (ix) Debtors' Counsel's knowledge that Mr. Maher was making certain Unauthorized Payments.

At this meeting, Debtors' Counsel offered to speak with the Chairman of North General's Board to obtain a waiver of attorney-client privilege so as to be able to share whatever information was necessary for the Examiner to conduct a thorough investigation of the relevant issues.  Debtors' Counsel also offered to facilitate meetings or conversations between the Examiner and any of the members of the Hospital's Board, including Rev. Dr. Calvin O. Butts

---

[3] Messrs. Stern and Gartman also met with Eric Huebscher of NHB Advisors, the financial advisors to the Official Committee of Unsecured Creditors, following their meeting with Debtors' Counsel.

III, Chairman of the Board of North General ("**Rev. Butts**"), Dr. Samuel J. Daniel, M.D., the

Hospital's former President and CEO ("**Dr. Daniel**"), Lisa M. Hackett, Esq., North General's

former Senior Counsel ("**Ms. Hackett**") and Ms. Renecia Lowery-Jeter, North General's former

Vice-President of Human Resources ("**Ms. Jeter**").

After the meeting, at the Examiner's request, Debtors' Counsel arranged for Mr. Maher

and Ms. Marianne Muise ("**Ms. Muise**") of Healthcare Management Solutions (**"HMS"**), who

has since 2009, and remains today very involved in the Debtors' financial affairs, to meet with

the Examiner.[4]

## DEBTORS' COUNSEL'S RESPONSE TO THE EXAMINER'S ALLEGATIONS

The Examiner's Report appears to be based primarily on the uncorroborated and

unsubstantiated statements of Mr. Maher (and to a certain extent Ms. Muise). Regrettably, at no

point following his meeting with Mr. Maher and Ms. Muise, did the Examiner speak with

Debtors' Counsel, the Hospital's Board or its former senior management to ascertain whether

any of these parties had information or documentation in their possession that would refute Mr.

Maher's statements, upon which the Examiner based his Report. As demonstrated herein,

substantial information and documentation exists refuting Mr. Maher's statements.

---

[4] Despite the express provisions of the Appointment Order, which states that the Examiner shall investigate "(iii) the role, including, without limitation the level of knowledge of …(b) members of the Debtors' current and former senior management and (c) members of the Debtors' Board of Directors, with respect to the payments, (vi) whether the Debtors' estates have any claims against any person or entity relating to the Payments, (v) the extent to which the Payments may be recoverable by the Debtors' estates, and (vi) other violations, if any, by the Debtors, the Debtors' management, the Debtors' Board of Directors, or the Debtors' professionals of their fiduciary duties in these cases," the Examiner never asked Debtors' Counsel to arrange for him to meet with any members of the Debtors' current and former senior management or members of the Debtors' Board. Neither did the Examiner, by his own initiative, choose or seek to speak with the Debtors' Board members or former management. As stated in the sworn affidavits of Rev. Dr. Calvin O. Butts III, Samuel J. Daniel M.D., Lisa M. Hackett and Renecia Lowery-Jeter annexed hereto as Exhibits "A" through "D", despite the Appointment Order, the Examiner never consulted any of them to discuss the Unauthorized Payments nor whether statements made by any of the parties referred to in the Examiner's Report were accurate.

## A. Mr. Maher Played a Significant Role in Preparing For North General's Bankruptcy Filings

Mr. Maher played a substantial and integral role in preparing for the Debtors' Chapter 11 cases. Contrary to the Examiner's Report, Debtors' Counsel submits that Mr. Maher was more involved in and had a better understanding of the bankruptcy process than most other similarly situated persons. Specifically, Mr. Maher and Ms. Hackett reviewed each of the Debtors' draft First-Day Pleadings prior to their filing and provided extensive comments thereto. Mr. Maher also reviewed drafts that were revised as per his own comments and the comments received by others and he reviewed each of the final drafts of the First-Day Pleadings before they were filed. He was most certainly aware of any changes that were made during the drafting process.[5]

As explained in the Affidavit of Lisa M. Hackett in Response to the Examiner's Report annexed hereto as Exhibit "A" (the "**Hackett Affidavit**"), "in the course of preparing the various applications and orders drafted by Windels Marx, Erin Zavalkoff-Babej and Derek Etheridge, associates at Windels Marx, would with respect to each application and order, advise me and Mr. Maher, who worked closely with Windels Marx to provide the relevant information pertaining to the Debtor, on the purpose of the application, the basis for the application in the Bankruptcy Code, the limitations and restrictions appurtenant thereto and the Court and Bankruptcy Code interpretations of the terminology used in the applications and orders". (Hackett Affidavit at ¶6).

---

[5] North General's pre-petition management and Mr. Maher also had the advice of Bankruptcy counsel in addition to Windels Marx, including: Epstein Becker, Manat Phelps, Cadwalader Wickersham & Taft and Togut, Segal & Segal, who also provided the Hospital's Board and Management, including Mr. Maher, advice concerning the procedures, process, restrictions and limitations applicable to a Debtor-in-Possession, especially with respect to the payment of pre-petition indebtedness. In addition, the Hospital's Board and management had extensive interactions with Mr. Ronald Gade, Alvarez & Marsal, Healthcare Industries Group , the Hospital's former restructuring advisors whose professionals additionally advised the Debtors as to the appropriateness of making certain payments in Bankruptcy. Mr. Louis Hernandez of Kurron Shares of America, the Hospital's former Chief Restructuring Advisors, also counseled the Debtors' Board and management, including Mr. Maher.

Debtors' Counsel' time records for the period leading up to the Petition Date, clearly

show the extent of Mr. Maher's involvement in the drafting process. Specifically, Mr. Simpson

notes in his time records the following:

| | | |
|---|---|---|
| 06/07/10 | Conversation with John Maher on first day orders. | (0.2 hrs) |
| 06/11/10 | Call from John Maher regarding Lora Lefebvre and Larry Volk calls and discussion of severance … | (0.5 hrs) |
| 06/16/10 | Call to John Maher regarding 1199 and FQHC, bumping and other rights, discussion of members, information to FQHC, etc. | (0.5 hrs) |
| 06/17/10 | Call to John Maher regarding salaries, discuss with B. Mercurio and E. Babej the rights of union members to severance, etc. | (0.3 hrs) |
| 06/22/10 | Call from John Maher regarding resolutions, severance, | (0.4 hrs) |
| 06/22/10 | Calls to and from John Maher regarding meeting with DASNY and DOH and discussion on budget items, ER, Rich Cook issues; discuss wage v. administrative claim, severance. | (0.5 hrs) |
| 06/27/10 | Call from John Maher regarding benefits and payment to union members during period. | (0.3 hrs) |
| 06/28/10 | Review Lefebvre email on severance, Paul Williams' response and discussion with John Maher regarding David Neier's statement. | (0.3 hrs) |
| 06/28/10 | Call from John Maher and conference call with Rev. Butts and Board regarding advice on termination notices under WARN, severance and salaries, etc., | (1.3 hrs) |
| 06/28/10 | Call from John Maher regarding vacation pay, etc. and his conversation with Lefebvre. | (0.2 hrs) |

Additionally, Mr. Etheridge, whose Affidavit in Response to the Examiner's Report is

annexed hereto as Exhibit "E" (the **"Etheridge Affidavit"**), notes in his time records for that

prepetition period several instances where he or other Windels Marx's associates consulted with

Mr. Maher regarding the preparation of the First-Day Pleadings, or where Mr. Maher met with

Debtors' Counsel specifically to review each of the First-Day Pleadings.

