# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                   :

In re:                                   :        Chapter 11 Case
                                   :        No. 10-13553 (SCC)
NORTH GENERAL HOSPITAL, *et al.*,    :
                                   :        **Jointly Administered**
                Debtors.     :
                                   :
------------------------------------------------------------x

## AFFIRMATION
## OF
## LISA M. HACKETT, ESQ
## IN RESPONSE TO EXAMINER'S REPORT

STATE OF NEW YORK    )
                            : ss.
COUNTY OF NEW YORK  )

       **LISA M. HACKETT, ESQ,** being duly sworn, deposes and says:

       1.     I am a member of the Bar of the Appellate Division of the Supreme Court of the State of New York, First Department, and the United States District Court for the Southern and Eastern Districts of New York. I am also the former Senior Counsel and Associate General Counsel of North General Hospital and its affiliated companies. Currently, I am the Project Director, Executive Administration of the Harlem Hospital Center, a member of the New York City Health & Hospitals Corporation. I have read the Examiner's Report, dated January 31, 2011 (the "Report"), on file in this chapter 11 case in the United States Bankruptcy Court for the Southern District of New York (the "Court" or "Bankruptcy Court"), and submit this affidavit based on my own personal knowledge to correct certain statements, misstatements and conclusions set forth in the Report.

### Senior Counsel

2.  I was formerly employed by North General Hospital (the "Hospital") for almost twenty (20) years. My final title was "Senior Counsel," a position I held for approximately two and one-half (2 ½) years. Prior to my promotion to the position of Senior Counsel I was the Associate General Counsel of the Hospital for approximately five (5) years.

3.  In the capacity as Senior Counsel, I worked very closely with and was the liaison between the Hospital and its outside law firms, including:

    a.  Windels Marx Lane & Mittendorf, LLP ("Windels Marx"), the Hospital's "corporate counsel" since January 2007, and later appointed as Bankruptcy Counsel and General Counsel for the Hospital December 31, 2008;

    b.  Garbarini & Scher, the Hospital's malpractice defense counsel; and

    c.  Garfunkel Wild P.C. and its predecessor, the Hospital's healthcare and regulatory counsel and advised on health care business matters.

In addition, on occasion I have worked with Epstein Becker, Manatt Phelps, Togut Segal & Segal, and Cadwalader Wickersham & Taft, all counsel on specific matters; and, Alvarez & Marsal, Healthcare Industry Group, the Hospital's former Restructuring Advisors, and Mr. Ronald Gade, the Hospital's former Chief Restructuring Officer.

4.  In addition to the abovementioned outside professionals, as Senior Counsel I interacted with the medical staff and all of the non-medical departments and divisions of the Hospital on a daily basis. These departments and divisions included: Human Resources, Finance/Accounting, Compliance, the Chief Executive and the Hospital's Board of Trustees. Once restructuring efforts were underway at the Hospital, I also worked on matters as directed by

the then CFO, the Dormitory Authority of the State of New York ("DASNY"), the NYS Department of Health ("DOH") and the NYS Department of Labor (the "DOL").

## Chapter 11

5. On June 21, 2010, the Debtors determined that they had no choice but to file for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). On July 2, 2010 (the "Petition Date"), the Debtors filed their petitions for chapter 11 protection. Commencing June 21 and continuing past the Petition Date, I was aware that Windels Marx, as retained as the Debtor's bankruptcy counsel, prepared approximately twenty (20) or more so-called "First Day" and "Second Day" motions and proposed orders for (i) retention of professionals, (ii) Court authorization to borrow from DASNY, (iii) authority to consummate the Hospital's Closure Plan promulgated by the DOH and, most importantly, (iv) the payment of pre-and post-petition salaries, wages, vacation, severance and benefits to both union (1199/SEIU) and non-union employees, and (v) payments to vendors on their pre-petition invoices. Instrumental to Windels Marx's efforts in drafting and review of the aforementioned documents was John P. Maher, MPH ("Maher"), the Hospital's then Executive Vice President and Chief Financial Officer and often also the Chief Operating Officer.

6. In the course of preparing the various applications and orders drafted by Windels Marx, Ms. Babej and Mr. Etheridge would with respect to each application and order, advise me and Mr. Maher, who worked closely with Windels Marx to provide relevant information pertaining to the Debtor, on the purpose of the application, the basis for the application in the Bankruptcy Code, the limitations and restrictions appurtenant thereto and the Court and Bankruptcy Code interpretations of the terminology used in the applications and orders. Mr. Maher reviewed not just the final product, but each draft leading up to the final and, if the U.S.

