# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
                                                                                  :

In re:                                                                 :        Chapter 11 Case
                                                                                  :        No. 10-13553 (SCC)
NORTH GENERAL HOSPITAL, *et al.*,         :
                                                                                  :        **Jointly Administered**
                                       Debtors.        :
                                                                                  :
-----------------------------------------------------------x

## CERTIFICATION OF REV. DR. CALVIN O. BUTTS, III
## IN RESPONSE TO EXAMINER'S REPORT

**REV. DR. CALVIN O. BUTTS, III,** hereby certifies the following to be true upon his personal knowledge and subject to penalties of perjury as follows:

1. I am the Senior Pastor of Abyssinian Baptist Church, Chairman of the Board of Directors of Abyssinian Development Corporation, President of the State University of New York at Old Westbury and the Chairman of the Board of Trustees of the North General Hospital (the "Hospital"). In the latter capacity, I submit this Certification in support of the Response by Windels Marx Lane & Mittendorf, LLP ("Windels Marx") to the Examiner's Report, dated January 31, 2011 (the "Report"), of Richard Stern, Esq. The purpose of this Certification is to expand on the information provided to the Bankruptcy Court in the Report with respect to "(ii) the role, including without limitation, the level of knowledge of (a) individual professionals of the Debtors (b) members of the Debtors' current and former senior Management and (c) members of the Debtors' Board of Directors with respect to the payment..." as set forth in the January 10, 2011 Order of the Bankruptcy Court approving Mr. Stern's appointment.

2. With respect to the above inquiry into the "level of knowledge" of the members of the Board of Trustees of the Hospital, the Trustees had no knowledge of the alleged unauthorized payments by John Maher ("Maher"), the Hospital's President and Chief Restructuring Officer, of

pre-petition obligations of the Debtors. While acknowledging that these payments were made, however, the Report attributes this breach to an alleged failure by the Debtors' counsel, Windels Marx, to advise and/or otherwise communicate to Maher, in his former capacity as the Debtors' Executive Vice-President and Chief Financial Officer, that he was not authorized by the Court's "Wage Order" to make the unauthorized payments. The aforesaid statement is not accurate.

3. For three (3) years prior to the commencement of this bankruptcy proceeding, Windels Marx and, in particular, Charles E. Simpson, Esq. ("Simpson") advised the Debtors, their Boards and their Management with regard to the requirements of the Bankruptcy Code with specific reference to the restrictions and limitations on the payment of pre-petition obligations. On numerous occasions, Windels Marx gave guidance to the Board and Management on the requirements, restrictions, prohibitions and limitations placed on the operation of the Hospital's business once the bankruptcy proceedings commenced.

4. In fact, Windels Marx was not the only law firm which provided the Trustees and Management, including Maher, with such advice. Deryck Palmer, Esq. of Cadwalader Wickersham & Taft and Frank Oswald, Esq. of Togut, Segal & Segal, as well as restructuring advisors, Louis Hernandez of Kurron Shares of America and Martin Winter and Ron Winters of Alvarez & Marsal, spent untold hours explaining the process and procedures that the Hospital and its staff would have to follow once the Bankruptcy petitions were filed. Because the Board was concerned about the payments of wages, salary, vacation and severance due to both union and non-union members, questions with respect to payment of salaries, vacation, severance and benefits arose on numerous occasions both pre-petition and post-petition at meetings of the Board, executive session meetings and meetings of professionals with the Board with regard to the Hospital's restructuring efforts. At the meetings that he attended, Mr. Simpson advised the

2

Board that pre-petition payments could be made to the Hospital's former employees but subject to the terms and conditions of a so-called "Wage Order" which was entered by the Bankruptcy Court and which permitted such payments subject to statutory limitations on payment of wages, salary and severance but that employee reimbursements, accrued sick time and vacation pay that had accrued pre-petition could not be paid. Mr. Simpson also advised the Board and Management that certain payments which could not be paid immediately after the filing of the Bankruptcy petition would be paid as part of the Hospital's Plan of Liquidation. Additionally, there were discussions with regard to payments on the various pensions, the union and various governmental agencies. This is to say that Windels Marx advised the Board and Management both pre-petition and post-petition on all of the various scenarios, restrictions, prohibitions, limitations, etc. with regard to payments under the Court's orders.

