**EXHIBIT C**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                        :

In re:                                                :        Chapter 11 Case
                                                       :        No. 10-13553 (SCC)
NORTH GENERAL HOSPITAL, *et al.*,       :
                                                       :        **Jointly Administered**
                           Debtors.    :
                                                       :
------------------------------------------------------------x

## AFFIDAVIT OF SAMUEL J. DANIEL, M.D.
## IN RESPONSE TO EXAMINER'S REPORT

STATE OF NEW YORK  )
                             ) : ss.
COUNTY OF NEW YORK)

        **SAMUEL J. DANIEL,** being duly sworn, deposes and says:

        1.       I am the former President and Chief Executive Officer of North General Hospital (the "Hospital") and a former member of the Board of Directors of North General Service Corporation, both Debtors-in-Possession (jointly with the North General Diagnostic & Treatment Center, the "Debtors"). As such, I am fully familiar with the facts and circumstances set forth below based upon my personal knowledge. I submit this Affidavit in support of the Response of Windels Marx Lane & Mittendorf, LLP ("Windels Marx") to the Examiner's Report, dated January 31, 2011 (the "Report"), of Richard Stern, Esq. (the "Examiner") with regard to (i) the alleged post-petition unauthorized payments of pre-petition obligations and (ii) to illuminate certain unsubstantiated findings and baseless conclusions made in the Report.

        2.       First, I am an attending physician at St. Luke's-Roosevelt Hospital Center in Manhattan and reside in Armonk, New York. Second, I have appeared in these proceedings

through my deposition held at the offices of Alston & Bird, LP. However, notwithstanding my residence and employment in the Metropolitan New York area, I was not contacted or interviewed by the Examiner with respect to his investigation, despite the fact that during most of the period during which the alleged unauthorized payments were made, I was the President and Chief Executive Officer of the Hospital, and responsible for the operations of the Debtors. There is no excuse for the failure of the Examiner to contact me with regard to his investigation.

3. This Affidavit speaks solely to those matters mentioned in the Report of which I have personal knowledge. These matters include the following:

    a. Advice given to the Board of Trustees (the "Board") and the Hospital's management ("Management") by Windels Marx and others on the procedures, limitations and restrictions on payment of pre-petition indebtedness during the Debtors' chapter 11 cases;

    b. Advice given by Windels Marx to John P. Maher, MPH, ("Maher"), the Hospital's then Executive Vice President and Chief Financial Officer, with respect to (i) his lack of authority to pay pre-petition indebtedness for salary, vacation and severance and (ii) the supremacy of the Bankruptcy Court's orders over the Dormitory Authority of the State of New York ("DASNY") budget (the "DASNY Budget") approved by the Bankruptcy Court in support of DASNY's DIP Loan;

    c. Participation by Mr. Maher and Lisa M. Hackett, Esq., ("Hackett"), the Hospital's Senior Counsel, in numerous drafting sessions regarding motions and orders with Windels Marx;

    d. Complaints by Hackett, Ms. Renecia Lowery-Jeter ("Jeter"), the Hospital's Vice-President of Human Resources, and Charles E. Simpson, Esq., the partner-in-

2

charge of the Debtors' representation at Windels Marx, concerning the payments made by Maher that contravened the provisions of the Bankruptcy Court's "Wage Order"; and,

e. Maher's bankruptcy experience.

## WINDELS MARX' ADVICE TO THE BOARD OF TRUSTEES AND MANAGEMENT REGARDING THE PROCEDURE IN CHAPTER 11

4. Prior to the filing of these chapter 11 cases by the Debtors, Windels Marx (Messrs. Charles E. Simpson and Derek Etheridge and Ms. Erin Babej-Zavalkoff) spent a considerable amount of time with the Officers and Trustees of the Hospital in Board meetings, conferences and Executive Sessions where they explained to the Debtors the difference between operating a Hospital under chapter 11 and how a hospital operates prior to such filing. These discussions included in various combinations, the Trustees, Mr. Maher, Ms. Hackett, Ms. Jeter, your deponent and others, and took place at various times prior to and following the filing of the petitions in these cases up to my resignation, which was effective August 5, 2010. During the aforesaid discussions, we were advised by Windels Marx that indebtedness of the Hospital prior to July 2, 2010 (the "Petition Date") could not be paid without an order from the Bankruptcy Court. The various motions that were filed by the Debtors for authority to make payments to former employees, vendors, insurers, etc. were discussed, as well as the role in the bankruptcy played by the Creditors' Committee, DASNY and the Bankruptcy Court. Throughout the 2010 pre-petition period and post-petition up to August 5, 2010, I can attest of my personal knowledge that Windels Marx advised the Debtors, including Maher, on bankruptcy procedures and was always available to provide advice and give answers to any inquiry made by Management and the staff at the Hospital; including Maher.

5. Furthermore, pre-petition, Management and Maher also had the advice of Bankruptcy counsel in addition to Windels Marx, including: Deryck Palmer, Esq. of Cadwalader

3

Wickersham & Taft, Frank Oswald, Esq. of Togut, Segal & Segal, who also provided the Board and Management, including Maher, advice concerning the procedures, process, restrictions and limitations, especially with respect to the payment of pre-petition indebtedness. The conclusion in the Examiner's Report that Windels Marx did not adequately advise the Hospital and Maher with regard to the payments he could make and could not make pursuant to the various Bankruptcy Court orders is simply not true.

