**EXHIBIT D**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                          :
In re:                                    :    Chapter 11 Case
                                          :    No. 10-13553 (SCC)
NORTH GENERAL HOSPITAL, et al.,           :
                                          :    **Jointly Administered**
                 Debtors.                 :
                                          :
------------------------------------------------------------x

## AFFIDAVIT OF RENECIA LOWERY-JETER
## RESPONSE TO EXAMINER'S REPORT

STATE OF MICHIGAN    )
                     : ss.
COUNTY OF OAKLAND    )

**RENECIA LOWERY-JETER,** being duly sworn, deposes and says:

1. I am the former Vice-President of Human Resources for North General Hospital (the "Hospital") and its affiliated companies. I have read the Examiner's Report, dated January 31, 2011 (the "Report"), on file in this chapter 11 case in the United States Bankruptcy Court for the Southern District of New York (the "Court" or "Bankruptcy Court"), and submit this affidavit based on my own personal knowledge to correct certain statements, misstatements and conclusions set forth in the Report.

### Vice-President of Human Resources

2. I was formerly employed by the Hospital for approximately one (1) year. During that period and until my position was eliminated as part of the Hospital's closure on September 30, 2010, my title was Vice-President Human Resources. Prior to my employment at North General Hospital, I was employed as the Director of Human Resources and Administration with the Isaac Group, an automotive supplier.

3. This Affidavit speaks solely to those matters (i) mentioned in the Report of which I have personal knowledge or (ii) which I feel are necessary to disclose to the Court to illuminate certain unsubstantiated findings and baseless conclusions by the Examiner. These matters include the following:

    a. Advice given by Windels Marx to Mr. John P. Maher, MPH ("Maher"), the Hospital's current President and Chief Restructuring Officer, with respect to (i) his lack of authority to pay pre-petition indebtedness for salary, vacation and severance and (ii) the supremacy of the Bankruptcy Court's orders over the Dormitory Authority of the State of New York ("DASNY") budget approved by the Bankruptcy Court as part of its approval of DASNY's DIP Loan;

    b. Complaints made to Samuel J. Daniel M.D., former President and Chief Executive Officer of North General Hospital, by me, Lisa Hackett, Esq., North General's former Senior Counsel, and by Charles E. Simpson, Esq. ("Mr. Simpson") the partner –in-charge of the Debtors' representation at Windels Marx Lane & Mittendorf LLP ("Windels Marx"), concerning the payments made by Maher that contravened the provisions of the Bankruptcy Court's "Wage Order";

    c. Payments Mr. Maher directed to be made, which payments were not authorized by Order of this Court and were made in blatant disregard of the advice and direction provided by Windels Marx; and

    d. Mr. Maher's bankruptcy experience.

## The Examiner's Report

4. I have been provided with a copy of the Examiner's Report which I have read; as well as an article on the Report in the Crains' Magazine (the "Article"). Although I was Vice-President of Human Resources throughout most of period during which the alleged unauthorized payments to former employees of the Hospital were made, I was not contacted by the Examiner with respect to his investigation nor was I interviewed or asked by the Examiner to comment on the statements made by Mr. Maher.

## Advice Given to Mr. Maher By Windels Marx

5. As Vice-President of Human Resources, I am personally aware of the advice given to Mr. Maher by Windels Marx regarding the payment of salary, vacation, severance and benefits to former North General employees who were either terminated just after the Hospital filed for bankruptcy under Chapter 11 on July 2, 2010, or once the hospital ceased operating on July 10, 2010.

6. On several occasions, Mr. Simpson advised Mr. Maher, Ms Hackett and me that any authority Hospital's management had to make the abovementioned payments was subject to the limitations and restrictions imposed by the Court's "Wage Order." Mr. Simpson also directed Mr. Maher, Ms. Hackett and me to disregard the DASNY budget approved by the Court as part of the DIP Loan if it conflicted with the Court's orders. In this regard, Mr. Simpson reiterated to the abovementioned individuals on numerous occasions that the provisions of the DASNY Budget were necessarily curtailed by the agreed-upon limitations on certain payments set forth in the Wage Order. Mr. Simpson also stressed that the payment of any entitlements to union and non-union employees was subject to a statutory "cap" of $11,725.00. In essence, the Examiner's accusation that Windels Marx failed to provide adequate legal advice to North

3

General's management, including Mr. Maher, is simply not based on the actual events as I witnessed them first-hand.

**Complaints to Dr. Daniel and Mr. Simpson**

7.  Shortly after the Hospital filed for Chapter 11 and the Court entered its first series of Orders authorizing certain payments on pre-petition obligations, Ms. Hackett and I complained to Dr Daniel about Mr. Maher's refusal to adhere to the Bankruptcy Court's orders. Dr. Daniel immediately referred Ms. Hackett and me to Mr. Simpson who confirmed whether the specific payments being made by Mr. Maher (or being directed to be made by Mr. Maher) were in contravention of the Wage Order. Where appropriate, Mr. Simpson advised us that the payment at issue was not permitted under the Wage Order (irrespective of whether or not it was permitted under the DASNY Budget).

