# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                    :
In re:                                              :          Chapter 11 Case
                                                    :          No. 10-13553 (SCC)
NORTH GENERAL HOSPITAL, *et al.*,                   :
                                                    :          **Jointly Administered**
                            Debtors.                :
                                                    :
-------------------------------------------------------------x

**AFFIRMATION**
**OF**
**LISA M. HACKETT, ESQ**
**IN RESPONSE TO EXAMINER'S REPORT**

STATE OF NEW YORK     )
                                : ss.
COUNTY OF NEW YORK  )

     **LISA M. HACKETT, ESQ,** being duly sworn, deposes and says:

     1.     I am a member of the Bar of the Appellate Division of the Supreme Court of the

State of New York, First Department, and the United States District Court for the Southern and

Eastern Districts of New York.  I am also the former Senior Counsel and Associate General

Counsel of North General Hospital and its affiliated companies.  Currently, I am the Project

Director, Executive Administration of the Harlem Hospital Center, a member of the New York

City Health & Hospitals Corporation.  I have read the Examiner's Report, dated January 31,

2011 (the "Report"), on file in this chapter 11 case in the United States Bankruptcy Court for the

Southern District of New York (the "Court" or "Bankruptcy Court"), and submit this affidavit

based on my own personal knowledge to correct certain statements, misstatements and

conclusions set forth in the Report.

### Senior Counsel

2.     I was formerly employed by North General Hospital (the "Hospital") for almost twenty (20) years. My final title was "Senior Counsel," a position I held for approximately two and one-half (2 ½) years. Prior to my promotion to the position of Senior Counsel I was the Associate General Counsel of the Hospital for approximately five (5) years.

3.     In the capacity as Senior Counsel, I worked very closely with and was the liaison between the Hospital and its outside law firms, including:

      a.    Windels Marx Lane & Mittendorf, LLP ("Windels Marx"), the Hospital's "corporate counsel" since January 2007, and later appointed as Bankruptcy Counsel and General Counsel for the Hospital December 31, 2008;

      b.    Garbarini & Scher, the Hospital's malpractice defense counsel; and

      c.    Garfunkel Wild P.C. and its predecessor, the Hospital's healthcare and regulatory counsel and advised on health care business matters.

In addition, on occasion I have worked with Epstein Becker, Manatt Phelps, Togut Segal & Segal, and Cadwalader Wickersham & Taft, all counsel on specific matters; and, Alvarez & Marsal, Healthcare Industry Group, the Hospital's former Restructuring Advisors, and Mr. Ronald Gade, the Hospital's former Chief Restructuring Officer.

4.     In addition to the abovementioned outside professionals, as Senior Counsel I interacted with the medical staff and all of the non-medical departments and divisions of the Hospital on a daily basis. These departments and divisions included: Human Resources, Finance/Accounting, Compliance, the Chief Executive and the Hospital's Board of Trustees. Once restructuring efforts were underway at the Hospital, I also worked on matters as directed by

the then CFO, the Dormitory Authority of the State of New York ("DASNY"), the NYS

Department of Health ("DOH") and the NYS Department of Labor (the "DOL").

## Chapter 11

5.      On June 21, 2010, the Debtors determined that they had no choice but to file for

relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). On July

2, 2010 (the "Petition Date"), the Debtors filed their petitions for chapter 11 protection.

Commencing June 21 and continuing past the Petition Date, I was aware that Windels Marx, as

retained as the Debtor's bankruptcy counsel, prepared approximately twenty (20) or more so-

called "First Day" and "Second Day" motions and proposed orders for (i) retention of

professionals, (ii) Court authorization to borrow from DASNY, (iii) authority to consummate the

Hospital's Closure Plan promulgated by the DOH and, most importantly, (iv) the payment of

pre-and post-petition salaries, wages, vacation, severance and benefits to both union

(1199/SEIU) and non-union employees, and (v) payments to vendors on their pre-petition

invoices. Instrumental to Windels Marx's efforts in drafting and review of the aforementioned

documents was John P. Maher, MPH ("Maher"), the Hospital's then Executive Vice President

and Chief Financial Officer and often also the Chief Operating Officer.

6.      In the course of preparing the various applications and orders drafted by Windels

Marx, Ms. Babej and Mr. Etheridge would with respect to each application and order, advise me

and Mr. Maher, who worked closely with Windels Marx to provide relevant information

pertaining to the Debtor, on the purpose of the application, the basis for the application in the

Bankruptcy Code, the limitations and restrictions appurtenant thereto and the Court and

Bankruptcy Code interpretations of the terminology used in the applications and orders. Mr.

Maher reviewed not just the final product, but each draft leading up to the final and, if the U.S.

Trustee's Office had comments, Mr. Maher, plus Windels Marx, would review and comment on the drafts that circulated until the U.S. Trustee's Office was satisfied with the language in the application and proposed order. Mr. Maher would occasionally report to the remaining Executive Team in place with the Debtor after the filing on the purpose and implications of those Final Orders that were filed with the Court. It was my understanding that once Mr. Maher had conferred with Mr. Simpson, the partner-in-charge at Windels Marx and his associates, that Mr. Simpson would sign the application and cause it to be filed with the Bankruptcy Court. Upon information and belief, the aforesaid procedure was followed in each instance of the twenty (20) or more applications prepared prior to and post-Petition Date.

### The Examiner's Report

7.      I have been provided with a copy of the Examiner's Report which I have read; as well as an article on the Report in the Crains' Magazine (the "Article"). Although I was the Senior Counsel and intimately involved in the bankruptcy process from prior to the Petition Date to the date my position was terminated, I was never interviewed or asked by the Examiner to comment on the statements made by Mr. Maher. However, from the Report and Article concerning the Debtors' unauthorized payments post-petition of pre-petition indebtedness, a common thread through the Report is as follows:

      a.      Windels Marx did not advise Mr. Maher as to which payments he was authorized to pay;

      b.      Mr. Maher had very little Bankruptcy experience or expertise; and

      c.      Windels Marx knew or should have known that Mr. Maher was making unauthorized payments.

These comments from the Report are inaccurate and require clarification.

**Unauthorized Payments**

8.     As I stated above, I have personal knowledge that Windels Marx advised Mr. Maher and me with respect to all of the applications and orders filed with the Court up to and including October 1, 2010, the date my position as Senior Counsel was terminated. Also, on numerous occasions as I monitored compliance with the Court's orders, I personally advised Mr. Maher that certain payments he was making to employees and/or vendors and medical providers were prohibited by the Court's orders. I would often advise Mr. Simpson of the prohibited payments made by Mr. Maher and Mr. Simpson would telephone Mr. Maher or come to the Hospital and direct Mr. Maher to cease the unauthorized payments. An example of the aforesaid was the payment of pre-petition vacation to Samuel J. Daniel, M.D., the Hospital's former President and CEO. Once Mr. Simpson was advised by me that these payments were being made to Dr. Daniel, Mr. Simpson telephoned and directed Mr. Maher and me that we were not authorized to make payments of vacation, benefits and/or severance to the Hospital's management except as set forth in the Court's orders and to (i) disregard the DASNY budget approved by the Court as part of the DIP Loan if it conflicted with the Court's orders, and (ii) that payment of these entitlements to union and non-union employees was subject to a statutory "cap" of $11,725.00. Noteworthy is that Mr. Maher had advised those remaining Executive Staff exactly what Mr. Simpson had advised, which was that he [Maher] was not authorized to make payments of vacations, benefits, and/or severance to the Hospital's management except as set forth in the Court's orders. Mr. Maher advised the remaining Executive Staff, however, that the Court would eventually grant these payments to the Executive staff that remained. After my termination from the Hospital, I filed an administrative priority expense proof of claim in the Chapter 11 Cases, which DASNY has filed opposition papers to disallow the Severance Claims

and classify such claims as general unsecured claims, and disallow the Vacation Claims as administrative expense claims under the Bankruptcy Code and classify the same claims as either priority claims to the extent of the limitations set forth under the Bankruptcy Code or otherwise as general unsecured claims.

**Payments to "Critical Vendors"**

9.  A significant portion of the Report refers to a "critical vendor" motion. As explained to Mr. Maher and me by Windels Marx, these critical vendors were those vendors who provided goods and services necessary to keep the Hospital operational and to provide critical services to patients admitted to the Hospital. However, by the time the list of critical vendors was drafted by Mr. Maher and Ms. Marianne Muise ("Muise") of Healthcare Management Solutions ("HMS"), the Debtors' financial and reimbursement consultants, the Hospital was closed and there were no longer any patients. Also, the critical vendor list consisted primarily of (i) vendors and individuals for whom Mr. Maher authorized contracts for services while he was functioning as COO and CFO for the Hospital, (ii) the goods and services they delivered could have been rendered, post-petition by former competent personnel of the Hospital and, most importantly, upon information and belief, (iii) none of the so-called "critical vendors" had ever threatened to withhold the provision of services or delivery of goods to the Hospital unless they were paid moneys owed to them pre-petition.

10. I brought to Mr. Simpson's attention that the vendors and professionals on the list of "critical vendors" were suspect and further inquiry would be required before filing.

11. Upon information and belief, Mr. Maher was made aware that no "critical vendor" motion would be made by Windels Marx unless an accurate list included only those vendors actually critical to the Hospital closure process and who also had threatened to withhold

goods and/or services unless paid pre-petition amounts owed to them. I often would request that Mr. Maher release payments to certain vendors, who I was advised by Windels Marx to be "critical" to the Hospital's closure process, and who also had threatened to withhold goods. For example, Grace's Marketplace, the landlord from whom the Hospital leased office space for back office space and FedEx. In each instance, Mr. Maher denied payment stating that the vendor was not critical, not on the critical vendor list, and therefore not subject to payment under Court order. It can be argued that in some instances, Mr. Maher ignored the advice that had been given by Windels Marx and failed to release authorized payments and in others made payments to vendors despite having been advised by counsel. In another instance, I brought to Windels Marx's attention that Mr. Maher authorized transfer of certain Hospital assets post-petition. Mr. Simpson corroborated my understanding that Mr. Maher had no authority to dispose of assets without a Court order, and contacted Mr. Maher directly to advise him accordingly.

**Maher's Bankruptcy Experience**

12. The Report makes note of the alleged lack of Bankruptcy experience on the part of Mr. Maher. This is inaccurate and management at the Hospital can attest otherwise. It is my firm belief that Mr. Maher would not have been hired as the Hospital's CFO, COO or CRO had he not represented to the Board of Trustees that he had experience with hospitals going through restructuring. In fact, it is my firm belief that had Mr. Maher not represented his restructuring experience at St. Barnabas and Union Hospitals in the Bronx and Parkway Hospital in Queens, the Board of Trustees would not have hired him as COO initially, and to hold both titles as COO and CFO as of 2009 and clearly would not have promoted him to President and Chief Restructuring Officer upon Dr. Daniel's resignation. Furthermore, if Mr. Maher is as inexperienced in Bankruptcy proceedings as he now claims to be, he never advised me, the

Hospital staff, the Board of Trustees, Windels Marx or the Hospital's other professionals of this alleged lack of experience. I was always under the impression, based on representations of such by Mr. Maher, that Mr. Maher had extensive experience in bankruptcies and restructuring distressed hospitals in New York and New Jersey.

13.     The Debtors are governed by their Board of Trustees or Board of Directors, as the case may be. These Boards are made up of the same individuals, although in different combinations. With respect to the Board of Trustees, Rev. Dr. Calvin O. Butts, III is the Chairman and Mr. Eugene Giscombe is the Vice-Chairman. Contrary to the statement attributed to Mr. Simpson at footnote 9 of the Report there is no "secretary for the Board". Meetings of the Board of Trustees are taped and, thereafter transcribed. Mr. Simpson has always taken notes at Board meetings, Executive Session and various meetings and conferences with 1199/SEIU, Alvarez & Marsal, etc. However, these are his personal notes Mr. Simpson has been asked on certain occasions. When resolutions were passed by the Board in Executive Session, to draft the resolutions for the Hospital's records and on other occasions Mr. Simpson has been asked to take minutes when the meetings were not being taped. However, Mr. Simpson's notes have never been considered the minutes of the Hospital's Board meetings. Mr. Simpson only takes minutes when requested by the Chairman.

## Conclusion

As set forth above, I was not contacted by the Examiner or his counsel as part of his investigation. As Senior Counsel I believe my personal knowledge and involvement would have allowed the Examiner to have a clearer picture of the roles played by Mr. Maher and others with regard to the unauthorized payments. The facts are that Mr. Maher and Ms. Muise controlled the process and there was no way any of the Debtors' professionals could have known the extent to

which Mr. Maher and Ms. Muise were making the unauthorized payments. Mr. Maher was selective in what orders he would follow once he was promoted to President and CRO post-petition. He was in control and chose to interpret the Court's orders and operated in an unbridled fashion with neither oversight nor accountability.

_____
Lisa M. Hackett, Esq.

Sworn to before me this 17th
day of February 2011

Derek Etheridge

**DEREK ETHERIDGE**
**Notary Public, State of New York**
**No. 02-ET6118250**
**Qualified in New York County**
**My Commission Expires 11/01/2012**

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                          :
In re:                                    :      Chapter 11 Case
                                          :      No. 10-13553 (SCC)
NORTH GENERAL HOSPITAL, *et al.,*         :
                                          :      **Jointly Administered**
                      Debtors.            :
                                          :
------------------------------------------------------------x

### CERTIFICATION OF REV. DR. CALVIN O. BUTTS, III
### IN RESPONSE TO EXAMINER'S REPORT

**REV. DR. CALVIN O. BUTTS, III,** hereby certifies the following to be true upon his

personal knowledge and subject to penalties of perjury as follows:

      1.      I am the Senior Pastor of Abyssinian Baptist Church, Chairman of the Board of

Directors of Abyssinian Development Corporation, President of the State University of New

York at Old Westbury and the Chairman of the Board of Trustees of the North General Hospital

(the "Hospital").    In the latter capacity, I submit this Certification in support of the Response by

Windels Marx Lane & Mittendorf, LLP ("Windels Marx") to the Examiner's Report, dated

January 31, 2011 (the "Report"), of Richard Stern, Esq.  The purpose of this Certification is to

expand on the information provided to the Bankruptcy Court in the Report with respect to "(ii)

the role, including without limitation, the level of knowledge of (a) individual professionals of

the Debtors (b) members of the Debtors' current and former senior Management and (c)

members of the Debtors' Board of Directors with respect to the payment…" as set forth in the

January 10, 2011 Order of the Bankruptcy Court approving Mr. Stern's appointment.

      2.      With respect to the above inquiry into the "level of knowledge" of the members of

the Board of Trustees of the Hospital, the Trustees had no knowledge of the alleged unauthorized

payments by John Maher ("Maher"), the Hospital's President and Chief Restructuring Officer, of

pre-petition obligations of the Debtors. While acknowledging that these payments were made, however, the Report attributes this breach to an alleged failure by the Debtors' counsel, Windels Marx, to advise and/or otherwise communicate to Maher, in his former capacity as the Debtors' Executive Vice-President and Chief Financial Officer, that he was not authorized by the Court's "Wage Order" to make the unauthorized payments. The aforesaid statement is not accurate.

3.      For three (3) years prior to the commencement of this bankruptcy proceeding, Windels Marx and, in particular, Charles E. Simpson, Esq. ("Simpson") advised the Debtors, their Boards and their Management with regard to the requirements of the Bankruptcy Code with specific reference to the restrictions and limitations on the payment of pre-petition obligations. On numerous occasions, Windels Marx gave guidance to the Board and Management on the requirements, restrictions, prohibitions and limitations placed on the operation of the Hospital's business once the bankruptcy proceedings commenced.

4.      In fact, Windels Marx was not the only law firm which provided the Trustees and Management, including Maher, with such advice. Deryck Palmer, Esq. of Cadwalader Wickersham & Taft and Frank Oswald, Esq. of Togut, Segal & Segal, as well as restructuring advisors, Louis Hernandez of Kurron Shares of America and Martin Winter and Ron Winters of Alvarez & Marsal, spent untold hours explaining the process and procedures that the Hospital and its staff would have to follow once the Bankruptcy petitions were filed. Because the Board was concerned about the payments of wages, salary, vacation and severance due to both union and non-union members, questions with respect to payment of salaries, vacation, severance and benefits arose on numerous occasions both pre-petition and post-petition at meetings of the Board, executive session meetings and meetings of professionals with the Board with regard to the Hospital's restructuring efforts. At the meetings that he attended, Mr. Simpson advised the

Board that pre-petition payments could be made to the Hospital's former employees but subject to the terms and conditions of a so-called "Wage Order" which was entered by the Bankruptcy Court and which permitted such payments subject to statutory limitations on payment of wages, salary and severance but that employee reimbursements, accrued sick time and vacation pay that had accrued pre-petition could not be paid. Mr. Simpson also advised the Board and Management that certain payments which could not be paid immediately after the filing of the Bankruptcy petition would be paid as part of the Hospital's Plan of Liquidation. Additionally, there were discussions with regard to payments on the various pensions, the union and various governmental agencies. This is to say that Windels Marx advised the Board and Management both pre-petition and post-petition on all of the various scenarios, restrictions, prohibitions, limitations, etc. with regard to payments under the Court's orders.

5. I also noted that the Report concludes that Mr. Maher had no prior bankruptcy experience. I find this statement extremely hard to believe. At the time Maher was hired by the Hospital, Messrs. Ron Gade and Maher represented to the Board and Senior Management that Mr. Maher had substantial bankruptcy experience from insolvent hospitals in the Bronx, Queens and in New Jersey. Because the Board was aware that any of the proposed combinations between the Hospital and a third party would require a bankruptcy proceeding to consummate due to the large amount of debt on the Hospital's books, it was a condition of his hiring as Chief Financial Officer that Mr. Maher have requisite bankruptcy/insolvency experience. Mr. Maher represented continuously throughout the period of his employment that he had substantial experience in hospital insolvency situations. Mr. Maher's representations were made not only to the Board but to Windels Marx, Alvarez & Marsal, Kurron, the other professionals, the NYS Department of Health and other State agencies. It is not clear how deep the Examiner dug into

Mr. Maher's background but regardless of what Maher's actual bankruptcy/insolvency experience has been, Mr. Maher clearly made numerous representations to the Trustees, Management and professionals that he was extremely experienced in Hospital bankruptcies and insolvencies.

6.      The officers of the Hospital's Board of Trustees are myself, as Chairman, and Mr. Eugene Giscombe, as Vice-Chairman. There are no other officers and have been no other officers during the course of my Chairmanship. Mr. Simpson is not and has never been an officer of the Board or any of the Debtors. In fact, Mr. Simpson was, until 2010, only present at Board meetings at the invitation of the Chairman. At the beginning of 2010, when it was apparent that Mr. Simpson's presence was necessary, in addition to that of Alvarez & Marsal, to report to the Board on the various discussions and negotiations between the Governor's Office, Congressman Rangel's Office, DASNY, DOH, HHC, State Senator Perkins, Assemblyman Wright, Councilwoman Veverito and other entities and individuals involved in the attempt to restructure the Hospital prior the following of the chapter 11 case. However, at monthly Board meetings the minutes were taped and later transcribed by the Hospital's staff. Mr. Simpson takes his notes but only takes minutes of meetings at my request or the request of other Board members with regard to preparing resolutions passed by the Board, usually at executive session. Mr. Simpson takes notes for his personal use at all meetings whether he is requested to later prepare minutes or not. He has jokingly referred to this practice as his means of "staying awake".

7.      Upon the appointment of the Examiner, Mr. Simpson discussed the matter with me and explained that it might be necessary to waive the "attorney/client and work product privileges" in order for the Hospital to be transparent and not to appear to withhold information

necessary for the Examiner to conduct his investigation. Mr. Simpson also advised that certain members of the Board and Management might be interviewed by the Examiner, at which interviews a representative of Windels Marx would also appear. I advised Mr. Simpson that at the time that a waiver of either of the privileges was necessary that I would approve such a waiver. Second, although advised that the Examiner might elect to interview Board members or Management, to my knowledge no past or current Board member has been approached or requested to be interviewed by the Examiner. Nor has any members of current Management, except for Mr. Maher and Ms. Marianne Muise, been interviewed by the Examiner. (Mr. Simpson advised the Board of the Examiner's investigation and Windels Marx' interview, Mr. Maher did not.) All of the Board members, with the exception of Mark Jeziorski reside within the five (5) boroughs of New York City. Mr. Jeziorski resides in New Jersey. Likewise, Samuel J. Daniel, M.D., the Hospital's former President and CEO, Lisa Alvarenga, the former Senior Vice-President, and Lisa Hackett, the Hospital's former Senior Counsel, reside or work within the New York City limits. Had the Examiner the desire to conduct a fair, impartial and thorough investigation, he would have interviewed some, if not all of the aforesaid individuals. The Report, as I read it, relates solely to statements and interpretations given by Mr. Maher. In most instances, these statements based upon my personal knowledge do not accurately reflect the facts and circumstances.

8.     I hereby certify under penalty of perjury that the foregoing is true and correct.


Executed on February        , 2011


Rev. Dr. Calvin O. Butts, III

5

# EXHIBIT C

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                    :
In re:                              :          Chapter 11 Case
                                    :          No. 10-13553 (SCC)
NORTH GENERAL HOSPITAL, *et al.*,   :
                                    :          **Jointly Administered**
                        Debtors.    :
                                    :
                                    :
------------------------------------------------------------x


### AFFIDAVIT OF SAMUEL J. DANIEL, M.D.
### IN RESPONSE TO EXAMINER'S REPORT


STATE OF NEW YORK    )
                     ) : ss.
COUNTY OF NEW YORK)


    **SAMUEL J. DANIEL,** being duly sworn, deposes and says:

    1.    I am the former President and Chief Executive Officer of North General Hospital

(the "Hospital") and a former member of the Board of Directors of North General Service

Corporation, both Debtors-in-Possession (jointly with the North General Diagnostic & Treatment

Center, the "Debtors"). As such, I am fully familiar with the facts and circumstances set forth

below based upon my personal knowledge. I submit this Affidavit in support of the Response of

Windels Marx Lane & Mittendorf, LLP ("Windels Marx") to the Examiner's Report, dated

January 31, 2011 (the "Report"), of Richard Stern, Esq. (the "Examiner") with regard to (i) the

alleged post-petition unauthorized payments of pre-petition obligations and (ii) to illuminate

certain unsubstantiated findings and baseless conclusions made in the Report.

    2.    First, I am an attending physician at St. Luke's-Roosevelt Hospital Center in

Manhattan and reside in Armonk, New York. Second, I have appeared in these proceedings

through my deposition held at the offices of Alston & Bird, LP. However, notwithstanding my residence and employment in the Metropolitan New York area, I was not contacted or interviewed by the Examiner with respect to his investigation, despite the fact that during most of the period during which the alleged unauthorized payments were made, I was the President and Chief Executive Officer of the Hospital, and responsible for the operations of the Debtors. There is no excuse for the failure of the Examiner to contact me with regard to his investigation.

3.     This Affidavit speaks solely to those matters mentioned in the Report of which I have personal knowledge. These matters include the following:

a.     Advice given to the Board of Trustees (the "Board") and the Hospital's management ("Management") by Windels Marx and others on the procedures, limitations and restrictions on payment of pre-petition indebtedness during the Debtors' chapter 11 cases;

b.     Advice given by Windels Marx to John P. Maher, MPH, ("Maher"), the Hospital's then Executive Vice President and Chief Financial Officer, with respect to (i) his lack of authority to pay pre-petition indebtedness for salary, vacation and severance and (ii) the supremacy of the Bankruptcy Court's orders over the Dormitory Authority of the State of New York ("DASNY") budget (the "DASNY Budget") approved by the Bankruptcy Court in support of DASNY's DIP Loan;

c.     Participation by Mr. Maher and Lisa M. Hackett, Esq., ("Hackett"), the Hospital's Senior Counsel, in numerous drafting sessions regarding motions and orders with Windels Marx;

d.     Complaints by Hackett, Ms. Renecia Lowery-Jeter ("Jeter"), the Hospital's Vice-President of Human Resources, and Charles E. Simpson, Esq., the partner-in-

charge of the Debtors' representation at Windels Marx, concerning the payments made by Maher that contravened the provisions of the Bankruptcy Court's "Wage Order"; and,

e.      Maher's bankruptcy experience.

## WINDELS MARX' ADVICE TO THE BOARD OF TRUSTEES AND MANAGEMENT REGARDING THE PROCEDURE IN CHAPTER 11

4.      Prior to the filing of these chapter 11 cases by the Debtors, Windels Marx (Messrs. Charles E. Simpson and Derek Etheridge and Ms. Erin Babej-Zavalkoff) spent a considerable amount of time with the Officers and Trustees of the Hospital in Board meetings, conferences and Executive Sessions where they explained to the Debtors the difference between operating a Hospital under chapter 11 and how a hospital operates prior to such filing. These discussions included in various combinations, the Trustees, Mr. Maher, Ms. Hackett, Ms. Jeter, your deponent and others, and took place at various times prior to and following the filing of the petitions in these cases up to my resignation, which was effective August 5, 2010. During the aforesaid discussions, we were advised by Windels Marx that indebtedness of the Hospital prior to July 2, 2010 (the "Petition Date") could not be paid without an order from the Bankruptcy Court. The various motions that were filed by the Debtors for authority to make payments to former employees, vendors, insurers, etc. were discussed, as well as the role in the bankruptcy played by the Creditors' Committee, DASNY and the Bankruptcy Court. Throughout the 2010 pre-petition period and post-petition up to August 5, 2010, I can attest of my personal knowledge that Windels Marx advised the Debtors, including Maher, on bankruptcy procedures and was always available to provide advice and give answers to any inquiry made by Management and the staff at the Hospital; including Maher.

5.      Furthermore, pre-petition, Management and Maher also had the advice of Bankruptcy counsel in addition to Windels Marx, including: Deryck Palmer, Esq. of Cadwalader

Wickersham & Taft, Frank Oswald, Esq. of Togut, Segal & Segal, who also provided the Board and Management, including Maher, advice concerning the procedures, process, restrictions and limitations, especially with respect to the payment of pre-petition indebtedness. The conclusion in the Examiner's Report that Windels Marx did not adequately advise the Hospital and Maher with regard to the payments he could make and could not make pursuant to the various Bankruptcy Court orders is simply not true.

## ADVICE GIVEN TO JOHN MAHER BY WINDELS MARX

6.      As the Chief Executive Officer, I was personally aware of advice given to Maher by Windels Marx regarding the payment of salary, vacation, severance and benefits to former employees of the Hospital once the Hospital closed on July 10, 2010. This occurred prior to my resignation from the Hospital; however, during that approximately one (1) month period, Mr. Simpson on numerous occasions advised Maher that his authority to make the above-mentioned payments was limited and restricted by the Bankruptcy Court's "Wage Order". Mr. Simpson also advised your deponent and Maher, Hackett and Jeter that notwithstanding the Bankruptcy Court approved budget from DASNY as part of the DIP Loan, the provisions of that budget was subject to compliance with the agreed to limitations on payments set forth in the Wage Order, the application supporting it and the $11,725.00 "cap" on the amount that could be paid to a claimant pursuant to the Bankruptcy Code. The findings and conclusions in the Report that Mr. Simpson and Windels Marx did not advise Maher concerning the prohibitions, restrictions and limitations on payments of pre-petition indebtedness under the Wage Order is simply not true.

