# EXHIBIT F

**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
(212) 237-1000
Charles E. Simpson (csimpson@windelsmarx.com)

*Attorneys for North General Hospital et al.,*
*Debtors-in-Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
In re                       :

                            :      Chapter 11 Case

NORTH GENERAL HOSPITAL *et al.,*   :      No. 10-13553 (SCC)

                            :

            Debtors.       :      **Jointly Administered**
------------------------------------------------------------x

## AFFIRMATION OF ERIN ZAVALKOFF-BABEJ IN
## RESPONSE TO EXAMINER'S REPORT

**ERIN ZAVALKOFF-BABEJ,** being an attorney duly authorized to practice law before

the Courts in the State of New York, hereby affirms the following to be true under penalty of

perjury:

    1.      I am associated with the firm of Windels Marx Lane & Mittendorf, LLP

("**Windels Marx**" or the "**Firm**").

    2.      All facts set forth below in this affirmation the ("**Affirmation**") are based upon

my personal knowledge, information from, and discussions I have had with certain of my

colleagues, communications with individuals employed by North General Hospital, *et al.*, as

defined below, and discussions with and correspondence from the Office of the United States

Trustee ("**U.S. Trustee**")

    3.      Starting in early May 2010, I began working with the Bankruptcy and Corporate

Reorganization Group at Windels Marx (the "**Bankruptcy Group**") to prepare for the possible

chapter 11 filing of North General Hospital ("**North General**" or the "**Hospital**"), North General

Service Corporation and North General Diagnostic & Treatment Center (collectively referred to

herein as the "**Debtors**"). In this regard, I worked most closely with Charles E. Simpson, Esq.

("**Mr. Simpson**"), a partner in the Bankruptcy Group, and Derek Etheridge, Esq. ("**Mr.**

**Etheridge**"), a senior associate in the Bankruptcy Group.

4.     Throughout the months of May and June of 2010 (the "**Preparation Period**"), I

assisted the Bankruptcy Group in drafting approximately twenty-three (23) "first day" motions

and proposed orders ("**First-Day Motions**"), including the Affidavit of Samuel J. Daniel in

Support of First Day Motions (the "**Daniel Affidavit**").

5.     During the Preparation Period, and in order to obtain the requisite information to

complete the First Day Motions, Mr. Etheridge and I consulted extensively with Lisa M. Hackett,

Esq. (" **Ms. Hackett**"), former Senior Counsel for the Debtors, Mr. John Maher ("**Mr. Maher**"),

currently President and Chief Restructuring Officer (f/k/a Executive Vice President and Chief

Financial Officer of the Debtors) and, to a lesser extent, Ms. Marianne Muise ("**Ms. Muise**") and

Ms. Monica Terrano (" **Ms. Terrano**").  Ms. Muise and Ms. Terrano are members of Health

Management Solutions, Inc. ("**HMS**") and upon information and belief have been the Hospital's

*de facto* accounting department since 2009

6.     The Bankruptcy Group, specifically Mr. Etheridge and I, solicited the information

necessary to complete the draft First Day Motions by contacting either Ms. Hackett and/or Ms.

Maher via email and sometimes by telephone.  In order to expedite the process of obtaining this

information, Mr. Etheridge and I usually sent these email requests to Ms. Hackett or Mr. Maher

attaching the relevant motion/application.  The information that was needed was identified in the

body of the email or in the attached motion/application (where the information that was needed

was highlighted in the body of the document). Mr. Etheridge and I began working more closely with Ms. Muise and Ms. Terrano as the Petition Date neared and the need for specific information intensified.

7.     On a number of occasions prior to North General's bankruptcy filing, the Bankruptcy Group met with Ms. Maher to discuss the First Day Motions, each of which was at a different stage of completion. In this regard, Mr. Maher spent the better part of several days in a conference room at Windels Marx's offices, where he reviewed draft First Day Motions and revisions to such drafts alongside the Bankruptcy Group.

8.     Mr. Maher played a significant role and was extremely helpful during the process of drafting, reviewing and revising the First Day Motions. In fact, I expressed to Mr. Maher on several occasions how grateful I was that he made his changes and noted his comments to the individual motions electronically in track changes, thus avoiding the need to work from a hand mark-up. Mr. Maher would send the Bankruptcy Group his comments and changes electronically as password protected documents.

9.     Oftentimes, Mr. Maher would note that some particular piece of information would have to be retrieved from records at the Hospital and that he would provide the information at a later time. This information was then sent to us usually in password protected documents. In general, this was the process by which the Bankruptcy Group and the Debtors would work in concert to prepare the First Day Motions.

10.     Approximately one (1) week prior to the filing, Mr. Etheridge contacted the U.S. Trustee regarding service of a binder containing the twenty-three (23) draft First Day Motions for the U.S. Trustee's review and comment. Shortly thereafter, Mr. Etheridge began speaking regularly with Andy Velez-Rivera, Esq. and subsequently, exclusively with Andrea Schwartz,

Esq. ("**Ms. Schwartz**"), regarding the status of each of the First Day. The primary purpose in the Bankruptcy Group's decision to consult with the U.S. Trustee was to avoid a possible objection to the First Day Motions by the U.S. Trustee's office, and to ensure a smooth bankruptcy filing. The Bankruptcy Group wished to work with the U.S. Trustee to address any issues or concerns prior to the first day hearings.

11. On June 28, 2010, Mr. Etheridge received a call from Ms. Schwartz stating that only a select number of First Day Motions prepared by the Bankruptcy Group and Mr. Maher should be filed on the first day. After that telephone call with the U.S. Trustee, Mr. Simpson, Mr. Etheridge and I discussed the U.S. Trustee's position and together decided that not all of these First-Day Motions were necessary to present to the Court at the first-day hearings. The details of this conversation and the decision not to file certain of the First Day Motions were relayed to Mr. Maher. Also, as Mr. Maher was working with Debtors' Counsel at Windels Marx's offices in the days leading up to the bankruptcy filing, Mr. Maher was certainly made aware of which First-Day Motions would be going forward and which would not be presented at the Debtors' first day hearings. Mr. Maher also attended the first-day hearings, was presented with a binder of the First-Day Motions at the first-day hearing, and most certainly was cognizant of the fact that not all of the First-Day Motions prepared by Debtors' Counsel, some of which were abandoned weeks earlier as being inappropriate based on the facts and circumstances, were presented to the Court for approval.

**Prepetition Wages Motion**

12. According to the Examiner's Report, Mr. Maher claimed to have never been made aware of the decision to exclude vacation benefits from the Wages Motion. (Examiner's Report at 19 ("According to Mr. Maher, Windels Marx did not advise the Debtors that certain categories

of wage-related items that were previously in drafts of the motion had been deleted from the Wage Motion, as filed"). According to Mr. Maher, he made a significant amount of the employee-related payments at issue because he thought the Wages Order as entered by the Court, approved the draft Wages Motion that he had reviewed and approved, which draft Mr. Maher indicated contained language including vacation benefits as part of the benefits the Debtors' were seeking approval to pay (Examiner Report at 19). This statement is absolutely false.

13.    Mr. Etheridge and I worked closely with Mr. Maher, Ms. Hackett and Ms. Renecia Lowery-Jeter, ("**Ms. Jeter**") former Vice-President of Human Resources at North General to prepare the Wage Motion. While the Wages Motion went through a number of iterations, however; Mr. Maher was included in all correspondence pertaining to this Motion. In fact, many of the revisions that were made were a result of comments or suggestions made by Mr. Maher.

14.    On July 1, 2010, a day before the Petition Date, Mr. Etheridge, Mr. Simpson and I spoke with Andrea Schwartz to discuss the U.S. Trustee's comments on the First Day Motions With respect to the Wage Motion, Ms. Schwartz indicated that the U.S. Trustee's Office wanted a "bare-bones" motion and would object to the payment of anything other than Employee Obligations (as that term is defined in the Wages Motion) including, without limitation, accrued but unpaid prepetition wages, salaries, commissions, withholding taxes and garnishments, on behalf of, the Employees provided that such payments did not exceed the statutory priority limits of $11,725 under § 507(a)(4) of the Bankruptcy Code.

15.    After the call with the U.S. Trustee, Mr. Simpson told Mr. Etheridge and I that he felt that any objection by the U.S. Trustee to the Debtors' inclusion of vacation benefits in the Wages Motion could be overruled by the Court because DASNY, the Debtors' lender, was not

adverse to the idea of the Debtors' making such payments. Mr. Simpson however, indicated that he would speak with Mr. Maher to review the U.S. Trustee's comments and to go over the Wages Motion line by line, so as to be certain Mr. Maher understood each of the provisions. During that telephone call on which Mr. Etheridge and I were present, Mr. Simpson explained to Mr. Maher what the U.S. Trustee's position was and counseled Mr. Maher that under the terms of the Wages Motion, he would not have the authority to pay prepetition wages or salary over the statutory cap of $11,725.00 and that he was not to pay (i) employee reimbursement expenses, including business expenses incurred in connection with services rendered for the benefit of the Debtors, including, without limitation, those relating to meals, travel, and other ordinary course reimbursable employee business expenses, (ii) benefit premiums and expenses on account of prepetition claims covered by any medical plans or insurance policies, and (iii) accrued vacation or sick and personal time.