| 05/13/10 | Conference with C. Simpson regarding review of drafted first day motions and need for same to be updated by John Maher. | (0.5 hrs) |
|---|---|---|
| 05/27/10 | Conference call with C. Simpson and John Maher regarding Maher's review of first day motions and orders and protocol for making revisions and inserting information. | (0.6 hrs) |
| 06/07/10 | Prepare with J. LeVeaux for meeting with John Maher to view and discuss first day motions. | (1.5 hrs) |
| 06/07/10 | Meeting in WML&M office with John Maher, J. LeVeaux, Babej to discuss content of first day orders. | (5.5 hrs) |
| 06/08/10 | Email to E. Babej forwarding first day motions revised by John Maher. | (0.2 hrs) |
| 06/08/10 | Conference with E. Babej regarding implementation of John Maher's revisions and discuss Maher's comments and suggested language edits. | (2.1 hrs) |
| 06/10/10 | Email from E. Babej listing information needed from John Maher in order to complete; critical vendor motion, joint administration motion, prepetition wages motion, ordinary course and administrative priority motion, professional compensation motion, utilities motion, cash management motion, worker's comp motion, prepetition sales tax motion; conference with J. LeVeaux regarding same. | (0.8 hrs) |
| 06/10/10 | Meeting with John Maher to discuss remaining information required to complete various first day motions and discuss meeting scheduled for 6/11/10. | (0.3 hrs) |
| 06/10/10 | Email E. Babej and discuss with J. LeVeaux need for meeting with John Maher to discuss open items. | (0.2 hrs) |
| 06/11/10 | Conference with E. Babej on mechanics of 3 tiered payroll system and language regarding same inserted | |

|          |                                                                                                                  |            |
|----------|------------------------------------------------------------------------------------------------------------------|------------|
|          | into prepetition wage motion by John Maher.                                                                      | (0.7 hrs)  |
| 06/18/10 | Conference with J. LeVeaux regarding affidavit of Dr Daniel in support of first day motions and information to be provided by John Maher to be included therein. |            |
| 06/22/10 | ….Message from C. Simpson regarding conference call scheduled for 6/22 with John Maher to discuss completion of first day motions. | (0.1 hrs)  |
| 06/23/10 | Conference with John Maher regarding revisions for first day motions, need to retrieve certain information to insert in motion. | (0.3 hrs)  |
| 06/24/10 | Receive and review email from M. Almonte to John Maher forwarding remaining motions that require updating by Maher. | (0.1 hrs)  |
| 06/24/10 | Conference with E. Babej regarding remaining first day motions to be forwarded to John Maher for review and comment. | (0.6 hrs)  |
| 06/27/10 | Review and discuss changes to Dr. Daniel affidavit in support of first day motions with John Maher. | (0.9 hrs)  |
| 06/28/10 | Conference call with E. Babej and John Maher regarding revisions to latest version of Dr. Daniel's affidavit in support of first day motions, DIP financing motion and DIP Term Sheet. | (0.6 hrs)  |
| 06/30/10 | Conference call with E. Babej, John Maher and Maryann Muise regarding prepetition wage motion. | (0.3 hrs)  |

Ms. Zavalkoff-Babej, whose Affirmation in Response to the Examiner's Report is annexed hereto as <u>Exhibit "F"</u> (the **"Babej Affirmation"**), and who worked extensively with Mr. Maher in finalizing the draft First-Day Pleadings, described Mr. Maher' involvement in preparing for North General's Chapter 11 filing in her time records, as follows:

|          |                                                                                                                  |            |
|----------|------------------------------------------------------------------------------------------------------------------|------------|
| 06/07/10 | Meeting with John Maher re NGH First Day Motions etc.. Discuss next steps. Commence Working on revising NGH Motions as per comments and information received from NGH… | (3.8 hrs)  |

| 06/08/10 | Work on revising NGH First Day Motions as per comments and information received from John Maher. Discussions & Correspondence with internal NGH Team re same | (5.3 hrs) |
|---|---|---|
| 06/09/10 | Work on revising NGH First Day Motions as per comments and information received from John Maher. Discussions & Correspondence with internal NGH Team | (7.8 hrs) |
| 06/22/10 | Research re notification under COBRA for loss of benefits. Misc. research re CBAs . Calls with J. Maher re same. Meeting with J. LeVeaux re status of all WARN, CBA, benefits and pension issues. | (3.5 hrs) |
| 06/11/10 | Work on revising NGH First Day Motions as per comments and information received from John Maher. Discussions & Correspondence with internal NGH Team re same. Create status chart of all relevant documents to be completed, status of documents and missing information needed from NGH to complete motions. Review bank account information. Review misc. agreements sent by NGH legal counsel. | (6.8 hrs) |
| 06/30/10 | Work on preparation for Filing, Work on revisions to First Day Motions, Orders and Affidavit. Meetings with D.E. re same. Calls with J. Maher and M. Muise re wage payment motion. Work on revising DIP Motion based on DIP Order received from DASNY's counsel. Revised Closure Motion. Communications with U.S. Trustee re first day motions. Obtain information from virtual data site. | (11.2 hrs) |
| 07/01/10 | Preparation for North General Chapter 11 filing. Work on revising motions, orders, affidavit in support of first day motions, several meetings with D.E. re changes to motion, affidavit etc.. Review DIP Agreement and DIP Order from DASNY's counsel. Communications with J. Maher re information needed for motions... | (15.3 hrs) |

Corporate associate, Jeanine Margiano noted in her time records the following, which time entry also demonstrates that Mr. Maher was involved in the discussions relating to the issues of severance.

| 06/23/10 | Conference with Ms. Babej regarding WARN Act notices, whether notice has to be given to pension recipients and terminated employees, letter to elected officials; conference with Mssrs. Maher and Simpson regarding same, and issues related to severance payments, retention of employees in the context of administrative versus wage claims.... | (7.9 hrs) |
|---|---|---|

Mr. Maher's awareness and understanding of the contents of each of the First-Day Pleadings is undeniable because, in addition to being in constant communication with Debtors' Counsel regarding the substance of each of the First-Day Pleadings, Mr. Maher spent several days leading up to the filing of the Chapter 11 cases working together with Debtors' Counsel at Windels Marx's offices to finalize the documents. As noted in the above-described time records, Mr. Maher participated in several drafting sessions with Debtors' Counsel. On several occasions prior to the Debtors' filing, Mr. Maher spent substantial time in a conference room at Windels Marx so as to be available to go through each of the First-Day Pleadings and draft orders. (Etheridge Affidavit at ¶6, Babej Affirmation at ¶ 7 ).

Initially, Debtors' Counsel prepared more than twenty (20) First-Day Pleadings. However, upon consultation with the U.S. Trustee, it was decided that not all of these First-Day Pleadings were necessary to present to the Court at the first-day hearings. (Etheridge Affidavit at ¶8, Babej Affirmation at ¶11). This was directly communicated to Mr. Maher. Also, as Mr. Maher was working with Debtors' Counsel at its offices in the days leading up to the bankruptcy filing, Mr. Maher was certainly aware of which First-Day Pleadings would be presented for approval and which would not be presented at the Debtors' first-day hearings. Moreover, Mr. Maher attended the first-day hearings before the Court, was presented with a binder of the First-Day Pleadings at the hearing, and was most certainly cognizant of the fact through conversations

with Debtors' Counsel that not all of the First-Day Pleadings prepared by Debtors' Counsel, were initially presented to the Court for approval.

**B.**     **Mr. Maher Was Fully Aware of the Decision to Exclude Vacation Payments from the Wages Motion**

As discussed in the Certification of Rev. Dr. Calvin O. Butts III, Chairman of the Board in Response to the Examiner's Report annexed hereto as <u>Exhibit "B"</u> (the "**Butts Certification**"), because the Board was concerned about the payments of wages, salary, vacation and severance due to both union and non-union employees, questions with respect to payment of salaries, vacation, severance and benefits arose on numerous occasions at meetings of the Board, which took place both pre-petition and post-petition, executive session meetings and meetings of professionals with the Board with regard to the Hospital's restructuring efforts. At the meetings that Mr. Simpson attended, and as Rev. Butts acknowledged in his certification, "Mr. Simpson advised the Board that pre-petition payments could be made to the Hospital's former employees, but only subject to the terms and conditions of a so-called "Wage Order" which was entered by the Bankruptcy Court and, which permitted such payments subject to statutory limitations on payment of wages, salary and severance but that employee reimbursements, accrued sick time and vacation pay that had accrued pre-petition could not be paid. Mr. Simpson also advised the Board and management that certain payments which could not be paid immediately after the filing of the Bankruptcy petition would be paid as part of the Hospital's Plan of Liquidation". (Butts Certification at ¶4).