Trustee's Office had comments, Mr. Maher, plus Windels Marx, would review and comment on the drafts that circulated until the U.S. Trustee's Office was satisfied with the language in the application and proposed order. Mr. Maher would occasionally report to the remaining Executive Team in place with the Debtor after the filing on the purpose and implications of those Final Orders that were filed with the Court. It was my understanding that once Mr. Maher had conferred with Mr. Simpson, the partner-in-charge at Windels Marx and his associates, that Mr. Simpson would sign the application and cause it to be filed with the Bankruptcy Court. Upon information and belief, the aforesaid procedure was followed in each instance of the twenty (20) or more applications prepared prior to and post-Petition Date.

### The Examiner's Report

7. I have been provided with a copy of the Examiner's Report which I have read; as well as an article on the Report in the Crains' Magazine (the "Article"). Although I was the Senior Counsel and intimately involved in the bankruptcy process from prior to the Petition Date to the date my position was terminated, I was never interviewed or asked by the Examiner to comment on the statements made by Mr. Maher. However, from the Report and Article concerning the Debtors' unauthorized payments post-petition of pre-petition indebtedness, a common thread through the Report is as follows:

    a. Windels Marx did not advise Mr. Maher as to which payments he was authorized to pay;

    b. Mr. Maher had very little Bankruptcy experience or expertise; and

    c. Windels Marx knew or should have known that Mr. Maher was making unauthorized payments.

These comments from the Report are inaccurate and require clarification.

## Unauthorized Payments

8.  As I stated above, I have personal knowledge that Windels Marx advised Mr. Maher and me with respect to all of the applications and orders filed with the Court up to and including October 1, 2010, the date my position as Senior Counsel was terminated. Also, on numerous occasions as I monitored compliance with the Court's orders, I personally advised Mr. Maher that certain payments he was making to employees and/or vendors and medical providers were prohibited by the Court's orders. I would often advise Mr. Simpson of the prohibited payments made by Mr. Maher and Mr. Simpson would telephone Mr. Maher or come to the Hospital and direct Mr. Maher to cease the unauthorized payments. An example of the aforesaid was the payment of pre-petition vacation to Samuel J. Daniel, M.D., the Hospital's former President and CEO. Once Mr. Simpson was advised by me that these payments were being made to Dr. Daniel, Mr. Simpson telephoned and directed Mr. Maher and me that we were not authorized to make payments of vacation, benefits and/or severance to the Hospital's management except as set forth in the Court's orders and to (i) disregard the DASNY budget approved by the Court as part of the DIP Loan if it conflicted with the Court's orders, and (ii) that payment of these entitlements to union and non-union employees was subject to a statutory "cap" of $11,725.00. Noteworthy is that Mr. Maher had advised those remaining Executive Staff exactly what Mr. Simpson had advised, which was that he [Maher] was not authorized to make payments of vacations, benefits, and/or severance to the Hospital's management except as set forth in the Court's orders. Mr. Maher advised the remaining Executive Staff, however, that the Court would eventually grant these payments to the Executive staff that remained. After my termination from the Hospital, I filed an administrative priority expense proof of claim in the Chapter 11 Cases, which DASNY has filed opposition papers to disallow the Severance Claims

and classify such claims as general unsecured claims, and disallow the Vacation Claims as administrative expense claims under the Bankruptcy Code and classify the same claims as either priority claims to the extent of the limitations set forth under the Bankruptcy Code or otherwise as general unsecured claims.

**Payments to "Critical Vendors"**

9. A significant portion of the Report refers to a "critical vendor" motion. As explained to Mr. Maher and me by Windels Marx, these critical vendors were those vendors who provided goods and services necessary to keep the Hospital operational and to provide critical services to patients admitted to the Hospital. However, by the time the list of critical vendors was drafted by Mr. Maher and Ms. Marianne Muise ("Muise") of Healthcare Management Solutions ("HMS"), the Debtors' financial and reimbursement consultants, the Hospital was closed and there were no longer any patients. Also, the critical vendor list consisted primarily of (i) vendors and individuals for whom Mr. Maher authorized contracts for services while he was functioning as COO and CFO for the Hospital, (ii) the goods and services they delivered could have been rendered, post-petition by former competent personnel of the Hospital and, most importantly, upon information and belief, (iii) none of the so-called "critical vendors" had ever threatened to withhold the provision of services or delivery of goods to the Hospital unless they were paid moneys owed to them pre-petition.