5. I also noted that the Report concludes that Mr. Maher had no prior bankruptcy experience. I find this statement extremely hard to believe. At the time Maher was hired by the Hospital, Messrs. Ron Gade and Maher represented to the Board and Senior Management that Mr. Maher had substantial bankruptcy experience from insolvent hospitals in the Bronx, Queens and in New Jersey. Because the Board was aware that any of the proposed combinations between the Hospital and a third party would require a bankruptcy proceeding to consummate due to the large amount of debt on the Hospital's books, it was a condition of his hiring as Chief Financial Officer that Mr. Maher have requisite bankruptcy/insolvency experience. Mr. Maher represented continuously throughout the period of his employment that he had substantial experience in hospital insolvency situations. Mr. Maher's representations were made not only to the Board but to Windels Marx, Alvarez & Marsal, Kurron, the other professionals, the NYS Department of Health and other State agencies. It is not clear how deep the Examiner dug into

3

Mr. Maher's background but regardless of what Maher's actual bankruptcy/insolvency experience has been, Mr. Maher clearly made numerous representations to the Trustees, Management and professionals that he was extremely experienced in Hospital bankruptcies and insolvencies.

6. The officers of the Hospital's Board of Trustees are myself, as Chairman, and Mr. Eugene Giscombe, as Vice-Chairman. There are no other officers and have been no other officers during the course of my Chairmanship. Mr. Simpson is not and has never been an officer of the Board or any of the Debtors. In fact, Mr. Simpson was, until 2010, only present at Board meetings at the invitation of the Chairman. At the beginning of 2010, when it was apparent that Mr. Simpson's presence was necessary, in addition to that of Alvarez & Marsal, to report to the Board on the various discussions and negotiations between the Governor's Office, Congressman Rangel's Office, DASNY, DOH, HHC, State Senator Perkins, Assemblyman Wright, Councilwoman Veverito and other entities and individuals involved in the attempt to restructure the Hospital prior the following of the chapter 11 case. However, at monthly Board meetings the minutes were taped and later transcribed by the Hospital's staff. Mr. Simpson takes his notes but only takes minutes of meetings at my request or the request of other Board members with regard to preparing resolutions passed by the Board, usually at executive session. Mr. Simpson takes notes for his personal use at all meetings whether he is requested to later prepare minutes or not. He has jokingly referred to this practice as his means of "staying awake".

7. Upon the appointment of the Examiner, Mr. Simpson discussed the matter with me and explained that it might be necessary to waive the "attorney/client and work product privileges" in order for the Hospital to be transparent and not to appear to withhold information

4

necessary for the Examiner to conduct his investigation. Mr. Simpson also advised that certain members of the Board and Management might be interviewed by the Examiner, at which interviews a representative of Windels Marx would also appear. I advised Mr. Simpson that at the time that a waiver of either of the privileges was necessary that I would approve such a waiver. Second, although advised that the Examiner might elect to interview Board members or Management, to my knowledge no past or current Board member has been approached or requested to be interviewed by the Examiner. Nor has any members of current Management, except for Mr. Maher and Ms. Marianne Muise, been interviewed by the Examiner. (Mr. Simpson advised the Board of the Examiner's investigation and Windels Marx' interview, Mr. Maher did not.) All of the Board members, with the exception of Mark Jeziorski reside within the five (5) boroughs of New York City. Mr. Jeziorski resides in New Jersey. Likewise, Samuel J. Daniel, M.D., the Hospital's former President and CEO, Lisa Alvarenga, the former Senior Vice-President, and Lisa Hackett, the Hospital's former Senior Counsel, reside or work within the New York City limits. Had the Examiner the desire to conduct a fair, impartial and thorough investigation, he would have interviewed some, if not all of the aforesaid individuals. The Report, as I read it, relates solely to statements and interpretations given by Mr. Maher. In most instances, these statements based upon my personal knowledge do not accurately reflect the facts and circumstances.

8. I hereby certify under penalty of perjury that the foregoing is true and correct.

Executed on February      , 2011

_____
Rev. Dr. Calvin O. Butts, III

5