## ADVICE GIVEN TO JOHN MAHER BY WINDELS MARX

6. As the Chief Executive Officer, I was personally aware of advice given to Maher by Windels Marx regarding the payment of salary, vacation, severance and benefits to former employees of the Hospital once the Hospital closed on July 10, 2010. This occurred prior to my resignation from the Hospital; however, during that approximately one (1) month period, Mr. Simpson on numerous occasions advised Maher that his authority to make the above-mentioned payments was limited and restricted by the Bankruptcy Court's "Wage Order". Mr. Simpson also advised your deponent and Maher, Hackett and Jeter that notwithstanding the Bankruptcy Court approved budget from DASNY as part of the DIP Loan, the provisions of that budget was subject to compliance with the agreed to limitations on payments set forth in the Wage Order, the application supporting it and the $11,725.00 "cap" on the amount that could be paid to a claimant pursuant to the Bankruptcy Code. The findings and conclusions in the Report that Mr. Simpson and Windels Marx did not advise Maher concerning the prohibitions, restrictions and limitations on payments of pre-petition indebtedness under the Wage Order is simply not true.

## MAHER AND HACKETT PARTICIPATED IN DRAFTING OF MOTIONS

7. Once the Board decided that the filing of a chapter 11 petition was necessary to provide for the orderly closure of the Hospital, Windels Marx rushed to complete the drafting of the Petition, Schedules and Statement of Financial Affairs, my Affidavit and other related petition documents. Participating with Windels Marx in this process was Maher, Hackett and, to a limited extent, Jeter. In addition, there were numerous motions, applications and orders which sought and received authority from the Bankruptcy Court to make various payments, retain professionals, comply with the NYS Department of Health's Closure Plan, etc. These motions were drafted and reviewed by Windels Marx with the participation of Maher and Hackett. In fact, Maher spent a number of days at Windels Marx' offices reviewing, revising and providing input to the motions and receiving instructions from Windels Marx on how to comply with the Orders and the restrictions and limitations therein. These motions and Orders were vetted at each stage and with respect to each draft by Hackett and Maher and, where appropriate, Jeter.

## MANAGEMENT COMPLAINTS TO WINDELS MARX

8. Almost immediately after the Bankruptcy Court entered orders authorizing the various retentions and payments, Hackett and Jeter complained to your deponent with regard to Maher's failure and refusal to comply with the Bankruptcy Court's orders and the favoritism that Maher exhibited from vendor to vendor and employee to employee. In most instances, I would refer Hackett and Jeter to Mr. Simpson to confirm whether the payments being made were appropriate under the Wage Order. In certain instances, your deponent telephoned Mr. Simpson to discuss whether payments that were being made were proper. In my conversations with Mr. Simpson he stated that Maher was following the directions of DASNY's Budget in the DIP Loan, as opposed to the Bankruptcy Court's orders. In one instance in particular, which related

5

to my vacation pay, Mr. Simpson directed Maher to cease making any additional payments and advised me that the payment was not authorized under the Bankruptcy Court's order notwithstanding the fact that the DASNY Budget provided for vacation payments. Mr. Simpson advised Maher, Hackett and myself that compliance with the Bankruptcy Court's order governed as opposed to the DASNY Budget. Mr. Simpson has advised me that I must repay the monies that I received and Maher approved relating to vacation pay and deferred compensation.

## MAHER'S BANKRUPTCY EXPERIENCE

9. The Report goes into great detail concerning Maher's alleged lack of bankruptcy experience. I was somewhat surprised by this statement as Maher was employed by the Hospital based upon his alleged experience in Hospital insolvencies and bankruptcies. It was communicated to the Board and management that Maher's extensive experience included years of insolvency and restructuring at St. Barnabas and Union Hospitals in the Bronx and limited stints at Parkway Hospital in Queens and others. Maher has always held himself out to the Hospital as an expert on hospital bankruptcies and insolvencies and, as a result, when he was recommended to the Hospital by Mr. Ronald Gade, the Hospital's then Chief Restructuring Officer, the Board voted to retain him as Executive Vice President and Chief Financial Officer and would later add Chief Operating Officer to his title.

10. Lastly, upon my resignation of the positions of President and Chief Executive Office of the Hospital, the Board "<u>promoted</u>" Maher to President and Chief Restructuring Officer of the Hospital. This promotion was partially due to Maher's representations of his expertise and knowledge of hospital bankruptcies and insolvencies. It was a promotion, not a raise. Maher assumed the position of President and the salary that went with it.

## CONCLUSION

The Examiner's Report is replete with flawed reasoning and conclusions due to the focus of the investigation on the unsupported and inaccurate statements of Mr. John Maher, the person who made the unauthorized payments, and appears to assist Maher in his attempt to deflect responsibility from himself to Windels Marx and others. It is inescapable reasoning that the Examiner's investigation should have included an interview with me, Maher's immediate supervisor, Hackett, Jeter and the members of the Board of Trustees, all of who were available. This investigation appears to have started from a preconceived conclusion and the Examiner elicited information solely from Maher to justify the desired result.

_____
Samuel J. Daniel, M.D.

Sworn to before me this
23rd day of February, 2011

_____
Notary Public

DEREK ETHERIDGE
Notary Public, State of New York
No. 02-ET6118250
Qualified in New York County
My Commission Expires 11/01/2012

7