**Mr. Maher's Deal With the Union**

8.  In order to appease the union employees and prevent further picketing Mr. Maher took it upon himself to negotiate an agreement with the 1199SEIU union to pay COBRA benefits for terminated union employees for a period of six (6) months. Ordinarily, when an employee is terminated, the former employer will make the monthly COBRA payment on behalf of the former employee and then recover the full amount from that former employee. Mr. Maher however, without seeking this Court's authority and without discussing or disclosing his arrangement with Windels Marx, simply agreed that the Hospital would make the COBRA payments for terminated union employees and that it would not seek to recover the amount expended.

9.  It is my understanding that Mr. Maher only mentioned the COBRA payments to Windels Marx on Friday February 18, 2011, after these payments were discovered by the NHB

Advisors, Committee's financial advisors. While Mr. Maher explained to Mr. Simpson that he was unaware that the Hospital had not sought to recover the amount it had expended from the terminated employees, the truth is rather a different one. Mr. Maher was the one who directed what payments were to be made, on whose behalf and if such payments were to be recovered from a third-party.

**Payments Made to Senior Management**

10. I had no authority to sign checks on the Hospital's behalf, only to submit and approve check requests, Mr. Maher was the individual charged with directing who should be paid, what and when. In this regard, Mr. Maher had comprehensive and almost total "power of the purse"

11. As the individual who was charged with approving check request I was directed by Mr. Maher to submit check requests to make a number of payments to senior management, which payments were neither authorized under the Bankruptcy Code nor by Order of this Court.

12. Among such payments was the payment of pre-petition vacation to Samuel J. Daniel, M.D., the Hospital's former President and CEO. More crucially, in total violation of the Wage Order, and without disclosing anything to Windels Marx, Mr. Maher directed me to (i) cause Dr. Daniel to be paid Ninety-Two Thousand ($92,000.00) Dollars from the Hospital's 457(b) Deferred Compensation Plan and (ii) sign, but not date paperwork necessary to process a payment to him from Mutual of America for amounts he believed he was due under the Deferred Compensation Plan.[1] It was my understanding that Mr. Maher would fill in the date at some point in the future and process a check from Mutual of America.

---

[1] It should also be noted that while Mr. Maher processed his change of title with the Human Resources Department, upon taking over Dr Daniel's position as President and Chief Restructuring Officer of North general, he never processed his raise through HR. Despite efforts to locate the requisite paperwork concerning his increase in salary, my department was unable to find anything evidencing Mr. Maher's salary increase. Upon information and belief,

5

## Maher's Bankruptcy Experience

13. The Report makes note of the alleged lack of bankruptcy experience on the part of Mr. Maher. This is inaccurate and management at the Hospital can attest otherwise. It is my firm belief that Mr. Maher would not have been hired as the Hospital's CFO, COO or CRO had he not represented to management and the Board of Trustees that he had substantial experience with hospitals going through restructuring. In fact, it is my firm belief that had Mr. Maher not represented his restructuring experience, the Board of Trustees would not have hired him as COO initially, and to hold both titles as COO and CFO as of 2009 and clearly would not have promoted him to President and Chief Restructuring Officer upon Dr. Daniel's resignation. Furthermore, if Mr. Maher is as inexperienced in Bankruptcy proceedings as he now claims to be, he never advised me, the Hospital staff, the Board of Trustees, Windels Marx or the Hospital's other professionals of this alleged lack of experience. Mr. Maher routinely asserted that he had extensive experience in bankruptcies and restructuring of distressed hospitals in New York and New Jersey. Further, the resume on file in his personnel record states the same.

## Conclusion

As set forth above, I was not contacted by the Examiner or his counsel as part of his investigation. As Vice President of Human Resources, I believe my personal knowledge and involvement would have given the Examiner a clearer picture of the roles played by Mr. Maher and others with regard to the unauthorized payments. The facts are that Mr. Maher controlled the purse strings, and the process for recording payments made by the Hospital would have made it very difficult for any of the Debtors' professionals to uncover the extent to which Mr. Maher was making unauthorized payments. Mr. Maher was selective in what orders he would follow

---

Mr. Maher processed his raised on the finance side, bypassing the HR department, which was the department charged with salary-related issues.

post-petition and was even more selective in what information he shared with management and Windels Marx. As already expressed herein, Mr. Maher controlled the Hospital's funds and chose who or who not to pay, when and in what amounts in an unrestrained fashion with neither oversight nor accountability and most crucially, in total disregard of this Court's orders.

                                                                                      Renecia Lowery-Jeter

Sworn to before me this
_____ day of February 2011

_____
Notary Public

VANESSA R. ROBINSON
Notary Public, State of Michigan
County of Wayne
My Commission Expires Jun. 10, 2012
Acting in the County of Oakland