## MAHER AND HACKETT PARTICIPATED IN DRAFTING OF MOTIONS

7.     Once the Board decided that the filing of a chapter 11 petition was necessary to provide for the orderly closure of the Hospital, Windels Marx rushed to complete the drafting of the Petition, Schedules and Statement of Financial Affairs, my Affidavit and other related petition documents. Participating with Windels Marx in this process was Maher, Hackett and, to a limited extent, Jeter. In addition, there were numerous motions, applications and orders which sought and received authority from the Bankruptcy Court to make various payments, retain professionals, comply with the NYS Department of Health's Closure Plan, etc. These motions were drafted and reviewed by Windels Marx with the participation of Maher and Hackett. In fact, Maher spent a number of days at Windels Marx' offices reviewing, revising and providing input to the motions and receiving instructions from Windels Marx on how to comply with the Orders and the restrictions and limitations therein. These motions and Orders were vetted at each stage and with respect to each draft by Hackett and Maher and, where appropriate, Jeter.

## MANAGEMENT COMPLAINTS TO WINDELS MARX

8.     Almost immediately after the Bankruptcy Court entered orders authorizing the various retentions and payments, Hackett and Jeter complained to your deponent with regard to Maher's failure and refusal to comply with the Bankruptcy Court's orders and the favoritism that Maher exhibited from vendor to vendor and employee to employee. In most instances, I would refer Hackett and Jeter to Mr. Simpson to confirm whether the payments being made were appropriate under the Wage Order. In certain instances, your deponent telephoned Mr. Simpson to discuss whether payments that were being made were proper. In my conversations with Mr. Simpson he stated that Maher was following the directions of DASNY's Budget in the DIP Loan, as opposed to the Bankruptcy Court's orders. In one instance in particular, which related

to my vacation pay, Mr. Simpson directed Maher to cease making any additional payments and advised me that the payment was not authorized under the Bankruptcy Court's order notwithstanding the fact that the DASNY Budget provided for vacation payments. Mr. Simpson advised Maher, Hackett and myself that compliance with the Bankruptcy Court's order governed as opposed to the DASNY Budget. Mr. Simpson has advised me that I must repay the monies that I received and Maher approved relating to vacation pay and deferred compensation.

## MAHER'S BANKRUPTCY EXPERIENCE

9.      The Report goes into great detail concerning Maher's alleged lack of bankruptcy experience. I was somewhat surprised by this statement as Maher was employed by the Hospital based upon his alleged experience in Hospital insolvencies and bankruptcies. It was communicated to the Board and management that Maher's extensive experience included years of insolvency and restructuring at St. Barnabas and Union Hospitals in the Bronx and limited stints at Parkway Hospital in Queens and others. Maher has always held himself out to the Hospital as an expert on hospital bankruptcies and insolvencies and, as a result, when he was recommended to the Hospital by Mr. Ronald Gade, the Hospital's then Chief Restructuring Officer, the Board voted to retain him as Executive Vice President and Chief Financial Officer and would later add Chief Operating Officer to his title.

10.      Lastly, upon my resignation of the positions of President and Chief Executive Office of the Hospital, the Board "promoted" Maher to President and Chief Restructuring Officer of the Hospital. This promotion was partially due to Maher's representations of his expertise and knowledge of hospital bankruptcies and insolvencies. It was a promotion, not a raise. Maher assumed the position of President and the salary that went with it.

## **CONCLUSION**

The Examiner's Report is replete with flawed reasoning and conclusions due to the focus of the investigation on the unsupported and inaccurate statements of Mr. John Maher, the person who made the unauthorized payments, and appears to assist Maher in his attempt to deflect responsibility from himself to Windels Marx and others. It is inescapable reasoning that the Examiner's investigation should have included an interview with me, Maher's immediate supervisor, Hackett, Jeter and the members of the Board of Trustees, all of who were available. This investigation appears to have started from a preconceived conclusion and the Examiner elicited information solely from Maher to justify the desired result.

_____
Samuel J. Daniel, M.D.

Sworn to before me this
23rd day of February, 2011

_____
Notary Public

DEREK ETHERIDGE
Notary Public, State of New York
No. 02-ET6118250
Qualified in New York County
My Commission Expires 11/01/2012

# EXHIBIT D

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                          :
In re:                                    :        Chapter 11 Case
                                          :        No. 10-13553 (SCC)
NORTH GENERAL HOSPITAL, *et al.*,         :
                                          :        **Jointly Administered**
                    Debtors.              :
                                          :
                                          :
---------------------------------------------------------------x

## AFFIDAVIT OF RENECIA LOWERY-JETER
## RESPONSE TO EXAMINER'S REPORT

STATE OF MICHIGAN     )
                      : ss.
COUNTY OF OAKLAND     )

**RENECIA LOWERY-JETER,** being duly sworn, deposes and says:

1.      I am the former Vice-President of Human Resources for North General Hospital

(the "Hospital") and its affiliated companies.  I have read the Examiner's Report, dated January

31, 2011 (the "Report"), on file in this chapter 11 case in the United States Bankruptcy Court for

the Southern District of New York (the "Court" or "Bankruptcy Court"), and submit this

affidavit based on my own personal knowledge to correct certain statements, misstatements and

conclusions set forth in the Report.

### Vice-President of Human Resources

2.      I was formerly employed by the Hospital for approximately one (1) year. During

that period and until my position was eliminated as part of the Hospital's closure on September

30, 2010, my title was Vice-President Human Resources.  Prior to my employment at North

General Hospital, I was employed as the Director of Human Resources and Administration with

the Isaac Group, an automotive supplier.

3.     This Affidavit speaks solely to those matters (i) mentioned in the Report of which I have personal knowledge or (ii) which I feel are necessary to disclose to the Court to illuminate certain unsubstantiated findings and baseless conclusions by the Examiner. These matters include the following:

a.     Advice given by Windels Marx to Mr. John P. Maher, MPH ("Maher"), the Hospital's current President and Chief Restructuring Officer, with respect to (i) his lack of authority to pay pre-petition indebtedness for salary, vacation and severance and (ii) the supremacy of the Bankruptcy Court's orders over the Dormitory Authority of the State of New York ("DASNY") budget approved by the Bankruptcy Court as part of its approval of DASNY's DIP Loan;

b.     Complaints made to Samuel J. Daniel M.D., former President and Chief Executive Officer of North General Hospital, by me, Lisa Hackett, Esq., North General's former Senior Counsel, and by Charles E. Simpson, Esq. ("Mr. Simpson") the partner –in-charge of the Debtors' representation at Windels Marx Lane & Mittendorf LLP ("Windels Marx"), concerning the payments made by Maher that contravened the provisions of the Bankruptcy Court's "Wage Order";

c.     Payments Mr. Maher directed to be made, which payments were not authorized by Order of this Court and were made in blatant disregard of the advice and direction provided by Windels Marx; and

d.     Mr. Maher's bankruptcy experience.

## The Examiner's Report

4.    I have been provided with a copy of the Examiner's Report which I have read; as well as an article on the Report in the Crains' Magazine (the "Article"). Although I was Vice-President of Human Resources throughout most of period during which the alleged unauthorized payments to former employees of the Hospital were made, I was not contacted by the Examiner with respect to his investigation nor was I interviewed or asked by the Examiner to comment on the statements made by Mr. Maher.

## Advice Given to  Mr. Maher By Windels Marx

5.    As Vice-President of Human Resources, I am personally aware of the advice given to Mr. Maher by Windels Marx regarding the payment of salary, vacation, severance and benefits to former North General employees who were either terminated just after the Hospital filed for bankruptcy under Chapter 11 on July 2, 2010, or once the hospital ceased operating on July 10, 2010.

6.    On several occasions, Mr. Simpson advised Mr. Maher, Ms Hackett and me that any authority Hospital's management had to make the abovementioned payments was subject to the limitations and restrictions imposed by the Court's "Wage Order." Mr. Simpson also directed Mr. Maher, Ms. Hackett and me to disregard the DASNY budget approved by the Court as part of the DIP Loan if it conflicted with the Court's orders.  In this regard, Mr. Simpson reiterated to the abovementioned individuals on numerous occasions that the provisions of the DASNY Budget were necessarily curtailed by the agreed-upon limitations on certain payments set forth in the Wage Order.  Mr. Simpson also stressed that the payment of any entitlements to union and non-union employees was subject to a statutory "cap" of $11,725.00.  In essence, the Examiner's accusation that Windels Marx failed to provide adequate legal advice to North

General's management, including Mr. Maher, is simply not based on the actual events as I witnessed them first-hand.

**Complaints to Dr. Daniel and Mr. Simpson**

7.     Shortly after the Hospital filed for Chapter 11 and the Court entered its first series of Orders authorizing certain payments on pre-petition obligations, Ms. Hackett and I complained to Dr Daniel about Mr. Maher's refusal to adhere to the Bankruptcy Court's orders. Dr. Daniel immediately referred Ms. Hackett and me to Mr. Simpson who confirmed whether the specific payments being made by Mr. Maher (or being directed to be made by Mr. Maher) were in contravention of the Wage Order. Where appropriate, Mr. Simpson advised us that the payment at issue was not permitted under the Wage Order (irrespective of whether or not it was permitted under the DASNY Budget).

**Mr. Maher's Deal With the Union**

8.     In order to appease the union employees and prevent further picketing Mr. Maher took it upon himself to negotiate an agreement with the 1199SEIU union to pay COBRA benefits for terminated union employees for a period of six (6) months. Ordinarily, when an employee is terminated, the former employer will make the monthly COBRA payment on behalf of the former employee and then recover the full amount from that former employee. Mr. Maher however, without seeking this Court's authority and without discussing or disclosing his arrangement with Windels Marx, simply agreed that the Hospital would make the COBRA payments for terminated union employees and that it would not seek to recover the amount expended.

9.     It is my understanding that Mr. Maher only mentioned the COBRA payments to Windels Marx on Friday February 18, 2011, after these payments were discovered by the NHB

Advisors, Committee's financial advisors. While Mr. Maher explained to Mr. Simpson that he was unaware that the Hospital had not sought to recover the amount it had expended from the terminated employees, the truth is rather a different one. Mr. Maher was the one who directed what payments were to be made, on whose behalf and if such payments were to be recovered from a third-party.

**Payments Made to Senior Management**

10.     I had no authority to sign checks on the Hospital's behalf, only to submit and approve check requests, Mr. Maher was the individual charged with directing who should be paid, what and when. In this regard, Mr. Maher had comprehensive and almost total "power of the purse"

11.     As the individual who was charged with approving check request I was directed by Mr. Maher to submit check requests to make a number of payments to senior management, which payments were neither authorized under the Bankruptcy Code nor by Order of this Court.

12.     Among such payments was the payment of pre-petition vacation to Samuel J. Daniel, M.D., the Hospital's former President and CEO. More crucially, in total violation of the Wage Order, and without disclosing anything to Windels Marx, Mr. Maher directed me to (i) cause Dr. Daniel to be paid Ninety-Two Thousand ($92,000.00) Dollars from the Hospital's 457(b) Deferred Compensation Plan and (ii) sign, but not date paperwork necessary to process a payment to him from Mutual of America for amounts he believed he was due under the Deferred Compensation Plan.[1] It was my understanding that Mr. Maher would fill in the date at some point in the future and process a check from Mutual of America.

---

[1] It should also be noted that while Mr. Maher processed his change of title with the Human Resources Department, upon taking over Dr Daniel's position as President and Chief Restructuring Officer of North general, he never processed his raise through HR. Despite efforts to locate the requisite paperwork concerning his increase in salary, my department was unable to find anything evidencing Mr. Maher's salary increase. Upon information and belief,

## Maher's Bankruptcy Experience

13.     The Report makes note of the alleged lack of bankruptcy experience on the part of Mr. Maher. This is inaccurate and management at the Hospital can attest otherwise. It is my firm belief that Mr. Maher would not have been hired as the Hospital's CFO, COO or CRO had he not represented to management and the Board of Trustees that he had substantial experience with hospitals going through restructuring. In fact, it is my firm belief that had Mr. Maher not represented his restructuring experience, the Board of Trustees would not have hired him as COO initially, and to hold both titles as COO and CFO as of 2009 and clearly would not have promoted him to President and Chief Restructuring Officer upon Dr. Daniel's resignation. Furthermore, if Mr. Maher is as inexperienced in Bankruptcy proceedings as he now claims to be, he never advised me, the Hospital staff, the Board of Trustees, Windels Marx or the Hospital's other professionals of this alleged lack of experience. Mr. Maher routinely asserted that he had extensive experience in bankruptcies and restructuring of distressed hospitals in New York and New Jersey. Further, the resume on file in his personnel record states the same.

## Conclusion

As set forth above, I was not contacted by the Examiner or his counsel as part of his investigation. As Vice President of Human Resources, I believe my personal knowledge and involvement would have given the Examiner a clearer picture of the roles played by Mr. Maher and others with regard to the unauthorized payments. The facts are that Mr. Maher controlled the purse strings, and the process for recording payments made by the Hospital would have made it very difficult for any of the Debtors' professionals to uncover the extent to which Mr. Maher was making unauthorized payments. Mr. Maher was selective in what orders he would follow

---

Mr. Maher processed his raised on the finance side, bypassing the HR department, which was the department charged with salary-related issues.

post-petition and was even more selective in what information he shared with management and Windels Marx. As already expressed herein, Mr. Maher controlled the Hospital's funds and chose who or who not to pay, when and in what amounts in an unrestrained fashion with neither oversight nor accountability and most crucially, in total disregard of this Court's orders.

Renecia Lowery-Jeter

Sworn to before me this
_____ day of February 2011

Notary Public

VANESSA R. ROBINSON
Notary Public, State of Michigan
County of Wayne
My Commission Expires Jun. 10, 2012
Acting in the County of Oakland

**EXHIBIT E**

**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
(212) 237-1000
Charles E. Simpson (csimpson@windelsmarx.com)

*Attorneys for North General Hospital et al.,*
*Debtors-in-Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re                        :

                          :      Chapter 11 Case

NORTH GENERAL HOSPITAL *et al.,*  :      No. 10-13553 (SCC)

                          :

            Debtors.     :      <u>**Jointly Administered**</u>
------------------------------------------------------------x

## AFFIDAVIT OF DEREK ETHERIDGE IN
## RESPONSE TO EXAMINER'S REPORT

STATE OF NEW YORK    )
                      ) ss:
COUNTY OF NEW YORK  )

     **DEREK ETHERIDGE**, being duly sworn, upon his oath, deposes and says:

     1.     I am a member of the Bar of the State of New York and associated with the firm

of Windels Marx Lane & Mittendorf, LLP ("<u>Windels Marx</u>" or the "<u>Firm</u>"), with offices in

several locations, including its main office located at 156 West 56th Street, New York, New York

10019.

     2.     All facts set forth below in this affidavit the ("Affidavit") are based upon my

personal knowledge, information from, and discussions I have had with certain of my colleagues,

communications with individuals employed[1] by North General Hospital, et al., as defined below,

---

[1] Included as "individuals employed by North General Hospital, et al." are members of Healthcare Management Solutions, Inc. (hereinafter referred to as "HMS").

{10620457:2}

and discussions with and correspondence from the Office of the United States Trustee.

3.　　Beginning in 2009, certain members of Windels Marx's Corporate Reorganizations, Creditors Rights and Workouts group worked specifically on matters related to the restructuring of North General Hospital and certain of its affiliates (the "Bankruptcy Group"). In or around April 2010, the Bankruptcy Group began preparing for the possible chapter 11 filing of North General Hospital ("North General" or the "Hospital"), North General Service Corporation ("Corporation") and North General Diagnostic & Treatment Center ("D&TC") (North General, Corporation and D&TC collectively referred to herein as the "Debtors"). Toward that end, the Bankruptcy Group consulted extensively with Lisa M. Hackett, Esq. ("Hackett"), former Senior Counsel for the Debtors, Mr. John Maher ("Maher"), currently President and Chief Restructuring Officer, but also the former Executive Vice President and Chief Financial Officer of the Debtors and, to a lesser extent, Ms. Marianne Muise ("Muise") and Ms. Monica Terrano ("Terrano") of HMS in order to gather information necessary to complete chapter 11 petitions, Schedules, Statements of Financial Affairs and various motions and orders.

4.　　Throughout the months of April, May and June of 2010, the Bankruptcy Group drafted approximately twenty-three (23) "first day" motions and proposed orders, including the Affidavit of Samuel J. Daniel in Support of First Day Motions (the "Daniel Affidavit").

5.　　Preceding the chapter 11 filing, these drafts were in various stages of completion and often required information that the Bankruptcy Group could only obtain from the Debtors. Consequently, the Bankruptcy Group solicited this information by contacting either Hackett and/or Maher via email with an attachment of the motion/application requiring information and some detail in either the body of the email or on the draft documents themselves of what

information was missing and needed to be provided. As the Petition Date neared and the need for specific information intensified, Maher permitted the Bankruptcy Group procure this information directly from Muise and Terrano.

6. The Bankruptcy Group met with Maher, who spent days at Windels Marx's offices, on several occasions prior to the filing to review with the Bankruptcy Group the drafts and proposed orders. Oftentimes, Maher would note that some particular piece of information would have to be retrieved from records at the Debtors' facilities and that he would provide the information at a later time. In general, this was the process by which the Bankruptcy Group and the Debtors would work in concert to draft the motions/applications and proposed orders.

7. One week prior to the filing, I contacted the Office of the United States Trustee, Region 2 (the "U.S. Trustee") regarding service of a binder containing the twenty-three (23) draft first day motions for the U.S. Trustee's review and comment. Shortly thereafter, I began speaking regularly with Andy Velez-Rivera, Esq. and subsequently, exclusively with Andrea Schwartz, Esq. ("Andrea Schwartz" or "Ms. Schwartz"), regarding the state of the first day motions and the information therein that Ms. Schwartz would require in order for her not to file an objection to the motions.

8. On June 28, 2010, I received a call from Ms. Schwartz stating that only a select number of the twenty-three (23) first day motions prepared by the Bankruptcy Group and Maher should be filed on the first day. Those motions were:

(i) Affidavit of Dr. Samuel J. Daniel (a) Pursuant to Local Bankruptcy Rule 1007-2, and (b) in Support of First Day Motions (the previously defined Daniel Affidavit);

(ii) Debtors' Motion for an Order (a) Authorizing but not Requiring Payment of Pre-Petition Wages and Related Obligations, (b) Authorizing Payment of Obligations

Related to Medical Providers; and (c) Authorizing and Directing Banks to Honor Checks with Respect Thereto (the "Wage Motion");

(iii) Debtors' Motion Pursuant to Federal Rule of Bankruptcy Procedure 1015(b) for Joint Administration and Procedural Consolidation of Cases (the "Joint Administration Motion");

(iv) Application to Extend Time to File Schedules, Lists of Creditors, Schedules of Assets and Liabilities, Statement of Financial Affairs and Schedule of Executory Contracts and Unexpired Leases ("Motion for Extension to File Schedules");

(v) Debtors' Motion for an Order Implementing Certain Notice and Case Management Procedures ("Case Management Motion");

(vi) Motion to (I) Authorize Debtors to Maintain and Use Existing Bank Accounts and Business Forms, (II) Authorizing the Debtors to Maintain and Use Existing Cash Management System ("Cash Management Motion");

(vii) Motion of the Debtors for Entry of Interim and Final Orders Pursuant to Sections 105(a), 363, and 1108 of the Bankruptcy Code (i) Authorizing the Debtors to Continue the Implementation, in Accordance with New York State Law, of a Plan of Closure for the Debtor's Hospital and Certain Affiliated Outpatient Clinics and Practices; and (ii) Scheduling a Final Hearing ("Closure Plan Motion"); and

(viii) Motion for Entry of Interim and Final Orders (i) Authorizing Debtors to Incur Postpetition Indebtedness (ii) Granting Senior Security Interests and Superpriority Claims (iii) Authorizing Debtors Use of Cash Collateral (iv) Granting Adequate Protection and Related Relief , and (v) Scheduling an Interim and Final Hearing ("DIP Motion").

**Critical Vendor Motion**

9.      While reviewing the list of twenty-three (23) first day motions with Ms. Schwartz over the telephone, she specifically indicated that a showing would have to be made pursuant to Rule 6003 in order for the critical vendor motion to be filed on the first day. She stated that unless the Debtors were able to show that first day relief is necessary to avoid immediate and irreparable harm, the critical vendor·motion could not be filed on the first day. On June 28, 2010, subsequent to my call with Ms. Schwartz, I had a conference with Charles E. Simpson ("Simpson"), the partner in charge of the Debtors' chapter 11 cases and Erin Babej ("Babej"), an associate working on the Debtors' chapter 11 cases, in Mr. Simpson's office to discuss the fact that the number of first day motions that the Debtors would be filing was significantly decreased at the direction of Ms. Schwartz. While discussing the Rule 6003 requirements and whether the Debtors were able to show immediate and irreparable harm with respect to critical vendors, it was collectively decided that we would contact Mr. Maher to determine whether the alleged critical vendors would not deliver goods and/or services without payment for prepetition goods and services and an order from the court, and thus be able to pass muster under Rule 6003.

10.      Babej and I had a conference call with Maher on the afternoon of June 28, 2010 to discuss, among other things, preparation of the Closure Plan Motion. During this conference call, Maher was informed of my conversation with Ms. Schwartz and the reduction in the number of first day motions to be filed. Maher was told that according to Rule 6003 of the Bankruptcy Rules, the Debtors would have to prove that the critical vendors would not provide services and/or deliver goods without payment for prepetition goods and/or services and an order from the court authorizing the Debtors to pay them on prepetition amounts owed. Maher did not indicate that such a showing could be made at which point Babej and I instructed him to provide

us with a list of all vendors that he deemed critical so that a motion authorizing all prepetition amounts owed to these vendors could be made. Maher did not provide us with such a list at that time, however, he copied me on an email dated June 28, 2010 to Helen Cooper at Epiq Bankruptcy Solutions ("Epiq") upon which he attached an excel spreadsheet with all open accounts payable (Attached hereto as Exhibit "1"). It could not be determined from viewing the spreadsheet which vendors were critical.

11.    Over the next two (2) weeks leading up to the filing of our second set of motions on July 15, 2010, the Bankruptcy Group, particularly Babej, continually requested that Maher provide us with information regarding critical vendors so that the draft critical vendor motion could be completed. On July 12, 2010, Babej sent an email to Muise of HMS indicating that Maher had directed all vendor-related questions to be sent to Muise and requesting a list of critical vendors (Attached hereto as Exhibit "2"). The email also described the definition of a critical vendor to Muise.  As this information was not forwarded by Muise on July 12, 2010 Babej sent a follow-up email the following day indicating that we intended to file the critical vendor motion on July 15, 2010 and that we needed the list of critical vendors (Attached hereto as Exhibit "3")

12.    On the afternoon of July 13, 2010, a binder with unexecuted drafts of the motions to be filed the following day, including the critical vendor motion, was delivered to Andrea Schwartz. The critical vendor motion was essentially in draft form as we had not yet received the list of critical vendors from the Debtors. On the afternoon of July 14, 2010, after the binder of motions were sent to Ms. Schwartz for review, Terrano forwarded an excel spreadsheet of purported critical vendors to Babej (Attached hereto as Exhibit "4"). Specifically, the list contained a total of 32 entities classified as either "Critical," "Ordinary Course," or

"Professional." Of the 32 entities on the list, only 5 of them were classified as Critical. These 5 entities were: Burns Security, Iron Mountain, Physician Reciprocal Insurance, Public Goods Pool and Statewide Assessment Pool.

13.     The Bankruptcy Group reviewed the list of critical vendors and determined that these entities did not qualify as critical vendors and would not pass muster under the Rule 6003 requirement. The critical vendor motion stated that it was necessary to pay critical vendors (i) to implement the Closure Plan and (ii) safeguard patients and the residents. However, the Hospital had discharged all of its patients by July 10, 2010, obviating the need for the critical vendors on the spreadsheet. The only vendor that could have been considered Critical under the circumstances was Burns Security for the safeguarding of the physical property and remaining staff.

14.     Following a conference on the matter among the Bankruptcy Group, Charles Simpson determined that he would not execute the critical vendor motion due to the fact that, in light of the closing of the Hospital and information he had received from Lisa Hackett concerning the make-up of the list, the list of critical vendors were not critical at all. On July 15, 2010, I called Hackett to discuss the Bankruptcy Group's concern with the list of vendors classified as Critical on the spreadsheet and forwarded the list to Hackett at her request for her to review. Having not received an updated list from the Debtors on July 15, 2010, a critical vendor motion was not filed on that day.

15.     Babej continued communicating with Muise regarding the critical vendor list and why the vendors classified as critical did not qualify as such. On July 21, 2010, in an effort to retool the critical vendor motion and file it, Babej requested a description of the services provided by the vendors classified as Critical. An email forwarding the updated critical vendor

list was forwarded by Muise on the same date (Attached hereto as Exhibit "5"). A review of the updated list further confirmed the Bankruptcy Group's initial impression that these were not critical vendors.

16.     On July 23, 2010, Andrea Schwartz sent Simpson and I an email containing certain issues with the draft critical vendor motion she received in the binder of motions forwarded on July 13, 2010 (Attached hereto as Exhibit "6"). Specifically, Ms. Schwartz inquired why the motion was necessary in light of the fact that all of the patients were discharged from the Hospital as of July 11, 2010. Simpson and I discussed the U.S. Trustee's comments and determined that based upon the information provided to us by the Hospital to date, none of the vendors classified as Critical were, in fact, critical. Simpson expressed this to Maher and informed him that if he wanted the critical vendor motion filed, he should consult with Garfunkel Wild P.C. to file it on the Debtors' behalf as Windels Marx would not.

17.     On August 20, 2010, Maher sent an email to Simpson and myself forwarding certain information on payments to Medical Providers requested by the Committee (Attached hereto as Exhibit "7"). Maher's email states that "the [C]ommittee also requested documents from providers who were threatening to stop service, if not paid. For those providers, (Anesthesiology and Pathology) e mails and letters are included. *Path was the only real threat, as the payment to Anesthesiology was for post petition services.*" (Emphasis added). Maher's own statement confirms what the US Trustee's concerns addressed and what the Bankruptcy Group concluded about the list of purported critical vendors forwarded by Maher. These entities did not qualify as critical vendors and consequently, a decision was made by Simpson not to file the motion. Thus, payments to these vendors authorized by Maher were made by him with the knowledge that there was no critical vendor motion or order authorizing such payments.