16.    Mr. Simpson also told Mr. Maher that the Debtors, despite the U.S. Trustee's comments, could certainly decide to file the Wages Motion without removing the request for authorization to pay vacation benefits to former employees. The Court would then decide whether to allow such payments over the objection of the U.S. Trustee. In response, Mr. Maher stated that he could live with the restrictions requested by the U.S. Trustee on the payment of vacation benefits and confirmed that he understood and approved the language in the final Wages Motion.

**Epiq Call Center Script**

17.    The Debtors engaged Epiq[1] prepetition as their claims and noticing agent in order to assist with the preparation of petitions, schedules and Statements of Financial Affairs, among

---

[1] By order of the Bankruptcy Court dated August 3, 2010, Epiq Bankruptcy Solutions was appointed the Debtors' claims and noticing agent. (Docket No 107)

other things. Just prior to the Petition Date, Epiq sought the Debtors' cooperation in preparing what it termed a call center script (the "**Call Center Script**"). The Call Center Script, once completed, would be used by Epiq's employees in responding to questions posed by the Debtors' various creditor constituencies who would be calling Epiq seeking information about the Debtors' Chapter 11 cases. As part of the Call Center Script, Epiq requested responses to a list of approximately fifty-seven (57) Frequently Asked Questions ("**FAQ's**") regarding every aspect of the Debtors' cases.

18. In order to respond most thoroughly to the FAQs, which questions concerned, among other things: (i) the post-petition treatment of employees, vendors, suppliers, retirees and others and (ii) how the Debtors would address outstanding pre-petition obligations with the above-mentioned constituencies, Mr. Etheridge and I requested assistance from Mr. Maher.

19. Soon after the Petition Date, concerned that the Epiq call center would begin receiving calls from parties-in-interest, Epiq pressed Mr. Etheridge and I to return to them the completed Call Center Script as soon as possible. In order to expedite the process, I reviewed and revised the draft responses to the FAQs initially prepared by Epiq and forwarded the document to Mr. Maher for his comment and to complete certain missing information.

20. On August 9, 2010, Mr. Maher sent me and Mr. Etheridge an email forwarding the Call Center Script that I had sent him, which script included my revisions as mentioned above. Mr. Maher stated in his forwarding email that we should "note the language around benefits the Hospital is not paying benefits on paid non-worked time, *i.e.*, vacation, severance, etc…after termination date". Upon receipt of Mr. Maher's email I recall telling him verbally that what we (Debtors' Counsel on behalf of Epiq) needed was for him to review the Call Center Script in its entirety, and to provide us with his comments. I also emphasized that we needed

him to fill in the information that I identified as missing in the draft I had sent him.

21.     On August 12, 2010, Mr. Maher sent an email to me ccing Mr. Etheridge and Mr. Simpson and attaching a copy of the Call Center Script with his comments and suggestions in track changes (Email from Mr. Maher to Debtors' Counsel attaching the Call Center Script with his comments in track changes is annexed hereto as Exhibit "1").

22.     The Call Center Script, aimed to provide responses to questions posed by key constituents affected by North General's bankruptcy filing. Among the questions that Mr. Maher provided commentary were questions concerning the payment of prepetition amounts due and owing to vendors and suppliers as well as questions about employee wages and the continuation of various employee benefits. Mr. Maher's track changes and comments to the Call Center Script clearly establish that Mr. Maher was aware of what payments he was authorized to make and what payments were prohibited.

**Mr. Maher Participated in the Decision not to File a Critical Vendor Motion**

23.     On June 28, 2010, I met with Messrs. Simpson and Etheridge to discuss the First Day Motions. During this discussion, Mr. Etheridge indicated that, pursuant to his earlier conversation with the U.S. Trustee, a showing would have to be made pursuant to Rule 6003 in order for the critical vendor motion to be filed on the first day. She stated that unless the Debtors were able to show that first day relief is necessary to avoid immediate and irreparable harm, the critical vendor motion could not be filed on the first day. While discussing the Rule 6003 requirements and whether the Debtors were able to show immediate and irreparable harm with respect to critical vendors, it was collectively decided that we would contact Mr. Maher to determine whether the alleged critical vendors were threatening not deliver essential goods and/or services without receiving payment on their outstanding prepetition invoices.

24.     On the afternoon of June 28, 2010, Mr. Etheridge and I had a conference call with

Mr. Maher to discuss, among other things, preparation of the Closure Plan Motion. During this conference call, Mr. Etheridge informed Mr. Maher of his conversation with Ms. Schwartz and the decision to reduce the number of First Day Motions to be filed as it was not necessary to put every First-Day Pleading prepared before the Court on the first day of the case. Regarding the Critical Vendor Motion, Mr. Etheridge and I explained to Mr. Maher that according to Rule 6003 of the Bankruptcy Rules, the Debtors would have to demonstrate in any Critical Vendor Motion that the alleged "critical vendors" would not provide services and/or deliver goods to the Debtors without receiving payment for prepetition goods and/or services, which payments on prepetition invoices would require an order from the court. During this discussion, Mr. Maher did not indicate that any of the Hospitals' vendors or suppliers had threatened to stop servicing the Hospital if they were not paid on their outstanding prepetition invoices. However, Mr. Etheridge and I asked Mr. Maher to reflect on how the Bankruptcy Code interprets the term "critical vendor" and instructed him to provide us with a list of all vendors that he deemed "critical" so that a motion authorizing the payment of prepetition amounts owed to these vendors could be made. Mr. Maher never provided me nor to my knowledge Mr. Etheridge with any such list of critical vendors at that time.

25.    On July 12, 2010, and in preparation for the Debtors' next hearing scheduled for August 2, I sent an email to Ms. Muise asking her for a list of critical vendors and the prepetition amounts each was owed. To be absolutely clear as to who would qualify as a "critical vendor under the Bankruptcy Code, I emphasized in my email that "…these are vendors that NGH will still need to deal with (until operations cease) and who would otherwise not provide NGH goods and services until they are paid these prepetition amounts that are due and owing." (Email from Erin Zavalkoff-Babej to Marianne Muise dated July 12, 2010 annexed hereto as Exhibit "2").

26.     On July 14, 2010, Ms. Terrano sent Mr. Etheridge and I a list of vendors that

North General "will need" along with their owed balances.  Mr. Maher and Ms. Muise were

copied on this email. (Email dated July 14, 2010 with attached "vendors required after

bankruptcy" annexed hereto as <u>Exhibit "3"</u>). Of the list of thirty-two (32) vendors attached to

Ms. Terrano's email, only five (5) vendors were identified as "Critical" and of these "critical"

vendors only two (2) of them were identified as having a prepetition amount owed to them (i.e.

Burns Security and Iron Mountain).  Two (2) of the other five (5) vendors identified as "critical"

on the Critical Vendors Spreadsheet from Ms. Terrano (Public Goods Pool and Statewide

Assessment Pool ) were in fact, not "vendors" at all.  The remaining vendor identified as critical

was Physicians Reciprocal Insurance, was according to the Debtors' spreadsheet not owed

anything for prepetition goods or services. The remaining vendors on the list provided to Mr.

Etheridge and me were either identified as "Ordinary Course" or "Professional" not as "Critical

Vendors".  According to the Debtors' Critical Vendors' Spreadsheet, of these vendors only five

of them were owed amounts for prepetition goods or services (American Appraisal $11,476.00,

Door Automation $2,298, Integro Insurance $32,253.67; New York City Fire Department $ $935

and Milliman USA $45,318).[2]

Mr. Etheridge and I reviewed the list of critical vendors and then consulted with Mr.

Simpson.  During this discussion, given the information provided to us by Ms. Terrano and based

on the Bankruptcy Code's understanding of who is a "critical vendor", we concluded that these

entities did not qualify and that more information would be needed to substantiate a filing of any

Critical Vendor Motion by the Hospital.

---

[2] In one instance, the Debtors listed their Public Relations Firm Joele Frank as a provider of real property assessments.

To clarify the term "critical vendor", and to ascertain whether any of the critical vendors on the spreadsheet mentioned above were really "critical" in the Code's sense of the term, on July 14, 2010, I sent an email to Ms. Muise clarifying the definition of a "critical vendor" as follows; "Just remember these are critical vendors, not every vendor. There should not be that many critical vendors for a hospital that is closing down. Usually an ongoing business has a number of critical vendors." (Email from Debtors' Counsel Defining "Critical Vendor" annexed hereto as Exhibit "4").

In connection therewith, on July 21, 2010, Debtors' Counsel requested that North General's management provide it with a description of the services provided by the vendors classified on its spreadsheet as "Critical". That same day, Ms. Muise forwarded to Mr. Etheridge and I an updated critical vendor spreadsheet, virtually identical to the spreadsheet forwarded by Ms. Terrano on July 14th. Ms. Muise's email attaching the Updated Critical Vendor List is annexed hereto as Exhibit 5". The updated list didn't clarify why these vendors were "critical", as such; I requested that Ms. Muise (copying Mr. Maher) provide a "short blurb" on certain entities so that it could explain the importance of these vendors and why they should be included in any Critical Vendor Motion. (Email Erin Zavalkoff-Babej Requesting Information re Critical Vendors and Ms. Muise's response thereto are annexed hereto as Exhibit "6").