According to the Examiner's Report, Mr. Maher claimed to have never been apprised of the decision to exclude vacation benefits from the Wages Motion (Examiner's Report at 19). ("According to Mr. Maher, Windels Marx did not advise the Debtors that certain categories of wage-related items that were previously in drafts of the motion had been deleted from the Wage

Motion, as filed). According to Mr. Maher, he made a significant number of the employee-related payments at issue because he thought the Wage Order, as entered, approved the draft Wage Motion that he had reviewed and approved, which draft Mr. Maher indicated contained language including vacation benefits as part of the benefits the Debtors' were seeking approval to pay (Examiner's Report at 19). This statement is absolutely false.

Attached to the Examiner's Report as Exhibit H is version #2 of the Wages Motion, which version does not contain the express exclusion of vacation benefits, it would thus appear from the Examiner's Report that version #2 of the Wages Motion was the last draft of this motion that Mr. Maher reviewed. Further according to the Examiner, Debtors' Counsel clandestinely excluded vacation benefits from the Wages Motion in a third version, which it denied Mr. Maher the opportunity to review.

The truth is different. Annexed hereto as Exhibit 4 is an email from Debtors' Counsel to Mr. Maher dated June 29, 2010, three (3) days before the Wages Motion was filed. Attached to this email is version #3 of the Wages Motion, which contains the following language at paragraph 20: "The Debtors are not seeking authorization to pay accrued vacation time to employees that leave the Debtors during these Chapter 11 cases". As the vast majority of the Debtors' employees were terminated after the Petition Date, most of the Debtors' employees were not entitled to prepetition accrued vacation pursuant to the terms of the Wages Motion. Therefore, prior to the Wages Motion being filed, Mr. Maher was specifically made aware that vacation benefits could not be paid to former employees.

In addition, on June 16, 2010, almost two (2) weeks before submission of the Wages Motion, Debtors' Counsel met face-to-face with North General's management specifically to discuss issues of severance and vacation. On that date, Mr. Simpson traveled to the Hospital and

spent over four (4) hours with Ms. Hackett and Ms. Jeter discussing the Hospital's obligations and responsibilities as a Debtor-in-Possession as well as the status of employees, severance, etc.[6]

Furthermore, shortly before the filing, Debtors' Counsel reviewed the final version of the Wages Motion with the U.S Trustee who indicated that she would object to the Hospital's payment of pre-petition vacation benefits, despite the fact that DASNY, who was funding the Hospital's Chapter 11 cases, did not object to the Hospital making these payments, which payments were included as part of the Debtors' approved budget.

Because Debtors' Counsel felt that any objection by the U.S. Trustee to the Debtors' inclusion of vacation benefits in the Wages Motion could be overruled by the Court because of DASNY's position on the making of such payments, Debtors' Counsel telephoned Mr. Maher to review the U.S. Trustee's comments and to go over the Wages Motion line by line. During that telephone conversation, on which Mr. Simpson, Mr. Etheridge and Ms. Zavalkoff-Babej were present, Debtors' Counsel explained to Mr. Maher what the U.S. Trustee had stated and counseled Mr. Maher that should the Debtors' wish to submit the Wages Motion without removing the request to pay vacation benefits to former employees, that it was possible that the Court would allow such payments over the objection of the U.S. Trustee. In response, Mr. Maher stated that he could live with the restrictions requested by the U.S. Trustee on the payment of vacation benefits and approved the language in the final Wages Motion.

Following the Petition Date, Debtors' Counsel continued to discuss the issues of severance, vacation and other benefits with North General's Board, its senior management and Mr. Maher. Many of these conversations concerned Debtors' senior management's (specifically Ms. Hackett and Ms. Jeter) concern that Mr. Maher was making payments in contravention of this Court's direct orders.

---

[6] Debtors' Counsel's time records are annexed to their monthly fee statements, which were filed with this Court.

As detailed by Ms. Hackett in her Affidavit, on numerous occasions she advised Mr. Maher that certain payments he wanted to make to employees and/or vendors or medical providers were prohibited by the Court's Orders. When she would advise Debtors' Counsel of the prohibited payments, Debtors' Counsel would phone Mr. Maher or travel to the Hospital to direct that Mr. Maher cease making such payments (Hackett Affidavit ¶8). Moreover, as Dr. Daniel acknowledges in his Affidavit, almost immediately after the Court entered Orders authorizing the various retentions and payments, Ms. Hackett and Ms. Jeter complained to him about Mr. Maher's failure and refusal to comply with the Court's orders and the favoritism Mr. Maher exhibited from vendor to vendor and employee to employee (Affidavit of Samuel J. Daniel M.D. in Response to the Examiner's Report annexed hereto as Exhibit C (the "Daniel Affidavit at ¶8)). (Affidavit of Renecia Lowery-Jeter in Response to the Examiner's Report annexed hereto as Exhibit D ("Jeter Affidavit" at ¶7)).

Following are certain of Debtors' Counsel's time records, which evidence that much time was spent discussing employee-related issues with Mr. Maher and his senior management team.

Charles Simpson

| 07/09/10 | Review email and questions to Renecia Jeter regarding WARN notices, wages, vacation, holiday and severance pay. |
| 07/13/10 | Review §503(c) of the Bankruptcy Code regarding severance and retention payments with D. Etheridge regarding Dr. Daniel, Maher, Kirton, Hackett and Jeter. |
| 07/22/10 | Call from Lisa Hackett and discussion with her and Renecia Jeter regarding hospital policy, budget, retention of labor counsel, pension processing, Milliman, etc. |

<u>Derek Etheridge</u>

07/13/10       Call John Maher to discuss Section 503(c) of the
               Bankruptcy Code and restrictions regarding executive
               compensation thereunder.

<u>Erin Zavalkoff-Babej</u>

07/06/10       Conference calls with NGH regarding employee and
               benefits issues (0.5); review WARN Notices and misc
               documents regarding same (0.9).

07/07/10       Conferences with RLJ at NGH regarding
               employee-related issues (0.6); review documents and
               WARN Notices regarding same (0.6).

07/12/10       Call from Renecia Jeter regarding Department of Labor
               and pension benefits.

**Mr. Maher was Aware of the Cap Imposed by § 507(a)(4) and Understood
that He was Unable to Make Payments In Excess of the Capped Amount**

Any notion that Mr. Maher was not aware of the statutory limitations imposed by

(i) §507(a)(4) for the priority payment of prepetition wages, salaries, commissions including

vacation, severance and sick leave earned within 180 days of the petition date and by (ii)

§507(a)(5) of the Bankruptcy Code for contributions to employee benefit plans arising from

services rendered within 180 days of the petition date is wholly inaccurate.

Clearly demonstrating Mr. Maher's knowledge and understanding on the cap placed on

prepetition wages, severance and benefit contributions is an email dated June 25, 2010, in which

Mr. Maher requests that Ms. Hackett provide him with "…all the contracts for individuals on

payroll, such as Daniel, Maher, Jeter, Kirton, Hackett, anyone who exceeds the 10K limit and

any other with a severance obligation….".[7] (Email Dated June 25, 2010 annexed hereto as

<u>Exhibit 5</u>).

---

[7] The "10K limit" Maher is referring to is the former statutory priority limit under §507(a)(4). While the former statutory priority limit was actually $10,950.00, Maher had, on occasion, casually referred to the amount as 10K. It

Further demonstrating North General's management's understanding of the existence of statutory cap under §507 of the Bankruptcy Code is the following email exchange between Debtors' Counsel , Mr. Maher, Ms. Muise , which took place on June 30, 2010:

First, Debtors' Counsel sent the following suggested language for inclusion the Wages Motion.