10. I brought to Mr. Simpson's attention that the vendors and professionals on the list of "critical vendors" were suspect and further inquiry would be required before filing.

11. Upon information and belief, Mr. Maher was made aware that no "critical vendor" motion would be made by Windels Marx unless an accurate list included only those vendors actually critical to the Hospital closure process and who also had threatened to withhold

goods and/or services unless paid pre-petition amounts owed to them. I often would request that Mr. Maher release payments to certain vendors, who I was advised by Windels Marx to be "critical" to the Hospital's closure process, and who also had threatened to withhold goods. For example, Grace's Marketplace, the landlord from whom the Hospital leased office space for back office space and FedEx. In each instance, Mr. Maher denied payment stating that the vendor was not critical, not on the critical vendor list, and therefore not subject to payment under Court order. It can be argued that in some instances, Mr. Maher ignored the advice that had been given by Windels Marx and failed to release authorized payments and in others made payments to vendors despite having been advised by counsel. In another instance, I brought to Windels Marx's attention that Mr. Maher authorized transfer of certain Hospital assets post-petition. Mr. Simpson corroborated my understanding that Mr. Maher had no authority to dispose of assets without a Court order, and contacted Mr. Maher directly to advise him accordingly.

**Maher's Bankruptcy Experience**

12. The Report makes note of the alleged lack of Bankruptcy experience on the part of Mr. Maher. This is inaccurate and management at the Hospital can attest otherwise. It is my firm belief that Mr. Maher would not have been hired as the Hospital's CFO, COO or CRO had he not represented to the Board of Trustees that he had experience with hospitals going through restructuring. In fact, it is my firm belief that had Mr. Maher not represented his restructuring experience at St. Barnabas and Union Hospitals in the Bronx and Parkway Hospital in Queens, the Board of Trustees would not have hired him as COO initially, and to hold both titles as COO and CFO as of 2009 and clearly would not have promoted him to President and Chief Restructuring Officer upon Dr. Daniel's resignation. Furthermore, if Mr. Maher is as inexperienced in Bankruptcy proceedings as he now claims to be, he never advised me, the

Hospital staff, the Board of Trustees, Windels Marx or the Hospital's other professionals of this alleged lack of experience. I was always under the impression, based on representations of such by Mr. Maher, that Mr. Maher had extensive experience in bankruptcies and restructuring distressed hospitals in New York and New Jersey.

13. The Debtors are governed by their Board of Trustees or Board of Directors, as the case may be. These Boards are made up of the same individuals, although in different combinations. With respect to the Board of Trustees, Rev. Dr. Calvin O. Butts, III is the Chairman and Mr. Eugene Giscombe is the Vice-Chairman. Contrary to the statement attributed to Mr. Simpson at footnote 9 of the Report there is no "secretary for the Board". Meetings of the Board of Trustees are taped and, thereafter transcribed. Mr. Simpson has always taken notes at Board meetings, Executive Session and various meetings and conferences with 1199/SEIU, Alvarez & Marsal, etc. However, these are his personal notes Mr. Simpson has been asked on certain occasions. When resolutions were passed by the Board in Executive Session, to draft the resolutions for the Hospital's records and on other occasions Mr. Simpson has been asked to take minutes when the meetings were not being taped. However, Mr. Simpson's notes have never been considered the minutes of the Hospital's Board meetings. Mr. Simpson only takes minutes when requested by the Chairman.

## Conclusion

As set forth above, I was not contacted by the Examiner or his counsel as part of his investigation. As Senior Counsel I believe my personal knowledge and involvement would have allowed the Examiner to have a clearer picture of the roles played by Mr. Maher and others with regard to the unauthorized payments. The facts are that Mr. Maher and Ms. Muise controlled the process and there was no way any of the Debtors' professionals could have known the extent to

which Mr. Maher and Ms. Muise were making the unauthorized payments. Mr. Maher was selective in what orders he would follow once he was promoted to President and CRO post-petition. He was in control and chose to interpret the Court's orders and operated in an unbridled fashion with neither oversight nor accountability.

                                                                     *[signature]*
                                                              Lisa M. Hackett, Esq.

Sworn to before me this 17th day of February 2011

Derek Etheridge

**DEREK ETHERIDGE**
Notary Public, State of New York
No. 02-ET6118250
Qualified in New York County
My Commission Expires 11/01/2012