**Prepetition Wage Motion**

18.     With the burden of reviewing the first day motions significantly lessened by the reduction of the number of documents to be reviewed, the US Trustee reviewed and commented on each of the first day motions and proposed orders up to and including the Petition Date. A conference call was held on July 1, 2010 with Andrea Schwartz on which myself, Simpson and Babej participated to discuss the U.S. Trustee's comments on the first day motions and corresponding orders.

19.     With respect to the Wage Motion, Ms. Schwartz indicated that the U.S. Trustee's Office wanted a "bare-bones" motion and would object to the payment of anything other than Employee Obligations (as that term is defined in the Motion) including, without limitation, accrued but unpaid prepetition wages, salaries, commissions, withholding taxes and garnishments, on behalf of, the Employees provided that such payments did not exceed the statutory priority limits of $11,725 under § 507(a)(4) of the Bankruptcy Code. The motion and order was thereafter revised to indicate that employee reimbursements, employee benefits and vacation and other leave, including the compensation for employees taking accrued vacation time, termination of employment, voluntary resignation or sick and personal time would not be paid pursuant to the Wage Motion. Simpson objected to what he considered was Ms. Schwarz' heavy-handedness, especially in light of the fact that the funds to make the aforesaid payments were funds from DASNY and DASNY wanted these employee claims paid. However, Simpson said he would leave it up to Maher whether we would make the motion notwithstanding Ms. Schwartz' objection and let Judge Chapman decide.

20.     Immediately after the conference call, Simpson, Babej and myself called Maher to advise him that in accordance with the Wage Motion, he was not to pay prepetition wages or

salary over the statutory cap of $11,725.00 and that he was not to pay (i) employee reimbursement expenses, including business expenses incurred in connection with services rendered for the benefit of the Debtors, including, without limitation, those relating to meals, travel, and other ordinary course reimbursable employee business expenses, (ii) benefit premiums and expenses on account of prepetition claims covered by any medical plans or insurance policies, and (iii) accrued vacation or sick and personal time. Mr. Simpson was adamant about Maher not paying these items as we had just hung up with the U.S. Trustee's Office and were specifically told how the Wage Motion and proposed order would have to be tailored in order to avoid an objection. Maher inquired as to how these expenses would be paid and Simpson told him that we could provide for payment of these items through the Plan. Maher indicated that he would only pay wages in accordance with the US Trustee's instructions.

21.     On July 26, 2010, I called Maher to discuss the retention of BDO USA LLP (the "July 26th Call"). During our conversation, John mentioned payments that were made to Medical Providers, as that term is defined in the Wage Motion. These payments had been identified in the motion for reconsideration of the wage order insofar as it authorized payment of obligations related to Medical Providers (the "Motion for Reconsideration") filed by the Official Committee of Unsecured Creditors (the "Committee"). Prior to this motion being filed, I was not privy to payments to Medical Providers as it was not Maher's practice to disclose to me whom he paid or in what amount. During the July 26th Call, I requested that a list of all such payments be forwarded to my attention immediately. Shortly thereafter, I received an email from Muise forwarding a list of Medical Providers that Maher claimed to have paid pursuant to the Wage Order (Attached hereto as Exhibit "8").

22.     Upon reviewing the list of payees and dates of payment with the Bankruptcy

Group, it was determined after reviewing the Wage Order that the Debtors were authorized, in accordance with ¶ 3 of the Wage Order, to pay most of the entities on the list. While most of the payments to Medical Providers appeared from the chart to have been authorized by the Wage Order, four of the payments seemed less clear. For instance, the payment to Emergency MD PC for emergency room services and River East Anesthesia appear to be for services rendered "through 7/10/2010." Payments to J. Edwards, M.D. and Madison Avenue Physician Services indicate that payments were for services rendered for "July 2010."

23.     The chart further indicated that payment to these particular Medical Providers was made on either July 2, 2010[2] (the Petition Date), or July 9, 2010, two (2) days after entry of the Wage Order. Again, with respect to these payments, I was never advised by Maher that they were being made and my counsel was never sought as to whether any of these payments were authorized.

24.     There were only two specific occasions that I recall Maher asking me whether he had authority to make a payment. In an email dated June 24, 2010 Maher inquired whether a tuition reimbursement request by an employee was subject to the "10K max rule"[3] and whether a motion covered it or not. At the time, the draft wage motion had yet to be reviewed by the U.S. Trustee's Office and, pursuant to the draft wage motion and order in circulation at the time, such a payment would be covered and I advised him of that (Attached hereto as Exhibit "9"). The second occasion occurred on July 28, 2010 when Maher called me and asked whether he was permitted to pay an exterminator to come to the hospital immediately to exterminate. Maher

---

[2] Maher later forwarded Simpson and I a revised chart indicating that payments originally described as having been made on 7/2/2011 were in fact made on 7/1/2011.

[3] The "10K max rule" Maher is referring to is the former statutory priority limit under §507(a)(4). While the former statutory priority limit was actually $10,950.00, Maher had, on occasion, casually referred to the amount as 10K. It should also be noted that Maher's specific reference to the statutory priority limit indicates that he was made aware that a limit did, in fact, exist. Contrary to this understanding, Maher routinely paid amounts in excess of the statutory priority limit without ever consulting counsel.

explained that the heat wave at the time had somehow elevated this into an emergency. From my perspective this was an ordinary course maintenance expense and advised him that it could be paid.

**Epiq Call Center Script**

25.     The Debtors engaged Epiq prepetition as their claims and noticing agent in order to assist with the preparation of petitions, schedules and Statements of Financial Affairs, among other things.  Beginning in June, 2010, Epiq began requesting that the Debtors prepare a call center script (the "Call Center Script") so that Epiq's employees could answer questions regarding the Debtors' chapter 11 filing should people call to inquire about same.  Epiq also requested answers to Frequently Asked Questions ("FAQ's") regarding the chapter 11 filing.

26.     In order to complete the Call Center Script and respond to the FAQ's, the Bankruptcy Group persistently asked Maher for his input in fulfilling Epiq's requests as the filing date approached. On August 9, 2010, Maher sent an email to Babej and myself forwarding a Call Center Script that bore revisions made by Babej. Maher stated in the forwarding email that we should "note language around benefits. The hospital is not paying benefits on paid non-worked time, i.e. vacation, severance, etc….after termination date." (Attached hereto as Exhibit "10").

27.     On August 12, 2010, Maher sent an email to Babej on which Simpson and myself were copied. Attached to the email was a copy of revisions Maher made to the Call Center Script (Attached hereto as Exhibit "11"). As is evident by the attachment, several of the questions and answers contained in the Call Center Script that Maher reviewed and in many cases, commented upon and/or revised reflect that Maher knew that he was not to pay amounts due on prepetition claims after the Petition Date.

28.     Furthermore, Simpson and myself met with Maher at the Hospital to discuss several matters on August 13, 2010, one of which was the finalization of the Call Center Script. Maher reviewed each and every answer to the questions contained in the Call Center Script in the presence of Simpson and myself and never indicated that he had any lack of understanding with respect to payments to vendors on prepetition invoices. Additionally, with respect to the question inquiring whether employees will continue to receive disability, holiday and vacation pay, the specific comment made to the question by Maher in the draft was "No."

**Utilities Motion**

29.     Since June 2010, the Bankruptcy Group had been conferring with Maher regarding information needed in order to draft the Utilities Motion. The Utilities Motion provided for the deposit by the Debtors', as adequate assurance of payment, of funds equaling fifteen (15) days of the Debtors' estimated aggregate postpetition utility expenses based upon average usage for the previous 12 months in a Utility Reserve, as that term is defined in the Utilities Motion. Drafts of the Utilities Motion had been circulated between Maher and the Bankruptcy Group for approximately one and a half months prior to it being filed. A copy of a draft utilities motion containing revisions by Maher is attached hereto (Attached hereto as Exhibit "12"). As is evident, there are no substantive differences between the attached draft and the Utilities Motion as filed.

30.     Additionally, members of the Bankruptcy Group, myself included, explained to Maher that he needed to provide us with the figures reflecting the total paid for each utility over the preceding 12 months so that we could determine the amount of adequate assurance to place in the Utility Reserve. On July 1, 2010, Terrano forwarded the information to Erin Babej in an email (Attached hereto as Exhibit "13"). The information clearly indicates that the Debtors'

staff, Maher, Muise and Terrano, understood what the Utilities Motion and Utilities Order provided for.

31.     Maher and I also corresponded with respect to Con Edison's request for more adequate assurance than the Utilities Order provided for. Maher addressed an email to Dean Mamet, a North General employee, and myself attaching a letter from Con Edison sent to him in response to the Utilities Motion and proposed order filed on July 15, 2010 and requesting additional adequate assurance of future payment be put into the Utility Reserve for Con Edison's continued service (Attached hereto as Exhibit "14"). Maher and I also corresponded regarding the NYC Water Board's (the "Water Board") request for more adequate assurance than the Utilities Order provided for. In fact, specific language was inserted into the Utilities Order as a result of an agreement between Maher and the Water Board to deposit 100% of the Water Board's estimated monthly cost of usage as adequate assurance of payment.  Maher was aware of precisely what the Utilities Order authorized him to do.

32.     Instead of depositing the adequate assurance amounts into the Utility Reserve, however, Babej indicated that Maher stated at a meeting to review alleged unauthorized payments by the Debtors that he unilaterally decided to make direct payments to several of the utility providers in lieu of making deposits. At no point did Maher ever inquire of me whether he could pay amounts owed on prepetition utility obligations in lieu of the adequate assurance payments provided for in the Utilities Motion and Utilities Order.

## CONCLUSION

33.     The Bankruptcy Group advised Maher of what was and was not authorized pursuant to each Order entered by this Court. The Bankruptcy Group did not maintain a physical presence at the Debtors' premises and therefore could not regulate the Debtors' actions on a

daily basis. I have documented the few occasions when Maher asked me whether or not he could make a specific payment. Although this only occurred twice, from my perspective, the fact that he asked at all indicated that he was aware that there were restrictions on whom he could and could not pay.

_Derek Etheridge_
Derek Etheridge

Sworn to before me this
11  day of March, 2011

_Maritza Segarra_
Notary Public

MARITZA SEGARRA
Notary Public, State of New York
No. 03-4652865
Qualified in Westchester County
Commission Expires December 13 2013

# EXHIBIT 1

**Etheridge, Derek**

| | |
|---|---|
| **From:** | John Maher [John.Maher@NGSC.ORG] |
| **Sent:** | Monday, June 28, 2010 2:52 PM |
| **To:** | Cook, J. Helen |
| **Cc:** | Etheridge, Derek |
| **Subject:** | 20100628 Match Vendor Master w Vendor ATB 20100228.xlsx |
| **Attachments:** | 20100628 Match Vendor Master w Vendor ATB 20100228.xlsx |

Helen,

Please find the attached AP update we discussed. Tab 1 is the file you should process....

Please call me with any questions....

jm

| VendorNum | VendorName | 0to30 | 31to60 |
|---|---|---|---|
| 3 | CALIGOR HOSPITAL SUPPLIES | $0.00 | $0.00 |
| 4 | A T & T - P.O. BOX 9001309 | $75.26 | $0.00 |
| 10 | A D P AUTOMATIC DATA PROC | $1,561.09 | $1,783.57 |
| 11 | ADVANCE MEDICAL DESIGNS INC | $0.00 | $0.00 |
| 12 | AESCULAP INC. | $0.00 | $272.54 |
| 15 | ALCON LABORATORIES, INC | $3,600.21 | $359.29 |
| 20 | AMERICAN ARBITRATION ASSOCIAT | $200.00 | $0.00 |
| 22 | AMERICAN HOSPITAL ASSOC | $0.00 | $0.00 |
| 28 | DEER PARK | $0.00 | $419.40 |
| 32 | ATLANTIC BUSINESS PRODUCTS | $0.00 | $368.00 |
| 36 | BOB BARKER CO INC | $477.51 | $0.00 |
| 39 | BAXTER HEALTHCARE CORPORATION | $6,143.72 | $16,704.72 |
| 52 | EMPIRE BLUE CROSS/ BLUE SHIEL | $0.00 | $0.00 |
| 58 | B. BRAUN MEDICAL INC. | $0.00 | $0.00 |
| 66 | CARDINAL HEALTH. | $7,529.69 | $0.00 |
| 69 | COMMITEE OF INTERNS & RESIDEN | $3,504.50 | $0.00 |
| 81 | FISHER SCIENTIFIC COMPANY | $4,708.88 | $7,304.92 |
| 85 | MEDFONE NATIONWIDE, INC. | $1,024.78 | $0.00 |
| 95 | N. S. LOW & CO. INC. | $0.00 | $1,438.59 |
| 96 | VOLUNTARY HOSPITALS HOUSE STA | $0.00 | $37,259.00 |
| 97 | CONCORD/SIMS INC | $0.00 | $0.00 |
| 99 | CONSOLIDATED EDISON OF NY | $2,562.51 | $0.00 |
| 100 | CON EDISON OF NEW YORK | $11,937.78 | $10,389.27 |
| 101 | CONSOLIDATED EDISON | $96,942.68 | $30,521.33 |
| 102 | COOK, INC | $0.00 | $98.34 |
| 104 | PRICEWATERHOUSECOOPERS LLP | $0.00 | $0.00 |
| 105 | PRICEWATERHOUSECOOPERS LLP. | $0.00 | $0.00 |
| 107 | CREST/GOOD MFG CO INC | $0.00 | $1,180.01 |
| 108 | HYPERTYPE, INC. | $1,088.50 | $892.50 |
| 111 | DAVOL INC | $0.00 | $2,414.48 |
| 114 | DCI - DESIGN COMMUNICATIONS, | $0.00 | $2,950.00 |
| 123 | FEDERAL EXPRESS CORP | $476.90 | $0.00 |
| 125 | FRESENIUS USA MANUFACTURING | $352.90 | $5,986.70 |
| 135 | W.L. GORE & ASSOCIATES, INC | $2,945.00 | $0.00 |
| 138 | GREATER NEW YORK BLOOD SERVIC | $6,093.50 | $31,539.10 |
| 139 | GREATER NEW YORK HOSPITAL ASS | $0.00 | $0.00 |
| 140 | MCKESSON HBOC | $0.00 | $3,067.83 |
| 146 | HOLLISTER INC | $0.00 | $453.42 |
| 153 | J & J CLINICAL DIAGNOSTICS, I | $0.00 | $0.00 |
| 154 | J & J HEALTH CARE SYSTEMS INC | $0.00 | $0.00 |
| 157 | LANDAUER, INC. | $0.00 | $1,823.00 |
| 161 | LOCAL 1199/EMPLOYER CHILD CAR | $7,815.60 | $9,958.67 |
| 162 | LOCAL 1199/JOB SECURITY FUND | $0.00 | $0.00 |
| 163 | NATIONAL BENEFIT FUND | $420,166.65 | $535,378.31 |
| 164 | NATIONAL PENSION FUND | $116,452.44 | $148,384.24 |
| 167 | HOSP LEAGUE/DIST 1199 TRAININ | $11,723.40 | $14,938.01 |
| 178 | EMDEON CORPORATION | $6,278.10 | $6,278.10 |
| 182 | MEDTRONIC | $290.00 | $0.00 |
| 185 | BOSTON SCIENTIFIC CORPORATION | $1,074.00 | $8,538.84 |
| 193 | MOUNT VERNON DENTAL LABS | $0.00 | $4,836.04 |
| 199 | NGH - PETTY CASH | $0.00 | $0.00 |

| | | | |
|---|---|---|---|
| 203 | PHYSICIANS' RECIPROCAL INSURE | $0.00 | $0.00 |
| 207 | UNITED HOSPITAL FUND OF NEW Y | $0.00 | $0.00 |
| 223 | NOUVEAU ELEVATOR INDUSTRIES I | $7,241.00 | $7,241.00 |
| 228 | NYS DEPT HEALTH-HOSPITAL & NU | $0.00 | $0.00 |
| 230 | VERIZON ACCESS BILLING | $0.00 | $0.00 |
| 231 | VERIZON | $10,280.27 | $0.00 |
| 236 | OLYMPUS AMERICA INC | $0.00 | $0.00 |
| 238 | ARCH WIRELESS, INC. | $6,048.84 | $0.00 |
| 241 | PHARMCO PRODUCTS INC | $0.00 | $0.00 |
| 242 | SOURCEONE HEALTHCARE TECHNOLO | $5,558.00 | $5,797.82 |
| 243 | IRON MOUNTAIN INC./PIERCE LEA | $440.15 | $16,519.94 |
| 259 | RUHOF CORP | $0.00 | $203.73 |
| 263 | SETTLEMENT HEALTH & MEDICAL | $1,850.00 | $0.00 |
| 266 | KENDALL/SHERWOOD DAVIS & GECK | $0.00 | $0.00 |
| 277 | ARROW INTERNATIONAL | $0.00 | $1,390.00 |
| 283 | SYNCOR INTERNATIONAL CORP | $3,821.43 | $6,321.37 |
| 292 | UNITED PARCEL SERVICE | $20.00 | $0.00 |
| 293 | UNITEX TEXTILE RENTAL SERVICE | $13,048.60 | $17,699.19 |
| 294 | UNITEX TEXTILE RENTAL SERVICE | $1,836.34 | $3,489.60 |
| 297 | WALTON PRESS, INC | $0.00 | $0.00 |
| 307 | ZIMMER, INC. | $4,725.92 | $0.00 |
| 308 | ZOLL MEDICAL CORPORATION GPO | $1,673.75 | $0.00 |
| 312 | STERIS CORP | $0.00 | $0.00 |
| 349 | NEWMAN, RANSFORD MD | $0.00 | $0.00 |
| 376 | INFINITY LIGHTING | $0.00 | $1,738.88 |
| 386 | WYETH LABORATORIES | $0.00 | $0.00 |
| 387 | COLLEGE OF AMERICAN PATHOLOGI | $0.00 | ($320.00) |
| 437 | NYC WATER BOARD | $0.00 | $15,260.12 |
| 472 | LORI'S HOSPITAL GIFT SHOPS | $0.00 | $0.00 |
| 581 | S.J. X-RAY CO | $0.00 | $0.00 |
| 582 | KRAMER SCIENTIFIC | $0.00 | $0.00 |
| 591 | MARTAB MEDICAL | $0.00 | $0.00 |
| 599 | MEDLINE | $42,158.91 | $13,112.23 |
| 619 | UNIMED COMMUNICATION | $0.00 | $0.00 |
| 623 | T.W. SMITH CORP | $6.95 | $91.15 |
| 675 | MICRO-OPTICS | $0.00 | $87.50 |
| 678 | IDX SYSTEM CORP. | $0.00 | $7,349.53 |
| 681 | SHARN INC. | $1,156.09 | $0.00 |
| 699 | NATIONAL BENEFIT FUND - RN'S | $170,103.76 | $294,341.49 |
| 702 | NATIONAL PENSION FUND - RN'S | $64,944.30 | $99,377.75 |
| 703 | LOCAL 1199 CHILD CARE FUND - | $4,358.68 | $6,669.65 |
| 747 | BEBAWI, MAGDI MD | $0.00 | $0.00 |
| 750 | EMMANUEL, JACQUELIN MD. | $0.00 | $0.00 |
| 754 | GODFREY, HENRY MD | $0.00 | $0.00 |
| 775 | GE MEDICAL SYSTEMS | $11,381.07 | $11,381.07 |
| 840 | ALIMED | $0.00 | $1,024.58 |
| 851 | ALL STATE SUPPLIES | $0.00 | $269.18 |
| 864 | OFFICE FOR GRADUATE MEDICAL E | $0.00 | $0.00 |
| 909 | AMERICAN APPRAISAL ASSOC. | $0.00 | $6,000.00 |
| 912 | ARTHREX | $1,188.50 | $0.00 |
| 925 | LINVATEC | $343.17 | $305.04 |
| 1097 | ARTHUR DOVE, M.D. | $0.00 | $0.00 |

| | | | |
|---|---|---|---|
| 1127 | RAO, KATIKANENI MD | $0.00 | $0.00 |
| 1134 | MOUNT SINAI SCHOOL OF MEDICIN | $2,492.92 | $2,492.92 |
| 1156 | GRANDERSON, JOSEPH D. MD. | $0.00 | $0.00 |
| 1159 | LONG ISLAND STAMP CORP | $0.00 | $102.50 |
| 1163 | CARDINAL HEALTH | $5,057.50 | $0.00 |
| 1180 | SHIRLEY ALEXANDER, RN. | $2,193.00 | $0.00 |
| 1185 | MONDAY AKHAREYI | $2,382.00 | $0.00 |
| 1267 | CREST HEALTHCARE SUPPLY | $0.00 | $0.00 |
| 1279 | METROPOLITAN NY LIBRARY COUNC | $0.00 | $0.00 |
| 1323 | PRAXAIR DISTRIBUTION, INC. | $0.00 | $5,287.24 |
| 1557 | STRYKER MEDICAL DIV | $0.00 | $0.00 |
| 1617 | AON CONSULTING, INC. | $0.00 | $0.00 |
| 1729 | DONNA MENDES M.D. | $0.00 | $0.00 |
| 1798 | ACS-MIDS | $0.00 | $1,682.63 |
| 1804 | RENATO GIORGINI, DPM | $0.00 | $0.00 |
| 1805 | GLENROY ASKA, DPM | $0.00 | $0.00 |
| 1838 | JOINT COMMISSION ON ACCREDITA | $0.00 | $75.00 |
| 1925 | DR.BABB, FRANK | $0.00 | $0.00 |
| 1944 | ABBOTT ROSS PRODUCTS | $0.00 | $175.44 |
| 2001 | UNITED HOSP. FUND PUBLICATION | $0.00 | $0.00 |
| 2043 | VITAL SIGNS COLORADO, INC. | $2,958.79 | $0.00 |
| 2081 | HANYS, INC. | $0.00 | $0.00 |
| 2149 | INAMED | $0.00 | $6,915.10 |
| 2292 | CHAIR, WORKERS' COMPENSATION | $0.00 | $0.00 |
| 2300 | GRAINGER | $120.15 | $5,907.22 |
| 2350 | FLORIDA HOSPITAL MEDICAL CENT | $0.00 | $0.00 |
| 2399 | BURNS INT'L SECURITY SERVICES | $0.00 | $113,503.63 |
| 2432 | BARD INTERVENTIONAL PRODUCTS | $0.00 | $0.00 |
| 2503 | LEICA INC. | $0.00 | $815.68 |
| 2530 | FERN PRINTING & OFFICE SUPPLI | $953.53 | $1,277.36 |
| 2542 | NYS WORKERS COMPENSATION BOAR | $0.00 | $0.00 |
| 2598 | TRANE SERVICE GROUP | $0.00 | $0.00 |
| 2600 | CORNELL UNIVERSITY ILR | $0.00 | $0.00 |
| 2616 | ROCHE DIAGNOSTICS CORPORATION | $8.00 | $23,186.07 |
| 2621 | CAPP USA | $0.00 | $0.00 |
| 2761 | FLAHM, INC | $0.00 | $0.00 |
| 2776 | ATLANTIC BUS PRODUCTS | $0.00 | $0.00 |
| 2787 | GRAYBAR | ($56.75) | $0.00 |
| 2827 | MCKESSON INFORMATION SOLUTION | $0.00 | $0.00 |
| 2946 | DR. LESLIE KERR | $300.00 | $0.00 |
| 2991 | U.S. ENDOSCOPY | $0.00 | $0.00 |
| 3047 | NYC FIRE DEPARTMENT | | |
| 3069 | QUANTIMETRIX | $0.00 | $0.00 |
| 3072 | EVERGREEN MEDICAL SERVICES IN | $0.00 | $0.00 |
| 3119 | GENERAL HOSPITAL SUPPLY CORPO | $0.00 | $0.00 |
| 3128 | DORMITORY AUTHORITY STATE OF | $0.00 | $50,000.00 |
| 3134 | LIEBERT CORPORATION | $0.00 | $0.00 |
| 3146 | HUNTLEIGH HEALTHCARE, INC. | $1,009.14 | $1,291.69 |
| 3175 | METROPOLITAN LIFE | $0.00 | $0.00 |
| 3190 | SEXAUER | $0.00 | $0.00 |
| 3249 | IOP INC. | $1,035.00 | $0.00 |
| 3300 | PER- SE TECHNOLOGIES, INC. | $0.00 | $0.00 |

| | | | |
|---|---|---|---|
| 3378 | TALX CORPORATION | $0.00 | $570.40 |
| 3428 | MOORE MEDICAL | $369.66 | $387.85 |
| 3445 | BECKMAN COULTER | $3,328.96 | $4,409.35 |
| 3453 | AMERICAN MEDICAL SYSTEMS | $8,555.31 | $3,360.79 |
| 3481 | NORTEL NETWORKS | $0.00 | $0.00 |
| 3514 | IMMUCOR/GAMAIA | $0.00 | $549.61 |
| 3542 | BARD ACCESS SYSTEMS | $2,487.00 | $0.00 |
| 3546 | VASETA ALSTON | $2,295.00 | $0.00 |
| 3560 | SHAMROCK SCIENTIFIC SPECIALTY | $0.00 | $334.40 |
| 3690 | MISA PLUMBING | $0.00 | $0.00 |
| 3770 | HARLEM HOSPITAL CENTER | $0.00 | $0.00 |
| 3782 | BOND, SCHOENECK & KING, LLP | $0.00 | $0.00 |
| 3910 | AIRTECH VACUUM | $0.00 | $0.00 |
| 3918 | HEADS UP FIRE SPRINKLER INC. | $0.00 | $0.00 |
| 4049 | TRANSCARE NEW YORK, INC. | $54,083.33 | $54,083.33 |
| 4094 | NEW BOLD CORP. | $0.00 | $0.00 |
| 4161 | DIAGNOSTIC MEDICAL CONSULTANT | $48,000.00 | $48,000.00 |
| 4189 | IMAN SAAD | $4,600.00 | $0.00 |
| 4283 | HAZEL FRASER | $0.00 | $425.00 |
| 4324 | OXFORD DOCUMENT MANAGEMENT | $5,417.96 | $5,282.62 |
| 4399 | ORTHOFIX INC. | $0.00 | $0.00 |
| 4405 | BERNADETTE CARTER | $0.00 | $0.00 |
| 4410 | ORLANDO RAMIREZ | $0.00 | $0.00 |
| 4452 | MT. SINAI MEDICAL CENTER OB/G | $41,651.33 | $41,651.33 |
| 4539 | LUCY LIU | $1,920.00 | $0.00 |
| 4554 | ROBERT LIMANI, MD | $0.00 | $0.00 |
| 4582 | THE TUTTLE AGENCY NEW YORK | $0.00 | $0.00 |
| 4618 | GLORIA C. RAMSEY | $0.00 | $0.00 |
| 4693 | ANTLER ELECTRIC MOTOR SVC. | $0.00 | $248.00 |
| 4915 | FBI FRIED BROTHERS INC | $0.00 | $412.07 |
| 5029 | HABIB KAMKHAJI | $0.00 | $0.00 |
| 5038 | DR. RAJI AYINLA | $0.00 | $0.00 |
| 5084 | ALAN LEE | $700.00 | $0.00 |
| 5091 | GARFUNKEL, WILD, & TRAVIS, P. | $2,250.51 | $25,991.88 |
| 5122 | STRYKER ORTHOPAEDICS | $0.00 | $0.00 |
| 5155 | ALPHA MEDICAL EQUIP. | $0.00 | $12,404.84 |
| 5170 | PAETEC COMMUNICATIONS | $6,663.51 | $0.00 |
| 5179 | MADISON AVENUE EMERGENCY MEDI | $0.00 | $0.00 |
| 5262 | JANICE SWEETING | $165.00 | $0.00 |
| 5297 | GE AMERSHAM/MEDI PHYSICS | $0.00 | $0.00 |
| 5328 | TOSHIBA EASY LEASE | $220.00 | $220.00 |
| 5336 | N.Y.C.P.M. | $5,003.01 | $0.00 |
| 5357 | GAMMEL & ASSOCIATES | $0.00 | $0.00 |
| 5374 | ATLANTIC BIOLOGICALS | $0.00 | $0.00 |
| 5378 | UTILISAVE,LLC | $0.00 | $0.00 |
| 5400 | ORTHOLOGIC CORP | $0.00 | $0.00 |
| 5442 | COMMERCE BANK | $0.00 | $0.00 |
| 5446 | PREMIERE GLOBAL SERVICES | $0.00 | $70.16 |
| 5448 | KRONOS INCORPORATED | $0.00 | $0.00 |
| 5496 | PREMIUM FINANCING SPECIALISTS | $1,032.60 | $0.00 |
| 5499 | DR.SHELBY SAMUEL | $0.00 | $0.00 |
| 5508 | DYNAMEX INC. | $55.67 | $217.14 |