Throughout the period of time devoted to discussions about the necessity of filing a Critical Vendor Motion in the Debtors' Chapter 11 Cases, Mr. Etheridge and I (and to a lesser extent Mr. Simpson) explained to North General's management and specifically to Mr. Maher and Ms. Hackett that "critical vendors" were those vendors who provided goods and services necessary to keep the Hospital operational and to provide critical services to patients admitted to the Hospital (and who would otherwise not provide the Hospital with these essential goods or

services is not paid on their outstanding prepetition invoices). However, by the time Mr. Etheridge and I received the initial list of such critical vendors from Ms. Terrano on July 14, 2010, the Hospital was closed and there were no longer any patients. Given the circumstances on the ground, I told Mr. Maher, Ms. Muise and Ms. Terrano on a number of occasions that the Court would not grant the relief they were seeking in the Critical Vendor Motion, because a hospital that is closed would have tremendous difficulty meeting the burden required to obtain such relief.

27.     While Mr. Maher may claim otherwise, and in fact did suggest in an email to me on October 28, 2010[3] (several weeks after the Committee first raised the issue of the unauthorized post-petition payments to certain employees and vendors), that he was not and should have been made aware of the decision not to file a Critical Vendor Motion in the weeks following the closure of the hospital, the truth is rather a different one.

28.     Mr. Maher was unequivocally aware of the decision (a decision in which he played a key role) that no "critical vendor" motion would be filed by Windels Marx unless a

---

[3] On October 28, 2010, Mr. Maher sent me the following email I should have known about the decision not to file....there are/were a number of vendors that would have been impacted. On that same day I responded to Mr. Maher as follows: " I believe the decision not to file a Critical Vendor motion was a decision that we discussed with you and Marianne over the course of several weeks. I recall receiving lists of vendors that after discussions with your team we reached the conclusion would not qualify under the statute as "critical". A critical vendor motion would have allowed you to pay prepetition amounts due and owing to "critical vendors", but there is a standard that needs to be met and I believe we decided after much back and forth that none of the vendors at issue would have qualified. I don't recall any of your vendors threatening to stop doing business with NGH post petition because of outstanding prepetition amounts due and owing. Remember that this kind of motion does not address your ability to make post petition payments, but rather allows the debtor to pay certain vendors that it cannot operate without (and which have demonstrated their unwillingness to work with the debtor if those amounts were not paid). Because the utility companies were forbidden by order of the court to discontinue services based on prepetition amounts outstanding (so long as they were adequately assured with that deposit) and because we sought and received approval to pay "medical providers" and employees prepetition amounts we discussed that there were no other vendors that were critical in that they would have stopped doing business with NGH if you didn't pay them. Not every vendor you deal with and that is important to the operations of the hospital qualifies as a "critical vendor". Unless there are vendors (essential to the operations of the hospital) that have not done business with NGH since the filing because of the prepetition amounts NGH owes them, we would not have a very convincing argument why any of these vendors should be paid for prevention amounts owed to them. (This email exchange between Mr. Maher and me is annexed hereto as Exhibit "7".)

critical vendor list could be compiled that included only those vendors actually "critical" to the Hospital closure process and who had also had threatened to withhold goods and/or services unless paid prepetition amounts owed to them. When no such list could be amassed, Windels Marx (specifically Messrs. Simpson and Etheridge) made clear to Mr. Maher, Ms. Muise, Ms. Hackett and Ms. Terrano that such a motion could not and would not be put before the Court.

**Utilities Motion**[4]

29.      Since June 2010, Mr. Etheridge and I as well as some other associates in the Bankruptcy Group had been conferring with Mr. Maher regarding the information needed in order to draft the Utilities Motion. The Utilities Motion provided for the deposit by the Debtors', as adequate assurance of payment, of funds equaling fifteen (15) days of the Debtors' estimated aggregate postpetition utility expenses based upon average usage for the previous 12 months in a Utility Reserve, as that term is defined in the Utilities Motion. Drafts of the Utilities Motion had been circulated between Maher and the Bankruptcy Group for approximately one and a half months prior to it being filed.

30.      Throughout the period spent drafting the Utilities Motion, Mr. Etheridge and I (as well as Mr. Simpson) explained to Mr. Maher, Ms Muise and Ms. Terrano that we needed the figures reflecting the total amount paid to each utility company over the preceding 12 months. This information, we explained, was necessary so that we could ascertain the amount of adequate assurance to place in the Utility Reserve. On July 1, 2010, Ms. Terrano forwarded me the information we had requested in an email with an attached excel spreadsheet (The July 1st email

---

[4] While Debtors' Counsel initially prepared a motion for authority to pay pre petition insurance premiums however, Mr. Maher informed Debtors' Counsel that the Hospital didn't owe any prepetition amounts to its insurance carriers. Debtors' Counsel concluded that if the Hospital didn't have any outstanding prepetition obligations an insurance motion to pay insurance premiums on a going forward basis was not necessary as the payment of insurance premiums is a payment in the ordinary course of a hospital's business. Moreover, the Closure Plan and the U.S. Trustee Guidelines, each required the Hospital to maintain insurance in the ordinary course of its operations.

from Ms. Terrano is annexed hereto as <u>Exhibit "8"</u>). The information undoubtedly shows that Mr. Maher, Ms. Muise and Ms. Terrano, understood what the Utilities Motion and Utilities Order provided for.

31.     Following the Creditor's Committee's discovery of the Unauthorized Payments made by Mr. Maher, Mr. Maher and I had several discussions about whether the various unauthorized payments he made to certain utility companies could arguably fall under the authority of the Utilities Order. Mr. Maher told me that he made these unauthorized payments to certain utility providers; (i) in lieu of making a deposit (which is what the Debtors' were authorized to make under the Utilities Order) and (ii) because these providers were critical vendors. Somewhat confused, I asked Mr. Maher how a utility company, required by Order of this Court to continue to provide the Debtors with services so long as it was adequately assured, constitute a critical vendor, which by definition was a vendor threatening to stop servicing the Debtors because of outstanding prepetition amounts due and owing.

32.     At a meeting to review the alleged unauthorized payments held on November 8, 2010 at North General, Mr. Maher explained to me that instead of depositing the adequate assurance amounts into the Utility Reserve as required under the Utility Order, he decided to make direct payments to several of the utility providers in lieu of making deposits. This was a unilateral decision on the part of Mr. Maher and at no point did Maher ever inquire of me whether he could pay amounts owed on prepetition utility obligations in lieu of making the adequate assurance payments provided for in the Utilities Motion and Utilities Order.

## CONCLUSION

33.     The Bankruptcy Group in general and Mr. Etheridge and I in particular advised Mr. Maher and his team of what was and was not authorized pursuant to each Order entered by

this Court. Mr. Maher played an integral part in the drafting process of all of the First Day (and subsequent) Motions put before the Court. Mr. Maher and Ms. Muise were both well acquainted with the Bankruptcy process, which was evidenced by the role each played during the Preparation Period and since the Petition Date. Mr. Maher, at his own discretion and without consulting me (or upon information and belief any of my colleagues at Windels Marx), chose which of the Court's directives he would and would not follow. Regrettably, the Bankruptcy Group did not maintain a physical presence at the Debtors' premises, but I am confident that Mr. Maher and the other members of his team were given the counsel that they deserved and that they were unequivocally aware of the limitations imposed by this Court's express Orders.

Affirmed this 10th day
of March, 2011

_____
Erin Zavalkoff-Babej

# EXHIBIT 1



## Zavalkoff-Babej, Erin

| | |
|---|---|
| **From:** | Etheridge, Derek |
| **Sent:** | Wednesday, March 09, 2011 1:09 PM |
| **To:** | Zavalkoff-Babej, Erin |
| **Subject:** | FW:10579987(2) 20100812 1810 |
| **Attachments:** | 10579987(2) 20100812 1810.docx |

**From:** John Maher [mailto:John.Maher@NGSC.ORG]
**Sent:** Thursday, August 12, 2010 6:13 PM
**To:** Zavalkoff-Babej, Erin
**Cc:** Etheridge, Derek; Simpson, Charles E.
**Subject:** 10579987(2) 20100812 1810

We should review certain items tomorrow AM...

Derek Etheridge | Windels Marx Lane & Mittendorf, LLP | 156 West 56th Street, New York, New York 10019 |
Direct Dial: 212.237.1073 | General Fax: 212.262.1215 | detheridge@windelsmarx.com | www.windelsmarx.com

<u>**FREQUENTLY ASKED QUESTIONS FOR CALL CENTER**</u>

<u>**Supplier Questions**</u>

<u>**General Questions**</u>

1. **What is Chapter 11?**

   Chapter 11 of the U.S. Bankruptcy Code is a legal mechanism for court supervised reorganization for restructuring of the hospital's obligations. It also provides a mechanism for the orderly liquidation or transfer of the hospital's assets and affiliated operations.

2. **Why did Hospital and the Diagnostic and Treatment Center (the Hospital) file to reorganize under Chapter 11 of the U.S. Bankruptcy Code?**

   The Hospital is taking this action because there are no viable resources for the additional funding required to maintain the hospital and meet operating costs. The hospital also tried several times to partner with third parties in an attempt to reorganize their operations and stave off bankruptcy however, these third party proposals that were unsuccessful.