> The Debtors believe that the Employee Obligations qualify as priority claims under section 507(a)(4). The Debtors submit, however, that to the extent any Employee is owed in excess of $10,950 on account of Employee Obligations for Prepetition Compensation, payment of such amounts is necessary and appropriate and is authorized under both section 363(b) and section 105(a) pursuant to the "necessity of payment" doctrine, which "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor."

Later on June 30, 2010, Ms. Muise responded to Debtors' Counsel's email as follows:

> "..we used the last payroll to estimate the number of employees that will/could exceed $10,950 in prepetition wages and vacation accrual (this does not include benefits, ie, statutory taxes or health ins etc). (the payrolls that will be paid next week are not completed yet, so I don't have the exact amounts due each employee yet) there are 131 employees (which include physicians and Sr Management) that exceed $10,950 for prepetition wages and vacation accrual. there are another 100 employees that exceed $9,000 but are less than $10,950(I wanted to see how many were close, in the event the actual payroll is a little higher than the one that we used as a basis to estimate wages and vacation accrual) prepetition wages include the Payrolls being paid on Friday 7/2, 7/9 and 7/16

> (Email attached hereto as Exhibit "6")

---

should also be noted that Maher's specific reference to the statutory priority limit indicates that he was made aware that a limit did, in fact, exist.

Debtors' Counsel's time entries from the days just prior to the Petition Date also evidence

that North General's management, and in particular Mr. Maher, was aware of the statutory cap

under §507(a)(4) and(5) of the Bankruptcy Code.

| | |
|---|---|
| 06/10/10 | Conference with C. Simpson and John Maher regarding payments due to 1199 for accrued benefits and research regarding chapter 11 filing on same; review CBA. |
| 06/26/10 | Email from Lisa Hackett regarding document forwarded to WML&M and that no other agreements exist with severance or $10,000 wage claim obligations. |
| 06/26/10 | Review Lisa Hackett email and John Maher response regarding contracts with employees that exceed the $10,000 wage claim limit and severance obligation; discuss with Maher |

Mr. Maher worked extensively to assist Debtors' Counsel in preparing the Affidavit of

Dr. Daniel in support of the Debtors' First Day Motions. In discussing the Debtors' Wages

Motion, Dr. Daniel makes the following statement, "The payroll and Employee Benefits for the

employees for the above-mentioned periods is less than $10,950.00 for each employee in nearly

all circumstances. In the event that certain of the Debtors' employees seek payment of salary or

Employee Benefits in excess of the $10,950.00 statutory cap, the Debtors' will address such

requests with an additional motion after consultation with the Office of the United States Trustee

and counsel to the committee of unsecured creditors, if any. ("Daniel Affidavit in Support of

Debtors' First-Day Motions" at Docket No. 2).

Time records prepared by Debtors' Counsel for that period also show Mr. Maher's

involvement in preparing the Daniel Affidavit in Support of the Debtors' First-Day Motions. On

June 23, 2010, Mr. Etheridge wrote in his time records "Conference with E. Babej to review

John Maher's revisions and supplemental information to Dr. Daniel's Affidavit in Support of

First Day Motions." On June 8, 2010, Mr. Etheridge indicated that he had a "conference with J. LeVeaux regarding affidavit of Dr. Daniel in support of first day motions and information to be provided by John Maher to be included therein". On June 27, 2010, Mr. Etheridge recorded that he reviewed and discussed changes to Dr. Daniel's affidavit in support of first day motions with John Maher and on June 28, 2010 he had a conference call with E. Babej and John Maher regarding revisions to latest version of Dr. Daniel's affidavit in support of first day motions, DIP financing motion and DIP Term Sheet. Finally in a time record dated June 30, 2010, Mr. Etheridge indicated that he reviewed Dr. Daniel's affidavit for references to § 507(a)(4) and emailed E. Babej regarding need to revise language to reflect that in the prepetition wage motion.

Additionally, each version of the Wages Motion reviewed by Mr. Maher including the draft he submitted to the Examiner contained language about the statutory cap.[8]

## C.  Mr. Maher's Agreement With the Union

On February 18, 2011, Mr. Maher telephoned Debtors' Counsel and explained that the Hospital had made approximately $600,000 in COBRA payments without the knowledge or advice of Debtors' Counsel on behalf of former employees, a substantial portion of which the Hospital never sought to recover from the employees. Ordinarily, when an employee is terminated, the former employer will make the monthly COBRA payment on behalf of the former employee and then recover the full amount from that former employee. In that conversation, Mr. Maher explained to Mr. Simpson and Ms. Zavalkoff-Babej that he was unaware that the Hospital had not sought to recover the amount it had expended from the terminated employees, and that this error was recently discovered by NHB, the Committee's financial advisors. Mr. Maher could not state with certainty how much the Hospital had paid out

---

[8] Rev. Butts, Ms. Jeter, Ms. Hackett and Dr. Daniel each confirmed in their respective affidavits that the payment and any entitlements was subject to a statutory cap (which Debtors' counsel discovered had recently been increased to $11,725.00.) (Jeter Affidavit at ¶6, Hackett Affidavit at ¶8, Daniel Affidavit at ¶6, Butts Certification at ¶4).

for COBRA that it did not recover. In this regard, as explained by Ms. Jeter in her Affidavit, Mr. Maher was the one who directed what payments were to be made, on whose behalf and if such payments were to be recovered from a third-party. (Jeter Affidavit at ¶8-9).

Contrary to statements made by Mr. Maher, in her affidavit, Ms. Jeter stated that Mr. Maher took it upon himself to negotiate an agreement with the union 1199/SEIU to pay COBRA benefits for terminated union employees for a period of six (6) months in order to appease the union employees and reduce or prevent their further picketing (Jeter Affidavit at 8-9). In summary, Mr. Maher, without seeking this Court's authority and without discussing or disclosing the arrangement he negotiated with the union with Debtors' Counsel, simply agreed that the Hospital would make the COBRA payments for terminated union employees and that it would not seek to recover the amounts expended. (Jeter Affidavit at ¶8-9).

**D.    Improper Payments Made to Senior Management**

As set forth in her affidavit, Ms. Jeter had no authority to sign checks on the Hospital's behalf and could only submit and approve check requests, Mr. Maher was the individual charged with directing who should be paid, what and when. In this regard, and according to Ms. Jeter, Mr. Maher had comprehensive and almost total "power of the purse" (Jeter Affidavit at ¶10).

In this regard, Ms. Jeter was directed by Mr. Maher to approve a number of payments to senior management, which payments were neither authorized under the Bankruptcy Code nor by Order of this Court. (Jeter Affidavit at ¶11). Among such payments was the payment of Forty Three Thousand ($43,000.00) Dollars pre-petition vacation to Dr. Daniel, the Hospital's former President and CEO. More crucially, in total violation of the Wages Order, and without disclosing anything to Windels Marx, Mr. Maher directed Ms. Jeter to (i) cause Dr. Daniel to be paid Ninety-Two Thousand ($92,000.00) Dollars from the Hospital's 457(b) Deferred

Compensation Plan and (ii) sign, but not date, paperwork necessary to process a payment to Mr. Maher from Mutual of America for amounts he believed he was due under the Deferred Compensation Plan.[9] As Ms. Jeter states in her affidavit, it was her understanding that Mr. Maher would fill in the date at some point in the future and process a check to himself from Mutual of America. (Jeter Affidavit at ¶10-12).

## E.     The Retention of Cushman Wakefield Without Court Approval

Clearly evidencing Mr. Maher's pattern of acting on his own volition, without consulting Debtors' Counsel so as to ensure that Debtors' Counsel sought the requisite Court approval is the following example. On July 29, 2010, Mr. Maher, on behalf of North General Hospital, entered into an agreement with Cushman & Wakefield, Inc. ("**C&W**") for the provision of appraisal services. A copy of the Letter of Engagement Annexed hereto as <u>Exhibit 7</u>. According to the Letter of Engagement, C&W was tasked with appraising the market value of the "Fee Simple Interest based on the properties' highest and best use and to estimate the going concern and alternative medical use value for the Hospital building." Letter of Engagement at 1. The two properties to be appraised were identified as (i) North General Hospital, a 9-story 280,000 square foot building with approximately 200 beds, and (ii) the Annex Building, a 30,000 square foot medical office building.