| | | | |
|------|--------------------------------|--------------|-------------|
| 5535 | GROUND ZERO SOFTWARE | $0.00 | $0.00 |
| 5563 | GALLS | $0.00 | $0.00 |
| 5617 | OSTEOMED CORP | $0.00 | $0.00 |
| 5620 | MILLIMAN USA | $0.00 | $0.00 |
| 5622 | BIO-MED PLUS, INC. | $0.00 | $0.00 |
| 5625 | DR. RAMON MOQUETE | $0.00 | $0.00 |
| 5645 | AGFA CORPORATION | $10,419.38 | $10,419.38 |
| 5683 | THE IMPART GROUP | $0.00 | $0.00 |
| 5689 | PARTSSOURCE | $0.00 | $611.00 |
| 5709 | CIR, SEIU LOCAL 1957 HEALTHCA | $547.00 | $0.00 |
| 5711 | VISITING NURSE SERVICE OF NEW | $0.00 | $0.00 |
| 5763 | INSTRUMENTATION LABORATORY | $0.00 | $2,280.00 |
| 5809 | OMNI FUNDING CORPORATION OF A | $225.00 | $998.20 |
| 5864 | MT. SINAI SCHOOL OF MEDICINE- | $937.66 | $937.66 |
| 5889 | MCQUAY-PREM AIR NEW YORK | $0.00 | $0.00 |
| 5958 | WILLIS OF NEW YORK, INC. | $0.00 | $0.00 |
| 5992 | DEPUY ORTHOPAEDIC INC. | $0.00 | $0.00 |
| 5997 | INSTITUTE FOR THE PUERTO RICA | $0.00 | $0.00 |
| 6042 | CAREHEALTH MEDICAL ASSOCIATES | $0.00 | $0.00 |
| 6044 | TRANSIT CENTER | ($16,867.23) | $16,867.23 |
| 6048 | MUSCULOSKELETAL TRANSPLANT FO | $479.00 | $0.00 |
| 6049 | HARRIET RUSH | $0.00 | $0.00 |
| 6087 | TIME WARNER CABLE | $109.95 | $0.00 |
| 6100 | EATON POWER/ POWERWARE | $0.00 | $436.74 |
| 6144 | SLR MEDICAL ANESTHESIA, PC | $0.00 | $0.00 |
| 6224 | RIVER EAST ANESTHESIA ASSOCIA | $0.00 | $0.00 |
| 6242 | EXACTECH | $0.00 | $0.00 |
| 6249 | IMCO TECHNOLOGIES | $0.00 | $0.00 |
| 6252 | SODEXHO, INC & AFFILIATES | $113,530.41 | $26,170.39 |
| 6271 | BIOPRO | $0.00 | $0.00 |
| 6272 | ENCORE MEDICAL CORPORATION | $0.00 | $0.00 |
| 6277 | PBS MEDICAL | $0.00 | $567.83 |
| 6322 | METRO-MEDICAL INDUSTRIES | $0.00 | $0.00 |
| 6330 | MOUNT SINAI RADIOLOGY ASSOCIA | $43,562.50 | $43,562.50 |
| 6342 | MEJ PERSONAL BUSINESS SERVICE | $0.00 | $0.00 |
| 6360 | SODEXHO MANAGEMENT, INC. | $68,548.55 | $5,325.87 |
| 6361 | KPMG, LLP | $0.00 | $0.00 |
| 6372 | ALL ABOUT OFFICES, LLC / DATA | $259.90 | $0.00 |
| 6375 | NEW YORK IMAGING | $900.00 | $1,015.18 |
| 6405 | WINDELS MARX LANE & MITTENDOR | $289,526.53 | $0.10 |
| 6408 | MSE, LLC | $0.00 | $0.00 |
| 6412 | ROYAL WASTE SERVICES, INC. | $3,401.00 | $2,871.60 |
| 6414 | STERICYCLE | $4,382.01 | $3,721.94 |
| 6415 | GATT COMMUNICATION INC. | $0.00 | $0.00 |
| 6422 | SPRINT | $0.00 | $165.56 |
| 6472 | MT. SINAI CENTER FOR CLINICAL | $0.00 | $24,158.02 |
| 6485 | MED-APPAREL SERVICE | $0.00 | $107.00 |
| 6492 | BIOMAGNETICS | $0.00 | $0.00 |
| 6509 | CARMITA DIEU-DONNE | $0.00 | $0.00 |
| 6530 | CYNTHIA MEYERS, M.D. | $0.00 | $0.00 |
| 6578 | MT. SINAI HOSPITAL / VASCULAR | $14,583.33 | $14,583.33 |
| 6588 | DELL MARKETING L.P. | $0.00 | $30,470.16 |

| | | | |
|---|---|---:|---:|
| 6590 | NEW YORK DIALYSIS SERVICES, I | ($30,000.00) | ($30,000.00) |
| 6596 | DERRICK NOBLES | $187.00 | $0.00 |
| 6604 | KCI | $448.73 | $0.00 |
| 6609 | SABOR BORINQUENO | $5,400.00 | $0.00 |
| 6614 | 1199 NATIONAL BENEFIT FUND | $0.00 | $0.00 |
| 6632 | VINSON & ELKINS | $0.00 | $0.00 |
| 6646 | DR- EMMANUEL GHADEHAN | $0.00 | $0.00 |
| 6647 | DR. OLUWOLE, SOJI | $0.00 | $0.00 |
| 6648 | MD. JENNY ROMERO | $0.00 | $0.00 |
| 6649 | DR. ADU, ALBERT | $0.00 | $0.00 |
| 6650 | DR. FRANKLIN MARSH | $0.00 | $0.00 |
| 6658 | MT. SINAI HOSPITAL/EMERGENCY | $7,083.33 | $7,083.33 |
| 6688 | MT. SINAI HOSPITAL-UROLOGY DE | $0.00 | $0.00 |
| 6689 | MT. SINAI HOSPITAL-NEUROLOGY | $5,896.25 | $5,896.25 |
| 6690 | MT. SINAI HOSPITAL/DERMATOLOG | $3,750.00 | $3,750.00 |
| 6706 | HEALTHPRO NURSING SOLUTIONS, | $0.00 | $0.00 |
| 6724 | TOPLINE MEDICAL DIV. OF DMS H | $0.00 | $0.00 |
| 6734 | THE OLD WESTBURY COLLEGE FOUN | $0.00 | $0.00 |
| 6735 | NEAT HEAT AND COOLING INC. | $0.00 | $0.00 |
| 6766 | MT. SINAI HOSPITAL-THORACIC S | $7,500.00 | $7,500.00 |
| 6784 | A+ ULTRASOUND TEMPS | $0.00 | $0.00 |
| 6792 | BURKE SUPPLY | $0.00 | $0.00 |
| 6801 | LENOVO, INC. | $0.00 | $0.00 |
| 6806 | ISOTIS ORTHOBIOLOGICS | $0.00 | $0.00 |
| 6819 | RELIABLE POWER ALTERNATIVES C | $0.00 | $0.00 |
| 6821 | WINKLEMAN COMPANY LLC | $0.00 | $0.00 |
| 6829 | SYNOVIS SURGICAL INNOVATION | $0.00 | $0.00 |
| 6847 | ACUMED | $0.00 | ($1,179.44) |
| 6848 | LINCOLN HOSPITAL | $0.00 | $0.00 |
| 6849 | ALLEGIANCE BILLING & CONSULTI | $0.00 | $26,204.08 |
| 6868 | HELEN FULD COLLEGE OF NURSING | $0.00 | $30,000.00 |
| 6886 | GEMSTAR GROUP, LLC | $0.00 | $0.00 |
| 6892 | H & J MEDICAL SUPPLIES INC. | $0.00 | $0.00 |
| 6902 | EXPERT BOILER REPAIR & WELDIN | $0.00 | $0.00 |
| 6911 | BESLER CONSULTING-NY | $0.00 | $0.00 |
| 6921 | KEYBOARD INSTRUMENT RENTALS | $0.00 | $0.00 |
| 6965 | COLUMBIA PRESBYTERIAN INPATIE | $0.00 | $0.00 |
| 6983 | MOUNT SINAI HOSPITAL - PEDIAT | $0.00 | $0.00 |
| 6990 | VIRTUAL RADIOLOGIC CONSULTANT | $16,112.50 | $15,827.50 |
| 6995 | PULSE COMBUSTION INC. | $0.00 | $0.00 |
| 7007 | HEALTHFIRST PHSP | $0.00 | $0.00 |
| 7009 | RELAY-HEALTH (PER-SE / NDC HE | $0.00 | $7,090.82 |
| 7055 | VITAL NETWORK SERVICES, INC. | $0.00 | $0.00 |
| 7079 | CREDITEK | $0.00 | $0.00 |
| 7098 | AACPM | $1,150.00 | $0.00 |
| 7120 | HEALTH RESOURCES OPTIMIZATION | $0.00 | $0.00 |
| 7122 | MANAGED HEALTH INC. | $0.00 | $0.00 |
| 7137 | MICHELE PRISCO | $1,119.68 | $0.00 |
| 7145 | WASOFF PLUMBING AND UTILITY C | $0.00 | $0.00 |
| 7158 | PACIFIC INTERPETERS | $1,015.56 | $1,075.23 |
| 7159 | DYNAMIC HEALTH IT | $0.00 | $440.00 |
| 7160 | MT. SINAI HOSPITAL/CATH. LAB | ($129,686.80) | $0.00 |

| | | | |
|---|---|---|---|
| 7165 | R. & SON SECURITY CORP. | $0.00 | $0.00 |
| 7179 | MEDICAL STAFFING DIRECT, INC. | $0.00 | $0.00 |
| 7197 | MT. SINAI HOSPITAL ENT SERVIC | $0.00 | $0.00 |
| 7198 | MT. SINAI HOSPITAL - CONSORTI | $7,150.00 | $7,150.00 |
| 7199 | MT. SINAI HOSPITAL - ORTHOPED | $28,083.33 | $28,083.33 |
| 7202 | SODEXHO INC. - ENGINEERING SE | $37,046.26 | ($3,158.68) |
| 7204 | TERJESEN ASSOCIATES ARCHITECT | $0.00 | $0.00 |
| 7205 | WILLIAM HIRD & CO., INC. | $0.00 | $0.00 |
| 7221 | HYDRO SERVICE & SUPPLIES, INC | $0.00 | $0.00 |
| 7244 | CIPRIANI 42ND STREET | $0.00 | $0.00 |
| 7247 | A TO ZEN PRODUCTIVITY | $0.00 | $0.00 |
| 7249 | HEALTH FACILITY ASSESSMENT FU | $0.00 | $0.00 |
| 7257 | RADIAC ENVIRONMENTAL SERVICES | $2,089.88 | $3,872.71 |
| 7269 | INTEGRO INSURANCE BROKERS | $0.00 | $0.00 |
| 7270 | ROTHSTEIN & HOFFMAN INTERNATI | $0.00 | $0.00 |
| 7287 | HDR ARCHITECTURE, INC. | $0.00 | $0.00 |
| 7305 | S.E.P.S. | $0.00 | $0.00 |
| 7313 | JOHN MAHER | $109.00 | $0.00 |
| 7325 | HOLOGIC LIMITED PARTNERSHIP/C | $0.00 | $3,415.90 |
| 7326 | ACUSTAF DEVELOPMENT CORP. | $5,415.00 | $5,585.00 |
| 7330 | DELOITTE TAX LLP | $0.00 | $0.00 |
| 7341 | SIGNTALK, LLC. | $520.00 | $1,420.00 |
| 7351 | KILBOURNE & KILBOURNE | $172.35 | $0.00 |
| 7355 | SRS ENTERPRISES | $0.00 | $0.00 |
| 7374 | SULLIVAN, COTTER & ASSOCIATES | $0.00 | $0.00 |
| 7386 | CICERO CONSULTING ASSOCIATES | $0.00 | $0.00 |
| 7402 | ORGANOGENESIS INC  LIVING TEC | $1,434.00 | $1,434.00 |
| 7407 | ARENT FOX, LLP | $0.00 | $0.00 |
| 7410 | ALEXANDER AIR CONDITIONING SE | $0.00 | $0.00 |
| 7411 | ADVANCED MEDICAL GAS / AMGAS | $0.00 | $0.00 |
| 7416 | SEQUENCE MANAGERS SOFTWARE, L | $1,000.00 | $0.00 |
| 7427 | TOTAL REPAIR EXPRESS,LLC | $0.00 | $0.00 |
| 7431 | DRESS FOR SUCCESS | $0.00 | $0.00 |
| 7433 | GE PERFORMANCE SOLUTIONS | $0.00 | $0.00 |
| 7440 | KNICKERBOCKER PARTITION CORPO | $0.00 | $0.00 |
| 7457 | EXPEDITIVE | $0.00 | $0.00 |
| 7461 | ERNEST ANDRE MORGAN | $0.00 | $0.00 |
| 7513 | DOOR AUTOMATION CORP. | $0.00 | $0.00 |
| 7514 | CINTAS CORPORATION | $0.00 | $0.00 |
| 7518 | PAT LEONARD SURGICAL INC | $0.00 | $0.00 |
| 7520 | VINLUAN & TUY LAW OFFICES | $0.00 | $0.00 |
| 7538 | DATA BUSINESS SYSTEM | $0.00 | $637.95 |
| 7539 | NEW YORK STATE BAR ASSOCIATIO | $0.00 | $0.00 |
| 7540 | EAST ORANGE FOOT & ANKLE | $0.00 | $700.00 |
| 7558 | MANHATTAN INFORMATION SYSTEMS | $0.00 | $0.00 |
| 7569 | CREATIVE HEALTH CONCEPTS | $0.00 | $0.00 |
| 7579 | GYRUS ACMI | $0.00 | $1,448.00 |
| 7588 | NATIONAL GOVERNMENT SERVICES | $0.00 | $205,500.00 |
| 7594 | STERLING INFOSYSTEMS, INC. | $0.00 | $201.87 |
| 7617 | MSC INDUSTRIAL SUPPLY | $0.00 | $0.00 |
| 7632 | RONALD TAMLER, MD | $300.00 | $0.00 |
| 7659 | CONSTRUCTION SPECIALTIES, INC | $0.00 | $0.00 |

| 7666 | ACADEMIC HEALTH PROFESSIONALS | $8,189.00 | $844.00 |
|---|---|---|---|
| 7671 | CRANEWARE, INC. | $0.00 | $0.00 |
| 7681 | HEIDELL, PITTONI, MUPRHY & BA | $142.82 | $0.00 |
| 7686 | AMERICAN TELEGRAM | $350.00 | $70.00 |
| 7690 | PARADISE CONSTRUCTION | $0.00 | $0.00 |
| 7693 | LOCAL 1199 COJ BENEFIT/PENSIO | $0.00 | $0.00 |
| 7714 | RJS ASSOCIATES | $0.00 | $0.00 |
| 7715 | SEDGWICK CLAIMS MANAGEMENT SE | $0.00 | $3,166.66 |
| 7725 | ENHANCE A COLOUR, CORP. | $0.00 | $0.00 |
| 7737 | GARBARINI & SCHER, PC. | $0.00 | $0.00 |
| 7756 | AQUA PURE CORP. | $0.00 | $1,897.08 |
| 7793 | CHARLES LEONARD MITCHELL, ESQ | $10,376.50 | $0.00 |
| 7811 | DISTINCTIVE PERSONNEL | $1,405.62 | $3,098.52 |
| 7813 | HEALTH PORT | $0.00 | $748.25 |
| 7838 | LDI COLOR TOOLBOX | $0.00 | $0.00 |
| 7848 | CADINE DESOUZA | $150.00 | $0.00 |
| 7854 | HP PRODUCTS CORPORATION | $0.00 | $466.37 |
| 7862 | KATHY ISOLDI | $800.00 | $0.00 |
| 7875 | AMERICAN PSYCHIATRIC PUBLISHI | $0.00 | $0.00 |
| 7893 | ATLANTIC COOLING TECH & SERVI | $0.00 | $0.00 |
| 7896 | SKY WATER | $0.00 | $0.00 |
| 7897 | WITHUM SMITH & BROWN | $0.00 | $0.00 |
| 7898 | BREA YANKOWITZ, PC | $0.00 | $3,123.61 |
| 7913 | TEED & COMPANY | $0.00 | $0.00 |
| 7925 | HOYA SURGICAL OPTICS | $0.00 | $0.00 |
| 7928 | MDF, INCORPORATED | $0.00 | $2,902.56 |
| 7936 | GREEN KEY RESOURCES, LLC. | $1,950.00 | $9,000.00 |
| 7950 | JAY DIETZ & ASSOCIATES, LTD | $408.05 | $0.00 |
| 7953 | WOUND CARE TECHNOLOGIES, INC. | $0.00 | $0.00 |
| 7959 | ALVAREZ AND MARSAL HOLDINGS, | $0.00 | ($375,000.00) |
| 7965 | VERITEXT NEW YORK REPORTING C | $0.00 | $717.59 |
| 7972 | MADISON AVE. PHYSICIAN SVS. ( | $20,833.33 | $20,833.33 |
| 7975 | NUCLEAR DIAGNOSTIC PROD. | $170.00 | $540.00 |
| 7988 | SIMONE CARBONEL | $720.00 | $0.00 |
| 7995 | SKALLER SUPPLY CO. INC. | $0.00 | $0.00 |
| 8025 | NORTH COUNTRY TRANS. LIV. SER | $0.00 | $0.00 |
| 8031 | MERCURY MEDICAL | $0.00 | $0.00 |
| 8044 | SMS SYSTEM MAINTENANCE SERVIC | $0.00 | $660.00 |
| 8049 | CORUS360 | $0.00 | $390.00 |
| 8057 | ANCHOR MEDICAL SUPPLY, INC. | $0.00 | $640.07 |
| 8058 | JOELE FRANK, WILKINSON BRIMME | $0.00 | $0.00 |
| 8065 | JOAN ANDERSEN & MITCHEL LIDOW | $0.00 | $0.00 |
| 8086 | SAMOON AHMAD | $300.00 | $0.00 |
| 8102 | GR INVENTORY | $0.00 | $0.00 |
| 8110 | MICHAEL FALZARANO AND ASSOCIA | $0.00 | $406.41 |
| 8118 | COMPACT HVAC, INC. | $0.00 | $0.00 |
| 8130 | TRENCH & MARINE PUMP CO. | $0.00 | $9,162.50 |
| 8132 | ERIC J. NESTLER | $0.00 | $0.00 |
| 8134 | DELTA DENTAL OF NEW YORK | $12,709.86 | $0.00 |
| 8136 | SUSAN WILLIAMS, MD | $300.00 | $0.00 |
| 8138 | ALL STAR REPORTERS, INC. | $0.00 | $590.05 |
| 8139 | ROSA OCAMPO | $150.00 | $0.00 |

| | | | |
|---|---|---|---|
| 8140 | DALILAH RESTREPO, MD. | $300.00 | $0.00 |
| 8141 | MIKE COSSI | $475.00 | $0.00 |
| 8142 | ANGELA TOLAS, CSR | $2,970.00 | $0.00 |
| 8143 | SMOOTH SPORTSWEAR | $733.96 | $0.00 |
| 8144 | MILVI VEHIK | $200.00 | $0.00 |
| 8145 | MELINDA VARGAS | $150.00 | $0.00 |
| 8146 | WANDA GARDENHIRE | $100.00 | $0.00 |
| 8147 | MELODY HICKS | $250.00 | $0.00 |
| 8148 | KANDICE PURDY | $247.00 | $0.00 |
| 50554 | | $0.00 | $0.00 |
| 73890 | | $0.00 | $0.00 |
| 307111 | CORRECTIONAL PHYSICIAN SERVIC | $0.00 | $0.00 |
| 400110 | EMPIRE HEALTHCHOICE AKA BLUE | $0.00 | $0.00 |
| 655240 | | $0.00 | $0.00 |
| 679460 | ADDERLY,ROSIE | $0.00 | $0.00 |
| 700110 | AMERICHOICE OF NEW YORK | $0.00 | $0.00 |
| 700110 | HEALTH PLUS | $0.00 | $0.00 |
| 703120 | HEALTHFIRST MCARE INPATIENT | $0.00 | $0.00 |
| 703130 | HEALTHFIRST MCAID INPATIENT | $0.00 | $0.00 |
| 705130 | METRO PLUS INPATIENT | $0.00 | $0.00 |
| 708110 | AETNA/NCO CLAIM OVERPAYMENT R | $0.00 | $0.00 |
| 708110 | AETNA/USHCARE COMML MANAGED | $0.00 | $0.00 |
| 708110 | AFTERMATH CLAIM SCIENCE, INC | $0.00 | $0.00 |
| 710130 | CENTERCARE HEALTH PLAN | $0.00 | $0.00 |
| 710130 | CENTERCARE INPATIENT | $0.00 | $0.00 |
| 712110 | O,R,S | $0.00 | $0.00 |
| 712120 | HIP OVERPAYMENT RECOVERY SERV | $0.00 | $0.00 |
| 712120 | HIP OVERPAYMENT RERCOVERY | $0.00 | $0.00 |
| 712120 | HIP VIP (MANAGED MCARE) | $0.00 | $0.00 |
| 712120 | OVERPAYMENT RECOVERY SERVICE | $0.00 | $0.00 |
| 755400 | MCBEE,JUANITA | $0.00 | $0.00 |
| 800110 | ACCENT | $0.00 | $0.00 |
| 800110 | AMERICAN MED & LIFE INS | $0.00 | $0.00 |
| 800110 | APS SUITE 1600 | $0.00 | $0.00 |
| 800110 | CIGNA HEALTHCARE | $0.00 | $0.00 |
| 800110 | LOCKBOX 1007 | $0.00 | $0.00 |
| 800110 | PRINCIPAL LIFE | $0.00 | $0.00 |
| 800110 | UNITED HEALTH CARE | $0.00 | $0.00 |
| 800200 | ORS/GHI | $0.00 | $0.00 |
| 801110 | LOCAL 1199 INPATIENT | $0.00 | $0.00 |
| 802501 | KIRBY FORENSIC CENTER | $0.00 | $0.00 |
| 802501 | MANHATTAN PSY CENTER OUTPT | $0.00 | $0.00 |
| 935420 | BORBON,MARIA | $0.00 | $0.00 |
| 1300610 | HART,CLARETTA | $0.00 | $0.00 |
| 1412980 | WOMACK,DELLA | $0.00 | $0.00 |
| 1456170 | MARSHALL,KENNETH | $0.00 | $0.00 |
| 1624210 | FARMER,ALLEGRO | $0.00 | $0.00 |
| 1728510 | | $0.00 | $0.00 |
| 1767870 | | $0.00 | $0.00 |
| 1787710 | | $0.00 | $0.00 |
| 1940930 | PATRICK,SYBIL | $0.00 | $0.00 |
| 2204450 | | $0.00 | $0.00 |

| | | | |
|---|---|---|---|
| 2284900 | | $0.00 | $0.00 |
| 2345550 | | $0.00 | $0.00 |
| 2364980 | | $0.00 | $0.00 |
| 2376840 | AGUILAR,FERNANDO | $0.00 | $0.00 |
| 2601960 | | $0.00 | $0.00 |
| 2739420 | | $0.00 | $0.00 |
| | | $1,846,685.66 | $2,011,724.83 |