   The Hospital took this step only after very careful consideration and consultation with experienced financial and legal experts. The Hospital decided that this would be the most effective path for Hospital to transfer its facilities to another entity and for that new entity to establish a health care facility that would continue to provide medical services to the East and Central Harlem communities.

   Deleted:

3. **Does this mean that the Hospital is going out of business?**

   Yes, North General and its Emergency Room were closed as of July 10, 2010

   **Does the Hospital have enough cash to stay in business?**

   No, however, North General lined up and received final approval of its Debtor-in-Possession loan, which will be available to fund the North General's Closure Plan and provide for the orderly and efficient closure and or transfer of the hospital's facilities and operations. A final order approving the DIP Facility was entered by the Bankruptcy Court on August 3, 2010.

   Deleted: has
   Deleted: has
   Deleted: interim
   Deleted: financing facility

   **How long will the bankruptcy process take?**

   There is no way to predict today with certainty how long the process will ultimately take, though cases frequently range from one to two years.

4. **Which entities are included in the filing?**

Deleted: (10579987:3)

Please refer to the Hospital's restructuring website at: *http://chap11.epiqsystems.com/NGH/Project* .

5. **Where can I find Chapter 11 case information?**

Please refer to the Hospital's restructuring website at: *http://chap11.epiqsystems.com/NGH/Project* .

Deleted: *http://chap11.epiqsystems.com/*

## Supplier Specific Questions

6. **Will suppliers continue to be paid for goods and services they provide to the Hospital?**

The Hospital intends to pay suppliers under normal terms for goods received and services rendered after July 2, 2010 (the Petition Date). Any claims for goods received or services rendered after the filing date are considered "administrative claims", which receive a priority status. At the First Day hearing held on July 7, 2010, the Court granted the Hospital interim approval to access up to $4.5 million of the DIP financing. Then on August 3, 2010, the Bankruptcy Court gave the hospital final approval to access up to $14 million of DIP Financing. A Portion of this amount will be used to pay suppliers for post-Petition Date goods and services

Deleted: . A

Deleted: portion

Suppliers who provided goods or rendered services to the Hospital prior to the Petition Date) may have what are referred to as "pre-petition claims." These claims cannot be paid at this time and will be addressed through a Chapter 11 plan of reorganization (liquidation) that will be filed later in the case. If you have such pre-petition claims, you will receive additional information from the Hospital's claims agent at a later date. The Hospital sincerely regrets the hardship or inconvenience that this may cause.

7. **I have unpaid invoices dated before the bankruptcy date (i.e., pre-petition invoices). What should I do?**

Once the Bankruptcy Court has confirmed the procedures and deadlines for filing claims, you will receive a proof-of-claim form and instructions on how to file the form.

8. **Will I need a claim form, or will I automatically be paid for the outstanding, pre-petition amount owed to me?**

At some point in the case, every creditor will receive a copy of a Bar Date Notice which will be accompanied by a proof of claim form with instructions as to deadlines, etc. If you have any questions regarding filing a claim, please seek legal counsel.

9. **Why can't the Hospital pay me what I am owed?**

Deleted: {10579987:3}

United States bankruptcy laws generally prohibit the payment of all unpaid invoices incurred before the hospital filed for relief under Chapter 11 of the Bankruptcy Code. The Hospital sincerely regrets the hardship or inconvenience that this may cause you.

**10. Why should I continue to provide the Hospital with goods and services if I have pre-petition claims?**

There is priority status of post-petition claims - Amounts owed for goods or services delivered after the bankruptcy filing are deemed "administrative liabilities." The Judge overseeing the case requires the Hospital to pay all administrative liabilities under the terms and conditions governing the transaction. Simply stated, the Hospital must pay for goods and services that it receives in the ordinary course of business after the filing. Also, it is important to understand that pursuant to the United States Bankruptcy Code, suppliers are required to fulfill all contractual obligations to the Hospital.

**11. What is my current balance? What is my pre-petition balance?**

The Hospital cannot provide current balances outstanding at this point because the Hospital is in the process of reviewing all of its records and separating pre- and post-petition invoices. However, within the next few days, the Hospital will be filing a "Schedule of Assets and Liabilities." In this document, the Hospital will list balances it believes are owed to its creditors. If you have further questions about this, please contact your attorney.

**12. Can't you just give me some idea of how much I will get paid on the past bills?**

While the Hospital cannot promise what the amount of payout will be on your claims, you can be sure that the Hospital will do everything it can to achieve the maximum recovery for all creditors. The Hospital sincerely regrets the hardship and inconvenience that this may cause you.

**13. Is it true that suppliers with outstanding pre-petition claims only get a few cents on the dollar for unpaid invoices?**

At this time, the Hospital is not able to estimate what value a general unsecured claim will have in its Chapter 11 cases. The Hospital sincerely regrets the hardship and inconvenience that this may cause you.

**14. If the Hospital can't pay me for pre-petition invoices, what assurances can be provided that I will be paid for post-petition goods and services?**

Under U.S. Bankruptcy Law, all claims for goods and services delivered on or after the filing date (the Petition Date) are considered administrative claims against the Hospital's bankruptcy estate. This means that the Hospital is allowed—and indeed obligated—to pay you in full and according to normal terms. The Hospital will be generating some cash flow through its collection on its patients' receivables and has also lined up and

received approval for a "DIP" financing facility with a $14 million loan commitment. These funds will be available to satisfy obligations associated with conducting the Hospital's businesses, including payment under normal terms for goods and services provided after the filings.

**Deleted:** with an initial loan commitment of $ 4.5 million. The Debtors will be seeking the Bankruptcy Court's approval for a subsequent loan commitment of $9.5 million at a hearing on August 2, 2010

15. **Will the Hospital attempt to negotiate new terms now that it has filed?**

The Hospital will continue to review the benefits and opportunities it has to improve its overall supplier relationships in the normal course of business. This will depend on the goods or services individual suppliers provide and the terms in place at the time of filing. The Hospital would anticipate that all supplier terms will be at normal market levels.

16. **Given the uncertainties of the situation, can I renegotiate my terms with the Hospital?**

The Hospital cannot pay more for goods and/or services at this time.

17. **When will I receive payment for goods and services delivered after the bankruptcy date?**

All goods and services delivered after July 2, 2010 will be paid according to established terms.

**Comment [I2]:** Is this Garfunkel?

**Deleted:** <#>I understand that companies that file for Chapter 11 are able to put some suppliers on a "Critical Vendors List" that allows them to continue to be paid under normal terms, even for invoices that are unpaid at the time of the filing. How can I get on that list? ¶
<#>A motion will be filed seeking to pay the prepetition claims of certain vendors. Although the Hospital feels as if all of its suppliers are "critical," the courts have placed very strict parameters on those vendors that can be paid at this time. If you feel as if you meet these parameters you should contact your legal counsel and they should write a letter to the Hospital's General Counsel explaining why you think you qualify. Please not that due to the fact that the hospital is now closed there will likely be very few vendors that qualify as "critical" under the Bankruptcy Code. ¶

**Formatted:** Bullets and Numbering

**Deleted:** normal

18. **What if I only want to be paid cash on delivery?**

The Hospital will continue to pay supplier invoices under customary terms. The Hospital believes it is in the best interests of its suppliers to maintain business as usual.

19. **Can I take back my goods?**

No. The Hospital understands your frustration, but bankruptcy law prohibits a seller from repossessing goods after a purchaser has filed for bankruptcy protection. The Hospital recommends that you consult with your legal counsel before taking any such action.

20. **Can I raise my product prices?**

The automatic stay provision associated with Chapter 11 filings prevents you from raising your prices in an effort to recoup pre-petition claims. Should you have a business reason to raise prices other than the Hospital's filing itself, you can communicate with your usual contact at the Hospital who will collect the requisite information from you and determine if a price change can be approved.

**Deleted:** {10579987:3}

## Utility Specific Questions

### 21. Do you intend to pay my pre-petition balance?

Unfortunately, federal bankruptcy laws generally prohibit the Hospital to pay outstanding invoices for goods and services received before the Petition Date. The hospital sincerely regrets the hardship this may present you.

### 22. If you don't pay my balance, the Utility Company will discontinue services.

The Hospital filed a motion in the Bankruptcy Court addressing how to provide utilities with adequate assurance to ensure continued service. A copy of the motion is available via a link at *http://chap11.epiqsystems.com/NGH/Project* .

> **Deleted:** The Bankruptcy Code prohibits utilities from discontinuing service within the first 20 days of a bankruptcy.

> **Deleted:** has

## Contract Labor Specific Questions

### 23. I provide contract employees to the hospital. Will I get paid?

Payment of your pre-petition amounts may be covered under the wage motion. A copy of the motion is available at the Hospital's restructuring website at: *http://chap11.epiqsystems.com/NGH/Project*. The Hospital expects you to honor your contract and continue to provide the employees and services provided pre-petition. [ THIS IS NOT ACCURATE PLEASE CONFIRM]

## What it Means for Employees

### 24. Will there be layoffs as a result of the filings? Will any departments be closed?

Yes, North General has provided WARN (Worker Adjustment and Retraining Notification) notices to a total of 941 of Hospital employees informing them that they will be laid off.

### 25. Should I keep coming to work as usual? Does this mean that my work schedule will change?

For those employees who did not receive a termination notice, you should keep working according to your usual schedule.