Under § 327(a) of the Bankruptcy Code, "a trustee, with the court's approval, may employ one of more attorneys, accountants, appraisers…." However, because Mr. Maher entered into this agreement with C&W without consulting Debtors' Counsel, Debtors' Counsel

---

[9] It should also be noted that while Mr. Maher processed his change of title with the Human Resources Department ("**HR**"), upon taking over Dr Daniel's position as President and Chief Restructuring Officer of North General, he never processed his raise through HR. Despite efforts to locate the paperwork authorizing his increase in salary, the HR department was unable to find anything evidencing the approval of Mr. Maher's salary increase. Upon information and belief, Mr. Maher processed his raised on the finance side, bypassing the HR department, which was the department, charged with salary-related issues.

was not in a position to advise Mr. Maher, and to ensure that the requirements set forth in §

327(a) of the Bankruptcy Code for retaining C&W as the Debtors' appraisers were satisfied.

**F.     Mr. Maher's Unauthorized Payment of the Examiner's Fees**

One of the most glaring examples of Mr. Maher's general disregard of the role of

Debtors' Counsel to provide the Debtors' with the requisite legal advice to properly navigate

these Chapter 11 cases, is his recent payment of 100% of the Examiner and Hughes Hubbard's

requested fees and expenses, which fees and expenses have not been approved by Order of this

Court.

At a February 15th Hearing, the Examiner indicated that he and his firm had accrued fees

and expenses well in excess of the $100,000 cap set by Order of the Court and that, without

taking into account certain cuts, were probably at about $150,000. See Exhibit 2 Transcript at 26:

21-25, 27:1-4).  In response, the Court directed the Examiner to "put in a fee application with

your actual fees and expenses and we can have a discussion with all parties as to whether or not

we can get relief from that cap…" Transcript at 27: 8-11.[10]

The Discharge Order provided that "the Examiner and Hughes Hubbard shall submit by

no later than March 1, 2011, an application for award of compensation for fees and

reimbursement of expenses incurred through and including February 15, 2011, which application

may include fees and expenses incurred in connection with its preparation and filing and the

Examiner and Hughes Hubbard shall not be required to file interim fee statements." See Exhibit

3 Discharge Order at 2).

---

[10] The Court, upon reaching its decision to discharge the Examiner, reiterated its position on the Examiner's fee and stated as follows: "Mr. Stern, you should submit a fee application reflecting all of the time and fees- fees and expenses that you have incurred.  I know you're cognizant of the cap but put it in and let's see if there's a basis for relief from the cap." (Transcript at 30: 22-25; 31: 1-5).

On February 28, 2011, the Examiner filed the "First and Final Application of Richard Stern, Examiner, and Hughes Hubbard & Reed LLP, Counsel to the Examiner for Compensation for Services Rendered and Reimbursement of Expenses Incurred during the Period from January 10, 2011 to February 15, 2011 (the "**Examiner's Fee Application**") (Docket No. 559). The Examiner's Fee Application calls for payment of compensation for services rendered in the amount of $144,815.00 and expenses in the amount of $31.80.

The Examiner's Fee Application is scheduled to be heard on Thursday, March 31, 2010 at 10:00 a.m. (prevailing eastern time) with objections to the fee application, if any, due on Thursday March 24, 2010 at 5:00 p.m. (prevailing eastern time).

Despite Mr. Maher's (i) understanding of the process for the payment of professional fees, which process he has been party to countless times over the course of these Chapter 11 cases; (ii) the NHB/ U.S.T. Firewall put in place by this Court's January 10, 2011 Order prohibiting payments without prior notice to NHB and the U.S. Trustee, (iii) attendance at the February 15th Hearing, during which the Court advised the Examiner to "put in a fee application with your actual fees and expenses and we can have a discussion with all parties as to whether or not we can get relief from that cap…" (Transcript at 27: 8-11) and (iii) Mr. Maher's review of the Examiner's Fee Application, which application clearly indicated that (a) parties have until March 24th at 5:00 p.m. to object to the Examiner's fees and expenses and (b) the Examiner's fees and expenses were to be considered and approved at a hearing scheduled for March 31st, Mr. Maher made the unilateral decision (without mentioning anything to Debtors' Counsel) to pay the Examiner and Hughes Hubbard 100% of their unapproved fees and expenses (a total of $144,846.80).

In connection therewith, on March 14, 2011, the Examiner sent a letter to Mr. Maher (copying the U.S. Trustee, Committee Counsel, Debtors' Counsel and Garfunkel & Wild, P.C.) enclosing the check of $144,856.80, which letter stated that the check was being returned because "our fees have not yet been approved by the Bankruptcy court. A copy of the March 14th Letter from the Examiner is annexed hereto as Exhibit 8.

By making this payment, which was neither made in accordance with any established Court Order nor approved by the Court at a hearing to approve the Examiner's Fee Application and after the expiration of the requisite objection period, the Examiner should have been alerted to the possibility that Mr. Maher may have been acting unilaterally, and that maybe this payment was not the only payment Mr. Maher decided to make without consulting Debtors' Counsel.

**G.    Mr. Maher Unequivocally Understood, Which Payments Were Authorized By the Bankruptcy Court and Which Were Not Authorized**

As is customary in larger chapter 11 cases, the claims and noticing agent appointed by order of the Court acts as a liaison between the Debtors and their various creditor constituencies. By Order, dated August 3, 2010, Epiq Bankruptcy Solutions was appointed the Debtors' claims and noticing agent. (Docket No 107).

Just prior to the Petition Date, Epiq sought the Debtors cooperation in preparing what it termed a call center script (the "**Call Center Script**"). The Call Center Script, once completed, would be used by Epiq's employees in responding to questions posed by the Debtors' various creditor constituencies who would be calling Epiq seeking information about the Debtors' Chapter 11 cases. As part of the Call Center Script, Epiq requested responses to a list of approximately fifty-seven (57) "Frequently Asked Questions" ("**FAQ's**") regarding every aspect of the Debtors' cases.

In order to respond most thoroughly to the FAQs, which questions concerned, among other things: (i) the post-petition treatment of employees, vendors, suppliers, retirees and others and (ii) how the Debtors would address outstanding pre-petition obligations with the above-mentioned constituencies, Debtors' Counsel requested input from Mr. Maher.

Soon after the Petition Date, concerned that the Epiq call center would begin receiving calls from parties-in-interest, Epiq pressed Debtors' Counsel to return the completed Call Center Script to it as soon as possible. In order to expedite the process, Debtors' Counsel prepared draft responses to the FAQs and forwarded them to Mr. Maher for his comment.

According to Mr. Etheridge, on August 9, 2010, Maher sent an email to Ms. Zavalkoff-Babej and Mr. Etheridge forwarding the Call Center Script, which included revisions made by Ms. Zavalkoff-Babej. Mr. Maher stated in his forwarding email that we should "note the language around benefits the Hospital is not paying benefits on paid non-worked time, *i.e.*, vacation, severance, eta...after termination date (Etheridge Affidavit at ¶26), (Babej Affirmation at ¶ 20 ).

Finally on August 12, 2010, Mr. Maher sent an email to Debtors' Counsel attaching a copy of the Call Center Script with Mr. Maher's comments and suggestions in track changes (The email Mr. Maher sent to Debtors' Counsel attaching the Call Center Script with his comments in track changes is annexed hereto as <u>Exhibit 9</u>). Mr. Maher's track changes and comments to the Call Center Script clearly establish that Mr. Maher was aware of what payments he was authorized to make and what payments were prohibited. (Etheridge Affidavit at ¶27) (Babej Affirmation at ¶ 21).