| 61to90 | 91to120 | 121+ | GrossAmnt |
|---|---|---|---|
| $0.00 | $0.00 | ($127.19) | ($127.19) |
| $0.00 | $0.00 | $0.00 | $75.26 |
| $0.00 | $0.00 | $0.00 | $3,344.66 |
| $0.00 | $0.00 | ($414.56) | ($414.56) |
| $0.00 | $0.00 | $0.00 | $272.54 |
| $0.00 | $0.00 | $0.00 | $3,959.50 |
| $0.00 | $0.00 | $0.00 | $200.00 |
| $0.00 | $0.00 | $144,640.00 | $144,640.00 |
| $1,211.25 | $0.00 | $0.00 | $1,630.65 |
| $3,094.86 | $698.16 | $704.76 | $4,865.78 |
| $0.00 | $0.00 | $0.00 | $477.51 |
| $0.00 | $0.00 | $0.00 | $22,848.44 |
| $0.00 | $0.00 | ($160,103.91) | ($160,103.91) |
| $0.00 | $0.00 | $1,150.00 | $1,150.00 |
| $0.00 | $0.00 | $0.00 | $7,529.69 |
| $0.00 | $0.00 | $0.00 | $3,504.50 |
| $9,878.86 | $0.00 | $0.00 | $21,892.66 |
| $0.00 | $0.00 | $0.00 | $1,024.78 |
| $3,670.08 | $0.00 | $0.00 | $5,108.67 |
| $0.00 | $0.00 | $0.00 | $37,259.00 |
| $0.00 | $0.00 | $143.04 | $143.04 |
| $0.00 | $0.00 | $0.00 | $2,562.51 |
| $0.00 | $0.00 | $0.00 | $22,327.05 |
| $0.00 | $0.00 | $0.00 | $127,464.01 |
| $0.00 | $0.00 | $0.00 | $98.34 |
| $0.00 | $0.00 | $373,591.00 | $373,591.00 |
| $0.00 | $0.00 | $26,850.00 | $26,850.00 |
| $4,006.75 | $0.00 | $0.00 | $5,186.76 |
| $0.00 | $0.00 | $0.00 | $1,981.00 |
| $1,384.79 | $0.00 | $0.00 | $3,799.27 |
| $0.00 | $0.00 | $0.00 | $2,950.00 |
| $0.00 | $0.00 | $0.00 | $476.90 |
| $0.00 | $0.00 | $0.00 | $6,339.60 |
| $0.00 | $0.00 | $0.00 | $2,945.00 |
| $13,097.70 | $0.00 | $0.00 | $50,730.30 |
| $0.00 | ($3,114.00) | $73,375.24 | $70,261.24 |
| $74,197.36 | $35,552.14 | $183,433.34 | $296,250.67 |
| $0.00 | $0.00 | $0.00 | $453.42 |
| $0.00 | $0.00 | $171,093.20 | $171,093.20 |
| $0.00 | $0.00 | $7,125.06 | $7,125.06 |
| $0.00 | $0.00 | $0.00 | $1,823.00 |
| $8,404.28 | $13.71 | $39,326.53 | $65,518.79 |
| $0.00 | $0.00 | $0.00 | $0.00 |
| $451,814.04 | $736.79 | $1,541,547.64 | $2,949,643.43 |
| $125,223.76 | $204.21 | $313,166.34 | $703,430.99 |
| $12,606.42 | $20.56 | $36,205.18 | $75,493.57 |
| $6,278.10 | $0.00 | $0.00 | $18,834.30 |
| $0.00 | $0.00 | $0.00 | $290.00 |
| $0.00 | $0.00 | $0.00 | $9,612.84 |
| $3,173.69 | $0.00 | $55.67 | $8,065.40 |
| $0.00 | $0.00 | $822.80 | $822.80 |

| | | | |
|---:|---:|---:|---:|
| ($525.00) | $0.00 | $525.00 | $0.00 |
| $0.00 | $0.00 | $8,500.00 | $8,500.00 |
| $7,241.00 | $8,009.75 | $19,176.00 | $48,908.75 |
| $0.00 | $0.00 | $2,891,057.91 | $2,891,057.91 |
| $0.00 | $0.00 | $3,878.44 | $3,878.44 |
| $0.00 | $0.00 | $0.00 | $10,280.27 |
| $0.00 | $0.00 | $8,647.50 | $8,647.50 |
| $0.00 | $0.00 | $0.00 | $6,048.84 |
| $0.00 | $0.00 | $481.55 | $481.55 |
| $4,735.30 | $0.00 | $0.00 | $16,091.12 |
| $291.10 | $5.14 | $1,275.36 | $18,531.69 |
| $0.00 | $0.00 | $0.00 | $203.73 |
| $0.00 | $0.00 | $0.00 | $1,850.00 |
| $0.00 | $0.00 | $483.76 | $483.76 |
| $0.00 | $0.00 | $0.00 | $1,390.00 |
| $4,813.56 | $0.00 | $0.00 | $14,956.36 |
| $0.00 | $0.00 | $0.00 | $20.00 |
| $13,375.52 | $0.00 | $0.00 | $44,123.31 |
| $15.15 | $0.00 | $0.00 | $5,341.09 |
| $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $0.00 | $4,725.92 |
| $0.00 | $0.00 | $0.00 | $1,673.75 |
| $0.00 | $0.00 | ($71.69) | ($71.69) |
| $0.00 | $0.00 | $418.84 | $418.84 |
| $1,829.52 | $0.00 | $0.00 | $3,568.40 |
| $0.00 | $0.00 | $9,249.10 | $9,249.10 |
| $78.00 | $0.00 | $0.00 | ($242.00) |
| $0.00 | $0.00 | $578,556.17 | $593,816.29 |
| $0.00 | $0.00 | $41,500.00 | $41,500.00 |
| $0.00 | $0.00 | $299.69 | $299.69 |
| $0.00 | $0.00 | $1,529.19 | $1,529.19 |
| $0.00 | $0.00 | $1,940.55 | $1,940.55 |
| $0.00 | $0.00 | $0.00 | $55,271.14 |
| $0.00 | $0.00 | $238.25 | $238.25 |
| $0.00 | $0.00 | $0.00 | $98.10 |
| $0.00 | $0.00 | $0.00 | $87.50 |
| $0.00 | $0.00 | $0.00 | $7,349.53 |
| $0.00 | $0.00 | $0.00 | $1,156.09 |
| $188,677.95 | $0.00 | $579,585.35 | $1,232,708.55 |
| $70,092.28 | $0.00 | $174,441.15 | $408,855.48 |
| $4,704.18 | $0.00 | $99.61 | $15,832.12 |
| $0.00 | $0.00 | $2,756.76 | $2,756.76 |
| $0.00 | $0.00 | $334.17 | $334.17 |
| $0.00 | $0.00 | $1,208.04 | $1,208.04 |
| $0.00 | $0.00 | $0.00 | $22,762.14 |
| $0.00 | $0.00 | $0.00 | $1,024.58 |
| $1,950.35 | $0.00 | $0.00 | $2,219.53 |
| $0.00 | $0.00 | $146,250.00 | $146,250.00 |
| $0.00 | $0.00 | $0.00 | $6,000.00 |
| $4,977.50 | $0.00 | $0.00 | $6,166.00 |
| $1,826.75 | $0.00 | $0.00 | $2,474.96 |
| $0.00 | $0.00 | $51.28 | $51.28 |

| | | | |
|---:|---:|---:|---:|
| $0.00 | $0.00 | $233.79 | $233.79 |
| $2,492.92 | $2,492.92 | $102,209.72 | $112,181.40 |
| $0.00 | $0.00 | $1,023.47 | $1,023.47 |
| $0.00 | $0.00 | $0.00 | $102.50 |
| $0.00 | $0.00 | ($360.80) | $4,696.70 |
| $0.00 | $0.00 | $0.00 | $2,193.00 |
| $0.00 | $0.00 | $0.00 | $2,382.00 |
| $102.83 | $0.00 | $0.00 | $102.83 |
| $0.00 | $0.00 | $1,132.05 | $1,132.05 |
| $2,888.92 | $0.00 | $0.00 | $8,176.16 |
| $0.00 | $0.00 | $880.00 | $880.00 |
| $0.00 | $0.00 | $1,750.00 | $1,750.00 |
| $0.00 | $0.00 | $25.67 | $25.67 |
| $1,682.63 | $0.00 | $0.00 | $3,365.26 |
| $0.00 | $0.00 | $58.55 | $58.55 |
| $0.00 | $0.00 | $270.00 | $270.00 |
| $0.00 | $0.00 | $0.00 | $75.00 |
| $0.00 | $0.00 | $417.25 | $417.25 |
| $0.00 | $0.00 | $0.00 | $175.44 |
| $0.00 | $0.00 | $6,000.00 | $6,000.00 |
| $0.00 | $0.00 | $0.00 | $2,958.79 |
| $0.00 | $0.00 | $243,313.00 | $243,313.00 |
| $8,521.65 | $0.00 | $0.00 | $15,436.75 |
| $0.00 | $0.00 | $50.00 | $50.00 |
| $2,141.87 | $0.00 | $215.12 | $8,384.36 |
| $0.00 | $0.00 | ($321.48) | ($321.48) |
| $109,805.98 | $0.00 | $0.00 | $223,309.61 |
| $0.00 | $563.60 | $0.00 | $563.60 |
| $0.00 | $0.00 | $0.00 | $815.68 |
| $0.00 | $0.00 | $0.00 | $2,230.89 |
| $0.00 | $0.00 | $6,242.50 | $6,242.50 |
| $0.00 | ($3,312.50) | $0.00 | ($3,312.50) |
| $0.00 | $0.00 | $15,000.00 | $15,000.00 |
| $0.00 | $0.00 | ($621.00) | $22,573.07 |
| $569.24 | $0.00 | $0.00 | $569.24 |
| $98.95 | $0.00 | $0.00 | $98.95 |
| $0.00 | $0.00 | $3,375.00 | $3,375.00 |
| $0.00 | $0.00 | $0.00 | ($56.75) |
| $0.00 | $0.00 | $8,806.00 | $8,806.00 |
| $0.00 | $0.00 | $0.00 | $300.00 |
| $0.00 | $0.00 | $2,000.00 | $2,000.00 |
| $935.00 | $0.00 | $0.00 | $935.00 |
| $0.00 | $0.00 | $345.97 | $345.97 |
| $0.00 | $0.00 | $248.00 | $248.00 |
| $0.00 | $0.00 | ($481.10) | ($481.10) |
| $0.00 | $0.00 | $552,500.00 | $602,500.00 |
| $0.00 | $0.00 | $525.00 | $525.00 |
| $0.00 | $0.00 | $0.00 | $2,300.83 |
| $0.00 | $0.00 | $50,063.07 | $50,063.07 |
| $0.00 | $0.00 | ($1,397.85) | ($1,397.85) |
| $0.00 | $0.00 | $0.00 | $1,035.00 |
| $0.00 | $0.00 | $79,782.29 | $79,782.29 |

| | | | |
|---:|---:|---:|---:|
| $0.00 | $0.00 | $0.00 | $570.40 |
| $0.00 | $0.00 | $0.00 | $757.51 |
| $5,917.67 | $0.00 | $0.00 | $13,655.98 |
| $0.00 | $0.00 | $6,320.00 | $18,236.10 |
| $0.00 | $0.00 | $7,188.00 | $7,188.00 |
| $590.41 | $0.00 | $0.00 | $1,140.02 |
| $0.00 | $0.00 | $0.00 | $2,487.00 |
| $0.00 | $0.00 | $0.00 | $2,295.00 |
| $0.00 | $0.00 | $0.00 | $334.40 |
| $0.00 | $0.00 | $1,316.87 | $1,316.87 |
| ($20,000.00) | ($20,000.00) | $380,000.00 | $340,000.00 |
| $0.00 | $0.00 | $70.00 | $70.00 |
| $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $1,360.25 | $1,360.25 |
| $54,083.33 | $54,083.33 | $208,062.59 | $424,395.91 |
| $0.00 | $0.00 | $9,270.00 | $9,270.00 |
| $0.00 | $0.00 | $0.00 | $96,000.00 |
| $0.00 | $0.00 | $0.00 | $4,600.00 |
| $0.00 | $0.00 | $0.00 | $425.00 |
| $4,956.50 | $2,420.00 | $0.00 | $18,077.08 |
| $0.00 | $0.00 | $1,155.00 | $1,155.00 |
| $0.00 | $0.00 | $96.00 | $96.00 |
| $0.00 | $0.00 | $14.95 | $14.95 |
| $41,651.33 | $41,651.33 | $1,684,505.94 | $1,851,111.26 |
| $0.00 | $0.00 | $0.00 | $1,920.00 |
| $0.00 | $0.00 | $111.63 | $111.63 |
| $4,192.50 | $4,042.00 | $0.00 | $8,234.50 |
| $0.00 | $0.00 | $378.79 | $378.79 |
| $2,530.50 | $0.00 | $0.00 | $2,778.50 |
| $0.00 | $0.00 | $0.00 | $412.07 |
| $0.00 | $0.00 | $30.00 | $30.00 |
| $0.00 | $0.00 | $362.82 | $362.82 |
| $0.00 | $0.00 | $0.00 | $700.00 |
| $12,406.90 | $3,665.25 | $0.00 | $44,314.54 |
| $0.00 | $0.00 | $7,520.00 | $7,520.00 |
| $0.00 | $0.00 | $0.00 | $12,404.84 |
| $0.00 | $0.00 | $0.00 | $6,663.51 |
| $0.00 | $0.00 | $90.00 | $90.00 |
| $0.00 | $0.00 | $0.00 | $165.00 |
| $0.00 | $0.00 | $3,291.00 | $3,291.00 |
| $0.00 | $0.00 | $0.00 | $440.00 |
| $0.00 | $1,667.67 | $56,679.44 | $63,350.12 |
| $0.00 | $0.00 | $15,000.00 | $15,000.00 |
| $0.00 | $0.00 | $334.22 | $334.22 |
| $0.00 | $0.00 | $15,035.41 | $15,035.41 |
| $0.00 | $0.00 | $8,400.00 | $8,400.00 |
| $0.00 | $0.00 | $6,300.00 | $6,300.00 |
| $0.00 | $0.00 | $0.00 | $70.16 |
| $0.00 | $0.00 | $16,407.82 | $16,407.82 |
| $0.00 | $0.00 | $0.00 | $1,032.60 |
| $0.00 | $0.00 | $391.84 | $391.84 |
| $0.00 | $0.00 | $0.00 | $272.81 |

| | | | |
|---:|---:|---:|---:|
| $0.00 | $0.00 | $5,900.00 | $5,900.00 |
| $0.00 | $0.00 | $523.99 | $523.99 |
| $0.00 | $0.00 | $6,347.00 | $6,347.00 |
| $0.00 | $0.00 | $45,318.00 | $45,318.00 |
| $0.00 | $0.00 | $10,037.33 | $10,037.33 |
| $0.00 | $0.00 | $39.09 | $39.09 |
| $250.00 | $0.00 | $29,368.00 | $50,456.76 |
| $0.00 | $0.00 | $6,225.00 | $6,225.00 |
| $0.00 | $0.00 | $400.10 | $1,011.10 |
| $0.00 | $0.00 | $0.00 | $547.00 |
| $0.00 | $0.00 | $72,528.90 | $72,528.90 |
| $0.00 | $0.00 | $0.00 | $2,280.00 |
| $0.00 | $0.00 | $8,032.89 | $9,256.09 |
| $937.66 | $937.66 | $108,070.90 | $111,821.54 |
| $0.00 | $0.00 | $12,329.72 | $12,329.72 |
| $0.00 | $0.00 | $94,489.60 | $94,489.60 |
| $0.00 | $0.00 | $145,309.75 | $145,309.75 |
| $0.00 | $0.00 | $2,000.00 | $2,000.00 |
| $0.00 | $0.00 | $114,805.70 | $114,805.70 |
| $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $0.00 | $479.00 |
| $0.00 | $0.00 | $270.13 | $270.13 |
| $0.00 | $0.00 | $0.00 | $109.95 |
| $0.00 | $0.00 | $0.00 | $436.74 |
| $0.00 | $0.00 | $7,059.00 | $7,059.00 |
| $0.00 | $0.00 | $7,441.00 | $7,441.00 |
| $0.00 | $0.00 | $5,413.00 | $5,413.00 |
| $0.00 | $0.00 | $2,239.00 | $2,239.00 |
| $0.00 | $0.00 | $0.00 | $139,700.80 |
| $1,340.00 | $0.00 | $0.00 | $1,340.00 |
| $0.00 | $0.00 | ($4,436.76) | ($4,436.76) |
| $0.00 | $0.00 | $0.00 | $567.83 |
| $0.00 | $0.00 | $3,705.00 | $3,705.00 |
| $43,562.50 | $56,228.16 | $4,206,120.05 | $4,393,035.71 |
| $0.00 | $0.00 | $340.00 | $340.00 |
| $0.00 | $0.00 | $0.00 | $73,874.42 |
| $0.00 | $0.00 | $80,000.00 | $80,000.00 |
| $0.00 | $0.00 | $0.00 | $259.90 |
| $0.00 | $0.00 | $1,750.00 | $3,665.18 |
| $0.00 | $0.00 | $0.00 | $289,526.63 |
| $0.00 | $0.00 | $9,315.00 | $9,315.00 |
| $0.00 | $0.00 | $0.00 | $6,272.60 |
| $0.00 | $0.00 | $0.00 | $8,103.95 |
| $0.00 | $0.00 | ($332.00) | ($332.00) |
| $0.00 | $0.00 | $0.00 | $165.56 |
| $24,678.37 | $20,115.51 | $1,264,262.43 | $1,333,214.33 |
| $0.00 | $0.00 | $0.00 | $107.00 |
| $0.00 | $0.00 | $1,220.00 | $1,220.00 |
| $0.00 | $0.00 | $16.07 | $16.07 |
| $0.00 | $0.00 | $1,008.13 | $1,008.13 |
| $14,583.33 | $14,583.33 | $641,666.52 | $699,999.84 |
| $3,358.03 | $1,949.00 | $0.00 | $35,777.19 |

| | | | |
|---:|---:|---:|---:|
| $0.00 | ($30,000.00) | $150,000.00 | $60,000.00 |
| $0.00 | $0.00 | $0.00 | $187.00 |
| $0.00 | $0.00 | $0.00 | $448.73 |
| $0.00 | $0.00 | $0.00 | $5,400.00 |
| $0.00 | $0.00 | $1,054,826.61 | $1,054,826.61 |
| $0.00 | $0.00 | $3,517.76 | $3,517.76 |
| $0.00 | $0.00 | $83.25 | $83.25 |
| $0.00 | $0.00 | $43.88 | $43.88 |
| $0.00 | $0.00 | $118.67 | $118.67 |
| $0.00 | $0.00 | $40.00 | $40.00 |
| $0.00 | $0.00 | $220.18 | $220.18 |
| $7,083.33 | $7,083.33 | $283,333.20 | $311,666.52 |
| $0.00 | $0.00 | $616,250.13 | $616,250.13 |
| $5,896.25 | $5,896.25 | $321,935.59 | $345,520.59 |
| $3,750.00 | $3,750.00 | $3,750.00 | $18,750.00 |
| $0.00 | $0.00 | $58,243.08 | $58,243.08 |
| $0.00 | $0.00 | $182.00 | $182.00 |
| $0.00 | $0.00 | $2,000.00 | $2,000.00 |
| $0.00 | $0.00 | $15,880.00 | $15,880.00 |
| $7,500.00 | $7,500.00 | $419,167.00 | $449,167.00 |
| $0.00 | $0.00 | $4,800.00 | $4,800.00 |
| $0.00 | $0.00 | $15,125.00 | $15,125.00 |
| $0.00 | $0.00 | $26,159.90 | $26,159.90 |
| $0.00 | $0.00 | $1,463.00 | $1,463.00 |
| $0.00 | $0.00 | $5,000.00 | $5,000.00 |
| $0.00 | $0.00 | $23,500.00 | $23,500.00 |
| $0.00 | $0.00 | $3,605.52 | $3,605.52 |
| $0.00 | $0.00 | $1,179.44 | $0.00 |
| $0.00 | $0.00 | $11,829.75 | $11,829.75 |
| $0.00 | $0.00 | $5,941.53 | $32,145.61 |
| $0.00 | $0.00 | $0.00 | $30,000.00 |
| $0.00 | $0.00 | $5,000.00 | $5,000.00 |
| $0.00 | $0.00 | $2,743.58 | $2,743.58 |
| $0.00 | $0.00 | $4,300.00 | $4,300.00 |
| $0.00 | $0.00 | $10,357.15 | $10,357.15 |
| $0.00 | $0.00 | $340.00 | $340.00 |
| $0.00 | $0.00 | $12,535.42 | $12,535.42 |
| $0.00 | $0.00 | $4,796.47 | $4,796.47 |
| $16,930.00 | $0.00 | $0.00 | $48,870.00 |
| $0.00 | $0.00 | $4,550.00 | $4,550.00 |
| $0.00 | $0.00 | $35,411.54 | $35,411.54 |
| $0.00 | $0.00 | $0.00 | $7,090.82 |
| $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $105,596.67 | $105,596.67 |
| $0.00 | $0.00 | $0.00 | $1,150.00 |
| $0.00 | $0.00 | $135,456.21 | $135,456.21 |
| $0.00 | $0.00 | $102,989.13 | $102,989.13 |
| $0.00 | $0.00 | $0.00 | $1,119.68 |
| $0.00 | $0.00 | $16,450.54 | $16,450.54 |
| $37.44 | $0.00 | $0.00 | $2,128.23 |
| $0.00 | $0.00 | $0.00 | $440.00 |
| $0.00 | $0.00 | $839,430.66 | $709,743.86 |

| | | | |
|---:|---:|---:|---:|
| $0.00 | $0.00 | $3,675.00 | $3,675.00 |
| $0.00 | $0.00 | $3,673.64 | $3,673.64 |
| $0.00 | $0.00 | $120,000.00 | $120,000.00 |
| $7,150.00 | $7,150.00 | $112,235.68 | $140,835.68 |
| $28,083.33 | $28,083.33 | $2,521,563.33 | $2,633,896.65 |
| $0.00 | $0.00 | $0.00 | $33,887.58 |
| $0.00 | $2,184.41 | $0.00 | $2,184.41 |
| $0.00 | $0.00 | $1,202.80 | $1,202.80 |
| $0.00 | $5,977.82 | $0.00 | $5,977.82 |
| $0.00 | $0.00 | $57,687.50 | $57,687.50 |
| $0.00 | $0.00 | $1,300.00 | $1,300.00 |
| $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $0.00 | $5,962.59 |
| $0.00 | $0.00 | $3,087.00 | $3,087.00 |
| $0.00 | $0.00 | $47,200.00 | $47,200.00 |
| $0.00 | $0.00 | $3,675.00 | $3,675.00 |
| $0.00 | $0.00 | $175.00 | $175.00 |
| $0.00 | $0.00 | $0.00 | $109.00 |
| $0.00 | $0.00 | $0.00 | $3,415.90 |
| $5,495.00 | $1,525.00 | $0.00 | $18,020.00 |
| $0.00 | $0.00 | $250.00 | $250.00 |
| $2,210.00 | $0.00 | $0.00 | $4,150.00 |
| $0.00 | $0.00 | $0.00 | $172.35 |
| $0.00 | $0.00 | $2,500.00 | $2,500.00 |
| $0.00 | $0.00 | $865.00 | $865.00 |
| $0.00 | $0.00 | $20,620.45 | $20,620.45 |
| $0.00 | $0.00 | $0.00 | $2,868.00 |
| $0.00 | $0.00 | $51,082.88 | $51,082.88 |
| $0.00 | $0.00 | $3,200.00 | $3,200.00 |
| $0.00 | $0.00 | $7,780.00 | $7,780.00 |
| $0.00 | $0.00 | $0.00 | $1,000.00 |
| $5,475.50 | $57.50 | $0.00 | $5,533.00 |
| $0.00 | $0.00 | $1,000.00 | $1,000.00 |
| $0.00 | $0.00 | $11,000.00 | $11,000.00 |
| $0.00 | $0.00 | $1,150.00 | $1,150.00 |
| $0.00 | $0.00 | $50,481.45 | $50,481.45 |
| $0.00 | $0.00 | $150.00 | $150.00 |
| $0.00 | $0.00 | $2,298.00 | $2,298.00 |
| $0.00 | $0.00 | ($234.90) | ($234.90) |
| $0.00 | $0.00 | $40.00 | $40.00 |
| $0.00 | $0.00 | $1,000.00 | $1,000.00 |
| $0.00 | $0.00 | $0.00 | $637.95 |
| $0.00 | $0.00 | $150.00 | $150.00 |
| $0.00 | $0.00 | $0.00 | $700.00 |
| $0.00 | $0.00 | $20,423.00 | $20,423.00 |
| $0.00 | $0.00 | $26,000.00 | $26,000.00 |
| $1,908.00 | $0.00 | $0.00 | $3,356.00 |
| $0.00 | $0.00 | $0.00 | $205,500.00 |
| $0.00 | $0.00 | $0.00 | $201.87 |
| $0.00 | $0.00 | ($92.72) | ($92.72) |
| $0.00 | $0.00 | $0.00 | $300.00 |
| $0.00 | $1,481.00 | $0.00 | $1,481.00 |

| | | | |
|---|---|---|---|
| $0.00 | $0.00 | $0.00 | $9,033.00 |
| $1,176.00 | $0.00 | $0.00 | $1,176.00 |
| $0.00 | $0.00 | $37,280.47 | $37,423.29 |
| $0.00 | $0.00 | $0.00 | $420.00 |
| $0.00 | $0.00 | $1,000.00 | $1,000.00 |
| $0.00 | $0.00 | $60,133.00 | $60,133.00 |
| $0.00 | $0.00 | $12,000.00 | $12,000.00 |
| $3,166.66 | $0.00 | $0.00 | $6,333.32 |
| $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $0.00 | $1,897.08 |
| $0.00 | $0.00 | $0.00 | $10,376.50 |
| $2,344.41 | $0.00 | $10,227.66 | $17,076.21 |
| $0.00 | $0.00 | $0.00 | $748.25 |
| $1,128.00 | $0.00 | $0.00 | $1,128.00 |
| $0.00 | $0.00 | $0.00 | $150.00 |
| $931.80 | $0.00 | $0.00 | $1,398.17 |
| $0.00 | $0.00 | $0.00 | $800.00 |
| $2,600.00 | $0.00 | $0.00 | $2,600.00 |
| $6,800.00 | $0.00 | $0.00 | $6,800.00 |
| $80.00 | $0.00 | $0.00 | $80.00 |
| $0.00 | $0.00 | $78,708.50 | $78,708.50 |
| $0.00 | $0.00 | $0.00 | $3,123.61 |
| $0.00 | $0.00 | $24,000.00 | $24,000.00 |
| $0.00 | ($60.00) | $0.00 | ($60.00) |
| $6,531.16 | $0.00 | $0.00 | $9,433.72 |
| $0.00 | $0.00 | $0.00 | $10,950.00 |
| $394.70 | $0.00 | $0.00 | $802.75 |
| $0.00 | $751.00 | $0.00 | $751.00 |
| $400,000.00 | $0.00 | $0.00 | $25,000.00 |
| $0.00 | $0.00 | $0.00 | $717.59 |
| $0.00 | $0.00 | $0.00 | $41,666.66 |
| $180.00 | $84.00 | $0.00 | $974.00 |
| $0.00 | $0.00 | $0.00 | $720.00 |
| $445.80 | $0.00 | $0.00 | $445.80 |
| $0.00 | $0.00 | $214.26 | $214.26 |
| $0.00 | $0.00 | $133.90 | $133.90 |
| $0.00 | $0.00 | $0.00 | $660.00 |
| $0.00 | $0.00 | $0.00 | $390.00 |
| $0.00 | $0.00 | $0.00 | $640.07 |
| $35,898.42 | $0.00 | $0.00 | $35,898.42 |
| $0.00 | $0.00 | $160,000.00 | $160,000.00 |
| $0.00 | $0.00 | $0.00 | $300.00 |
| $0.00 | $0.00 | $1,074.34 | $1,074.34 |
| $0.00 | $0.00 | $0.00 | $406.41 |
| $4,714.51 | $0.00 | $0.00 | $4,714.51 |
| $0.00 | $0.00 | $0.00 | $9,162.50 |
| $300.00 | $0.00 | $0.00 | $300.00 |
| $0.00 | $0.00 | $0.00 | $12,709.86 |
| $0.00 | $0.00 | $0.00 | $300.00 |
| $0.00 | $0.00 | $0.00 | $590.05 |
| $25.00 | $0.00 | $0.00 | $175.00 |

| | | | |
|---|---|---|---|
| $0.00 | $0.00 | $0.00 | $300.00 |
| $0.00 | $0.00 | $0.00 | $475.00 |
| $0.00 | $0.00 | $0.00 | $2,970.00 |
| $0.00 | $0.00 | $0.00 | $733.96 |
| $0.00 | $0.00 | $0.00 | $200.00 |
| $0.00 | $0.00 | $0.00 | $150.00 |
| $0.00 | $0.00 | $0.00 | $100.00 |
| $0.00 | $0.00 | $0.00 | $250.00 |
| $0.00 | $0.00 | $0.00 | $247.00 |
| $0.00 | $0.00 | $45.00 | $45.00 |
| $0.00 | $0.00 | $12.56 | $12.56 |
| $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $2,140.00 | $2,140.00 |
| $0.00 | $0.00 | $39.70 | $39.70 |
| $0.00 | $0.00 | $62.56 | $62.56 |
| $0.00 | $0.00 | $2,622.06 | $2,622.06 |
| $0.00 | $0.00 | $2,412.04 | $2,412.04 |
| $0.00 | $0.00 | $12,600.00 | $12,600.00 |
| $0.00 | $0.00 | $3,585.76 | $3,585.76 |
| $0.00 | $0.00 | $6,339.09 | $6,339.09 |
| $0.00 | $0.00 | $3,052.00 | $3,052.00 |
| $0.00 | $0.00 | $9,820.00 | $9,820.00 |
| $0.00 | $0.00 | $9,900.00 | $9,900.00 |
| $0.00 | $0.00 | $4,695.30 | $4,695.30 |
| $0.00 | $0.00 | $3,411.18 | $3,411.18 |
| $0.00 | $0.00 | $4,750.00 | $4,750.00 |
| $0.00 | $0.00 | $8,550.00 | $8,550.00 |
| $0.00 | $0.00 | $7,220.70 | $7,220.70 |
| $0.00 | $0.00 | $3,800.00 | $3,800.00 |
| $0.00 | $0.00 | $4,750.00 | $4,750.00 |
| $0.00 | $0.00 | $87.00 | $87.00 |
| $0.00 | $0.00 | $1,024.00 | $1,024.00 |
| $0.00 | $0.00 | $20,790.00 | $20,790.00 |
| $0.00 | $0.00 | $2,241.28 | $2,241.28 |
| $0.00 | $0.00 | $162.50 | $162.50 |
| $0.00 | $0.00 | $3,199.60 | $3,199.60 |
| $0.00 | $0.00 | $935.87 | $935.87 |
| $0.00 | $0.00 | $5,120.50 | $5,120.50 |
| $0.00 | $0.00 | $8,584.00 | $8,584.00 |
| $0.00 | $0.00 | $3,681.69 | $3,681.69 |
| $0.00 | $0.00 | $2,973.17 | $2,973.17 |
| $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $0.00 | $0.00 |
| $0.00 | $0.00 | $25.12 | $25.12 |
| $0.00 | $0.00 | $12.56 | $12.56 |
| $0.00 | $0.00 | $32.08 | $32.08 |
| $0.00 | $0.00 | $50.00 | $50.00 |
| $0.00 | $0.00 | $80.00 | $80.00 |
| $0.00 | $0.00 | $39.00 | $39.00 |
| $0.00 | $0.00 | $15.00 | $15.00 |
| $0.00 | $0.00 | $13.29 | $13.29 |
| $0.00 | $0.00 | $13.29 | $13.29 |

| | | | |
|---:|---:|---:|---:|
| $0.00 | $0.00 | $13.40 | $13.40 |
| $0.00 | $0.00 | $32.55 | $32.55 |
| $0.00 | $0.00 | $15.00 | $15.00 |
| $0.00 | $0.00 | $222.00 | $222.00 |
| $0.00 | $0.00 | $130.00 | $130.00 |
| $0.00 | $0.00 | $75.00 | $75.00 |
| $1,904,639.43 | $264,677.36 | $25,524,194.40 | $31,551,921.68 |