### 26. Have any special trustees, receivers or other third parties been added to the Board as a result of the filing?

No.

> **Deleted:** There have been no changes in the Hospital's Board of Directors as a result of the filings

### 27. Where should employees go for information about the reorganization?

> **Deleted:** {10579987:3}

Information about the reorganization is posted on the following web site (*http://chap11.epiqsystems.com/NGH/Project* .

Comment [I3]: Delete entire section.

Deleted: <#>This website will be updated regularly. The Hospital will also communicate with you directly when there are significant developments to report. If you have any further questions, please call _____ at 212 _____.¶

28. **I am a temporary employee. Will I still get paid?**

The Hospital plans to continue paying those temporary employees it continues to retain in the postpetition period as usual.

Formatted: Bullets and Numbering

Deleted: its

29. **I am a contractor. Will I still get paid?**

The Hospital plans to continue paying those independent contractors it continues to retain, in the postpetition period as usual.

Deleted: its

30. **I am a consultant. Will I still get paid? Will I be treated as a temporary employee or as a vendor?**

Consultants will be paid as usual for all post-petition work performed. Regarding any outstanding fees that have not been paid, information for general unsecured creditors is available on the Hospital's restructuring website at *http://chap11.epiqsystems.com/NGH/Project*.

Comment [I4]: ???? SPEAK TO DEREK ABOUT THIS

Deleted: ¶

Formatted: Font: Not Bold

Formatted: Indent: Left: 0.25"

## Wages and Benefits

31. **Does the Hospital have enough cash to meet its payroll and benefit obligations?**

Yes, the Hospital plans to continue paying post-petition wages and benefits for worked time.

Comment [I5]: ??? My answer would be "Yes, payroll will end on X"

Deleted: Payroll will terminate on ____, 2010

Comment [I6]: ??? My answer would be No.

Deleted: Yes, as required. As is typical in Chapter 11 cases, the Hospital expects that the proceedings will not affect its current compensation policies

32. **Will there be any changes in employee pay going forward?**

The Hospital expects that the proceedings will not affect its current pay policies.

Deleted: No.

Comment [I7]: Was this discussed at hearing??? DISCUSS WITH DEREK

Comment [I8]: ????

33. **Will overtime still be offered?**

In some cases, overtime may be offered.

34. **Can I still file my medical and dental insurance claims?**

Yes. You can and should file your claims as you normally would.

Deleted: <#>Will the filings affect employee health care benefits (such as medical, vision or dental plans) and employee life insurance or disability benefits for U.S. employees? ¶
<#>The Hospital asked and received Bankruptcy Court for approval to continue its current policies with respect to these matters. If the Hospital makes changes to such policies these changes will be announced through the normal communication channels.¶

Formatted: Bullets and Numbering

Comment [I9]: ?????

Formatted: Bullets and Numbering

35. **I am a U.S. employee, will COBRA benefits still be provided to employees if they are separated from the hospital after the filing?**

Deleted: {10579987:3}

Yes. The Hospital expects that COBRA continuation coverage will continue.

## Paychecks and Expense Claims

36. Am I going to be paid as usual now that the Hospital has made these filings?

The Hospital plans to continue providing all wages.

37. When will I next be paid?

There will be no delay in your next paycheck or direct deposit, and expense reimbursement will be made as usual.

38. Will there be anything different about Hospital's paychecks as a result of the filings?

No

39. Will my bank/credit union still accept my paycheck or direct deposit?

Every paycheck issued or direct deposit made by the Hospital should be honored. However, if you experience any problems cashing your paycheck or having an institution honor your direct deposit, please contact the Human Resources Department at 212 423-2363

40. Can I continue to charge my business expenses?

Yes. You may do so as you have in the past, following the same procedures for submitting any qualified business expenses in accordance with hospital policy

## Retirement Benefits/Hospital 403(b) Plan

41. Are the assets in 403(b) plans for employees protected from creditors' claims in the bankruptcy proceedings?

Yes. Federal law protects the funds in 403(b) savings plans from the claims of a hospital's creditors. All individual 403(b) accounts are set up in the individual employee's name. This means that the Hospital cannot use these assets to meet its other obligations or to pay its debts.

41. What happens to the accounts of employees who are participants in the 403(b) Plan?

The assets in its 403(b) plans are held in a trust. These assets are protected under federal law against the claims of the Hospital's creditors, which means that the Hospital can't use any of these assets to meet other obligations or to pay its debts. While the Hospital could make changes to such a plan during the reorganization proceedings, those changes would

---

Comment [10]: DE suggested on Fri, 7/2 that last paychecks were going out on 7/2.

Comment [11]: ???

Formatted: Bullets and Numbering

Comment [12]: ????

Formatted: Bullets and Numbering

Formatted: Bullets and Numbering

Deleted: Yes, the words (or letters) "Debtor In Possession" (or DIP) may appear on your check (s).

Formatted: Bullets and Numbering

Formatted: Bullets and Numbering

Formatted: Bullets and Numbering

Comment [jm13]: Yes, it is still accurate.

Deleted: . [ IS THIS ACCURATE]

Deleted: ¶

Formatted: Bullets and Numbering

Deleted: {10579987:3}

only affect future contributions to the plan, not past contributions.  Irrespective of the filings, all investments contained in an individual's 403(b) account are subject to some level of market risk.

42. Now that the Hospital has made these filings, can employees access their 403(b) account funds before retirement without incurring penalties?

No. The IRS rules for 403(b) withdrawals remain in place and will not change as a result of the Hospital's filings.

Formatted: Bullets and Numbering

Comment [jm14]: Confirm

43. Will the Hospital continue to make the hospital match contribution for the 403(b) plans?

The Hospital intends to continue the Hospital's contributions for those 403(b) plans that currently have such a match.

Formatted: Bullets and Numbering

Comment [jm15]: Confirmed to pay match.

Comment [16]: JOHN CONFIRM STATUS .

44. Are the assets in Hospital's pension plans protected from creditors' claims in bankruptcy proceedings?

Formatted: Bullets and Numbering

Yes.  Federal law protects the assets in qualified defined pension plans from the claims of a hospital's creditors.  The assets are held in trust.  This means that the Hospital cannot use these assets to meet its other obligations.

45. Is it true the pension plan is underfunded?  As a result, will the PBGC (Pension Benefit Guaranty Corp.) take over the plan?

Formatted: Bullets and Numbering

At this point it is likely that the PBGC will take over the pension plan.

46. Is it true that if the PBGC takes over my qualified defined benefit pension plan, I may receive a smaller pension than I am entitled to?

Formatted: Bullets and Numbering

Comment [17]: No.

Formatted: Bullets and Numbering

Formatted: Indent: Left: 0.5", No bullets or numbering

 The Pension Benefits Guaranty Corporation has a web site that explains what happens when they assume responsibility for a qualified defined benefit pension plan.

Deleted: The Hospital has asked for court approval to continue its current policies with respect to these matters.  As is customary in similar cases, the Hospital fully expects the Court to approve its request.  If the Hospital makes changes to such policies in connection with cost-reduction efforts, any changes would be announced through its normal communication channels.No¶

## Miscellaneous Policies and Practices

47. Will employees continue to receive disability, holidays and vacation pay?

Yes.

Comment [18]: How do we want to answer this? I think we are contemplating applying for modifications to our union contracts sometime in the future of this process, but do we want to let them know now?

## Unions

48. What happens now with the unions' collective bargaining agreements?  Will you begin negotiations to change them?

Formatted: Bullets and Numbering

Deleted: t

The current collective bargaining agreements will more than likely be renegotiated.

Deleted: {10579987:3}

Have you spoken to our major unions about this action?  What did they say? Comment [I19]: ????

The Hospital has discussed the current situation with the leadership of the Hospital's unions.  The Hospital is committed to keeping them informed of events and actions as it goes through the process.

## Inactive Employees

Comment [I20]: Need to confer with client on these issues.

49. **I am on a leave of absence.  Before beginning my leave, my supervisor told me that when I returned, I would be reinstated to the job I previously held, or if that position were eliminated, that I would be reinstated in a similar position.  Now that Hospital has made these filings, does that still apply?**

Formatted: Bullets and Numbering

No.  The hospital has ceased operating and has been closed since July 10, 2010

Deleted: The hospitasl has permanently

**I am receiving severance from the Hospital.  How are my severance payments affected by the filings?**

The Hospital plans to honor CBA-related payment of severance wages to Union employees.

## Retiree Questions

Comment [I21]: We need to confer with the client on these issues.

Formatted: Bullets and Numbering

50. **Will I continue to receive my monthly pension check from the Bank of New York?**

As a member of either the Hospital Pension Plan for Salaried Employees or the Hospital Pension Plan for Hourly Employees, you will continue to receive your monthly pension check as usual at this time.  The Bank of Bank of New York will continue to mail your check directly to your home or deposit the sum directly into your bank account.

51. **Is it possible that the Hospital's qualified defined benefit pension plan could be changed or terminated as a result of the Chapter 11 filing?**

Formatted: Bullets and Numbering

Yes, it is possible that changes to the Plan may occur.