In this regard, on August 13, 2010, Mr. Etheridge met with Mr. Maher at North General to discuss several matters, one of which was the finalization of the Call Center Script. At this

meeting, in Debtors' Counsel's presence, Mr. Maher reviewed each of the FAQs and the draft responses contained in the Call Center Script. At no time did Mr. Maher state that he was unclear as to which creditor constituencies would be entitled to receive payments on prepetition invoices and in what amounts.

Additionally, with respect to the question inquiring whether employees will continue to receive disability, holiday and vacation pay, the specific comment made to the question by Maher and noted on the draft Call Center Script was "No." (Etheridge Affidavit at ¶28).

**H.      Debtors' Response to the Committee's Allegations of Unauthorized Payments Doesn't Suggest Debtors' Counsel Failed to Provide the Debtors' with the Requisite Advice**

On January 4, 2011, the Debtors' filed a Response to the Official Committee of Unsecured Creditors' Allegations of Unauthorized Payments of Pre-Petition Obligations (Docket No. 420) ("**Debtors' Response to Alleged Unauthorized Payments**").

Attached as Exhibit "A" to the Debtors' Response to Alleged Unauthorized Payments, was a chart prepared by Mr. Maher entitled "Analysis of Post-Petition Payments made for Pre-Petition Obligations (the "**Unauthorized Payment Chart**"). This Unauthorized Payment Chart listed each challenged payment by "Vendor Name" with the "Method of Payment, "Payment Date", "Potential Recovery" or amount of payment, "Payment Classification" and "Debtors Notes/Comments" with respect to the basis of each disbursement.

In the "Debtors' Notes/Comments" section of the Unauthorized Payment Chart, Mr. Maher indicated that he relied on the following Orders of this Court and the DIP Budget approved by Order of this Court as authority for the disbursements challenged by the Committee:

- Order (A) Authorizing But Not Requiring Payment of Pre-Petition Wages and Related Obligations; (B) Authorizing Payment of Obligations Related to Medical Providers; and (C) Authorizing and Directing Banks to Honor Checks with Respect Thereto, dated July 7, 2010 (the "Wage Order").

- Order Pursuant to Sections 105(a) and 366 of the Bankruptcy Code Approving the Proposed Adequate Assurance, Approving the Procedures for Resolving Objections, and Prohibiting Utilities from Altering, Refusing or Discontinuing Service, dated August 3, 2010 (the "Utilities Order").

- Final Order (I) Authorizing Debtors to Incur Post-petition Indebtedness; (II) Granting Senior Security Interests and Superpriority Claims; (III) Authorizing the Debtors to Use Cash Collateral; (IV) Granting Adequate Protection; and (V) Providing Related Relief, dated August 3, 2010 (the "DIP Order").

- Affidavit of John P. Maher, Executive Vice President and Chief Financial Officer of North General Hospital in Support of Debtors' Operating Budget, sworn to July 8, 2010, with the Debtors' Expense and Cash Projection annexed thereto as Exhibit "A".

- Statement in Support of Withdrawal of the Motion of the Official Committee of Unsecured Creditors for Reconsideration of the Order (A) Authorizing But Not Requiring Payment of Pre-petition Wages and Related Obligations, (B) Authorizing Payment of Obligations Related to Medical Providers, and (C) Authorizing and Directing Banks to Honor Checks with Respect Thereto, insofar as it Authorizes Payment of Obligations Related to Medical Providers, dated October 8, 2010.

In addition to the Orders set forth above, the Debtors referred the Court to the Statement submitted by Martin G. Bunin, Esq. of Alston & Bird LLP, dated October 8, 2010, annexed as Exhibit "F" to the Response to the Alleged Unauthorized Payments wherein the Committee recognized that the following types of disbursements by the Debtors were appropriate:

1. Post-petition payments within the scope of the "doctrine of necessity";

2. Earmarked federal funds; and

3. *de minimis* amounts below $8,000.00.

Based upon the above, Mr. Maher indicated in the Response to the Alleged Unauthorized Payments that with the exception of a total of $24,367.30 marked as "pre-petition", the payments and disbursements challenged by the Committee were authorized by the above Orders of this Court.

More crucially however, nowhere in the Debtors' Response to the Alleged Unauthorized Payments and Mr. Maher's attached Chart of Unauthorized Payments, containing the Debtors' Notes/Comments did Mr. Maher, as the Debtors' President and CRO, allege that he made any such Unauthorized Payments because Debtors' Counsel failed to provide him with the requisite advice. Nor was there any mention in the Response to the Alleged Unauthorized Payments that any Unauthorized Payments were made under some allegedly filed critical vendor motion or insurance motion.

## I.   Mr. Maher was Involved in the Debtors' Ultimate Decision not to File a Motion to pay Critical Vendors nor a Motion to Make Payments to Insurers

The decision whether or not to file a Critical Vendor Motion was not made in haste. Rather, numerous discussions ensued between Debtors' Counsel, Mr. Maher, Ms. Muise and Ms. Monica Terrano ("**Ms. Terrano**"), who worked alongside Ms. Muise as a consultant for HMS, as to which vendors qualified as "critical vendors" under the Bankruptcy Code.

Prior to the Petition Date, Debtors' Counsel had frequent email exchanges, meetings and conference calls with Mr. Maher to discuss the various First-Day Pleadings. However, after discussions with the U.S. Trustee about limiting the number of first-day applications and after reviewing Bankruptcy Rule 6003, Debtors' Counsel questioned whether the critical vendor motion could qualify for first day relief, i.e. was such a motion necessary to avoid immediate and irreparable harm.

During a conference call with Mr. Maher on June 28, 2010, Messrs. Etheridge and Simpson informed Mr. Maher of the conversation with the U.S. Trustee's Office and about the decision to reduce the number of first day motions to be filed. Mr. Maher was also informed that under the Bankruptcy Code, the Debtors would have to demonstrate that the "critical vendors" would not deliver goods without an order from the Court authorizing the Debtors to pay them on

prepetition amounts owed. At no point during this conversation did Mr. Maher suggest that there were vendors that the Hospital was required to deal with, who had indicated an unwillingness to deal with the Debtors until they were paid on their outstanding prepetition amounts. (Etheridge Affidavit at ¶10), (Babej Affirmation at ¶ 23). As such, Debtors' Counsel suggested that Mr. Maher provide them with a list of all vendors that he deemed critical so that a motion authorizing all prepetition amounts owed to these critical vendors could be made.[11] (Etheridge Affidavit at ¶10), (Babej Affirmation at ¶ 24).

After the Petition Date, on July 12, 2010, Ms. Zavalkoff-Babej sent an email to Ms. Muise asking her for a list of critical vendors and the prepetition amounts each was owed. Debtors' Counsel emphasized that "...these are vendors that NGH will still need to deal with (until operations cease) and who would otherwise not provide NGH goods and services until they are paid these prepetition amounts that are due and owing." (Email from Erin Zavalkoff-Babej to Marianne Muise dated July 12, 2010 annexed hereto as Exhibit 10).

On July 14, 2010, Ms. Terrano sent Mr. Etheridge and Ms. Zavalkoff-Babej a list of vendors that North General "will need" along with their owed balances. Mr. Maher and Ms. Muise were copied on this email. (Email dated July 14, 2010 with attached "vendors required after bankruptcy" annexed hereto as Exhibit 11) Of the list of thirty-two (32) vendors attached to Ms. Terrano's email, only five (5) vendors were identified as "Critical" and of these "critical" vendors only two (2) of them were identified as having a prepetition amount owed to them (*i.e.* Burns Security and Iron Mountain). Two (2) of the other five (5) vendors identified as "critical" on the Critical Vendors Spreadsheet from Ms. Terrano (Public Goods Pool and Statewide

---

[11] After the June 28, 2010 conference call, Mr. Maher did not provide Debtors' Counsel with a list of the Hospital's "critical vendors". Debtors' Counsel was however, copied on an email dated June 28, 2010 to Helen Cooper at Epiq attached to which was an excel spreadsheet with all open accounts payable (Etheridge Affidavit at ¶10). This spreadsheet of outstanding prepetition amounts, did not identify, which vendors were critical.