# EXHIBIT 2

**Etheridge, Derek**

| | |
|---|---|
| **From:** | Zavalkoff-Babej, Erin |
| **Sent:** | Friday, March 11, 2011 1:58 PM |
| **To:** | Etheridge, Derek |

**Subject:** FW: NGH

---

**From:** Zavalkoff-Babej, Erin
**Sent:** Monday, July 12, 2010 6:12 PM
**To:** 'Marianne Muise'
**Subject:** NGH

Hi Marianne,

John said you were the person I should reach out to to get some vendor-related information.  If possible can you send me a list of your critical vendors and how much you owe these critical vendors (prepetition amounts that have not been paid).  Basically, these are vendors that NGH will still need to deal with (until operations cease) and who would otherwise not provide NGH goods and services until they are paid these prepetition amounts that are due and owing.

Let me know if you have any questions.

Erin

# EXHIBIT 3

**Etheridge, Derek**

| | |
|---|---|
| **From:** | Zavalkoff-Babej, Erin |
| **Sent:** | Friday, March 11, 2011 2:03 PM |
| **To:** | Etheridge, Derek |
| **Subject:** | FW: NGH |

**From:** Zavalkoff-Babej, Erin
**Sent:** Tuesday, July 13, 2010 3:37 PM
**To:** 'Marianne Muise'
**Subject:** RE: NGH

estimate what the maximum amount you would need if you can.

**From:** Marianne Muise [mailto:mmuise@hmsconsultants.com]
**Sent:** Tuesday, July 13, 2010 3:34 PM
**To:** Zavalkoff-Babej, Erin
**Subject:** RE: NGH

Erin: what if we are missing invoices.
one example is EPIQ, we only have the May invoice,
how do we handle that, if this motion is to set an amount not to exceed??
we might not have all the invoices for these critical vendors, and I don't want to be short

```
MLM
Marianne L. Muise, FHFMA
Principal
Healthcare Management Solutions LLC
voice: 845-497-1312
efax: 888-307-6949
mmuise@hmsconsultants.com
www.hmsconsultants.com
```

```
This e-mail message and any attachment is intended solely for the
The message and/or attachment may contain confidential informatio
If you are not the intended recipient of this message, you must n
disseminate the information. Instead, please notify the sender an
and any attachment from your system. Thank you for your cooperati
```

On July 13, 2010 at 1:26 PM "Zavalkoff-Babej, Erin" <ebabej@windelsmarx.com> wrote:

> don;t need addresses at this point just the total amount you need to pay for all prepetition
> amounts due to your critical vendors. Name and kind of service they are providing
>
> **From:** Marianne Muise [mailto:mmuise@hmsconsultants.com]
> **Sent:** Tuesday, July 13, 2010 1:16 PM
> **To:** Zavalkoff-Babej, Erin
> **Subject:** Re: NGH
>
> Erin: also, do you need utility suppliers identified, or was that included in another motion?

```
MLM
Marianne L. Muise, FHFMA
Principal
Healthcare Management Solutions LLC
voice: 845-497-1312
efax: 888-307-6949
mmuise@hmsconsultants.com
www.hmsconsultants.com
```

```
This e-mail message and any attachment is intended solely for th
The message and/or attachment may contain confidential informati
```

If you are not the intended recipient of this message, you must not read, use, retain or
disseminate the information. Instead, please notify the sender and delete the message
and any attachment from your system. Thank you for your cooperation.

On July 12, 2010 at 6:12 PM "Zavalkoff-Babej, Erin" <ebabej@windelsmarx.com> wrote:

Hi Marianne,
John said you were the person I should reach out to to get some vendor-related information. If possible can you send me a list of your
critical vendors and how much you owe these critical vendors (prepetition amounts that have not been paid). Basically, these are
vendors that NGH will still need to deal with (until operations cease) and who would otherwise not provide NGH goods and services
until they are paid these prepetition amounts that are due and owing.
Let me know if you have any questions.
Erin
Erin Zavalkoff-Babej | Windels Marx Lane & Mittendorf, LLP | 156 West 56th Street, New York, New York 10019 | Direct Dial: 212.237.1176 |
General Fax: 212.262.1215 | ebabej@windelsmarx.com | www.windelsmarx.com

IRS Circular 230 Disclosure: As required by Federal Regulations, we inform you that any tax advice contained herein was not written or intended to be used (and cannot be used) for the
purpose of avoiding federal tax penalties, or for the purpose of promoting, marketing, or recommending any transaction or matter to another party.

This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, regardless of whether you are a named
recipient, please notify the sender by reply e-mail and delete the message and any attachments.

Erin Zavalkoff-Babej | Windels Marx Lane & Mittendorf, LLP | 156 West 56th Street, New York, New York 10019 | Direct Dial: 212.237.1176 | General
Fax: 212.262.1215 | ebabej@windelsmarx.com | www.windelsmarx.com

IRS Circular 230 Disclosure: As required by Federal Regulations, we inform you that any tax advice contained herein was not written or intended to be used (and cannot be used) for the purpose of
avoiding federal tax penalties, or for the purpose of promoting, marketing, or recommending any transaction or matter to another party.

This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, regardless of whether you are a named recipient, please
notify the sender by reply e-mail and delete the message and any attachments.

# EXHIBIT 4

# Etheridge, Derek

| | |
|---|---|
| **From:** | Zavalkoff-Babej, Erin |
| **Sent:** | Friday, March 11, 2011 1:56 PM |
| **To:** | Etheridge, Derek |
| **Subject:** | FW: critical vendors |
| **Attachments:** | vendor_required_after_bankrupcy07142010submitted.xlsx |

**From:** Monica Terrano [mailto:Monica.Terrano@NGSC.ORG]
**Sent:** Wednesday, July 14, 2010 11:35 AM
**To:** Zavalkoff-Babej, Erin
**Cc:** Marianne Muise; John Maher
**Subject:** critical vendors

Erin,

Attached is last of vendors that North General will need along with their owed balances. Please let me know if anything further is required.

NORTH GENERAL
CRITICAL VENDORS (GOODS & SUPPLIES)

| Vendors that need to Continue | Amount owed Pre-Petition as of 7/13/2010 Accounts | Estimated Amount Owed | Grand Total | Classification | Description of Vendor Services | Comments |
|---|---|---|---|---|---|---|
| Burns Security | 363,310 | 140,000.00 | 503,309.61 | Critical | Outsourced Security Services | |
| Iron Mountain | 18,849.32 | 20,000.00 | 38,849.32 | Critical | Record Storage | |
| Physician Reciprocal Insurance | | 20,000.00 | 20,000.00 | Critical | Malpractice Insurance | |
| Public Goods Pool | | 134,799.00 | 134,799.00 | Critical | NYS Bad Debt Pools; must pay in order to receive monthly distribution | Payments will be offset by Revenue |
| Statewide Assessment Pool | | 120,000.00 | 120,000.00 | Critical | NYS Assessment; must pay in order to receive monthly distribution | Payments will be offset by Revenue |
| 3M Health Information | | 70,000.00 | 70,000.00 | Ordinary Course | DRG & coding software | |
| ACME Fire Alarm & Fire Systems | | 45,000.00 | 45,000.00 | Ordinary Course | Fire Alarm Maintenance & Repairs | |
| ADT Security | | 1,000.00 | 1,000.00 | Ordinary Course | Security & Alarm system Maintenance & repairs | |
| AFCO Insurance | | 65,000.00 | 65,000.00 | Ordinary Course | Financing for insurance premiums | |
| American Appraisal | 11,476.00 | 48,500.00 | 59,976.00 | Ordinary Course | Property appraisal services | |
| AT&T | | 150.00 | 150.00 | Ordinary Course | Back up telephone line | |
| Atlantic Business | 334.22 | | 334.22 | Ordinary Course | Copier lease | |
| Distinctive Personnel | | 1,000.00 | 1,000.00 | Ordinary Course | Temporary employment agency | |
| Door Automation | 2,298.00 | | 2,298.00 | Ordinary Course | Maintenance & Repairs | |
| Federal Express | 941.80 | 200.00 | 1,141.80 | Ordinary Course | Overnight shipping | |
| First Insurance | | 9,870.00 | 9,870.00 | Ordinary Course | Malpractice Insurance | |
| Harley Construction Management Corp | | 64,000.00 | 64,000.00 | Ordinary Course | Construction company | |
| Integro Insurance | 32,253.67 | | 32,253.67 | Ordinary Course | General Liability Insurance | Payments will be offset by Revenue |
| Joele Frank | | 12,000.00 | 12,000.00 | Ordinary Course | Property appraisal services | |
| LDI Colored Toolbox | | 2,500.00 | 2,500.00 | Ordinary Course | Copier maintenance | |
| NYC Fire Department | 935.00 | 2,985.00 | 3,920.00 | Ordinary Course | Fire saftey & permits | |
| Pitney Bowes | | 10,000.00 | 10,000.00 | Ordinary Course | Postage machines | |
| System Maintenance Services | | 2,000.00 | 2,000.00 | Ordinary Course | Software & licenses & maintenance | |
| United Parcel Services | 131.05 | 200.00 | 331.05 | Ordinary Course | Overnight Shipping | |
| Vital Network | | 10,000.00 | 10,000.00 | Ordinary Course | Software & licenses & maintenance | |
| Deloitte Tax | 160,750.00 | | 160,750.00 | Professional | Independent Audit firm (year end tax issues) | |
| Emdeon Corp | 18,834.30 | 6,300.00 | 25,134.30 | Professional | Revenue cycle services (billing & collection) | |
| Epiq Systems | | 55,000.00 | 55,000.00 | Professional | Bankruptcy claim service | |
| Garbarini & Scher | | 25,000.00 | 25,000.00 | Professional | Malpractice Attorneys | |
| Healthcare Management Solutions | | 31,000.00 | 31,000.00 | Professional | Finance, Reimbursement & Revenue Cycle consultants | |
| Milliman USA | 45,318.00 | 39,000.00 | 84,318.00 | Professional | Pension actuary | |
| BDO Seidman | | 55,000.00 | 55,000.00 | Professional | Independent Audit firm (year end audit, pension audits, grant audits) | |
| **Total** | **655,430.97** | **990,504.00** | **1,645,934.97** | | | |

# EXHIBIT 5

**Etheridge, Derek**

| | |
|---|---|
| **From:** | Marianne Muise [mmuise@hmsconsultants.com] |
| **Sent:** | Wednesday, July 21, 2010 1:02 PM |
| **To:** | Zavalkoff-Babej, Erin |
| **Cc:** | Maher John; Etheridge, Derek |
| **Subject:** | Critical Vendor list Updated 7-21-2010 |

**Attachments:** vendor_required_after_bankrupcy07142010 Revised 7-21-2010.xlsx

Erin: attached is corrected copy of the critical vendor list.
(we corrected the description on a few vendors)

please let me know if you have any questions.


MLM
Marianne L. Muise, FHFMA
Principal
Healthcare Management Solutions LLC
voice: 845-497-1312
efax: 888-307-6949
mmuise@hmsconsultants.com
www.hmsconsultants.com

This e-mail message and any attachment is intended solely for the
The message and/or attachment may contain confidential informatio
If you are not the intended recipient of this message, you must n
disseminate the information. Instead, please notify the sender an
and any attachment from your system. Thank you for your cooperati

NORTH GENERAL
CRITICAL VENDORS (GOODS & SUPPLIES)

| Vendors that need to Continue | Amount owed to Continue as of 7/13/2010 Accounts | Estimated Amount Owed | Grand Total | Classification | Description of Vendor Services | Comments |
|---|---|---|---|---|---|---|
| Burns Security | 363,310 | 140,000.00 | 503,309.61 | Critical | Outsourced Security Services | |
| Iron Mountain | 18,849.32 | 20,000.00 | 38,849.32 | Critical | Record Storage | |
| Physcian Reciprocal Insurance | | 20,000.00 | 20,000.00 | Critical | Malpractice Insurance | |
| Public Goods Pool | 134,799.00 | | 134,799.00 | Critical | NYS Bad Debt Pools; must pay in order to receive monthly distribution | Payments will be offset by Revenue |
| Statewide Assessment Pool | 120,000.00 | | 120,000.00 | Critical | NYS Assessment; must pay in order to receive monthly distribution | Payments will be offset by Revenue |
| 3M Health Information | | 70,000.00 | 70,000.00 | Ordinary Course | DRG & coding software | |
| ACME Fire Alarm & Fire Systems | | 49,000.00 | 49,000.00 | Ordinary Course | Fire Alarm Maintenance & Repairs | |
| ADT Security | | 1,000.00 | 1,000.00 | Ordinary Course | Security & Alarm system Maintenance & repairs | |
| AFCO Insurance | | 65,000.00 | 65,000.00 | Ordinary Course | Financing for insurance premiums | |
| American Appraisal | 11,476.00 | 48,500.00 | 59,976.00 | Ordinary Course | Property appraisal services | |
| Distinctive Personnel | | 1,000.00 | 1,000.00 | Ordinary Course | Temporary employment agency | |
| Door Automation | 2,298.00 | | 2,298.00 | Ordinary Course | Maintenance & Repairs | |
| First Insurance | | 9,870.00 | 9,870.00 | Ordinary Course | Malpractice Insurance | |
| Harley Construction Management Corp | | 64,000.00 | 64,000.00 | Ordinary Course | Construction company | Payments will be offset by Revenue |
| Integro Insurance | 32,253.67 | | 32,253.67 | Ordinary Course | Insurance Brokers | |
| Joele Frank | | 12,000.00 | 12,000.00 | Ordinary Course | Public Relations | |
| LDI Colored Toolbox | 12,000.00 | | 2,500.00 | Ordinary Course | Copier maintenance | |
| NYC Fire Department | 935.00 | 2,985.00 | 3,920.00 | Ordinary Course | Fire saftey & permits | |
| Pitney Bowes | 10,000.00 | | 10,000.00 | Ordinary Course | Postage machines | |
| System Maintenance Services | 2,000.00 | | 2,000.00 | Ordinary Course | Software & licenses & maintenance | |
| Vital Network | 10,000.00 | | 10,000.00 | Ordinary Course | Computer Network maintenance | |
| Epiq Systems | 55,000.00 | | 55,000.00 | Professional | Bankruptcy claim service | |
| Garbarini & Scher | 25,000.00 | | 25,000.00 | Professional | Malpractice Attorneys | |
| Healthcare Management Solutions | 31,000.00 | | 31,000.00 | Professional | Finance, Reimbursement & Revenue Cycle consultants | |
| Milliman USA | 45,318.00 | 39,000.00 | 84,318.00 | Professional | Pension actuary | |
| BDO Seidman | | 55,000.00 | 55,000.00 | Professional | Independent Audit firm (year end audit, pension audits, grant audits) | |
| **Total** | **474,439.60** | **987,654.00** | **1,462,093.60** | | | |

# EXHIBIT 6

**Etheridge, Derek**

| | |
|---|---|
| **From:** | Schwartz, Andrea B. (USTP) [Andrea.B.Schwartz@usdoj.gov] |
| **Sent:** | Friday, July 23, 2010 5:35 PM |
| **To:** | Etheridge, Derek |
| **Cc:** | Simpson, Charles E. |
| **Subject:** | North General - Critical Vendor Motion |

Here are our issues:

1. Why is the motion necessary in light of the fact that all of the patients were discharged from the hospital as of July 11, 2010? The motion says only that it is necessary to pay "critical vendors" (i) to implement the Closure Plan and (ii) safeguard the patients and the residents. Without explanation, it does not appear to be necessary.
2. The motion includes a blank for the "Critical Vendor Cap."??
3. The motion does not include a list of the "critical vendors" to be paid. We request seeing the list, and the amounts being sought to be paid.

Andrea B. Schwartz, Esq.
Trial Attorney
U.S. Department of Justice
Office of the United States Trustee
*Southern District of New York*
33 Whitehall Street, 21st Floor
New York, NY 10004
(212) 510-0500 (Tel.)
(212) 668-2255 (Fax)

# EXHIBIT 7

**Etheridge, Derek**

| | |
|---|---|
| **From:** | John Maher [John.Maher@NGSC.ORG] |
| **Sent:** | Friday, August 20, 2010 4:33 PM |
| **To:** | Etheridge, Derek |
| **Cc:** | Simpson, Charles E.; John Maher |
| **Subject:** | FW: |
| **Attachments:** | CC Physician Payment.pdf |

Derek/Charles,

Attached is the information on  professional payments  the Committee requested.  The Excel schedule in front provides information on checks and wires, clearing dates etc. , and persons associated with the grants. There is an alpha code that references the detail documents i.e. check requests, checks, wires, etc.

Regarding the grants, if the monies are not spent for the purpose for which the grant was requested, the monies are to be returned. Therefore,  in addition to the motion allowing the payment for pre-petition services, had the payment not been made, the monies would have to be refunded to the granting agency.

The committee also requested documents from providers who were threatening to stop service, if not paid. For those providers, (Anesthesiology and Pathology) e mails and letters are included. Path was the only real threat, as the payment to Anesthesiology was for post petition services.

Contracts for these providers are in the virtual data room. The contracts shopuld be appended to the attached.

# EXHIBIT 8

## Etheridge, Derek

| | |
|---|---|
| **From:** | Marianne Muise [mmuise@hmsconsultants.com] |
| **Sent:** | Tuesday, July 27, 2010 2:02 PM |
| **To:** | Etheridge, Derek |
| **Cc:** | Maher John |
| **Subject:** | North General MD Payments |

**Attachments:** medical_payments_made_in_july.xls

attached is the list of payments made to physicians in July as requested.
please let me know if you need anything else.


MLM
Marianne L. Muise, FHFMA
Principal
Healthcare Management Solutions LLC
voice: 845-497-1312
efax: 888-307-6949
mmuise@hmsconsultants.com
www.hmsconsultants.com

This e-mail message and any attachment is intended solely for the
The message and/or attachment may contain confidential informatio
If you are not the intended recipient of this message, you must n
disseminate the information. Instead, please notify the sender an
and any attachment from your system. Thank you for your cooperati

3/11/2011

**North General Hospital**
**Payments to Physicians July 2010**

| Paid week Ending | Check # | Ck Date | Vendor # | For Services Rendered | Vendor Name | Category # | Amount | |
|---|---|---|---|---|---|---|---|---|
| 7/2/2010 | 74620 | 7/2/2010 | 5084 | 6/1 &6/8-2010 | ALAN LEE | 3.1.1 | 700.00 | Grant |
| 7/2/2010 | 74627 | 7/2/2010 | 4539 | June 1-15 | LUCY LIU | 3.1.1 | 1,920.00 | Grant |
| 7/2/2010 | 74632 | 7/2/2010 | 7988 | June 2010 | SIMONE CARBONEL | 3.1.1 | 720.00 | Grant |
| 7/2/2010 | | 7/2/2010 | | through 7/10/2010 | Emergency MD PC | 3.1.1 | 111,287.00 | Emergency Room |
| 7/2/2010 | | 7/2/2010 | | through 7/10/2010 | River East Anesthesia | 3.1.1 | 41,617.00 | Anesthesia |
| 7/9/2010 | 74638 | 7/9/2010 | 7592 | July 2010 | J. EDWARDS, M.D | 3.1.1 | 27,083.00 | Surgery |
| 7/9/2010 | 74639 | 7/9/2010 | 7961 | June 2010 | MADISON AVENUE | 3.1.1 | 20,850.00 | Urology |
| 7/9/2010 | 74672 | 7/9/2010 | 5084 | May 3 & 17 June 7,21,15,22 &29 | ALAN LEE | 3.1.1 | 2,450.00 | Grant |
| 7/9/2010 | 74678 | 7/9/2010 | 7744 | June 3-6, 2010 | DILRUBA NABI, M | 3.1.1 | 1,200.00 | Nephrology |
| 7/9/2010 | 74685 | 7/9/2010 | 7761 | June 2010 | JOHN SOH | 3.1.1 | 8,000.00 | Oral Surgeon |
| 7/9/2010 | 74687 | 7/9/2010 | 4539 | June 16-30 | LUCY LIU | 3.1.1 | 2,400.00 | Grant |
| 7/9/2010 | 74690 | 7/9/2010 | 7972 | July 2010 | MADISON AVE. PH | 3.1.1 | 20,833.33 | Pathology |
| 7/9/2010 | 74698 | 7/9/2010 | 7988 | June 2010 | SIMONE CARBONEL | 3.1.1 | 1,200.00 | Grant |
| | | | | | | | | |

# EXHIBIT 9

**Etheridge, Derek**

| | |
|---|---|
| **From:** | John Maher [John.Maher@NGSC.ORG] |
| **Sent:** | Thursday, June 24, 2010 8:46 PM |
| **To:** | Etheridge, Derek |
| **Subject:** | Tuition Reimbursement |

If any employee has submitted (and has not been paid) or is planning to submit for tuition reimbursement, I presume  this falls under the $10K max rule...does a motion cover this or not....?

# EXHIBIT 10

**Etheridge, Derek**

| | |
|---|---|
| **From:** | John Maher [John.Maher@NGSC.ORG] |
| **Sent:** | Monday, August 09, 2010 4:06 PM |
| **To:** | Zavalkoff-Babej, Erin |
| **Cc:** | Etheridge, Derek |
| **Subject:** | EZB COMMENTS TO FAQ FOR NGH CALL CENTER (10579987-2) 20100809 1600 |
| **Attachments:** | EZB COMMENTS TO FAQ FOR NGH CALL CENTER (10579987-2) 20100809 1600.docx |

See attached. Please note language around benefits. The hospital is not paying benefits on paid non-worked time, i.e. vacation, severance, etc....after termination date.

Also, please review language around 403 (b) accounts vs. the original language on 401(k)s.

Suggest we review tomorrow for final changes.

3/11/2011

# EXHIBIT 11

**Etheridge, Derek**

| | |
|---|---|
| **From:** | John Maher [John.Maher@NGSC.ORG] |
| **Sent:** | Thursday, August 12, 2010 6:13 PM |
| **To:** | Zavalkoff-Babej, Erin |
| **Cc:** | Etheridge, Derek; Simpson, Charles E. |
| **Subject:** | 10579987(2) 20100812 1810 |
| **Attachments:** | 10579987(2) 20100812 1810.docx |

We should review certain items tomorrow AM...

<u>**FREQUENTLY ASKED QUESTIONS FOR CALL CENTER**</u>

<u>**Supplier Questions**</u>

<u>**General Questions**</u>

1. **What is Chapter 11?**

   Chapter 11 of the U.S. Bankruptcy Code is a legal mechanism for court supervised reorganization for restructuring of the hospital's obligations. It also provides a mechanism for the orderly liquidation or transfer of the hospital's assets and affiliated operations.

2. **Why did Hospital and the Diagnostic and Treatment Center (the Hospital) file to reorganize under Chapter 11 of the U.S. Bankruptcy Code?**

   The Hospital is taking this action because there are no viable resources for the additional funding required to maintain the hospital and meet operating costs. The hospital also tried several times to partner with third parties in an attempt to reorganize their operations and stave off bankruptcy however, these third party proposals that were unsuccessful.