While U.S. federal law protects qualified defined benefit pension plans from retroactive changes to plan benefits, it is possible that there could be changes to the qualified defined benefit pension plan in the future.  Any such changes would be announced as appropriate.  In the U.S., the Pension Benefit Guaranty Corporation also provides protection for qualified defined benefit pension programs.

52. **What happens if a qualified defined benefit pension plan is terminated?**

Formatted: Bullets and Numbering

If a qualified defined benefit pension plan is terminated, the liabilities of the plan are determined and the assets of the plan are used to satisfy those liabilities.  If it is determined that the plan has sufficient assets, then all plan benefits are paid in accordance

Deleted: {10579987:3}

with the plan terms and the Employee Retirement Income Security Act of 1974 (ERISA). In the event that there are insufficient assets to pay all approved benefits, then the plan will be administered by the Pension Benefit Guaranty Corporation (PBGC), which is an independent agency chartered under federal law.

The rules governing distribution of plan assets are complex. Generally speaking, however, all reasonable administrative expenses are paid by the plan first. Then the plan's remaining assets would be distributed in accordance with guidelines of ERISA.

For more information about the PBGC insurance protections and its limitations, go to *www.pbgc.gov.*

53. **Are the assets in the Hospital's 403(b) plans for retirees protected from creditors' claims in the bankruptcy proceedings?**

Yes. Federal law protects the funds in 403(b) savings plans from the claims of a hospital's creditors. All individual 403(b) accounts are set up in the individual retiree's name. This means that the Hospital cannot use these assets to meet its other obligations or to pay its debts.

54. **What happens to the accounts of retirees who are participants in the 403(b) plan?**

The assets in its 403(b) plans are held in a trust, which is separate from the hospital. These assets are protected under U.S. federal law against the claims of the Hospital's creditors, which means that the hospital can't use any of these assets to meet other obligations or to pay its debts. While the Hospital could make changes to such a plan during the reorganization proceedings, those changes would only affect future hospital contributions to the plan, not past contributions. Irrespective of the filings, all investments contained in an individual's 403(b) account are subject to some level of market risk.

55. **Will there be any impact on retiree medical benefits as a result of the filings?**

There will be no changes to the retiree medical benefits as a result of the filing. [CONFIRM]

56. **Where should retirees go for information about the reorganization?**

Information about the reorganization is posted on the external web site, (*http://chap11.epiqsystems.com/NGH/Project* . and these will be updated regularly. The Hospital will also communicate with you directly when there are significant developments to report.

**Patient Questions**

57. **How can I get additional information?**

{10579987:4}

Further information will be posted as available on the Hospital's restructuring website *http://chap11.epiqsystems.com/NGH/Project*

The hospital has provided contact phone numbers for various inquiries on its website at http://www.northgeneral.org/

Formatted: Underline

Deleted: {10579987:3}

{10579987:4}

# EXHIBIT 2



## Zavalkoff-Babej, Erin

**From:**   Zavalkoff-Babej, Erin
**Sent:**   Monday, July 12, 2010 6:12 PM
**To:**   'Marianne Muise'
**Subject:** NGH

Hi Marianne,

John said you were the person I should reach out to to get some vendor-related information.  If possible can you send me a list of your critical vendors and how much you owe these critical vendors (prepetition amounts that have not been paid).  Basically, these are vendors that NGH will still need to deal with (until operations cease) and who would otherwise not provide NGH goods and services until they are paid these prepetition amounts that are due and owing.

Let me know if you have any questions.

Erin

# EXHIBIT 3



# Zavalkoff-Babej, Erin

| | |
|---|---|
| **From:** | Monica Terrano [Monica.Terrano@NGSC.ORG] |
| **Sent:** | Wednesday, July 14, 2010 11:35 AM |
| **To:** | Zavalkoff-Babej, Erin |
| **Cc:** | Marianne Muise; John Maher |
| **Subject:** | critical vendors |
| **Attachments:** | vendor_required_after_bankrupcy07142010submitted.xlsx |

Erin,

Attached is last of vendors that North General will need along with their owed balances. Please let me know if anything further is required.

NORTH GENERAL
CRITICAL VENDORS (GOODS & SUPPLIES)

| Vendors that need to Continue | Amount owed Pre-Petition as of 7/13/2010 Accounts | Estimated Amount Owed | Grand Total | Classification | Description of Vendor Services | Comments |
|---|---|---|---|---|---|---|
| Burns Security | 363,310 | 140,000.00 | 503,309.61 | Critical | Outsourced Security Services | |
| Iron Mountain | 18,849.32 | 20,000.00 | 38,849.32 | Critical | Record Storage | |
| Physician Reciprocal Insurance | | 20,000.00 | 20,000.00 | Critical | Malpractice Insurance | Payments will be offset by Revenue |
| Public Goods Pool | | 134,799.00 | 134,799.00 | Critical | NYS Bad Debt Pools; must pay in order to receive monthly distribution | |
| Statewide Assessment Pool | | 120,000.00 | 120,000.00 | Critical | NYS Assessment; must pay in order to receive monthly distribution | Payments will be offset by Revenue |
| 3M Health Information | | 70,000.00 | 70,000.00 | Ordinary Course | DRG & coding software | |
| ACME Fire Alarm & Fire Systems | | 45,000.00 | 45,000.00 | Ordinary Course | Fire Alarm Maintenance & Repairs | |
| ADT Security | | 1,000.00 | 1,000.00 | Ordinary Course | Security & Alarm system Maintenance & repairs | |
| AFCO Insurance | | 65,000.00 | 65,000.00 | Ordinary Course | Financing for insurance premiums | |
| American Appraisal | 11,476.00 | 48,500.00 | 59,976.00 | Ordinary Course | Property appraisal services | |
| AT&T | | 150.00 | 150.00 | Ordinary Course | Back up telephone line | |
| Atlantic Business | 334.22 | | 334.22 | Ordinary Course | Copier lease | |
| Distinctive Personnel | | 1,000.00 | 1,000.00 | Ordinary Course | Temporary employment agency | |
| Door Automation | 2,298.00 | | 2,298.00 | Ordinary Course | Maintenance & Repairs | |
| Federal Express | 941.80 | 200.00 | 1,141.80 | Ordinary Course | Overnight shipping | |
| First Insurance | | 9,870.00 | 9,870.00 | Ordinary Course | Malpractice Insurance | |
| Harley Construction Management Corp | | 64,000.00 | 64,000.00 | Ordinary Course | Construction company | Payments will be offset by Revenue |
| Integro Insurance | 32,253.67 | | 32,253.67 | Ordinary Course | General Liability Insurance | |
| Joelé Frank | | 12,000.00 | 12,000.00 | Ordinary Course | Property appraisal services | |
| LDI Colored Toolbox | | 2,500.00 | 2,500.00 | Ordinary Course | Copier maintenance | |
| NYC Fire Department | 935.00 | 2,985.00 | 3,920.00 | Ordinary Course | Fire saftey & permits | |
| Pitney Bowes | | 10,000.00 | 10,000.00 | Ordinary Course | Postage machines | |
| System Maintenance Services | | 2,000.00 | 2,000.00 | Ordinary Course | Software & licenses & maintenance | |
| United Parcel Services | 131.05 | 200.00 | 331.05 | Ordinary Course | Overnight Shipping | |
| Vital Network | | 10,000.00 | 10,000.00 | Ordinary Course | Software & licenses & maintenance | |
| Deloitte Tax | 160,750.00 | | 160,750.00 | Professional | Independent Audit firm (year end tax issues) | |
| Emdeon Corp | 18,834.30 | 6,300.00 | 25,134.30 | Professional | Revenue cycle services (billing & collection) | |
| Epiq Systems | | 55,000.00 | 55,000.00 | Professional | Bankruptcy claim service | |
| Garbarini & Scher | | 25,000.00 | 25,000.00 | Professional | Malpractice Attorneys | |
| Healthcare Management Solutions | | 31,000.00 | 31,000.00 | Professional | Finance, Reimbursement & Revenue Cycle consultants | |
| Milliman USA | 45,318.00 | 39,000.00 | 84,318.00 | Professional | Pension actuary | |
| BDO Seidman | | 55,000.00 | 55,000.00 | Professional | Independent Audit firm (year end audit, pension audits, grant audits) | |
| Total | 655,430.97 | 990,504.00 | 1,645,934.97 | | | |

# EXHIBIT 4



**Zavalkoff-Babej, Erin**

| | |
|---|---|
| **From:** | Zavalkoff-Babej, Erin |
| **Sent:** | Wednesday, July 14, 2010 10:35 AM |
| **To:** | 'Marianne Muise' |
| **Subject:** | RE: NGH |

Ok
Just remember these are "critical vendors" not every vendor. There should not be that many critical vendors for a hospital that is closing down. Usually an ongoing business has a number of critical vendors.  let me know if you have any questions.