Assessment Pool ) were in fact, not "vendors" at all[12]. The remaining vendor identified as critical was Physicians Reciprocal Insurance, was according to the Debtors' spreadsheet not owed anything for prepetition goods or services. The remaining vendors on the list provided to Debtors' Counsel were either identified as "Ordinary Course" or "Professional". According to the Debtors' Critical Vendors' Spreadsheet, of these vendors only five of them were owed amounts for prepetition goods or services (American Appraisal $11,476.00, Door Automation $2,298, Integro Insurance $32,253.67; New York City Fire Department $ $935 and Milliman USA $45,318).[13]

Mr. Etheridge and Ms. Zavalkoff-Babej reviewed the list of critical vendors with Mr. Simpson who determined that these entities did not qualify as "critical vendors" under the Bankruptcy Code's stringent qualifications.[14]

To clarify the term "critical vendor", on July 14, 2010, Ms. Zavalkoff-Babej sent an email to Ms. Muise clarifying the definition of a "critical vendor" as follows; "Just remember these are critical vendors, not every vendor. There should not be that many critical vendors for a hospital that is closing down. Usually an ongoing business has a number of critical vendors." (Email annexed hereto as Exhibit 12).

On July 21, 2010, Ms. Zavalkoff-Babej requested that North General's management provide it with a description of the services provided by the vendors classified on its spreadsheet as "Critical". That same day, Ms. Muise forwarded an updated critical vendor spreadsheet,

---

[12] Payments made by the Debtors to the Statewide Assessment Pool and the Public Goods Pool were monthly payments that the Debtors were required to make if they were to receive a monthly distribution from these pools. Debtors' Counsel submits that any such payments cannot be viewed as Unauthorized Payments in satisfaction of any prepetition obligation or debt. The pool payments do not qualify as payments on antecedent debt because there is no debt the result of which, if not paid, could be an enforcement action against the Debtors. The Debtors do not "owe" money to these pools. Rather if the Debtors do not contribute to such pools the only result is that the Debtors will not be in a position to receive a distribution from such pools.

[13] In one instance, the Debtors listed their Public Relations Firm Joele Frank as a provider of real property assessments.

[14] The draft Critical Vendor Motion stated that it was necessary to pay critical vendors (i) to implement the Closure Plan and (ii) safeguard patients and the residents. However, by July 10, 2010, the Hospital had discharged all of its patients and was effectively closed, thus arguably obviating the need for any of the critical vendors identified by the Debtors.

virtually identical to the spreadsheet forwarded by Ms. Terrano on July 14th. The updated list

didn't clarify why these vendors were "critical", as such, Ms. Zavalkoff-Babej requested that Ms.

Muise (copying Mr. Maher) provide a "short blurb" on certain entities so that it could explain the

importance of these vendors and why they should be included in the critical vendor motion.

(Email annexed hereto as Exhibit 13)[15].

Notably, on July 23, 2010, the U.S. Trustee sent Mr. Etheridge an email highlighting

certain issues with the draft critical vendor motion she received as part of a larger binder of

motions forwarded on July 13, 2010 (U.S Trustee's Email of 7/23 annexed hereto as Exhibit 14).

Specifically, the U.S Trustee questioned why a critical vendor motion was necessary in light of

the fact that all of the patients were discharged from the Hospital as of July 11th. [16]

Debtors' Counsel explained to North General's management and specifically to Mr.

Maher and Ms. Hackett that these critical vendors were those vendors who provided goods and

services necessary to keep the Hospital operational and to provide critical services to patients

admitted to the Hospital. However, by the time Debtors' Counsel received the initial list of such

vendors on July 14, 2010, the Hospital was closed and there were no longer any patients. Also,

upon consulting with Ms. Hackett about the list of critical vendors supplied by Mr. Maher and

Ms. Muise, Debtors' Counsel was told that the vendors and professionals on the list of "critical

---

[15] Based on the revised spreadsheet forwarded by Ms. Muise, Debtors' Counsel concluded the following: (i) Physicians Reciprocal Insurance did not have any unpaid prepetition invoices, as such no critical vendor motion was needed and the Debtors could continue to pay its insurance premiums postpetition in the ordinary course of business as no amounts were owed pre-petition; (ii) the Public Goods Pool was first and foremost not a "vendor" and more crucially, it didn't qualify as a creditor of the Debtors' estate. If the Debtors' failed to make the pool payments they would simply not receive any disbursements from the pool. Also, any payments from the Debtors to the Public Goods Pool were a contemporaneous exchange of new value for which the Debtors received more than they gave and (iii) Milliman was not a "critical vendor" because not only were the services it was providing not "critical", but there was nothing to suggest that Milliman would not continue to provide postpetition services to the Debtors if it was not paid on its prepetition invoices.

[16] Further evidencing the fact that none of the Debtors' vendors were according to the Bankruptcy Code's definition, "critical vendors, is the following email from Mr. Maher to Debtors' Counsel dated August 20, 2010 wherein Mr. Maher states that "the committee also requested documents from providers who were threatening to stop service, if not paid. For those providers, (Anesthesiology and Pathology) e mails and letters are included. Path was the only real threat, as the payment to Anesthesiology was for post petition services." (Email annexed hereto as Exhibit "15").

vendors" were suspect and further inquiry would be required before filing any critical vendor motion. (Hackett Affidavit at ¶10).

Through its discussions with Ms. Hackett, and as explained in Mr. Hackett's Affidavit, Debtors' Counsel learned that the critical vendor list consisted primarily of: (i) vendors and individuals for whom Mr. Maher authorized contracts for services while he was functioning as Chief Operating Officer and Chief Financial Officer for the Hospital, (ii) the goods and services they delivered could have been rendered, post-petition by former competent personnel of the Hospital and, most importantly, upon information and belief, (iii) none of the so-called "critical vendors" had ever threatened to withhold the provision of services or delivery of goods to the Hospital unless they were paid moneys owed to them pre-petition. (Hackett Affidavit at ¶9).

Mr. Maher was made aware that no "critical vendor" motion would be filed by Windels Marx unless a critical vendor list could be compiled that included only those vendors actually critical to the Hospital closure process and who also had threatened to withhold goods and/or services unless paid prepetition amounts owed to them.[17] (Hackett Affidavit at ¶11).

## J. Mr. Maher Does Not Lack Bankruptcy Experience nor an Understanding of the Bankruptcy Process

The Examiner states in his Report, that Mr. Maher, the individual responsible for making the authorized payments, had little or no prior bankruptcy-related experience. (Examiner's Report at 1). In fact, as explained in the Daniel Affidavit, Mr. Maher communicated to the Board and management that he had extensive experiences with hospital insolvencies, and had been, prior to North General, involved in the restructuring of such hospitals as St. Barnabas and

---

[17] While Debtors' Counsel initially prepared a motion for authority to pay pre petition insurance premiums however, Mr. Maher informed Debtors' Counsel that the Hospital didn't owe any prepetition amounts to its insurance carriers. Debtors' Counsel concluded that if the Hospital didn't have any outstanding prepetition obligations an insurance motion to pay insurance premiums on a going forward basis was not necessary as the payment of insurance premiums is a payment in the ordinary course of a hospital's business. Moreover, the Closure Plan and the U.S. Trustee Guidelines, each required the Hospital to maintain insurance in the ordinary course of its operations.

Union Hospitals in the Bronx and the early stages of Parkway Hospital in Queens and others in New Jersey. (Daniel Affidavit at ¶9), (Butts Certification at ¶ 6), (Jeter Affidavit at ¶ 13). (Mr. Maher's resume on file in his personnel record states that he has extensive experience in bankruptcies and restructuring of distressed hospitals in New York and New Jersey).