   The Hospital took this step only after very careful consideration and consultation with experienced financial and legal experts. The Hospital decided that this would be the most effective path for Hospital to transfer its facilities to another entity and for that new entity to establish a health care facility that would continue to provide medical services to the East and Central Harlem communities. | Deleted: |

3. **Does this mean that the Hospital is going out of business?**

   Yes, North General and its Emergency Room were closed as of July 10, 2010

   **Does the Hospital have enough cash to stay in business?**

   No, however, North General lined up and received final approval of its Debtor-in-Possession loan, which will be available to fund the North General's Closure Plan and provide for the orderly and efficient closure and or transfer of the hospital's facilities and operations. A final order approving the DIP Facility was entered by the Bankruptcy Court on August 3, 2010.

   | Deleted: has |
   | Deleted: has |
   | Deleted: interim |
   | Deleted: financing facility |

   **How long will the bankruptcy process take?**

   There is no way to predict today with certainty how long the process will ultimately take, though cases frequently range from one to two years.

4. **Which entities are included in the filing?**

   | Deleted: {10579987:3} |

{10579987:4}

Please refer to the Hospital's restructuring website at: *http://chap11.epiqsystems.com/NGH/Project* .

5. **Where can I find Chapter 11 case information?**

Please refer to the Hospital's restructuring website at: *http://chap11.epiqsystems.com/NGH/Project* .

**Deleted:** *http://chap11.epiqsystems.com/*

## Supplier Specific Questions

6. **Will suppliers continue to be paid for goods and services they provide to the Hospital?**

The Hospital intends to pay suppliers under normal terms for goods received and services rendered after July 2, 2010 (the Petition Date). Any claims for goods received or services rendered after the filing date are considered "administrative claims", which receive a priority status. At the First Day hearing held on July 7, 2010, the Court granted the Hospital interim approval to access up to $4.5 million of the DIP financing. Then on August 3, 2010, the Bankruptcy Court gave the hospital final approval to access up to $14 million of DIP Financing. A Portion of this amount will be used to pay suppliers for post-Petition Date goods and services

**Deleted:** . A

**Deleted:** portion

Suppliers who provided goods or rendered services to the Hospital prior to the Petition Date) may have what are referred to as "pre-petition claims." These claims cannot be paid at this time and will be addressed through a Chapter 11 plan of reorganization (liquidation) that will be filed later in the case. If you have such pre-petition claims, you will receive additional information from the Hospital's claims agent at a later date. The Hospital sincerely regrets the hardship or inconvenience that this may cause.

7. **I have unpaid invoices dated before the bankruptcy date (i.e., pre-petition invoices). What should I do?**

Once the Bankruptcy Court has confirmed the procedures and deadlines for filing claims, you will receive a proof-of-claim form and instructions on how to file the form.

8. **Will I need a claim form, or will I automatically be paid for the outstanding, pre-petition amount owed to me?**

At some point in the case, every creditor will receive a copy of a Bar Date Notice which will be accompanied by a proof of claim form with instructions as to deadlines, etc. If you have any questions regarding filing a claim, please seek legal counsel.

9. **Why can't the Hospital pay me what I am owed?**

**Deleted:** {10579987:3}

United States bankruptcy laws generally prohibit the payment of all unpaid invoices incurred before the hospital filed for relief under Chapter 11 of the Bankruptcy Code. The Hospital sincerely regrets the hardship or inconvenience that this may cause you.

10. **Why should I continue to provide the Hospital with goods and services if I have pre-petition claims?**

There is priority status of post-petition claims - Amounts owed for goods or services delivered after the bankruptcy filing are deemed "administrative liabilities." The Judge overseeing the case requires the Hospital to pay all administrative liabilities under the terms and conditions governing the transaction. Simply stated, the Hospital must pay for goods and services that it receives in the ordinary course of business after the filing. Also, it is important to understand that pursuant to the United States Bankruptcy Code, suppliers are required to fulfill all contractual obligations to the Hospital.

11. **What is my current balance? What is my pre-petition balance?**

The Hospital cannot provide current balances outstanding at this point because the Hospital is in the process of reviewing all of its records and separating pre- and post-petition invoices. However, within the next few days, the Hospital will be filing a "Schedule of Assets and Liabilities." In this document, the Hospital will list balances it believes are owed to its creditors. If you have further questions about this, please contact your attorney.

12. **Can't you just give me some idea of how much I will get paid on the past bills?**

While the Hospital cannot promise what the amount of payout will be on your claims, you can be sure that the Hospital will do everything it can to achieve the maximum recovery for all creditors. The Hospital sincerely regrets the hardship and inconvenience that this may cause you.

13. **Is it true that suppliers with outstanding pre-petition claims only get a few cents on the dollar for unpaid invoices?**

At this time, the Hospital is not able to estimate what value a general unsecured claim will have in its Chapter 11 cases. The Hospital sincerely regrets the hardship and inconvenience that this may cause you.

14. **If the Hospital can't pay me for pre-petition invoices, what assurances can be provided that I will be paid for post-petition goods and services?**

Under U.S. Bankruptcy Law, all claims for goods and services delivered on or after the filing date (the Petition Date) are considered administrative claims against the Hospital's bankruptcy estate. This means that the Hospital is allowed—and indeed obligated—to pay you in full and according to normal terms. The Hospital will be generating some cash flow through its collection on its patients' receivables and has also lined up and

{10579987:4}

Deleted:

Deleted: =

Deleted: few months

Comment [I1]: Is this WMLM or Garfunkel? ASK DEREK TO CONFIRM

Deleted: your

Deleted: In the

Deleted: {10579987:3}

received approval for a "DIP" financing facility with a $14 million loan commitment. These funds will be available to satisfy obligations associated with conducting the Hospital's businesses, including payment under normal terms for goods and services provided after the filings.

**Deleted:** with an initial loan commitment of $ 4.5 million. The Debtors will be seeking the Bankruptcy Court's approval for a subsequent loan commitment of $9.5 million at a hearing on August 2, 2010

15. **Will the Hospital attempt to negotiate new terms now that it has filed?**

The Hospital will continue to review the benefits and opportunities it has to improve its overall supplier relationships in the normal course of business. This will depend on the goods or services individual suppliers provide and the terms in place at the time of filing. The Hospital would anticipate that all supplier terms will be at normal market levels.

16. **Given the uncertainties of the situation, can I renegotiate my terms with the Hospital?**

The Hospital cannot pay more for goods and/or services at this time.

17. **When will I receive payment for goods and services delivered after the bankruptcy date?**

All goods and services delivered after July 2, 2010 will be paid according to established terms.

**Comment [I2]:** Is this Garfunkel?

**Deleted:** <#>I understand that companies that file for Chapter 11 are able to put some suppliers on a "Critical Vendors List" that allows them to continue to be paid under normal terms, even for invoices that are unpaid at the time of the filing. How can I get on that list? ¶
<#>A motion will be filed seeking to pay the prepetition claims of certain vendors. Although the Hospital feels as if all of its suppliers are "critical," the courts have placed very strict parameters on those vendors that can be paid at this time. If you feel as if you meet these parameters you should contact your legal counsel and they should write a letter to the Hospital's General Counsel explaining why you think you qualify. Please not that due to the fact that the hospital is now closed there will likely be very few vendors that qualify as "critical" under the Bankruptcy Code. ¶

**Formatted:** Bullets and Numbering

**Deleted:** normal

18. **What if I only want to be paid cash on delivery?**

The Hospital will continue to pay supplier invoices under customary terms. The Hospital believes it is in the best interests of its suppliers to maintain business as usual.

19. **Can I take back my goods?**

No. The Hospital understands your frustration, but bankruptcy law prohibits a seller from repossessing goods after a purchaser has filed for bankruptcy protection. The Hospital recommends that you consult with your legal counsel before taking any such action.

20. **Can I raise my product prices?**

The automatic stay provision associated with Chapter 11 filings prevents you from raising your prices in an effort to recoup pre-petition claims. Should you have a business reason to raise prices other than the Hospital's filing itself, you can communicate with your usual contact at the Hospital who will collect the requisite information from you and determine if a price change can be approved.

**Deleted:** {10579987:3}

## Utility Specific Questions

21. **Do you intend to pay my pre-petition balance?**

    Unfortunately, federal bankruptcy laws generally prohibit the Hospital to pay outstanding invoices for goods and services received before the Petition Date. The hospital sincerely regrets the hardship this may present you.

22. **If you don't pay my balance, the Utility Company will discontinue services.**

    The Hospital filed a motion in the Bankruptcy Court addressing how to provide utilities with adequate assurance to ensure continued service. A copy of the motion is available via a link at *http://chap11.epiqsystems.com/NGH/Project* .

**Deleted:** The Bankruptcy Code prohibits utilities from discontinuing service within the first 20 days of a bankruptcy.

**Deleted:** has

## Contract Labor Specific Questions

23. **I provide contract employees to the hospital. Will I get paid?**

    Payment of your pre-petition amounts may be covered under the wage motion. A copy of the motion is available at the Hospital's restructuring website at: *http://chap11.epiqsystems.com/NGH/Project*. The Hospital expects you to honor your contract and continue to provide the employees and services provided pre-petition. [ THIS IS NOT ACCURATE PLEASE CONFIRM]

## What it Means for Employees

24. **Will there be layoffs as a result of the filings? Will any departments be closed?**

    Yes, North General has provided WARN (Worker Adjustment and Retraining Notification) notices to a total of 941 of Hospital employees informing them that they will be laid off.

25. **Should I keep coming to work as usual? Does this mean that my work schedule will change?**

    For those employees who did not receive a termination notice, you should keep working according to your usual schedule.

26. **Have any special trustees, receivers or other third parties been added to the Board as a result of the filing?**

    No.

**Deleted:** There have been no changes in the Hospital's Board of Directors as a result of the filings

27. **Where should employees go for information about the reorganization?**

**Deleted:** {10579987:3}

Information about the reorganization is posted on the following web site (*http://chap11.epiqsystems.com*/NGH/Project .

28. **I am a temporary employee. Will I still get paid?**

The Hospital plans to continue paying those temporary employees it continues to retain in the postpetition period as usual.

29. **I am a contractor. Will I still get paid?**

The Hospital plans to continue paying those independent contractors it continues to retain, in the postpetition period as usual.

30. **I am a consultant. Will I still get paid? Will I be treated as a temporary employee or as a vendor?**

Consultants will be paid as usual for all post-petition work performed. Regarding any outstanding fees that have not been paid, information for general unsecured creditors is available on the Hospital's restructuring website at *http://chap11.epiqsystems.com*/NGH/Project.

## Wages and Benefits

31. **Does the Hospital have enough cash to meet its payroll and benefit obligations?**

Yes, the Hospital plans to continue paying post-petition wages and benefits for worked time.

32. **Will there be any changes in employee pay going forward?**

The Hospital expects that the proceedings will not affect its current pay policies.

33. **Will overtime still be offered?**

In some cases, overtime may be offered.

34. **Can I still file my medical and dental insurance claims?**

Yes. You can and should file your claims as you normally would.

35. **I am a U.S. employee, will COBRA benefits still be provided to employees if they are separated from the hospital after the filing?**

**Comment [I3]:** Delete entire section.

**Deleted:** <#>This website will be updated regularly. The Hospital will also communicate with you directly when there are significant developments to report. If you have any further questions, please call ___ ___ at 212 ...¶

**Formatted:** Bullets and Numbering

**Deleted:** its

**Deleted:** its

**Comment [I4]:** ???? SPEAK TO DEREK ABOUT THIS

**Deleted:** ¶

**Formatted:** Font: Not Bold

**Formatted:** Indent: Left: 0.25"

**Comment [I5]:** ??? My answer would be "Yes, Payroll will end on X"

**Deleted:** Payroll will terminate on ___, 2010

**Comment [I6]:** ??? My answer would be No.

**Deleted:** Yes, as required. As is typical in Chapter 11 cases, the Hospital expects that the proceedings will not affect its current compensation policies

**Deleted:** No.

**Comment [I7]:** Was this discussed at hearing??? DISCUSS WITH DEREK

**Comment [I8]:** ????

**Deleted:** <#>Will the filings affect employee health care benefits (such as medical, vision or dental plans) and employee life insurance or disability benefits for U.S. employees? ¶ <#>The Hospital asked and received Bankruptcy Court for approval to continue its current policies with respect to these matters. If the Hospital makes changes to such policies these changes will be announced through the normal communication channels.¶

**Formatted:** Bullets and Numbering

**Comment [I9]:** ?????

**Formatted:** Bullets and Numbering

**Deleted:** {10579987:3}

Yes.  The Hospital expects that COBRA continuation coverage will continue.

## Paychecks and Expense Claims

Comment [I10]: DE suggested on Fri, 7/2 that last paychecks were going out on 7/2.

36. Am I going to be paid as usual now that the Hospital has made these filings?

Comment [I11]: ???
Formatted: Bullets and Numbering

The Hospital plans to continue providing all wages.

37. When will I next be paid?

Comment [I12]: ????
Formatted: Bullets and Numbering

There will be no delay in your next paycheck or direct deposit, and expense reimbursement will be made as usual.

38. Will there be anything different about Hospital's paychecks as a result of the filings?

Formatted: Bullets and Numbering

No

Deleted: Yes, the words (or letters) "Debtor In Possession" (or DIP) may appear on your check (s).

39. Will my bank/credit union still accept my paycheck or direct deposit?

Formatted: Bullets and Numbering

Every paycheck issued or direct deposit made by the Hospital should be honored. However, if you experience any problems cashing your paycheck or having an institution honor your direct deposit, please contact the Human Resources Department at 212 423-2363

40. Can I continue to charge my business expenses?

Formatted: Bullets and Numbering

Yes.  You may do so as you have in the past, following the same procedures for submitting any qualified business expenses in accordance with hospital policy.

Comment [jm13]: Yes, it is still accurate.
Deleted: .  [ IS THIS ACCURATE]

## Retirement Benefits/Hospital 403(b) Plan

41. Are the assets in 403(b) plans for employees protected from creditors' claims in the bankruptcy proceedings?

Deleted: ¶

Yes.  Federal law protects the funds in 403(b) savings plans from the claims of a hospital's creditors.  All individual 403(b) accounts are set up in the individual employee's name.  This means that the Hospital cannot use these assets to meet its other obligations or to pay its debts.

41. What happens to the accounts of employees who are participants in the 403(b) Plan?

Formatted: Bullets and Numbering

The assets in its 403(b) plans are held in a trust.  These assets are protected under federal law against the claims of the Hospital's creditors, which means that the Hospital can't use any of these assets to meet other obligations or to pay its debts.  While the Hospital could make changes to such a plan during the reorganization proceedings, those changes would

Deleted: (10579987:3)

only affect future contributions to the plan, not past contributions.  Irrespective of the filings, all investments contained in an individual's 403(b) account are subject to some level of market risk.

42. **Now that the Hospital has made these filings, can employees access their 403(b) account funds before retirement without incurring penalties?**

Formatted: Bullets and Numbering

No. The IRS rules for 403(b) withdrawals remain in place and will not change as a result of the Hospital's filings.

Comment [jm14]: Confirm

43. **Will the Hospital continue to make the hospital match contribution for the 403(b) plans?**

Formatted: Bullets and Numbering

The Hospital intends to continue the Hospital's contributions for those 403(b) plans that currently have such a match.

Comment [jm15]: Confirmed to pay match.

Comment [l16]: JOHN CONFIRM STATUS .

44. **Are the assets in Hospital's pension plans protected from creditors' claims in bankruptcy proceedings?**

Formatted: Bullets and Numbering

Yes.  Federal law protects the assets in qualified defined pension plans from the claims of a hospital's creditors.  The assets are held in trust.  This means that the Hospital cannot use these assets to meet its other obligations.

45. **Is it true the pension plan is underfunded?  As a result, will the PBGC (Pension Benefit Guaranty Corp.) take over the plan?**

Formatted: Bullets and Numbering

At this point it is likely that the PBGC will take over the pension plan.

46. **Is it true that if the PBGC takes over my qualified defined benefit pension plan, I may receive a smaller pension than I am entitled to?**

Formatted: Bullets and Numbering
Comment [l17]: No.
Formatted: Bullets and Numbering
Formatted: Indent: Left: 0.5", No bullets or numbering

The Pension Benefits Guaranty Corporation has a web site that explains what happens when they assume responsibility for a qualified defined benefit pension plan.

Deleted: The Hospital has asked for court approval to continue its current policies with respect to these matters.  As is customary in similar cases, the Hospital fully expects the Court to approve its request.  If the Hospital makes changes to such policies in connection with cost-reduction efforts, any changes would be announced through its normal communication channels.No¶

## Miscellaneous Policies and Practices

47. **Will employees continue to receive disability, holidays and vacation pay?**

Yes.

Comment [l18]: How do we want to answer this? I think we are contemplating applying for modifications to our union contracts sometime in the future of this process, but do we want to let them know now?

## Unions

48. **What happens now with the unions' collective bargaining agreements?  Will you begin negotiations to change them?**

Formatted: Bullets and Numbering

The current collective bargaining agreements will **more than likely be renegotiated.**

Deleted: t

Deleted: {10579987:3}

{10579987:4}

**Have you spoken to our major unions about this action? What did they say?** Comment [I19]: ????

The Hospital has discussed the current situation with the leadership of the Hospital's unions. The Hospital is committed to keeping them informed of events and actions as it goes through the process.

## Inactive Employees

Comment [I20]: Need to confer with client on these issues.

49. **I am on a leave of absence. Before beginning my leave, my supervisor told me that when I returned, I would be reinstated to the job I previously held, or if that position were eliminated, that I would be reinstated in a similar position. Now that Hospital has made these filings, does that still apply?**

Formatted: Bullets and Numbering

No. The hospital has ceased operating and has been closed since July 10, 2010

Deleted: The hospitasl has permanently

**I am receiving severance from the Hospital. How are my severance payments affected by the filings?**

The Hospital plans to honor CBA-related payment of severance wages to Union employees.

## Retiree Questions

Comment [I21]: We need to confer with the client on these issues.

Formatted: Bullets and Numbering

50. **Will I continue to receive my monthly pension check from the Bank of New York?**

As a member of either the Hospital Pension Plan for Salaried Employees or the Hospital Pension Plan for Hourly Employees, you will continue to receive your monthly pension check as usual at this time. The Bank of Bank of New York will continue to mail your check directly to your home or deposit the sum directly into your bank account.

51. **Is it possible that the Hospital's qualified defined benefit pension plan could be changed or terminated as a result of the Chapter 11 filing?**

Formatted: Bullets and Numbering

Yes, it is possible that changes to the Plan may occur.

While U.S. federal law protects qualified defined benefit pension plans from retroactive changes to plan benefits, it is possible that there could be changes to the qualified defined benefit pension plan in the future. Any such changes would be announced as appropriate. In the U.S., the Pension Benefit Guaranty Corporation also provides protection for qualified defined benefit pension programs.

52. **What happens if a qualified defined benefit pension plan is terminated?**

Formatted: Bullets and Numbering

If a qualified defined benefit pension plan is terminated, the liabilities of the plan are determined and the assets of the plan are used to satisfy those liabilities. If it is determined that the plan has sufficient assets, then all plan benefits are paid in accordance

Deleted: {10579987:3}

{10579987:4}

with the plan terms and the Employee Retirement Income Security Act of 1974 (ERISA). In the event that there are insufficient assets to pay all approved benefits, then the plan will be administered by the Pension Benefit Guaranty Corporation (PBGC), which is an independent agency chartered under federal law.

The rules governing distribution of plan assets are complex. Generally speaking, however, all reasonable administrative expenses are paid by the plan first. Then the plan's remaining assets would be distributed in accordance with guidelines of ERISA.

For more information about the PBGC insurance protections and its limitations, go to *www.pbgc.gov.*

53. **Are the assets in the Hospital's 403(b) plans for retirees protected from creditors' claims in the bankruptcy proceedings?**

Yes. Federal law protects the funds in 403(b) savings plans from the claims of a hospital's creditors. All individual 403(b) accounts are set up in the individual retiree's name. This means that the Hospital cannot use these assets to meet its other obligations or to pay its debts.

54. **What happens to the accounts of retirees who are participants in the 403(b) plan?**

The assets in its 403(b) plans are held in a trust, which is separate from the hospital. These assets are protected under U.S. federal law against the claims of the Hospital's creditors, which means that the hospital can't use any of these assets to meet other obligations or to pay its debts. While the Hospital could make changes to such a plan during the reorganization proceedings, those changes would only affect future hospital contributions to the plan, not past contributions. Irrespective of the filings, all investments contained in an individual's 403(b) account are subject to some level of market risk.

55. **Will there be any impact on retiree medical benefits as a result of the filings?**

There will be no changes to the retiree medical benefits as a result of the filing. [CONFIRM]

56. **Where should retirees go for information about the reorganization?**

Information about the reorganization is posted on the external web site, (*http://chap11.epiqsystems.com/*NGH/Project . and these will be updated regularly. The Hospital will also communicate with you directly when there are significant developments to report.

**Patient Questions**

57. **How can I get additional information?**

(10579987:4)

Further information will be posted as available on the Hospital's restructuring website *http://chap11.epiqsystems.com/NGH/Project*

The hospital has provided contact phone numbers for various inquiries on its website at http://www.northgeneral.org/

Formatted: Underline

Deleted: {10579987:3}

{10579987:4}

# EXHIBIT 12

**Etheridge, Derek**

| | |
|---|---|
| **From:** | John Maher [John.Maher@NGSC.ORG] |
| **Sent:** | Wednesday, June 23, 2010 7:39 PM |
| **To:** | Etheridge, Derek |
| **Cc:** | Zavalkoff-Babej, Erin |
| **Subject:** | NGH Utilities-Adequate Assurance Motion (DCK 15) (10438858-5) Revised 20100623 1945 |
| **Attachments:** | NGH Utilities-Adequate Assurance Motion (DCK 15) (10438858-5) Revised 20100623 1945.docx |

**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
(212) 237-1000
Charles E. Simpson (csimpson@windelsmarx.com)

Proposed Attorneys for North General Service Corporation,
North General Hospital and North General Diagnostic and Treatment Center
Debtors-in-Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
In re                                          :
                                               :
NORTH GENERAL SERVICE CORPORATION,  :    Chapter 11
                                               :    Case No. 10-
            Debtor                  :
                                               :
---------------------------------------------------------------x

In re                                          :
                                               :    Chapter 11
NORTH GENERAL HOSPITAL,             :    Case No. 10-
                                               :
            Debtor.                 :
---------------------------------------------------------------x
In re                                          :
                                               :    Chapter 11
NORTH GENERAL DIAGNOSTIC AND       :    Case No. 10-
TREATMENT CENTER,                   :
                                               :
            Debtor.                 :
---------------------------------------------------------------x

## DEBTORS' MOTION FOR AN ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a) AND 366 (A) DETERMINING THAT THEIR UTILITY COMPANIES ARE ADEQUATELY ASSURED OF FUTURE PAYMENT, (B) ESTABLISHING PROCEDURES FOR DETERMINING REQUESTS FOR ADEQUATE ASSURANCE OF FUTURE PAYMENT, AND (C) PROHIBITING UTILITY COMPANIES FROM ALTERING, REFUSING, OR DISCONTINUING UTILITY SERVICES

North General Service Corporation ("Corporation"), North General Hospital ("North

General") and North General Diagnostic and Treatment Center (D&TC), as debtors and debtors-

{10438858:5}

in-possession (together, the "Debtors"), by and through their undersigned counsel, hereby move this Court for entry of an order, pursuant to §§ 105(a) and 366 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), (a) determining that the utilities are adequately assured of future payment, (b) establishing procedures for determining requests for adequate assurance of payment for future utility services, and (c) prohibiting utility companies from discontinuing, altering, or refusing service (the "Motion"). In support of this Motion, the Debtors refer to and rely upon the Affidavit of Dr. Samuel J. Daniel Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York ("Local Bankruptcy Rules") in Support of Chapter 11 Petitions and First Day Motions and Applications (the "Daniel Affidavit") filed contemporaneously herewith, and respectfully represent as follows:

## JURISDICTION; VENUE; STATUTORY BASES FOR RELIEF

1.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C §§ 157 and 1334 and the Standing Order of Referral of Cases to Bankruptcy Judges of the District Court for the Southern District of New York, dated July 19, 1984 (Ward, Acting C.J.). This is a core proceeding pursuant to 28 U.S.C § 157(b). Venue of this case and proceeding is proper in this district pursuant to 28 U.S.C §§ 1408 and 1409.

2.     The relief sought in this Motion is based upon Bankruptcy Code §§ 105 and 366.

## BACKGROUND

2.     On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under title 11, United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"). The Debtors have requested that the cases be jointly administered for procedural purposes only.

3.     The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108. No trustee, examiner, or

official committee of unsecured creditors has been appointed.

4.    Corporation, a not-for-profit, tax-exempt entity is the parent corporation to North General.  North General is a not-for-profit 200 -bed community hospital located in upper Manhattan that has serviced the communities of East and Central Harlem since the 1970s. D&TC is a not-for-profit, tax-exempt entity. wholly dependent on and supported by North General. D&TC operates a health care center at North General, which was established to deliver enhanced outpatient primary care services for adults and children, as well as programs and services specializing in diabetes treatment. pediatric weight management, cardiovascular services, a women's health center and a school-based health program.

5.    East and Central Harlem are economically poor and working class communities populated primarily by Latinos and African-Americans.  Relative to the rest of New York City, East and Central Harlem is inhabited by traditionally underserved populations living at higher levels of poverty who suffer disproportionately from increased rates of mortality due to common illnesses and treatable diseases.  Residents in these communities rank among the bottom ten New York City neighborhoods and experience below average scores for general health, maternal and child health, infectious disease (including pneumonia, influenza and HIV/AIDS) and chronic disease (including heart disease, diabetes and lung diseases).  The Debtors' existence has been vital to providing the residents of Harlem with the health services they critically require

6.    From its inception North General faced a systemic problem of undercapitalization and is burdened with a debt- load vastly disproportionate to its ability to service such debt. North General is simply too small and its inpatient volumes too low for it to carry the financial obligations it has incurred.

7.    Presently, North General's monthly cash flow shortage is projected to be between

approximately $2.5 million and $4 million. As of April 30, 2010, North General's obligations include $135 million of mortgage debt, which is categorized as a current liability, $55 million in restructuring loans and $103 million of other obligations for a total of $293 million in outstanding liabilities.[1] North General's total assets equal approximately $67 million, which amount includes total current assets of approximately $21 million, $12 million in limited use noncurrent assets, and property, plant and equipment ("PP&E") of approximately $31 million. Its net asset deficiency is approximately $226 million.