Erin

---

**From:** Marianne Muise [mailto:mmuise@hmsconsultants.com]
**Sent:** Wednesday, July 14, 2010 10:19 AM
**To:** Zavalkoff-Babej, Erin
**Subject:** Re: NGH

Erin:  we finished late last night, and have one or two questions for John;
he should sign off on it by 11:30


MLM
Marianne L. Muise, FHFMA
Principal
Healthcare Management Solutions LLC
voice: 845-497-1312
efax: 888-307-6949
mmuise@hmsconsultants.com
www.hmsconsultants.com


This e-mail message and any attachment is intended solely for the
The message and/or attachment may contain confidential informatio
If you are not the intended recipient of this message, you must n
disseminate the information. Instead, please notify the sender an
and any attachment from your system. Thank you for your cooperati


On July 13, 2010 at 9:27 PM "Zavalkoff-Babej, Erin" <ebabej@windelsmarx.com> wrote:

> Did you forget me?
> Erin Zavalkoff-Babej
>
> ---
> **From:** Marianne Muise <mmuise@hmsconsultants.com>
> **To:** Zavalkoff-Babej, Erin
> **Sent:** Tue Jul 13 15:34:25 2010
> **Subject:** RE: NGH
>
> Erin:  what if we are missing invoices.
> one example is EPIQ, we only have the May invoice,
> how do we handle that, if this motion is to set an amount not to exceed??
> we might not have all the invoices for these critical vendors, and I don't want to be short
>
>
> MLM
> Marianne L. Muise, FHFMA
> Principal
> Healthcare Management Solutions LLC
> voice: 845-497-1312
> efax: 888-307-6949
> mmuise@hmsconsultants.com
> www.hmsconsultants.com
>
>
> This e-mail message and any attachment is intended solely for th
> The message and/or attachment may contain confidential informati
> If you are not the intended recipient of this message, you must
> disseminate the information. Instead, please notify the sender a
> and any attachment from your system. Thank you for your cooperat
>
> On July 13, 2010 at 1:26 PM "Zavalkoff-Babej, Erin" <ebabej@windelsmarx.com>

wrote:

don;t need addresses at this point just the total amount you need to pay for all prepetition amounts due to your critical vendors. Name and kind of service they are providing

**From:** Marianne Muise [mailto:mmuise@hmsconsultants.com]
**Sent:** Tuesday, July 13, 2010 1:16 PM
**To:** Zavalkoff-Babej, Erin
**Subject:** Re: NGH

Erin: also, do you need utility suppliers identified, or was that included in another motion?

```
MLM
Marianne L. Muise, FHFMA
Principal
Healthcare Management Solutions LLC
voice: 845-497-1312
efax: 888-307-6949
mmuise@hmsconsultants.com
www.hmsconsultants.com
```

This e-mail message and any attachment is intended solely for the addressee.
The message and/or attachment may contain confidential information.
If you are not the intended recipient of this message, you must not read, use, retain or
disseminate the information. Instead, please notify the sender and delete the message
and any attachment from your system. Thank you for your cooperation.

On July 12, 2010 at 6:12 PM "Zavalkoff-Babej, Erin" <ebabej@windelsmarx.com> wrote:

Hi Marianne,
John said you were the person I should reach out to to get some vendor-related information. If possible can you send me a list of your critical vendors and how much you owe these critical vendors (prepetition amounts that have not been paid). Basically, these are vendors that NGH will still need to deal with (until operations cease) and who would otherwise not provide NGH goods and services until they are paid these prepetition amounts that are due and owing.
Let me know if you have any questions.
Erin
Erin Zavalkoff-Babej | Windels Marx Lane & Mittendorf, LLP | 156 West 56th Street, New York, New York 10019 | Direct Dial: 212.237.1176 |
General Fax: 212.262.1215 | ebabej@windelsmarx.com | www.windelsmarx.com

IRS Circular 230 Disclosure: As required by Federal Regulations, we inform you that any tax advice contained herein was not written or intended to be used (and cannot be used) for the
purpose of avoiding federal tax penalties, or for the purpose of promoting, marketing, or recommending any transaction or matter to another party.

This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, regardless of whether you are a named
recipient, please notify the sender by reply e-mail and delete the message and any attachments.

Erin Zavalkoff-Babej | Windels Marx Lane & Mittendorf, LLP | 156 West 56th Street, New York, New York 10019 | Direct Dial: 212.237.1176 | General
Fax: 212.262.1215 | ebabej@windelsmarx.com | www.windelsmarx.com

IRS Circular 230 Disclosure: As required by Federal Regulations, we inform you that any tax advice contained herein was not written or intended to be used (and cannot be used) for the purpose of
avoiding federal tax penalties, or for the purpose of promoting, marketing, or recommending any transaction or matter to another party.

This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, regardless of whether you are a named recipient, please
notify the sender by reply e-mail and delete the message and any attachments.

Erin Zavalkoff-Babej | Windels Marx Lane & Mittendorf, LLP | 156 West 56th Street, New York, New York 10019 | Direct Dial: 212.237.1176 | General Fax:
212.262.1215 | ebabej@windelsmarx.com | www.windelsmarx.com

IRS Circular 230 Disclosure: As required by Federal Regulations, we inform you that any tax advice contained herein was not written or intended to be used (and cannot be used) for the purpose of avoiding
federal tax penalties, or for the purpose of promoting, marketing, or recommending any transaction or matter to another party.

This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, regardless of whether you are a named recipient, please notify the
sender by reply e-mail and delete the message and any attachments.

3/11/2011

# EXHIBIT 5



## Zavalkoff-Babej, Erin

| | |
|---|---|
| **From:** | Marianne Muise [mmuise@hmsconsultants.com] |
| **Sent:** | Wednesday, July 21, 2010 1:02 PM |
| **To:** | Zavalkoff-Babej, Erin |
| **Cc:** | Maher John; Etheridge, Derek |
| **Subject:** | Critical Vendor list Updated 7-21-2010 |
| **Attachments:** | vendor_required_after_bankrupcy07142010 Revised 7-21-2010.xlsx |

Erin: attached is corrected copy of the critical vendor list.
(we corrected the description on a few vendors)

please let me know if you have any questions.


MLM
Marianne L. Muise, FHFMA
Principal
Healthcare Management Solutions LLC
voice: 845-497-1312
efax: 888-307-6949
mmuise@hmsconsultants.com
www.hmsconsultants.com

This e-mail message and any attachment is intended solely for the
The message and/or attachment may contain confidential informatio
If you are not the intended recipient of this message, you must n
disseminate the information. Instead, please notify the sender an
and any attachment from your system. Thank you for your cooperati

## NORTH GENERAL
## CRITICAL VENDORS (GOODS & SUPPLIES)

| Vendors that need to Continue | Amount owed Pre-Petition as of 7/13/2010 Accounts | Estimated Amount Owed | Grand Total | Classification | Description of Vendor Services | Comments |
|---|---|---|---|---|---|---|
| Burns Security | 363,310 | 140,000.00 | 503,309.61 | Critical | Outsourced Security Services | |
| Iron Mountain | 18,849.32 | 20,000.00 | 38,849.32 | Critical | Record Storage | |
| Physician Reciprocal Insurance | | 20,000.00 | 20,000.00 | Critical | Malpractice Insurance | |
| Public Goods Pool | | 134,799.00 | 134,799.00 | Critical | NYS Bad Debt Pools; must pay in order to receive monthly distribution | Payments will be offset by Revenue |
| Statewide Assessment Pool | | 120,000.00 | 120,000.00 | Critical | NYS Assessment; must pay in order to receive monthly distribution | Payments will be offset by Revenue |
| 3M Health Information | | 70,000.00 | 70,000.00 | Ordinary Course | DRG & coding software | |
| ACME Fire Alarm & Fire Systems | | 49,000.00 | 49,000.00 | Ordinary Course | Fire Alarm Maintenance & Repairs | |
| ADT Security | | 1,000.00 | 1,000.00 | Ordinary Course | Security & Alarm system Maintenance & repairs | |
| AFCO Insurance | | 65,000.00 | 65,000.00 | Ordinary Course | Financing for insurance premiums | |
| American Appraisal | 11,476.00 | 48,500.00 | 59,976.00 | Ordinary Course | Property appraisal services | |
| Distinctive Personnel | | 1,000.00 | 1,000.00 | Ordinary Course | Temporary employment agency | |
| Door Automation | 2,298.00 | | 2,298.00 | Ordinary Course | Maintenance & Repairs | |
| First Insurance | | 9,870.00 | 9,870.00 | Ordinary Course | Malpractice Insurance | |
| Hartey Construction Management Corp | | 64,000.00 | 64,000.00 | Ordinary Course | Construction company | Payments will be offset by Revenue |
| Integro Insurance | 32,253.67 | | 32,253.67 | Ordinary Course | Insurance Brokers | |
| Joele Frank | | 12,000.00 | 12,000.00 | Ordinary Course | Public Relations | |
| LDI Colored Toolbox | | 2,500.00 | 2,500.00 | Ordinary Course | Copier maintenance | |
| NYC Fire Department | 935.00 | 2,985.00 | 3,920.00 | Ordinary Course | Fire safltey & permits | |
| Pitney Bowes | | 10,000.00 | 10,000.00 | Ordinary Course | Postage machines | |
| System Maintenance Services | | 2,000.00 | 2,000.00 | Ordinary Course | Software & licenses & maintenance | |
| Vital Network | | 10,000.00 | 10,000.00 | Ordinary Course | Computer Network maintenance | |
| Epiq Systems | | 55,000.00 | 55,000.00 | Professional | Bankruptcy claim service | |
| Garbarini & Scher | | 25,000.00 | 25,000.00 | Professional | Malpractice Attorneys | |
| Healthcare Management Solutions | | 31,000.00 | 31,000.00 | Professional | Finance, Reimbursement & Revenue Cycle consultants | |
| Milliman USA | 45,318.00 | 39,000.00 | 84,318.00 | Professional | Pension actuary | |
| BDO Seidman | | 55,000.00 | 55,000.00 | Professional | Independent Audit firm (year end audit, pension audits, grant audits) | |
| **Total** | **474,439.60** | **987,654.00** | **1,462,093.60** | | | |

# EXHIBIT 6



## Zavalkoff-Babej, Erin

**From:** Zavalkoff-Babej, Erin
**Sent:** Wednesday, July 21, 2010 1:17 PM
**To:** 'Marianne Muise'
**Subject:** RE: Critical Vendor list Updated 7-21-2010

Hi
Thanks so much for this. A couple of quick questions. Can you provide me a short blurb on the following entities just so I can explain the importance of these entities and why they should be included in the critical vendor motion.