According to Ms. Hackett, and Dr. Daniel, Mr. Maher held himself out as somewhat of an expert on hospital insolvencies and, as a result, when he was recommended by Mr. Ronald Gade, the Hospital's then Chief Restructuring Officer, the Board of Trustees voted to retain him as Executive Vice President and Chief Financial Officer and would later add Chief Operating Officer to his title (Hackett Affidavit at ¶12-13), (Daniel Affidavit at ¶9). Also as stated in the Daniel Affidavit, upon Dr. Daniel's resignation from the positions of President and Chief Executive Office of the Hospital, the Board "promoted" Maher to President and Chief Restructuring Officer of the Hospital. This promotion was due to Maher's alleged expertise and knowledge of Hospital bankruptcies and insolvencies (Daniel Affidavit at ¶10).[18]

As further explained by Rev. Butts in his certification, because the Board was aware that any proposed combinations between the Hospital and a third party to address the Hospital's financial situation would require a bankruptcy proceeding to consummate due to the large amount of debt on the Hospital's books, it was a condition of Mr. Maher's hiring as Chief Financial Officer that Mr. Maher have requisite bankruptcy/insolvency experience. As Rev. Butts states, "Mr. Maher represented continuously throughout the period of his employment that he had substantial experience in hospital insolvency situations. Mr. Maher's representations

---

[18] The Examiner submits that Debtors' Counsel was obligated to seek this Court's approval for the Board to promote Mr. Maher to the position formerly occupied by Dr. Daniel, upon Dr. Daniel's resignation. Prior to Dr. Daniel's resignation, Mr. Maher had taken on the duties performed by Dr. Daniel, in addition to his own responsibilities. So while Mr. Maher assumed the salary commensurate with the position he was promoted to, the net effect on the Debtors' estate, was a decrease on an annual basis of $275,000 for the payment of salaries to senior management. Moreover, despite the Examiner's contention, there is nothing in the Bankruptcy Code requiring that a Debtor-in-Possession obtain authority of the Bankruptcy Court prior to promoting an individual to fill a vacancy upon the resignation of another individual. It would seem that such actions, so long as they are approved by the Hospital's Board, fall under the rubric of actions taken in the ordinary course of the Hospital's business.

were made not only to the Board but to Windels Marx, Alvarez & Marsal, Kurron, the other professionals, the NYS Department of Health and other State agencies." (Butts Certification at ¶ 5).

As stated by Ms. Hackett, "If Mr. Maher is as inexperienced in Bankruptcy proceedings as he suggested he was to the Examiner (or as the Examiner simply concluded he was), he never advised the Hospital staff, the Board of Trustees, Windels Marx or the Hospital's other professionals of this alleged lack of experience". (Hackett Affidavit at ¶12).

To believe that Mr. Maher lacked the necessary bankruptcy-related experience if such was every necessary to understand, when instructed by this Court and by Debtors' Counsel, what he was or was not authorized to pay, suggests that the Board of a not-for-profit hospital in chapter 11 made the decision to hire Mr. Maher and then promote him to the positions of President and Chief Restructuring Officer, despite his alleged limited bankruptcy experience, and on top of that, to pay him $450,000.00 to do a job that the Examiner's Report suggests he is patently unqualified to perform.[19]

### K.     Mr. Maher's Incorrect Assertion that the DIP Budget Determined Which Payments Were Authorized.

On several occasions, Mr. Maher expressed to Debtors' Counsel that the DASNY budget, approved by Order of this Court as part of the DIP Loan, allowed him to make certain severance, vacation, benefits or other benefits-related payments.

As stated by Ms. Jeter in her affidavit, however, Mr. Simpson advised Mr. Maher, Ms. Hackett and herself that any authority Hospital's management had to make payments of salary,

---

[19] As already referenced herein, Mr. Maher has worked alongside Ms. Muise from HMS during the pendency of these Chapter 11 Cases. HMS has served as the Debtors' financial and reimbursement manager since July of 2009, providing extensive services relating to the Debtor's general financial needs, federal and state reporting obligations, and audit related matters. Like Mr. Maher, HMS also has considerable experience with rendering such services to debtors in other large healthcare bankruptcy cases as well, including Saint Vincent's Catholic Medical Centers of New York and Cabrini Medical Center. (Affidavit in further support of the Debtor's Motion Pursuant to Section 365 of the Bankruptcy Code and Rule 6006 of the Federal Rules of Bankruptcy Procedure for Authorization to Assume Contract with Healthcare Management Solutions LLC) [Docket No. 274].

vacation, severance and other benefits payments was subject to the limitations and restrictions imposed by the Court's "Wage Order." Mr. Simpson also directed Mr. Maher, Ms. Hackett and Ms. Jeter to disregard the DASNY budget approved by the Court as part of the DIP Loan if it conflicted with the Court's orders. In this regard, Mr. Simpson reiterated to the abovementioned individuals on numerous occasions that the provisions of the DASNY Budget were necessarily curtailed by the agreed-upon limitations on certain payments set forth in the Wage Order. Mr. Simpson also stressed that the payment of any entitlements to union and non-union employees was subject to a statutory "cap" of $11,725.00. (Jeter Affidavit at ¶6), (Hackett Affidavit at ¶8).

**L.      The Debtors' Monthly Operating Statements Did Not Contain Sufficient Detail to Conclude that the Debtors Were Making Unauthorized Payments**

Each month the Debtors file a monthly operating report (MOR). The Debtors' monthly operating reports ("**MORs**") were circulated to Debtors' Counsel, DASNY and the Committee. However, while the MORs contains information concerning the Debtors' post-petition payments, the information in the MORs was not broken-down or sufficiently detailed so as to make obvious the Debtors' Unauthorized Payments. While the MORs noted payments made for vacation and severance, there was no information in these reports that showed the individuals to whom the payments were being made or the amounts they individually received. Therefore and without requesting additional information from Debtors' management, it was not possible to conclude on the face of the Debtors' MORs that any Unauthorized Payments were in fact being made.

Neither DASNY, which was financing these payments nor the Committee, whose financial advisors were heavily focused on the details of such MORs, discovered the Unauthorized Payments by reviewing these reports. Moreover, Debtors' Counsel, confident that Debtors' management would only be making payments in accordance with this Court's express

Orders or Debtors' Counsel's advice did not think to conduct a "forensic" examination of the MORs with an eye towards uncovering some impropriety on the part of Debtors' management.

## CONCLUSION

In his Report, the Examiner concluded that Debtors' Counsel was responsible for the Debtors' failure to abide by the provisions of the Bankruptcy Code and this Court's Orders entered in these Chapter 11 cases. Unfortunately, shortcomings in the Examiner's investigation permitted the Examiner to make these incorrect assumptions and draw incorrect conclusions. The Examiner's declarations, which were regrettably based on inaccurate or false information and statements supplied solely by Mr. Maher (and perhaps to a lesser extent Ms. Muise) unfairly and adversely maligned Debtors' Counsel's reputation.

As explained in detail herein and contrary to the Examiner' reported assertions:

- Windels Marx did advise Mr. Maher as to which payments he was authorized to pay;

- Mr. Maher was informed of changes made to the Wages Motion (as defined herein), which changes excluded the payment of vacation benefits from the list of benefits the Debtors' were seeking authority to pay;

- Mr. Maher was aware that Debtors' Counsel did not file a Critical Vendor Motion or an Insurance Motion;

- Mr. Maher represented to North General's management, the Board and Debtors' Counsel that he had extensive experience in hospital bankruptcies and insolvencies;

- Windels Marx did not know nor could it have known that Mr. Maher was making unauthorized payments.

By this Response, supported by evidence and sworn testimony of the very people who were most closely connected with these Chapter 11 cases, Debtors' Counsel has demonstrated that the Examiner's Report has no probative value and that the Examiner's conclusions were in error.

Dated: New York, New York
March 22, 2011

Respectfully submitted,

**WINDELS MARX LANE & MITTENDORF, LLP**

**By:** */s/ Charles E. Simpson*
       **Charles E. Simpson (csimpson@windelsmarx.com)**
       **A Member of the Firm**

       156 West 56th Street
       New York, New York 10019
       (212) 237-1000

       *Attorneys for North General Hospital, et al.,*
       *Debtors-in-Possession*