**Deleted:** 2
**Deleted:** 1
**Deleted:** 88
**Deleted:** 6

**Deleted:** for a net
**Deleted:** of
**Deleted:** 2

     8.     Detailed information regarding the Debtors' history, business, capital structure, finances, and the circumstances leading to these Chapter 11 filings is set forth in the Affidavit of Dr. Samuel J. Daniel Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York ("Local Bankruptcy Rules") in Support of First Day Motions and Applications, filed contemporaneously herewith (the "Daniel Affidavit").

## RELIEF REQUESTED

     3.     Bankruptcy Code § 366(a) prevents utility companies from discontinuing, altering or refusing service to a debtor during the first thirty (30) days of a Chapter 11 case. After such 30-day period, however, a utility company has the option of terminating its services pursuant to § 366(c)(2) if a debtor has not furnished to it adequate assurance of payment.

     4.     By this Motion, pursuant to Bankruptcy Code §§ 105(a) and 366(a), the Debtors hereby seek entry of an order (the "Order"): (a) prohibiting the Utility Companies (as defined below) currently providing services, or that will be providing services, to the Debtors from altering, refusing or discontinuing services to, or discriminating against, the Debtors (i) by virtue of the commencement of cases under the Bankruptcy Code or (ii) solely on the basis that the

---

[1] Of the $288 million in outstanding liabilities, $212 million are categorized as current liabilities

Debtors are indebted to the Utility Companies on account of prepetition invoices, pending entry of the Order granting the relief sought herein; (b) determining that the Utility Companies have received adequate assurance of payment for future utility services, pending entry of the Order; (c) approving the Debtors' proposed offer of adequate assurance and procedures governing the Utility Companies' requests for additional or different adequate assurance; (d) permitting Utility Companies to opt-out of the procedures established herein; (e) determining that the Debtors are not required to provide any additional adequate assurance beyond what is proposed by this Motion; and (f) scheduling a final hearing on the Motion (the "Final Hearing") within thirty (30) days of the Petition Date.

## THE UTILITY COMPANIES

5.      In connection with the operation and now the winding-down of their businesses and management of their properties, the Debtors obtain and will continue to require electricity, water, heat, natural gas, telephone, communications, trash removal, and/or other services of this general character (together, the "Utility Services") from different utility companies (the "Utility Companies" and each, individually, a "Utility Company"). Attached as Exhibit "A" is a list of all, or substantially all, of the Utility Companies that were providing services to the Debtors as of the Petition Date (the "Utility Companies List")[2].  The Utility Services are vital to the Debtors' ability to effectuate its Closing Plan in a safe and efficient manner, and, therefore, must continue uninterrupted during the pendency of the Debtors' Chapter 11 cases.

---

[2] The Debtors have made an extensive and good faith effort to identify all Utility Companies and include them on the Utility Service List. For each Utility Company, the Utility Service List identifies: (a) the name and address of the Utility Company; (b) to the extent known, the account number under which the Utility Company provides services to the Debtors; (c) the type of utility services provided by the Utility Company; and (d) the proposed Adequate Assurance Deposit (as defined below).  The inclusion of any entity on, as well as any omission of any entity from Exhibit "A" is not an admission by the Debtors that such entity is, or is not, a utility within the meaning of Bankruptcy Code § 366, and the Debtors reserve all rights with respect thereto.  In addition, the Debtors are requesting that this Motion apply to all of the Debtors' Utility Companies, whether or not such Utility Company is included on Exhibit "A".  The Debtors have proposed a procedure for supplementing the list of Utility Companies on Exhibit "A".

6. Due to the essential public health nature of the Debtors' businesses, including the paramount need to care for their patients, it is essential that the Utility Companies continue to provide Utility Services to the Debtors through the course of the Chapter 11 cases. The Debtors cannot maintain their facilities and, therefore, cannot effectively and safely implement their Closure Plan, in the absence of continuous utility service. The temporary or permanent discontinuation of Utility Services at any of the Debtors' facilities could endanger and irreparably harm the Debtors' winding-down efforts and even more importantly the safety of their patients.

7. Prior to the Petition Date, the Debtors were generally current with respect to the Utility Services' invoices and the average aggregate monthly cost of the Debtors' Utility Services was approximately $225,000.00 [UPDATE]. The Debtors expect that there may be deviations from this monthly figure in the future as the Debtors begin implementing their Closure Plan. The Debtors' budget provides for the current payment of all Utility Services provided to the Debtors after the Petition Date. Moreover, the Debtors represent that they will continue to pay all post-petition obligations, all undisputed invoices for post-petition utility services rendered by the Utility Companies to the Debtors, as billed and when due.

8. Uninterrupted Utility Service is essential to the Debtors' ability to care for their patients throughout this winding-down period. The Debtors intend to pay their post-petition obligations to the Utility Companies in a timely manner. The Debtors propose to make these payments from their cash reserves as of the Petition Date, post-Petition Date revenues, and through anticipated access to debtor-in-possession financing.[3]

**THE ADEQUATE ASSURANCE DEPOSIT**

---

[3] Concurrently with the filing of this Motion, the Debtors have filed a motion to approve post-petition financing.

Deleted: 00

9.     The Debtors propose to provide a deposit equal to two (2) weeks of Utility Services, calculated as a historical average over the calendar year 2009, to any Utility Company that requests such a deposit in writing (each, an "Adequate Assurance Deposit"), *provided that*: (a) such request is made in writing no later than thirty (30) days after the Petition Date (the "Request Deadline"); (b) such requesting Utility Company does not already hold a deposit equal to or greater than the Adequate Assurance Deposit (which existing deposit shall be deemed to be the Adequate Assurance Deposit for the purposes of this Motion); and (c) such requesting Utility Company is not currently paid in advance for its services.  As a condition of requesting and accepting an Adequate Assurance Deposit, the requesting Utility Company shall be deemed to have stipulated that the Adequate Assurance Deposit constitutes adequate assurance of payment to such Utility Company within the meaning of § 366 of the Bankruptcy Code.[4]

> **Comment [jm1]:** Con Ed deposit $249

10.     Likewise, any Utility Company that does not request an Adequate Assurance Deposit by the Request Deadline and does not file a Procedures Objection (defined *infra*) to opt-out of the Adequate Assurance Procedures (as described below) shall be deemed to have adequate assurance that is satisfactory to it, within the meaning of Bankruptcy Code § 366.

11.     The Debtors submit that the availability of the Adequate Assurance Deposit (if timely requested), in conjunction with the Debtors' demonstrated ability to pay for future utility services in the ordinary course of business (collectively, the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance of future payment to the Utility Companies.  If any Utility Company believes additional assurance is required, it may request such assurance pursuant to the procedures set forth below.

## THE ADEQUATE ASSURANCE PROCEDURES

---

[4] The Debtors further request that any Adequate Assurance Deposit requested by, and provided to, any Utility Company pursuant to the procedures described above be returned to the Debtors at the conclusions of these Chapter 11 cases, if not returned or applied sooner.

12.    In light of the severe consequences to the Debtors from any interruption in the Utility Services by the Utility Companies, but recognizing the right of the Utility Companies to evaluate the Proposed Adequate Assurance on a case-by-case basis, the Debtors propose that this Court approve and adopt the following procedures (the "Adequate Assurance Procedures"):

(a)    Any Utility Company requesting an Adequate Assurance Deposit must make such request in writing to (i) North General Hospital, 1879 Madison Avenue, New York, New York 10035 (Attn: John P. Maher, EVP/COO), and (ii) Windels Marx Lane & Mittendorf, LLP, 156 West 56th Street, New York, New York 10019 (Attn: Charles E. Simpson, Esq. and Derek Etheridge, Esq.) (together, the "Notice Parties"), so that it is actually received on or before the Request Deadline (the "Adequate Assurance Request"). Any Utility Company that fails to make an Adequate Assurance Request (or an Additional Assurance Request (as defined below)) shall be deemed to have been provided with adequate assurance of payment as required by Bankruptcy Code § 366 and shall be prohibited from discontinuing, altering, or refusing to provide Utility Services, including on account of unpaid charges for prepetition Utility Services.

(b)    Five (5) days from receipt of the Adequate Assurance Request, the Debtors shall provide the requesting Utility Company with a deposit (in the form of a check) equal to two (2) weeks of Utility Services, calculated as a historical average over the past twelve (12) months; *provided, however,* that such requesting Utility Company does not already hold a deposit equal to or greater than two (2) weeks of Utility Services; and *provided, further,* that such Utility Company is not currently paid in advance for its Utility Services. Any Utility Company that submits an Adequate Assurance Request and holds a deposit of less than two (2) weeks of Utility Service shall receive an amount equal to the difference between the deposit held and the Adequate Assurance Deposit. Any Utility Company that is currently paid in advance for its Utility Service shall continue to be paid pursuant to the ordinary course of business.

(c)    Any Utility Company desiring additional assurance of future payment for Utility Service beyond the Proposed Adequate Assurance must serve a request (an "Additional Assurance Request") so that it is received by the Notice Parties.

(d)    Any Additional Assurance Request must (i) be made in writing; (ii) set forth the location(s) for which Utility Services are provided and the relevant account number(s); (iii) set forth the amount and form of additional assurance of payment requested; (iv) describe any deposits, prepayments or other security currently held by the requesting Utility Company; and (v) explain why the requesting Utility Company believes the Proposed Adequate Assurance is not sufficient adequate assurance of future payment.

(e)    Upon the Debtors' receipt of any Additional Assurance Request at the addresses set forth above, the Debtors shall have the greater of (i) fourteen (14) days from the receipt of such Additional Assurance Request or (ii) thirty (30) days from the Petition Date (collectively, the "Resolution Period") to negotiate with the requesting Utility Company to resolve its

Additional Assurance Request. The Resolution Period may be extended by agreement of the Debtors and the applicable Utility Company.

(f)     The Debtors, in their discretion, may resolve any Additional Assurance Request by mutual agreement with the requesting Utility Company and without further order of the Court, and may, in connection with any such resolution, in their discretion, provide the requesting Utility Company with additional adequate assurance of future payment in a form satisfactory to the Utility Company, including, but not limited to, cash deposits, prepayments and/or other forms of security, if the Debtors believe such additional assurance is reasonable.

(g)     If the Debtors determine that an Additional Assurance Request is not reasonable, and are not able to resolve such request during the Resolution Period, the Debtors, during or immediately after the Resolution Period, will request a hearing before this Court to determine the adequacy of assurances of payment made to the requesting Utility Company (the "Determination Hearing"), pursuant to Bankruptcy Code § 366(c)(3)(A).[5]

(h)     Pending the resolution of the Additional Assurance Request at a Determination Hearing, the Utility Company making such request shall be restrained from discontinuing, altering or refusing service to the Debtors on account of unpaid charges for prepetition services or on account of any objections to the Proposed Adequate Assurance.

13.     Absent compliance with the Adequate Assurance Procedures and/or the Opt-Out Procedures (as defined below), the Utility Companies are forbidden to discontinue, alter, or refuse service, including on account of any unpaid pre-petition charges, or require additional adequate assurance of payment other than the Proposed Adequate Assurance.

## THE OPT-OUT PROCEDURES

14.     Historically, Bankruptcy Code § 366 permitted Chapter 11 debtors to put the onus on utility providers to argue that the form of adequate assurance proposed by the debtor was insufficient. The modifications by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (the "BAPCPA") to § 366 arguably shift the burden onto debtors to (i) provide adequate assurance that the utility providers find satisfactory, and (ii) to seek court review if a utility provider does not accept the proposed adequate assurance. Pursuant to the revised § 366, a Utility Company could, on the 29th day following the Petition Date, announce that the

---

[5] Bankruptcy Code § 366(c)(3)(A) provides that "[o]n request of a party in interest and after notice and a hearing, the court may order modification of the amount of an assurance of payment...." 11 U.S.C. § 366(c)(3)(A).

proposed adequate assurance is not acceptable, demand an unreasonably large deposit in the

context of the risk from the Debtors, and threaten to terminate Utility Services the next day

unless the Debtors comply with the demand. While the Debtors do not concede the foregoing is

a correct reading of revised § 366, the Debtors nonetheless believe it is prudent to require Utility

Companies to raise any objections to the Adequate Assurance Procedures so that such objections

may be heard by the Court prior to the running of the 30-day period following the Petition Date.

15.     To avoid the possibility of the situation described above, the Debtors propose the

following procedures (the "Opt-Out Procedures"):

(a)     Any Utility Company that objects to the Adequate Assurance Procedures must
file an objection to such procedures (a "Procedures Objection") so that it is actually received by
the Notice Parties within twenty (20) days of entry of the Order.

(b)     Any Procedures Objection must (i) be made in writing; (ii) set forth the
location(s) for which utility services are provided and the relevant account number(s); (iii) set
forth the amount and form of additional assurance of payment requested; (iv) describe any
deposits, prepayments or other security currently held by the objecting Utility Company; (v)
explain why the objecting Utility Company believes the Proposed Adequate Assurance is not
sufficient adequate assurance of future payment; and (vi) set forth why the Utility Company
believes it should be exempt from the Adequate Assurance Procedures.

(c)     The Debtors, in their discretion, may resolve any Procedures Objection by mutual
agreement with the objecting Utility Company and without further order of the Court, and may,
in connection with any such resolution and in their discretion, provide a Utility Company with
additional adequate assurance of future payment, including, but not limited to, cash deposits,
prepayments or other forms of security, if the Debtors believe such additional assurance is
reasonable.

(d)     If the Debtors determine that a Procedures Objection is not reasonable and are not
able to reach a prompt alternative resolution with the objecting Utility Company, the Procedures
Objection will be heard at the Final Hearing.

(e)     All Utility Companies that do not timely file a Procedures Objection are deemed
to consent to, and shall be bound by, the Adequate Assurance Procedures. The sole recourse of
all Utility Companies that do not timely file a Procedures Objection shall be to submit an
Additional Assurance Request pursuant to the Adequate Assurance Procedures, and such Utility
Companies shall be prohibited from discontinuing, altering, or refusing service to the Debtors,
including on account of unpaid charges for prepetition services, pending any Determination
Hearing that may be conducted pursuant to the Adequate Assurance Procedures.

## FINAL HEARING DATE

16.     In order to resolve any Procedures Objections within thirty (30) days of the Petition Date, the Debtors request that the Court schedule the Final Hearing on any unresolved Procedures Objections approximately twenty-five (25) days after the Petition Date.

## SUBSEQUENT MODIFICATIONS OF UTILITY COMPANIES LIST

17.     It is possible that, despite the Debtors' best efforts, certain Utility Companies have not yet been identified by the Debtors or included on the Utility Companies List. To the extent that the Debtors identify additional Utility Companies, the Debtors will file amendments to the Utility Companies List, and shall serve copies of the Order (when and if entered) on such newly-identified Utility Companies.  The Debtors request that the Order be binding on all Utility Companies, subject to their rights to the Proposed Adequate Assurance and to request additional adequate assurance, regardless of when any given Utility Company was added to the Utility Companies List.

## BASIS FOR THE REQUESTED RELIEF

18.     The relief requested herein will ensure that the Debtors' operations will not be disrupted as they implement their Closure Plan.  As noted above, any disruption of the Utility Services, even for a brief time, could put the Debtors' patients at risk during the Debtors' winding down process.  Furthermore, the relief requested provides the Utility Companies with a fair and orderly procedure for determining requests for additional or different adequate assurance.  Without the Adequate Assurance Procedures, the Debtors could be forced to address numerous requests by Utility Companies in a disorganized manner at a critical period in these Chapter 11 cases and during a time when the Debtors' efforts could be more productively focused on the Debtors' operations and restructuring for the benefit of all parties-in-interest.

19. Bankruptcy Code § 366 protects a debtor against the immediate termination of utility services after commencing its case. Under that section, a utility company may not, during the first thirty (30) days of a Chapter 11 case, alter, refuse, or discontinue services to a debtor solely because of unpaid prepetition amounts. A utility company may, however, do so if following such 30-day period, the debtor does not provide "adequate assurance" of payment for post-petition services in a form "satisfactory" to the utility.

20. Before the enactment of the BAPCPA, it was well established by courts, commentators, and legislative history that Bankruptcy Code § 366 did not require, as a matter of course, that the debtor provide a deposit or other security to its utilities as adequate assurance of payment. *See Virginia Elec. & Power Co., v. Caldor. Inc.-N.Y.*, 117 F.3d 646, 650 (2d Cir. 1997) ("even assuming that 'other security' should be interpreted narrowly, we agree with the appellees that a bankruptcy court's authority to 'modify' the level of the 'deposit or other security,' provided for under [section] 366(b), includes the power to require no 'deposit or other security' where none is necessary to provide a utility supplier with 'adequate assurance of payment.'").

21. Pursuant to the recently enacted Bankruptcy Code § 366(c) however, in a Chapter 11 case, a utility company may alter, refuse, or discontinue utility service if, within thirty (30) days after the commencement of the Chapter 11 case, the utility company does not receive adequate assurance in a form that is "satisfactory" to the utility company, subject to the Court's ability to modify the amount of adequate assurance. Furthermore, pursuant to § 366(c)(3)(B), in determining whether an assurance of payment is adequate, the court may not consider (i) the absence of security before the petition date, (ii) the debtor's history of timely payments, or (iii) the availability of an administrative expense priority. The Debtors believe that the Proposed Adequate Assurance is sufficient and reasonable and constitutes adequate assurance of payment

under Bankruptcy Code § 366(c).

22.     The relief requested in this Motion and the Adequate Assurance Procedures proposed herein are similar to the relief granted in other recent Chapter 11 cases filed after the BAPCPA became effective. *See, e.g., In re The New York Racing Association Inc.*, Case No. 06-12618 (JMP) (Bankr. S.D.N.Y. Nov. 2, 2006); *In re Silicon Graphics, Inc., et al.*, Case No. 06-10977 (Bankr. S.D.N.Y. May 25, 2006) (approving deposit equal to two (2) weeks of utility service, calculated as a historic average over the past twelve (12) months to any utility provider that (i) requested such a deposit in writing, (ii) did not already hold a deposit equal to or greater than two (2) weeks of utility service, and (iii) and is not currently paid in advance); *In re Dana Corporation*, Case No. 06-10354 (Bankr. S.D.N.Y. March 29, 2006) (same); *In re Calpine Corporation*, Case No. 05-60200 (Bankr. S.D.N.Y. Jan. 18, 2006) (same); *In re Refco, Inc.*, Case No. 05-60006 (RDD) (Bankr. S.D.N.Y. Dec. 9, 2005) (approving deposit of a sum equal to 50% of the estimated costs of monthly utility consumption); *In re Nellson Nutraceutical. Inc.*, Case No. 06-10072 (Bankr. D. Del. Feb. 23, 2006) (same).

23.     Further, the Court possesses the power, under Bankruptcy Code § 105(a), to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The proposed procedures will ensure that the Debtors will continue Utility Services without prejudicing the Utility Companies.

24.     Based on the foregoing, the Debtors submit that the relief requested herein is necessary and appropriate, is in the best interests of their estates and creditors, and should be granted in all respects.

25.     Notice of this Motion has been given via facsimile, hand delivery, electronic mail, or overnight mail to: (a) the Office of the United States Trustee; (b) the Debtors' thirty (30)

largest unsecured creditors on a consolidated basis; (c) the Debtors' six (6) largest secured

creditors on a consolidated basis; (d) counsel for the Debtors' proposed post-petition lender; (e)

the Office of the United States Attorney; (f) the Dormitory Authority of the State of New York;

(g) the Office of New York State Attorney General; (h) the New York State Department of

Health; (i) the Internal Revenue Service; (j) the Department of Law, City of New York; (k) all

those who have entered an appearance in this case pursuant to Bankruptcy Rule 2002: and (l) on

each Utility Company listed in the Utility Companies List, and on each Utility Company

subsequently added by the Debtors to the Utility Companies List. The Debtors submit that under

the circumstances no other notice need be given.

      26.    No previous request for the relief sought herein has been made to this or any other

Court.

      **WHEREFORE**, the Debtors request entry of an interim and final order, substantially in

the forms attached as Exhibits "B" and "C" respectively, granting the relief requested herein, and

such other and further relief as is just and proper.

Formatted: Highlight

Dated: New York, New York
      June   , 2010

                    **WINDELS MARX LANE & MITTENDORF, LLP**

         By:  _____

                Charles E. Simpson (csimpson@windelsmarx.com)
                **A Member of the Firm**

                156 West 56th Street
                New York, New York 10019
                (212) 237-1000

                Proposed Attorneys for North General Service Corporation,
                North General Hospital and
                North General Diagnostic and Treatment Center
                Debtors-in-Possession.

{10438858:5}

# EXHIBIT A

## UTILITY SERVICE

## [UPDATE]

| Utility Name and Address | Facility Address | Account # | Type of Utility | Proposed Adequate Assurance |
|---|---|---|---|---|
| Consolidated Edison<br>James Rooney, 9th Floor<br>4 Irving Place<br>New York, NY 10003 | | | Natural Gas?<br>Electricity?<br>Lighting? | $1,982.54 |
| | | | Natural Gas?<br>Electricity?<br>Lighting? | $65,601.81 |
| | | | Natural Gas?<br>Electricity?<br>Lighting? | $6,674.38 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| NYC Water Board<br>Barbara Baird<br>59-17 Junction Blvd.<br>Flushing, NY 11373 | | | Water Charges | $6,357.42 |
| | | | | |
| DCI Communication<br>6851 Jericho Turnpike<br>Suite 260<br>Syosset, NY 11791 | | | Telephone &<br>Telegraph? | $1,184.62 |
| | | | | $ |
| | | | | $ |
| | | | (Managed<br>Internet<br>Service)? | $ |
| Verizon Access Billing<br>P.O. Box 1100<br>Albany, NY 12212-5124 | | | Telephone &<br>Telegraph | $897.00 |
| | | | | |
| | | | | |

| Utility Name and Address | Facility Address | Account # | Type of Utility | Proposed Adequate Assurance |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| Verizon Wireless<br>P.O. Box 489<br>Newark, NJ 07101 | | | Telephone & Telegraph | $253.96 |
| | | | | |
| Verizon<br>P.O. Box 15124<br>Albany, NY 12212-5124 | | | | $3,080.69 |
| Paetec Communications, Inc.<br>One Paetec Plaza<br>600 Willowbrook Office Park<br>Fairport, NY 14450 | | | Telephone | $4,424.73 |
| Arch Wireless, Inc.<br>890 E. Heinberg Street<br>Pensacola, FL 32502 | | | | $1,142.04 |
| Qwest Business Services<br>P.O. Box 856169<br>Louisville, KY 40285-6169 | | | | $734.27 |

Need to add Royal Waste and Stericycle

# EXHIBIT 13

## Etheridge, Derek

| | |
|---|---|
| **From:** | Zavalkoff-Babej, Erin |
| **Sent:** | Thursday, July 01, 2010 5:05 PM |
| **To:** | Caruso, Michael; Etheridge, Derek |
| **Subject:** | FW:utilities1 (2).xls |
| **Attachments:** | utilities1 (2).xls |

**From:** Monica Terrano [mailto:Monica.Terrano@NGSC.ORG]
**Sent:** Thursday, July 01, 2010 5:02 PM
**To:** Zavalkoff-Babej, Erin
**Subject:** FW: utilities1 (2).xls

Please forward to Derick

**From:** Dean Mamet
**Sent:** Thursday, July 01, 2010 2:26 PM
**To:** John Maher
**Cc:** Monica Terrano
**Subject:** utilities1 (2).xls

John, these are the utilitiy bills for 12 months.  The tab average is per month.

Dean

Erin Zavalkoff-Babej | Windels Marx Lane & Mittendorf, LLP | 156 West 56th Street, New York, New York 10019
| Direct Dial: 212.237.1176 | General Fax: 212.262.1215 | ebabej@windelsmarx.com | www.windelsmarx.com

3/11/2011

12 month average utilities

| | | 12 months | average per month |
|---|---|---|---|
| 231 | verizon | 140662 | 11721.83 |
| 230 | Verizon Access Billing | 11910.2 | 992.5167 |
| 2058 | Verizon Wireless | 33733.81 | 2811.151 |
| 7646 | Verizon Business | 30798.16 | 2566.513 |
| 7663 | Verizon Online | 1079.88 | 89.99 |
| 99 | **Con Edison** | 43883 | 3656.917 |
| 100 | **Con Edison** | 154011.3 | 12834.28 |
| 101 | Con Edison | 1665801 | 138816.7 |
| 437 | NYC  Water Board | 158747.4 | 13228.95 |
| 5170 | Paetec Communications | 96615.99 | 8051.333 |
| 223 | **Nouveau Elevator** | 126587.8 | 10548.98 |
| 6412 | **Royal Waste** | 88833.6 | 7402.8 |
| 6414 | **Stericycle** | 63080.13 | 5256.678 |
| 7257 | **Radiac** | 34864.45 | 2905.371 |
| 140 | **Star McKesson** | 452487.1 | 37707.26 |

# EXHIBIT 14

**Etheridge, Derek**

| | |
|---|---|
| **From:** | John Maher [John.Maher@NGSC.ORG] |
| **Sent:** | Tuesday, July 27, 2010 12:06 PM |
| **To:** | Dean Mamet; Etheridge, Derek |
| **Attachments:** | Con Ed Deposit Request.pdf |

FYI....See attached.



Law Department

Consolidated Edison Company
of New York, Inc.
4 Irving Place
New York NY 10003-0987
www.conEd.com



July 21, 2010

North General Hospital
1879 Madison Avenue
New York, New York 10035

Attn: John Maher, EVP/CFO

Re: North General Hospital, *et al.*
Case No. 10-13553 (SCC)

Dear Mr. Maher:

Consolidated Edison Company of New York, Inc. (Con Edison) is requesting payment from North General Hospital, *et al.*, in the amount of $347,315.00, as adequate assurance of future payments of post petition utility charges for the 6 accounts in our service territory, as a <u>full service</u> customer to Con Edison. (See enclosed)

This amount is based on two months' average monthly billing.

My number is 212-460-4392, if you have any questions or wish to discuss this further.

Very truly yours,

Gale Dakers, Supervisor
dakersg@coned.com
Consolidated Edison Company
4 Irving Place, room 1875-S
New York, NY 10003
Attn: Bankruptcy Group

GDD
313269

# NORTH GENERAL HOSPITAL
## CASE # 10B-13553 FILED ON 7/2/10

| ACCOUNT NUMBER | DEPOSIT AMOUNT | ADDRESS |
|---|---|---|
| 49-4182-2075-0001-7 | $265,000.00 | 1879 MADISON AVE ENT |
| 49-4182-2076-0001-5 | $1,775.00 | 1879 MADISON AVE ENTM |
| 45-2017-5500-0001-9 | $3,450.00 | 1735 PARK AVE 2LT |
| 49-4182-2077-0001-3 | $50,935.00 | 1879 MADISON AVE HTCA |
| 45-2219-0730-0102-5 | $4,180.00 | 1997 LEXINGTON AVE PLP |
| 49-4081-0017-0001-5 | $21,975.00 | 1824 MADISON AVE HOSP |
| | | |
| TOTAL AMOUNT | $347,315.00 | |