Physicians Reciprocal Insurance
Public Goods Pool
Milliman USA

Also are we adding Perot? and HMS?

Thanks so much

Erin

---

**From:** Marianne Muise [mailto:mmuise@hmsconsultants.com]
**Sent:** Wednesday, July 21, 2010 1:02 PM
**To:** Zavalkoff-Babej, Erin
**Cc:** Maher John; Etheridge, Derek
**Subject:** Critical Vendor list Updated 7-21-2010

Erin: attached is corrected copy of the critical vendor list.
(we corrected the description on a few vendors)

please let me know if you have any questions.


MLM
Marianne L. Muise, FHFMA
Principal
Healthcare Management Solutions LLC
voice: 845-497-1312
efax: 888-307-6949
mmuise@hmsconsultants.com
www.hmsconsultants.com


This e-mail message and any attachment is intended solely for the
The message and/or attachment may contain confidential informatio
If you are not the intended recipient of this message, you must n
disseminate the information. Instead, please notify the sender an
and any attachment from your system. Thank you for your cooperati

3/11/2011

# EXHIBIT 7



# Zavalkoff-Babej, Erin

**From:** Zavalkoff-Babej, Erin
**Sent:** Thursday, October 28, 2010 2:45 PM
**To:** 'John Maher'
**Cc:** Simpson, Charles E.; Etheridge, Derek
**Subject:** RE: Motion on Critical Vendors

JM,

I believe the decision not to file a Critical Vendor motion was a decision that we discussed with you and Marianne over the course of several weeks. I recall receiving lists of vendors that after discussions with your team we reached the conclusion would not qualify under the statute as "critical".

A critical vendor motion would have allowed you to pay **prepetition amounts due and owing to** "critical vendors", but there is a standard that needs to be met and I believe we decided after much back and forth that none of the vendors at issue would have qualified. I don't recall any of your vendors threatening to stop doing business with NGH post petition because of outstanding prepetition amounts due and owing. Remember that this kind of motion does not address your ability to make post petition payments, but rather allows the debtor to pay certain vendors that it cannot operate without (and which have demonstrated their unwillingness to work with the debtor if those amounts were not paid).

Because the utility companies were forbidden by order of the court to discontinue services based on prepetition amounts outstanding (so long as they were adequately assured with that deposit) and because we sought and received approval to pay "medical providers" and employees prepetition amounts we discussed that there were no other vendors that were critical in that they would have stopped doing business with NGH if you didn't pay them. Not every vendor you deal with and that is important to the operations of the hospital qualifies as a "critical vendor".

Unless there are vendors (essential to the operations of the hospital) that have not done business with NGH since the filing because of the prepetition amounts NGH owes them, we would not have a very convincing argument why any of these vendors should be paid for prevention amounts owed to them.

Call me to discuss

EZB

---

**From:** John Maher [mailto:John.Maher@NGSC.ORG]
**Sent:** Thursday, October 28, 2010 2:11 PM
**To:** Zavalkoff-Babej, Erin
**Cc:** Simpson, Charles E.
**Subject:** RE: Motion on Critical Vendors

I should have known about the decision not to file....there are/were a number of vendors that would have been impacted.

We need to talk about this...ASAP

jm

---

**From:** Zavalkoff-Babej, Erin [mailto:ezavalkoff-babej@windelsmarx.com]
**Sent:** Thursday, October 28, 2010 1:03 PM
**To:** John Maher

3/11/2011

**Subject:** RE: Motion on Critical Vendors

JM,

We never filed a critical vendor motion. We decided aginst it because a hospital that was shutting down would have a hard time arguing that any vendors were critical (especially because you also have to show that these vendor will refuse to work with you if you don't pay their prepetition amounts).

I reviewed the Utilities Motion and the Wages Motion so whenever you want to chat call me.

BABE J

---

**From:** John Maher [mailto:John.Maher@NGSC.ORG]
**Sent:** Thursday, October 28, 2010 12:51 PM
**To:** Zavalkoff-Babej, Erin
**Cc:** Simpson, Charles E.
**Subject:** Motion on Critical Vendors

E-

The attached file is the motion I was referring to yesterday.

jm

Erin Zavalkoff-Babej | Windels Marx Lane & Mittendorf, LLP | 156 West 56th Street, New York, New York 10019 | Direct Dial: 212.237.1176 | General Fax: 212.262.1215 | ezavalkoff-babej@windelsmarx.com | www.windelsmarx.com

IRS Circular 230 Disclosure: As required by Federal Regulations, we inform you that any tax advice contained herein was not writen or intended to be used (and cannot be used) for the purpose of avoiding federal tax penalties, or for the purpose of promoting, marketing, or recommending any transaction or matter to another party.

This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, regardless of whether you are a named recipient, please notify the sender by reply e-mail and delete the message and any attachments.

3/11/2011

# EXHIBIT 8



## Zavalkoff-Babej, Erin

**From:** Zavalkoff-Babej, Erin
**Sent:** Friday, July 02, 2010 9:53 AM
**To:** 'Monica Terrano'
**Subject:** RE: utilities1 (2).xls

for that utilities chart it would be great if you could great another column for a 2 week period and then total the one month column and the 2 week column I have no idea how to do that on excel. Thanks again for all your help

**From:** Monica Terrano [mailto:Monica.Terrano@NGSC.ORG]
**Sent:** Friday, July 02, 2010 9:22 AM
**To:** Zavalkoff-Babej, Erin
**Subject:** RE: utilities1 (2).xls

Here is the attorneys name/address for the Jimmy Williams malpractice case listed as 1.5 million.

Elizaberth Montesara, ESQ
Sullivan Papain Block
McGrath& Cannavo
120 Broadway PC
New York, NY 10271

**From:** Zavalkoff-Babej, Erin [mailto:ebabej@windelsmarx.com]
**Sent:** Thursday, July 01, 2010 5:56 PM
**To:** Monica Terrano
**Subject:** RE: utilities1 (2).xls

thanks sooo much :)

**From:** Monica Terrano [mailto:Monica.Terrano@NGSC.ORG]
**Sent:** Thursday, July 01, 2010 5:55 PM
**To:** Zavalkoff-Babej, Erin
**Subject:** RE: utilities1 (2).xls

Approximately 3.1 million annually

**From:** Zavalkoff-Babej, Erin [mailto:ebabej@windelsmarx.com]
**Sent:** Thursday, July 01, 2010 5:52 PM
**To:** Monica Terrano
**Subject:** RE: utilities1 (2).xls

for the utilities can you tell me the grand total for all utilities annually?
Thanks a million for all your help

**From:** Monica Terrano [mailto:Monica.Terrano@NGSC.ORG]
**Sent:** Thursday, July 01, 2010 5:02 PM
**To:** Zavalkoff-Babej, Erin
**Subject:** FW: utilities1 (2).xls

Please forward to Derick

**From:** Dean Mamet
**Sent:** Thursday, July 01, 2010 2:26 PM
**To:** John Maher
**Cc:** Monica Terrano
**Subject:** utilities1 (2).xls

John, these are the utilitiy bills for 12 months.  The tab average is per month.

Dean

Erin Zavalkoff-Babej | Windels Marx Lane & Mittendorf, LLP | 156 West 56th Street, New York, New York 10019 | Direct Dial: 212.237.1176 | General Fax: 212.262.1215 | ebabej@windelsmarx.com | www.windelsmarx.com

IRS Circular 230 Disclosure: As required by Federal Regulations, we inform you that any tax advice contained herein was not written or intended to be used (and cannot be used) for the purpose of avoiding federal tax penalties, or for the purpose of promoting, marketing, or recommending any transaction or matter to another party.

This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, regardless of whether you are a named recipient, please notify the sender by reply e-mail and delete the message and any attachments.

Erin Zavalkoff-Babej | Windels Marx Lane & Mittendorf, LLP | 156 West 56th Street, New York, New York 10019 | Direct Dial: 212.237.1176 | General Fax: 212.262.1215 | ebabej@windelsmarx.com | www.windelsmarx.com

IRS Circular 230 Disclosure: As required by Federal Regulations, we inform you that any tax advice contained herein was not written or intended to be used (and cannot be used) for the purpose of avoiding federal tax penalties, or for the purpose of promoting, marketing, or recommending any transaction or matter to another party.

This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, regardless of whether you are a named recipient, please notify the sender by reply e-mail and delete the message and any attachments.

3/11/2011