# EXHIBIT 1

WINDELS MARX LANE & MITTENDORF, LLP
156 WEST 56TH STREET
NEW YORK, NEW YORK 10019
TELEPHONE: 212.237.1000
FACSIMILE: 212.262.1215

Charles E. Simpson

212.237.1070

csimpson@windelsmarx.com

NEW BRUNSWICK, NJ

PRINCETON, NJ

STAMFORD, CT

February 14, 2011

**BY HAND and REGULAR MAIL**

Richard Stern, Esq., Examiner
c/o Hughes Hubbard & Reed, LLP
One Battery Park Plaza
New York, NY 10004-1482

-and-

Hughes Hubbard & Reed, LLP
One Battery Park Plaza
New York, NY 10004-1482

    Re:    **In re North General Hospital, *et al.*, Debtors-in-Possession
            Chapter 11 Case No. 10-13553, Jointly Administered/
            Examiner's Report**

Gentlemen:

    As you are aware, this firm is the Bankruptcy Court-appointed attorneys for North General Hospital, North General Service Corporation and North General Diagnostic & Treatment Center, Debtors-in-Possession (jointly, the "Debtors'), in their jointly administered chapter 11 case currently pending in the U.S. Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). We are in receipt of the Examiner's Report (the "Report"), dated January 31, 2011, on file with the Bankruptcy Court, pursuant to the Order, dated January 6, 2011, appointing Richard Stern, Esq., the Examiner in the Debtors' chapter 11 case, to investigate, among other things, "payments made by the Debtors on account of pre-petition obligations and other violations by the Debtors of their fiduciary duties".

    We have reviewed the Report and the few exhibits annexed thereto and respectfully take issue with the Examiner's conclusions and recommendations resulting from the flawed investigation and findings.

{10620495:1}

The Report appears to be based primarily on the unsupported statements of a certain employee or employees of the Debtors. As a result, this office has decided to prepare a Response to the Report refuting the Examiner's findings and his conclusions (the "Response"). In preparing this firm's Response, with the permission of the Board of Trustees (the "Board") of the Debtors, we have retrieved all of the pertinent time entries, email communications and other documentary evidence that exists, and which corroborates this firm's responses to the Examiner's limited inquiry and refutes the Examiner's findings and conclusions. We have also been provided with sworn affidavits from Board and corporate officers of the Debtors which also contradict the Examiner's findings and conclusions.

Due to the need to prepare and file numerous objections to proofs of claim on file in this case before a Bankruptcy Court-established deadline last week, we anticipate filing our Response by Thursday, February 17, 2011, but not later than Friday, February 18. Inasmuch as the Examiner reserved the right to supplement or modify his Report if he learned of additional relevant information, we would like to extend to the Examiner, or his counsel, the opportunity to visit our offices and review our proposed Response and the documentary evidence and sworn statements supporting the Response.

Please contact the undersigned if the Examiner or his counsel elects to avail themselves of the above invitation. Based on current schedules and obligations, we will be available from and after Wednesday, February 16, 2011.

Should you have any questions concerning the above, please do not hesitate to contact the undersigned at your earliest opportunity.

Very truly yours,

/s/ Charles E. Simpson

Charles E. Simpson

CES:mvr
cc: Hon. Shelley C. Chapman,
    *U.S. Bankruptcy Judge*
    Tracy Hope Davis, Esq.
    Andrea Schwartz, Esq.
    *Office of the U.S. Trustee*
    Martin Bunin, Esq., Alston & Bird, LLP
    *Attorneys for the Official Committee*
    *of Unsecured Creditors*
    David Neier, Esq., Winston & Strawn, LLP
    *Attorneys for the Dormitory Authority*
    *of the State of New York*

{10620495:1}

# EXHIBIT 2

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
---------------------------------------X
In Re:                                  :   10-13553 (SCC)
                                        :
        NORTH GENERAL HOSPITAL,         :   One Bowling Green
                                        :   New York, New York
                Debtor.                 :   February 15, 2011
---------------------------------------X
OFFICIAL COMMITTEE OF UNSECURED         :   10-04205
 CREDITORS OF NORTH GENERAL             :
 HOSPITAL, et al.,                      :
                                        :
            Plaintiffs,                 :
                                        :
            v.                          :
                                        :
THE DORMITORY AUTHORITY OF THE STATE    :
 OF NEW YORK,                           :
                                        :
            Defendant.                  :
---------------------------------------X
```

TRANSCRIPT OF MOTION TO DISMISS ADVERSARY PROCEEDING
AND PRE-TRIAL CONFERENCE
BEFORE THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:           ERIN ZAVALKOFF-BABEJ, ESQ.
                          Windels, Marx, Lane & Mittendorf
                          156 West 56th Street
                          New York, New York   10019

For Creditors Comm.:      MARTIN G. BUNIN, ESQ.
                          MICHAEL JOHNSON, ESQ.
                          Alston & Bird LLP
                          90 Park Avenue
                          New York, New York   11042

For Dormitory Auth.:      DAVID NEIER, ESQ.
 of NYS                   Winston & Strawn
                          200 Park Avenue
                          New York, New York   10166
                          (Appearances continued on next page)

Court Transcriber:        CARLA NUTTER
                          Regency Reporting, Inc.
                          575 Madison Avenue
                          New York, New York   10022

APPEARANCES CONTINUED:

                              MR. RICHARD STERN
                              Hughes, Hubbard
                              One Battery Park Plaza
                              New York, New York  10004

For the U.S. Trustee:         United States Trustee's Office
                              BY:  ANDREA B. SCHWARTZ, ESQ.
                              Assistant United States Trustee
                              33 Whitehall Street
                              New York, New York  10004

1    THE COURT:  Good morning.  Please be seated.

2    Where is Mr. Simpson?  Ah, you've changed.

3    MS. ZAVALKOFF-BABEJ:  I have.

4    MR. NEIER:  Your Honor --

5    THE COURT:  Mr. Neier, how are you?

6    MR. NEIER:  Good morning, Your Honor.  I don't think

7    Mr. Simpson, you know, thought it prudent for him to go since

8    it was just a pre-trial conference on the adversary proceeding.

9    MS. ZAVALKOFF-BABEJ:  So he sent me.

10    THE COURT:  Okay.  All right, well, I guess I can

11    understand that, although there were a number of things filed

12    on the docket in the last 24 hours and also matters pertaining

13    to the examiner that I had hoped to discuss.

14    So, are you comfortable with that?

15    (No verbal response)

16    THE COURT:  All right.  So why don't we take care of

17    the pre-trial first.

18    Is Ms. Schwartz going to join us?

19    MALE VOICE:  She's in the hallway.

20    THE COURT:  Okay.  All right.  Mr. Neier, Mr. Bunin,

21    the adversary.

22    MALE VOICE:  Do you want us to get the U.S. Trustee?

23    THE COURT:  No, we can do the adversary first.

24    MR. NEIER:  The defendant is always happy to go

25    first.

1    MALE VOICE:  Yes.

2    THE COURT:  Whoever wants to speak first.

3    MR. JOHNSON:  Your Honor, Mike Johnson on behalf of

4    the committee.

5    THE COURT:  Good morning.

6    MR. JOHNSON:  How are you?

7    THE COURT:  Okay.

8    MR. JOHNSON:  I'm not sure how Your Honor would like

9    to proceed this morning.  You've been flooded, I think, with a

10   fair amount of paper --

11   THE COURT:  I have.

12   MR. JOHNSON:  -- over the past few business days --

13   THE COURT:  Why don't we start with just confirming

14   what I have --

15   MR. JOHNSON:  Okay, Your Honor.

16   THE COURT:  -- so we make sure that I have

17   everything.

18   I have briefing on both the statute of limitations

19   issue which was submitted some time ago and I also have your

20   briefing on the recharacterization issue and I think that's all

21   that I expect to receive on the adversary.  I don't know if you

22   folks were planning on submitting replies.

23   MR. NEIER:  Your Honor, we had contemplated a reply

24   on the motion to dismiss but it's up to you.  If you don't

25   think that would be helpful, then we're happy not to do it.

1     THE COURT:  I guess there was one issue that I was

2 interested in having a reply to from Mr. Bunin and that is from

3 the committee -- I know that you'll do all the work -- and that

4 is Mr. Neier raised a point at the end of his brief relating to

5 the -- even if the debt were to be recharacterized the security

6 agreement would stay in place.  It wasn't a large or lengthy

7 point but --

8     MR. JOHNSON:  Yes, Your Honor, we're --

9     THE COURT:  -- I would be interested in having a

10 written reply to that.

11     MR. JOHNSON:  Sure, Your Honor.  We'd be happy to do

12 that.  In fact, we've already started to do a little bit of

13 research on that point.

14     THE COURT:  Okay.

15     MR. JOHNSON:  Does Your Honor have a date in mind?

16     THE COURT:  I don't.  I don't.  I'll leave that to

17 you.  Just some time -- you know, some time in the next two

18 weeks, why don't we say?

19     MR. JOHNSON:  Yes, that would be fine, Your Honor.

20     THE COURT:  So other than that, I don't have a firm

21 date.

22     MR. JOHNSON:  Okay, Your Honor.

23     MR. NEIER:  You know, that's the <u>Dowsky</u> case?

24     THE COURT:  Yes.

25     MR. NEIER:  <u>Dowsky Island Properties</u>?

1          THE COURT:  Right.

2          MR. NEIER:  It doesn't have a lot of discussion on

3  the point.  The reason that we think it's important, just to

4  Mr. Johnson knows, is because in this case the 1989 mortgage is

5  still in effect.

6          THE COURT:  Right.

7          MR. NEIER:  And it's been amended a couple of times -

8  -

9          THE COURT:  Right.

10         MR. NEIER:  -- but it's still in effect and,

11  therefore --

12         THE COURT:  Well, that's why I think it's an

13  interesting point.

14         MR. NEIER:  Yes.

15         THE COURT:  So --

16         MR. NEIER:  I don't know if we actually said that in

17  the end of the brief as we were rushing to get it out the door

18  but that was --

19         THE COURT:  No, but -- right.  I think I assumed as

20  much and that's why I think I'd be interested hearing your

21  reply.

22         MR. JOHNSON:  Yes.  Absolutely.  Well, you know,

23  there's always -- almost always in the case of secured lending

24  going to be some sort of lien or mortgage that's out there --

25         THE COURT:  Right.

1   MR. JOHNSON: We can certainly address sort of how

2   most courts would address that.

3   THE COURT: Right. No, I understand that and I mean

4   I suppose if -- I don't want to open it up too much because I

5   really don't want an additional set of briefs but if there's

6   anything that you feel is particularly compelling that you'd

7   like to reply to feel free to do so.

8   MR. JOHNSON: Okay.

9   THE COURT: But it was a very helpful set of briefs.

10  I also got exhibits. I got the committee's exhibits;

11  two bound volumes of exhibits which were largely the loan

12  documentation, it looked like there were some e-mails in there

13  as well.

14  MR. JOHNSON: And some deposition transcript

15  excerpts.

16  THE COURT: Okay. All right.

17  MR. JOHNSON: There's one thing mechanically, Your

18  Honor, to consider as I've consulted with Mr. Neier on

19  deposition transcripts. We did do one non-party -- non-party -

20  - the adversary proceeding deposition. We took the deposition

21  of Dr. Daniel, the former CEO and president of the debtor and

22  Mr. Neier and I are in agreement that rather than subpoenaing

23  him to appear live --

24  THE COURT: Right.

25  MR. JOHNSON: -- we would be happy to rely on --

1          THE COURT:  Just going to do designations and

2     counter-designations?

3          MR. JOHNSON:  Yes.  If Your Honor is okay with that -

4     -

5          THE COURT:  Absolutely.

6          MR. JOHNSON:  -- and there's not a hearsay problem

7     from Your Honor's perspective --

8          THE COURT:  That's fine.

9          MR. JOHNSON:  Okay.

10         THE COURT:  That's fine.

11         MR. JOHNSON:  Okay.  There are some excerpts from his

12    deposition that are part of that compendium.

13         THE COURT:  Okay.  So that compendium represents the

14    universe of documents that you will draw from for your trial

15    exhibits?

16         MR. JOHNSON:  That's correct, Your Honor.

17         THE COURT:  Okay.  Mr. Neier, did we get exhibits

18    from you?

19         MR. NEIER:  You did get exhibits from me but we did

20    not put in our trial exhibits.  Our trial exhibits will -- you

21    know, it won't be Boston Gen but it will be a real big --

22         THE COURT:  Thank Heavens for some small things.

23         MR. NEIER:  It will be a number of boxes.

24         THE COURT:  Okay.

25         MR. NEIER:  The loan documentation we think is

1  relevant, of course, is 1989, 1998, 2003.  I'm endeavoring to

2  get the official transcripts just because they're bound volumes

3  and they're not BATES stamp numbered --

4       THE COURT:  Right.

5       MR. NEIER:  -- but they might be easier to go through

6  and then --

7       THE COURT:  Okay.

8       MR. NEIER:  -- I'm also going to obviously put in

9  officially the copies of those documents which have every page

10 BATES stamped and we'll have trial exhibits.

11      THE COURT:  Okay.

12      MR. NEIER:  Other than that it will be the documents

13 that we did submit which were just a handful of documents but

14 it will still be a substantial amount of paperwork and --

15      THE COURT:  All right.  In terms of live witnesses,

16 are we having live testimony?

17      MR. NEIER:  We are having live testimony.  I don't

18 think it will take particularly long but, obviously, I'm the

19 defendant.  It might be different --

20      THE COURT:  All right.  And you're going to do --

21      MR. NEIER:  As far as I know there are two witnesses;

22 Mr. Bolk and Mr. Tittle, the committee's expert.

23      THE COURT:  Right.  And I have their declarations

24 already.  So are you going to rely on their declarations for

25 the direct?

1      MR. NEIER:  Yes, Your Honor.  From Mr. Bolk at least.

2      THE COURT:  Okay.

3      MR. JOHNSON:  Yes, that's correct, Your Honor.

4      THE COURT:  Okay.  All right.  So what --

5      MR. JOHNSON:  But there will be live cross-

6 examination and then redirect to the extent necessary.

7      THE COURT:  Okay.  So all in just on this and without

8 regard to other confirmation issues what's your estimate of the

9 amount of time that we need for this?

10      MR. NEIER:  I was figuring on half a day, really.  I

11 mean I don't think it's really that long.

12      MR. JOHNSON:  I would rather to be on the safe side

13 set aside an entire day if we could?

14      THE COURT:  Okay.

15      MR. JOHNSON:  But I don't think it should go beyond a

16 single day.

17      THE COURT:  Do you think we can do the entire

18 confirmation hearing in a day?

19      MR. JOHNSON:  I'll let Mr. Bunin speak to that.

20      MR. BUNIN:  The committee will be filing a

21 confirmation objection and so there will be argument with

22 respect to that.

23      THE COURT:  Okay.

24      MR. BUNIN:  But there is --

25      THE COURT:  The unsecureds accepted, I noted.

1    MR. BUNIN:  I did get some calls from some unsecured

2    creditors wondering where it's indicated where the recovery was

3    specified.  I think -- I don't have any comment on that other

4    than, I guess, some unsecured creditors will say yes to just

5    about anything.

6             THE COURT:  Yes, they will.  But the med mal class

7    did not accept; right?

8             MR. BUNIN:  There are some potential --

9             MR. NEIER:  By one vote, Your Honor.  Just one single

10   vote.

11            THE COURT:  Right.

12            MR. BUNIN:  There are some issues we're looking into

13   with respect to the ballots; whether -- there's at least one

14   creditor that we know who got both ballots to vote and a notice

15   that it couldn't vote and we're trying to --

16            THE COURT:  Is that a difference that will make a

17   difference in light of the -- let me see.  Because there were

18   quite -- the numerosity was carried by quite a large margin

19   wasn't it?

20            MR. NEIER:  I think it's 52 to 16?

21            THE COURT:  Yes.

22            MR. BUNIN:  I don't know at this point, Your Honor.

23            THE COURT:  All right.  Well, needless to say, you

24   can do -- you know, you're free to do whatever you want to do

25   but if it's not going to make a difference it may not be worth

1    the effort.

2        MR. BUNIN:  With respect to confirmation there is one

3    possible deposition that the committee may wish to take with

4    respect to confirmation.

5        THE COURT:  All right.  Well, I assume -- you've been

6    working together well so I assume you don't need me to get in

7    the middle of all that.  You'll just let each other know what

8    you're planning to do.

9        MR. NEIER:  You know, I personally think confirmation

10   is really going to be the March 10th time frame when we go

11   through the admin and priority claims.

12       THE COURT:  When we go through the admin claims;

13   right.

14       MR. NEIER:  That will really be whether we're even

15   there yet.

16       THE COURT:  Right.

17       MR. NEIER:  I'll tell you, Your Honor, we're still

18   short.  We're short by -- we have a slight disagreement on the

19   numbers but we're short by $3 million to $4 million.  Even if

20   Your Honor rules exactly as the debtors at DASNY requested in

21   the various claims objections -- and we haven't gotten very far

22   with Albany, in fact we've gotten nowhere but, you know, we're

23   continuing to try and nobody has told me stop work.  I'm at

24   least hopeful that somebody will come up with the necessary

25   funds just to pay the priority and admin claims.

1        Ms. Hepner and I have had a conversation about that

2   because 87 percent of the priority and admin claims are to --

3        THE COURT:  Are her folks.

4        MR. NEIER:  -- are to the pension funds.

5        THE COURT:  Right.

6        MR. NEIER:  Not really her folks but they're the

7   ultimate beneficiaries of the pension fund --

8        THE COURT:  Right.

9        MR. NEIER:  -- and even assuming that the Court were

10  to rule in line with the objections, 87 percent of what would

11  left over would be the union or the pension funds and beyond

12  that the largest claim after that is another fund for the

13  committee of interns and residents.  So about 95 percent of the

14  priority and admin amount that we hope is left over would go

15  towards these pension funds so we're trying to explore some

16  kind of innovative way to get through the hurdle.

17       I've told Ms. Hepner we're not going to go there

18  unless we absolutely need to but I think we are absolutely

19  going to need to and we'll have to see how they do on

20  confirmation as well.

21       THE COURT:  All right.  Well, this is why I'm sorry

22  that Mr. Simpson is not here today but Windels, Marx is here.

23       This is my segway to the examiner and to that whole

24  situation and the reason I'm segwaying on this point is because

25  to the extent that the work of the examiner -- and I'll get to

the latest round of correspondence that I received with respect
to what action Windels, Marx intends to take -- Ms. Schwartz,
to the extent that -- and I don't want to prejudge the issue --
but to the extent that the examiner's report as it may be
further supplemented -- and we'll get to that -- may provide a
basis for the United States Trustee objecting to the fees in
whole or in part of Windels, Marx leading to potential
disgorgement.  Then timing and adjusting timing on the
resolution of that issue may provide funds that could help
enable this case to be confirmable with respect to the
administrative claims.

MS. SCHWARTZ:  Andrea Schwartz for the United States
Trustee.

Your Honor, we got Mr. Simpson's letter -- a copy of
Mr. Simpson's letter yesterday and it was at our request that
Mr. Stern, the examiner, come today to this pre-trial
conference and he's here in the courtroom.

THE COURT:  Okay.

MS. SCHWARTZ:  We asked him to come because we also
had some questions with respect to the process.

As we see it, Your Honor, Your Honor entered an order
on January 6th appointing the examiner --

THE COURT:  Right.

MS. SCHWARTZ:  -- and forgive me for just briefly
running this down but you entered the order on January 6th

1  appointing the examiner.  The order provides that no later than

2  February 10th the examiner was to issue his report.

3          THE COURT:  Right.

4          MS. SCHWARTZ:  In our case we had the benefit of an

5  examiner who worked very diligently and quickly --

6          THE COURT:  Right.  And issued the report early;

7  right.

8          MS. SCHWARTZ:  January 31st he issued the report.

9          THE COURT:  Right.

10         MS. SCHWARTZ:  Then Your Honor had a conference with

11  all the parties here in chambers and it was clear that any

12  party that had any questions or concerns with respect to the

13  report could in fact contact the examiner which we understand -

14  -

15         THE COURT:  And the committee did so.

16         MS. SCHWARTZ:  -- we understand on multiple occasions

17  the committee did so and the examiner made himself available to

18  understand any issues and in fact on the morning of February

19  10th filed a supplement to his report.

20         THE COURT:  Well, in the chambers conference my

21  recollection is that Mr. Simpson indicated his displeasure with

22  the report and his intention to file a reply and produce

23  voluminous documents that in his words would "cut against" the

24  examiner's conclusions.

25         MS. SCHWARTZ:  Right.  And I think where the U.S.

1  Trustee is coming down with respect to this is that she

2  believes in the integrity of the process and she also wants to

3  see the case moved towards confirmation and, you know, this is

4  Your Honor's order and this is Your Honor's directives with

5  respect to the examiner but as far as the United States Trustee

6  is concerned on Thursday the examiner had sent to us just for

7  comment a proposed discharge order --

8       THE COURT:  Right.  Which is where I thought we were

9  going until I received Mr. Simpson's letter but --

10      MS. SCHWARTZ:  And I want to note, Your Honor, I'm

11  not sure Your Honor wants to consider that letter as part of

12  the record because it hasn't in fact been filed on the docket.

13      THE COURT:  It was filed on the docket.

14      MS. SCHWARTZ:  Oh, okay.  This was yesterday --

15      THE COURT:  Yes.

16      MS. SCHWARTZ:  -- and it wasn't on the docket.

17      THE COURT:  Right.

18      MS. SCHWARTZ:  But now that it is at least part of

19  the court record --

20      THE COURT:  Right.

21      MS. SCHWARTZ:  -- you know, the order provided as

22  Your Honor is aware for a very short time frame for the

23  examiner to do his report --

24      THE COURT:  Yes.

25      MS. SCHWARTZ:  -- and a very limited amount of funds

1    to be --

2              THE COURT:  Correct.  Expended.

3              MS. SCHWARTZ:  -- expended in connection with that.

4         At this point it appears that debtor's counsel did

5    not contact the examiner during that time period in between the

6    chambers conference except for yesterday.

7         Mr. Stern is here and he can speak for himself --

8              THE COURT:  Right.  Well, Ms. Schwartz -- yes, I

9    would like to hear from Mr. Stern -- but Mr. Simpson appears to

10   be taking the position that the reason for the delay is that he

11   needed to prepare and file numerous objections to proofs of

12   claim.  While that's true, I was not entirely happy with the

13   fact that we got to where we got to and those objections had

14   not yet been filed.  So I'm not sure that that stands as an

15   excuse for a delay in filing a response to the examiner but --

16              MS. SCHWARTZ:  I think --

17              THE COURT:  -- let me just continue for one second --

18              MS. SCHWARTZ:  Yes, I apologize.

19              THE COURT:  -- just to kind of play this out a little

20   bit because if we had no confirmation issues what would happen,

21   I think, in this case is we would get to the end of the case

22   and then there would be fee applications and I'm guessing that

23   the U.S. Trustee would file an objection to Windels, Marx' fees

24   and as was the case in Leslie Fay and other cases, the

25   misconduct if you will -- although that's a strong word --

1  identified by the examiner may well form the basis for an

2  objection to the payment of further fees and a basis for an

3  order of disgorgement to compensate the estate for what

4  happened and to defray the cost of the examiner.  In other

5  words, if the conduct is found to have occurred and that

6  conduct necessitated the appointment of an examiner and the

7  examiner in fact found that the conduct occurred, then I think

8  there's authority for the subject of the examiner's report to

9  defray the cost of the examiner.

10        So in a normal case that would all play out at the

11  end.  If we discharge the examiner now and do not allow this to

12  play out as Mr. Simpson would like it to play out, then the

13  Court will not have the benefit of the examiner's response to

14  what Windels, Marx puts forward.

15        MS. SCHWARTZ:  Well, I am 100 percent with Your

16  Honor's thought process and train --

17        THE COURT:  Okay.

18        MS. SCHWARTZ:  -- and I have a thought with respect

19  to that.

20        THE COURT:  Okay.

21        MS. SCHWARTZ:  And that is that it is an alternative

22  that in the order discharging the examiner the Court provide

23  for the examiner to be able to participate at the Court's order

24  and direction with respect to any evidentiary matters that

25  arise with respect to any potential objection to fees or motion

1    for disgorgement with respect to the fees.

2           THE COURT:  How about -- let me make a

3    counterproposal and --

4           MS. SCHWARTZ:  It was just a suggestion.

5           THE COURT:  -- we need to hear from Mr. Stern.  I

6    also need to hear from Mr. Stern in terms of the amount of fees

7    that have been incurred to date.

8           My countersuggestion would be -- and, again, to pick

9    up on preserving some ability to bring this to a head in

10   conjunction with confirmation -- is that I extend the deadline,

11   allow for Mr. Simpson to file what he says he's going to file

12   which is -- and he says it's going to be -- well, he says he's

13   going to be available from and after tomorrow --

14          MS. SCHWARTZ:  Right.  I didn't know that he was

15   going to -- I think he extended an invitation to the examiner

16   to come to his office.

17          THE COURT:  Yes, it is an invitation.

18          What I would like to do is to give him a firm

19   deadline, particularly since we've pressed Mr. Westin in

20   service with regard to other matters pertaining to the debtors

21   and that at this point other than with respect to the

22   prosecution of the objections to the administrative claims it's

23   largely in the hands of Mr. Neier and Mr. Bunin with respect to

24   confirmation and in fact it's largely in the hands of Mr. Neier

25   in terms of keeping the lines of communication open to Albany.

1    So what I would be inclined to do subject to your

2 rights to be heard is to place a deadline for a production of

3 any documents that Windels, Marx wishes to produce and a

4 deadline for any meeting that Windels, Marx wishes to have with

5 the examiner subject to Mr. Stern's schedule and that the

6 appointment be extended through a date to allow Mr. Stern time

7 to review whatever documentation or listen to whatever further

8 matters Mr. Simpson wishes to bring to his attention and to

9 have Mr. Stern file one more final report and then we discharge

10 him and we consider his fee application and then he's done.

11    I'm not inclined, Ms. Schwartz, to have Mr. Stern

12 have to hang around for a fee hearing and then I would look to

13 the U.S. Trustee to figure out whether or not there's some

14 mechanism after Mr. Stern issues his final supplementary report

15 to bring the issue of fees to a head sooner rather than later

16 so that if we have a gap -- and, ultimately, there would be a

17 disgorgement of fees -- that we have those funds available to

18 help get this case confirmed.

19    I realize that there's probably no precedent for this

20 and it's a little unorthodox but it makes sense to me as I'm

21 saying it.

22    MS. SCHWARTZ:  Well, let's talk about it in a few

23 separate steps.

24    THE COURT:  Okay.

25    MS. SCHWARTZ:  I'm going to back it out from the fee

1   part.

2          First of all, in order for us to take any action

3   other than a motion to disgorge --

4          THE COURT:  Right.

5          MS. SCHWARTZ:  -- fees that have already been paid --

6          THE COURT:  Right.

7          MS. SCHWARTZ:  -- we have to have the fee application

8   -- the actual fee application from Windels, Marx.

9          THE COURT:  Well, but we have --

10         MS. SCHWARTZ:  We have their monthlies but we --

11         THE COURT:  But on the fee application that we spent

12  so much quality time talking about two days before Christmas --

13         MS. SCHWARTZ:  Right.

14         THE COURT:  Right?  I did enter an order --

15         MS. SCHWARTZ:  True quality.

16         THE COURT:  -- approving those fees.

17         MS. SCHWARTZ:  Yes, that's right.

18         THE COURT:  So I think that in excess of $1.3 million

19  has already been paid to Windels, Marx.

20         MS. SCHWARTZ:  Right.  Okay.  So I think what Your

21  Honor is saying is that the U.S. Trustee is at the point --

22  that it's ripe at this point -- well, we have to really wait

23  for any --

24         THE COURT:  We'd have to wait for -- right.

25         MS. SCHWARTZ:  Right.  But I think the other thing

1    that is important here is that in order for us to prosecute our

2    motion, assuming we file a motion to disgorge or we file an

3    objection, in order for us to prosecute that motion we very

4    well may need the testimony of the examiner with respect to

5    that and that's --

6        THE COURT:  Okay.  That's fair but I'd like the

7    documentary record to be closed so that's why I'm not inclined

8    to let Mr. Stern off the hook yet when Mr. Simpson has said he

9    wants to come back in for one more round which I, frankly, had

10    thought would have already taken place but it didn't.

11        MS. SCHWARTZ:  The only problem I have at this point

12    -- and it's because we're just talking about it here today --

13        THE COURT:  Right.

14        MS. SCHWARTZ:  -- is that the U.S. Trustee is her own

15    separate party --

16        THE COURT:  Yes.

17        MS. SCHWARTZ:  -- so the examiner does not work for

18    the U.S. Trustee.

19        THE COURT:  Understood.

20        MS. SCHWARTZ:  So, therefore, the documents that are

21    produced to the examiner are not produced to the U.S. Trustee -

22    -

23        THE COURT:  Right.

24        MS. SCHWARTZ:  -- and we don't want to be in the

25    position where we have the applicant disputing what our view is

23

with respect to the documents that have been found by the examiner. Do you follow what I'm saying?

THE COURT: Right. But I am looking at -- the U.S. Trustee is absolutely her own party-in-interest and can do whatever she thinks is appropriate but what I don't want to happen is I've read the examiner's report, I've read the supplemental report and I don't want to have to walk out fifteen minutes before the movie is over with respect to the examiner when the examiner is going to have further conversations with Mr. Simpson and his folks and it would be helpful to the Court to have the benefit of his observations in that regard.

MS. SCHWARTZ: Oh, I agree, and I'm sure that we're going to rely -- I mean the foundation for at least, you know, a part of our position is going to be the examiner's report.

THE COURT: Right. But without prejudice to --

MS. SCHWARTZ: And I think what Your Honor is saying is we don't want to relitigate the same issues between the two --

THE COURT: And that's precisely why --

MS. SCHWARTZ: And we don't either.

THE COURT: Right. That's precisely why I think it doesn't make sense to let off with the examiner before it's over so that we have the benefit of the full -- Mr. Stern, could you come up?

1          MS. SCHWARTZ:  Yes, I think at this point you need to

2     hear from Mr. Stern with respect to --

3          THE COURT:  I'm very sorry that Mr. Simpson isn't

4     here today but time is of the essence.

5          MR. STERN:  Good morning, Your Honor.  Richard Stern

6     from Hughes, Hubbard.

7          THE COURT:  Good morning, Mr. Stern.

8          MR. STERN:  A couple of observations --

9          THE COURT:  Sure.

10         MR. STERN:  -- and I appreciate you hearing us this

11    morning.

12         I guess there are two issues; one is the fee issue

13    and I've listened this morning --

14         THE COURT:  Your fees or --

15         MR. STERN:  Sorry, my fees.

16         THE COURT:  Your fees are going to be taken care of

17    no matter what but go ahead.

18         MR. STERN:  I appreciate that, Your Honor, but just

19    listening this morning as to the administrative burden on this

20    estate I was also concerned about, you know, additional fees

21    for myself and my attorneys.  That's one issue.

22         The second issue is we obviously have a process where

23    it's a cooperative process in that the process that I tried to

24    invoke in preparing the initial report as well as the

25    supplemental report; Mr. Bunin contacted me a number of times,

1    we had a number of conversations, I took his comments into

2    consideration and I filed a revised report.  Similarly, Mr.

3    Westin called me.  He had one issue, I talked it out with him

4    and he concluded that no change to my report was necessary.  I

5    gave him the opportunity to talk to his client and advise me if

6    from their perspective any changes were necessary and he got

7    back to me and said they were not requesting any --

8              THE COURT:  And by "his client" you mean Mr. Maher?

9              MR. STERN:  Mr. Maher; yes.

10             THE COURT:  Okay.

11             MR. STERN:  I heard nothing from Windels, Marx which

12   was their prerogative.

13             What I'm concerned about now is that we'll go through

14   the same what I'll call cooperative process; I'll listen to

15   them, I'll meet with them, I'll get the information and then

16   I'll file a supplemental report if necessary and then we get to

17   the litigation part and they start deposing me and serving me

18   with subpoenas, calling me as a witness.  So we duplicated the

19   effort in a sense and given them the opportunity of a

20   cooperative process but then they may take advantage of a

21   litigious process and I've heard the U.S. Trustee's

22   representative, Ms. Schwartz, talk about potentially having me

23   as a witness and what I'm concerned about is the burden on the

24   estate and the duplication from going through an additional

25   cooperative process and then a litigation process.

1       THE COURT:  Right.  I think that the issue of your

2   being, you know, put on the firing line exists whether or not

3   you file a further supplement because if you don't file a

4   further supplement and Mr. Simpson and Windels, Marx produces

5   documents and takes the position that you were wrong, then in

6   the context of the fee dispute if the U.S. Trustee chooses to

7   proceed we're going to need to hear from you anyway.

8       When we undertook this, though, there was the

9   agreement of all parties that your fee -- that the examiner's

10  fees were going to be covered and that has to be the case,

11  otherwise, in this kind of a situation the estate wouldn't have

12  the benefit of the examiner and it's my view that the

13  examiner's fees are going to be paid for so-to-speak either

14  through -- the estate is going to be compensated for the

15  examiner's fees either eventually through disgorgements in

16  litigation that's obtained or through fitting you into whatever

17  budget is left.

18      So I have no intention of having you work and not be

19  compensated including if you're dragged into litigation

20  pursuant to any fee matters that the U.S. Trustee raises.

21      Where is your firm now with respect to accrued fees

22  and expenses?

23      MR. STERN:  We're well in excess of the cap, Your

24  Honor.  I'd say without some cuts which I'm going to take we're

25  at about $150,000.00 but I'm going to reduce that based on a

1  number of issues.

2      MS. SCHWARTZ:  Just to refresh your recollection,

3  Your Honor, the order provided for $100,000.00.

4      THE COURT:  I know.  I know that.

5      MR. STERN:  And I'm cognizant of that and, frankly,

6  I'm prepared to just take $100,000.00 given that that was the

7  cap but I think going forward I would ask Your Honor --

8      THE COURT:  Well, you can put in a fee application

9  with your actual fees and expenses and we can have a discussion

10  with all parties as to whether or not we can get relief from

11  that cap but I'm just thinking about the points that you're

12  making and you're raising some good points about duplication of

13  effort.

14      I suppose -- and I'm thinking out loud here -- that

15  to the extent that Windels, Marx submits additional documents

16  and submits a writing that sets forth a basis for me to

17  conclude that your conclusions were not supported or wrong, I

18  can make my own judgment as to whether I agree with that or not

19  without your putting in a response and to the extent that I

20  can't come to my own conclusion I suppose I can always ask you

21  for your input without your having to file a whole additional

22  supplemental report.

23      Ms. Schwartz, do you agree with that?

24      MS. SCHWARTZ:  I do agree with that, Your Honor, and

25  I mean it's an interesting discussion that we're having here

1    because I think we're all trying to arrive at what the best --

2    the most efficient way is --

3              THE COURT:  Most economic; right.

4              MS. SCHWARTZ:  Most economic and also how do we get -

5    -

6              THE COURT:  The truth.

7              MS. SCHWARTZ:  -- the case to confirmation --

8              THE COURT:  Right.

9              MS. SCHWARTZ:  You know, our overall case is to get

10   the case to confirmation.

11             So in that vein, Your Honor could enter the discharge

12   --

13             THE COURT:  Right.

14             MS. SCHWARTZ:  I mean could enter the discharge order

15   now --

16             THE COURT:  Right.

17             MS. SCHWARTZ:  -- and, you know, the discharge order

18   could contain certain provisions addressing the various things

19   that Your Honor has raised here, set a deadline and, I would

20   suggest, a very tight deadline because, you know, Your Honor,

21   it appears that all the other parties were able to contact Mr.

22   Stern during the time frame that Your Honor originally set --

23             THE COURT:  It does.

24             MS. SCHWARTZ:  -- and that let Windels, Marx file

25   whatever they want to file with respect to the report.

1    THE COURT:  All right.  So let's do that, Mr. Stern.

2    MR. STERN:  Can I just add -- excuse me, Your Honor.

3    THE COURT:  Go ahead.

4    MR. STERN:  One other possibility which would be --

5    and this is unique -- but basically give Windels, Marx a

6    choice; have me stay on, listen to them and file a supplemental

7    report and as part of that agree not to litigate over the

8    report or --

9    THE COURT:  I don't think he's going to do that

10   because he's going to litigate with the U.S. Trustee and to the

11   extent that the U.S. Trustee may rely on the work that you did,

12   I think which they're entitled to rely on -- Mr. Neier, you're

13   the money man so let me hear from you.

14   MR. NEIER:  Yes.  First of all, I would just suggest

15   to the Court that the Court has wide discretion as to what the

16   examiner's functions are going forward and even whether the

17   examiner can be called as a witness or as you suggest just come

18   back to court and give an oral report.  Judge Carey in the

19   Tribune case, which actually is on for a hearing today and

20   quite a contested one, discharged the examiner even though

21   there's a competing plan battle and both sides wanted the

22   examiner to testify, discharged the examiner and forbid anybody

23   from conducting discovery against the examiner or, you know,

24   compelling the examiner to testify at the confirmation hearing

25   with competing plans and I think that basis does exist.

1           THE COURT:  Okay.

2           MR. NEIER:  There is precedent for the Court to

3 terminate how the examiner responds to things and --

4           THE COURT:  Well, as I said --

5           MR. NEIER:  -- I don't think the process --

6           THE COURT:  Right.

7           MR. NEIER:  -- with all due respect to the U.S.

8 Trustee's Office, I don't think there is a process for an

9 examiner's report.  I don't think there is a report and then

10 there has to be a response.

11           THE COURT:  No, I totally agree with that but --

12           MS. SCHWARTZ:  I don't think we said that.

13           THE COURT:  Yes.  As I'm thinking about it I think

14 that to the extent that Windels, Marx wants to make a

15 submission it can make a submission.  It can make the

16 submission to the Court and I'm perfectly capable of comparing

17 the submission to Mr. Stern's report and coming to my own

18 conclusion --

19           MR. NEIER:  Or inviting a response if you want.

20           THE COURT:  -- or inviting a response or submitting

21 questions to Mr. Stern.

22         So I think that I'm at a decision point.  What I'd

23 like to do is discharge Mr. Stern.  Windels, Marx is free to do

24 whatever it wants.  Mr. Stern will be discharged as of the time

25 that I enter the order.

1     Mr. Stern, you should submit a fee application

2 reflecting all of the time and fees -- fees and expenses that

3 you have incurred.  I know that you're cognizant of the cap but

4 put it in and let's see if there's a basis for relief from the

5 cap.  The U.S. Trustee may have a position in that regard but

6 now that -- and then we can cross the bridge of whether or not

7 -- once you're discharged you're not obligated to respond to

8 Windels, Marx.  If they issue a subpoena in connection with

9 further proceedings in the court we can deal with that then as

10 Mr. Neier suggests.

11     MS. SCHWARTZ:  And, obviously, we'll reserve all our

12 rights with respect to --

13     THE COURT:  Right.

14     MS. SCHWARTZ:  -- being able to call the examiner or

15 what discovery with respect to that.  Clearly, this is not the

16 Tribune case and I'm not sure what Judge Carey -- why Judge

17 Carey ruled the way he ruled but we'll just reserve all our

18 rights with respect to that.

19     THE COURT:  Right.  I think --

20     MR. NEIER:  I think it's because Mr. Clay didn't want

21 the job basically.

22     THE COURT:  Well, I think Mr. Stern would be happy to

23 have the job but he's being sensitive to the money constraints

24 that we have in this case which are significant.

25     MR. NEIER:  Your Honor, just two points.

1       I think Mr. Simpson would have been here had he known

2  that the U.S. Trustee's Office had invited Mr. Stern. Nobody

3  told him that.

4       THE COURT: I understand and I can imagine that Mr.

5  Simpson is going to be very unhappy --

6       MR. NEIER: I would think so.

7       THE COURT: -- but there's a representative of his

8  firm here --

9       MS. SCHWARTZ: That's right and, Your Honor --

10      MR. NEIER: Yes, Your Honor.

11      THE COURT: And, you know --

12      MR. NEIER: I'm just saying that the Court shouldn't

13  hold it against him for not being here because --

14      MS. SCHWARTZ: And I don't think Mr. Neier represents

15  Mr. Simpson. I mean at this point --

16      THE COURT: Ms. Schwartz, I am in no way holding it

17  against Mr. Simpson but the fact is that lawyers often forget

18  that they're not individually the counsel, the law firm is and

19  the law firm is here.

20      MR. NEIER: Yes, Your Honor.

21      THE COURT: So --

22      MR. NEIER: I'm just -- the Court had expressed some

23  unhappiness that he's not here. Had I known that the examiner

24  was --

25      THE COURT: Not unhappiness. You know, given how

near and dear this case is to his heart I had expected to see

him here but it's fine that he's not here.

MS. SCHWARTZ: And, Your Honor, we're actually

surprised that he's not here too, because we asked the examiner

to come here in light of Mr. Simpson's letter that we received

yesterday.

MS. ZAVALKOFF-BABEJ: In all fairness, Your Honor --

THE COURT: Yes.

MS. ZAVALKOFF-BABEJ: Windels, Marx.

THE COURT: Identify yourself for the court reporter,

please.

MS. ZAVALKOFF-BABEJ: It's Erin Zavalkoff from

Windels, Marx on behalf of North General.

I believe that subsequent to Mr. Simpson sending this

letter out that he would like to get this response to the Court

by tomorrow --

THE COURT: Okay.

MS. ZAVALKOFF-BABEJ: -- end of day and that's really

why he sent me down --

THE COURT: Okay.

MS. ZAVALKOFF-BABEJ: -- because I don't believe he

was under the impression that this would be discussed today.

He really thought that it would just be the pre-trial that was

taking place.

THE COURT: All right. Well --

1   MR. NEIER:  And before anybody agrees on a deadline

2   of tomorrow I'd just point out that we had this chambers

3   conference on Thursday --

4       THE COURT:  Yes, we did.

5       MR. NEIER:  -- and Mr. Simpson said he'd get all the

6   objections on file on Monday.

7       We worked night and day over the weekend to Wednesday

8   to get all these objections out.  Mr. Westin's firm, Mr.

9   Simpson's firm, our firm, we worked very hard.  It was a

10  monumental effort.  Whatever the Court thinks about whether the

11  examiner's report should have been responded to before then,

12  there is no question that the last week has been a very trying

13  week for everybody.

14      THE COURT:  Understood.  No, I understand and that's

15  why it's completely understandable to me that he didn't -- and

16  to his credit he put the interests of the estate first and I

17  appreciate that.  I was merely commenting on the possibility

18  that the admin claims could have been objected to much earlier.

19      MR. NEIER:  Yes, Your Honor.

20      THE COURT:  So, but look, I've learned in this case

21  it is what it is, we have to go from where we are.  Nothing

22  that I'm saying is intended to be critical of Mr. Simpson.  No

23  decisions are being made here today other than the examiner is

24  going to be discharged and that Windels, Marx is free to pursue

25  the course of action that it set forth in its letter but Mr.

1    Stern is going to be discharged so --

2              MS. ZAVALKOFF-BABEJ:  I think Windels just would like

3    the opportunity, obviously, to address what the examiner --

4              THE COURT:  Certainly.  Right.

5              MS. ZAVALKOFF-BABEJ:  -- stated in his report.

6              THE COURT:  Right.  And Windels, Marx can file that

7    on the docket and there it is.

8              MS. ZAVALKOFF-BABEJ:  Correct.

9              THE COURT:  Mr. Bunin.

10             MR. BUNIN:  Your Honor, Marty Bunin for the creditors

11   committee.

12             The committee doesn't take a position with respect to

13   the examiner issues and we'll be guided by Your Honor.

14             THE COURT:  Okay.

15             MR. BUNIN:  I do want to say though I just want to

16   make sure I understand where things are going.

17             So if I understand correctly Mr. Stern will be

18   discharged, Windels, Marx will have an opportunity to file --

19             THE COURT:  Whatever it wants.

20             MR. BUNIN:  -- whatever it wants.

21             THE COURT:  Right.

22             MR. BUNIN:  And then if Mr. Stern determines to file

23   a supplement after his --

24             THE COURT:  No, no supplement.

25             MR. BUNIN:  There won't be a supplement.

1    THE COURT: No supplement. No supplement.

2    If I after reading Windels, Marx reply am scratching
3    my head and I can't figure something out, then I'm reserving my
4    rights to ask questions of Mr. Stern but I think I can look at
5    the two submissions and form a conclusion.

6    MR. BUNIN: I just would note, Judge -- and I had
7    mentioned this to Mr. Stern in one of our conversations before
8    February 10th -- in the Enron case Judge Gonzalez noted on the
9    record with respect to a response filed by an accounting firm
10   to one of the examiner's reports that there was no provision in
11   the Code for filing responses or making submissions objecting
12   to or commenting on examiners reports and --

13   THE COURT: Well, I think that's absolutely accurate.
14   On the other hand, there's no provision for it but there's also
15   no prohibition on it and to the extent that the examiner has
16   made what I would characterize as serious accusations against
17   the firm I think it's their right to file something that in
18   their view disputes those conclusions. Whether or not they can
19   get compensated for that exercise is a whole different story --
20   just a whole different story.

21   MR. BUNIN: Thanks, Judge.

22   THE COURT: Okay.

23   MR. BUNIN: I just wanted to make sure I understood
24   where we were going.

25   THE COURT: Yes. Okay. All right.

1    So because Mr. Simpson is not here perhaps we won't

2    discuss any further the suggestion that I made with respect to

3    any action that the U.S. Trustee might deem appropriate with

4    regard to fees but I would encourage the parties to talk about

5    that among themselves after -- Ms. Schwartz, I know you would

6    need to talk to the U.S. Trustee.

7    MS. SCHWARTZ:  The only thing I was going to say is -

8    - obviously, I need to speak to the U.S. Trustee but I mean to

9    the extent that we have issues that are ripe now, the U.S.

10   Trustee may take action now and that's not to say that the

11   committee may not take action.  I mean certainly any party-in-

12   interest that has an obligation -- a fiduciary obligation to

13   the creditors of the estate, you know, may take action.

14   I mean I haven't spoken with the committee with

15   respect to that.

16   THE COURT:  Right.  Without prejudging the issue I

17   merely made the observation in light of Mr. Neier's report that

18   we are "short" money and I have a fair amount of skepticism

19   about his ability to get more money out of Albany, although I

20   appreciate the effort but I don't want this thing to fail.

21   MS. SCHWARTZ:  Right.  Well, fortunately, we don't

22   file fee apps.

23   THE COURT:  Right.  So someone will submit -- I don't

24   know if the -- I haven't seen a discharge order.  I don't know

25   if it needs to be revised.

1    MS. SCHWARTZ: The examiner will submit that to Your

2    Honor --

3    THE COURT: Okay.

4    MS. SCHWARTZ: -- and I think the examiner is still

5    looking at just getting the form of it in order.

6    THE COURT: Okay. All right.

7    MR. STERN: That's right, Your Honor. Thank you.

8    THE COURT: Okay. All right. So we're done with

9    that.

10    Ms. Schwartz, I'll leave it in your hands as to what

11    happens with respect to fees. I think we're clear that

12    Windels, Marx can do whatever it feels it needs to do but it's

13    going to be in the form of something filed on the docket with

14    no expectation that Mr. Stern is going to respond. All right?

15    MS. SCHWARTZ: Correct.

16    THE COURT: Are we now all done with filing the

17    objections to the administrative claims?

18    MR. NEIER: I believe that's correct, Your Honor. I

19    do have a --

20    THE COURT: There was a motion to shorten; right?

21    MR. NEIER: I do have a by-hand package containing

22    the motion to shorten, although we did send the Word version of

23    the order to Your Honor's --

24    THE COURT: I have it. Yes, I have it.

25    So should I enter that today?

1         MR. NEIER: Yes, Your Honor, because we think that

2 there's plenty of time between now and March 10th to respond --

3         THE COURT: Okay.

4         MR. NEIER: -- and we don't think that these are

5 among the more complicated.

6         THE COURT: All right. So I'll grant the motion to

7 shorten.

8         MR. NEIER: Thank you, Your Honor.

9         THE COURT: And then I'm just paging through

10 everything else that I've gotten and then I also notice that

11 there's a notice of presentment for a plan exclusivity

12 extension.

13         MS. ZAVALKOFF-BABEJ: Correct.

14         THE COURT: And I understand there's no objection to

15 that.

16         MS. ZAVALKOFF-BABEJ: Correct, Your Honor.

17         THE COURT: All right. So the presentment date on

18 that is the 18th. Assuming no objection I'll enter that.

19         That leads us to next week which is the target date

20 for filing the modified plan and the other documents.

21         MR. NEIER: Your Honor, Mr. Westin has circulated the

22 changes he would propose to make and the parties have

23 tentatively scheduled Thursday afternoon as the page turn

24 ceremony --

25         THE COURT: The page turn ceremony.

1          MR. NEIER:  -- that we're going to have.

2          MS. ZAVALKOFF-BABEJ:  With respect to that, Your

3     Honor, Mr. Westin sent us -- we just got a copy of their draft

4     so we'll also endeavor to take a look at that particularly with

5     the issues that are of particular concern to our office.

6          THE COURT:  Okay.

7          MS. ZAVALKOFF-BABEJ:  We won't participate in a page

8     turn --

9          THE COURT:  Right.

10         MS. ZAVALKOFF-BABEJ:  -- but we will attempt to give

11    comments there.

12         THE COURT:  Okay.

13         MS. ZAVALKOFF-BABEJ:  And also, Your Honor should be

14    expecting shortly a supplemental application with respect to

15    Mr. Westin, Mr. Westin's firm in accordance with Your Honor's

16    direction.

17         THE COURT:  Okay.

18         MR. NEIER:  Mr. Westin also was involved very heavily

19    in the priority and admin claims so he may have had some delay

20    in getting that out.

21         THE COURT:  Okay.  All right.

22         MS. SCHWARTZ:  No, we've seen it.

23         MR. NEIER:  Okay.

24         THE COURT:  Mr. Bunin, you've done your own analysis

25    of the existing documents?  When we were here last this all

started -- the page turn concept started with your observations about inconsistencies among the plan documents. So have you been working with Mr. Westin or you've done your own thing?

MR. BUNIN: After the last conference, Judge, I had an outline, Your Honor will recall, of some selected comments --

THE COURT: Right.

MR. BUNIN: -- which I furnished separately by e-mail both to Mr. Westin and Mr. Simpson. We did not see or have any conversations after that with regard to Mr. Westin's mark-up of the plan but the committee has been invited to the Thursday page turner and we'll be attending.

THE COURT: Okay. Great. You'll also need to -- by the 25th I think it was contemplated that you would identify a new trustee for the liquidating trust; right? Mr. Neier?

MR. NEIER: Well, I'm going to defer to the Court in terms of picking a liquidating trustee. If the Court wants DASNY's input, I'd rather not be the person selecting the trustee, I'd rather be --

THE COURT: Well, the debtor is going to make the selection with the input of the committee.

MR. BUNIN: I assume that after the page turner is completed the parties will have a discussion about who an appropriate person would be to be the liquidating trustee.

THE COURT: Okay. All right. I mean my observation

1    at the conference was that I viewed my role as approving or

2    disapproving but not picking -- no selecting -- and I think you

3    all agreed to that.

4           MR. NEIER:  I was just trying to put myself in the

5    same camp, Your Honor.

6           THE COURT:  Okay.  Fair enough.

7           All right.  Anything else?

8                  (No verbal response)

9           THE COURT:  Okay.  Onward and upward.

10          Thank you, folks, very much.  We're adjourned.

11          MS. SCHWARTZ:  Thank you, Your Honor.

12          THE COURT:  Oh, one more thing.  This is Mr.

13   Schneiderman's last appearance in this case.  He's moving on

14   for bigger and better things after having served for a year and

15   Ms. Edelbaum and Ms. Eisen will be picking things up after

16   that.

17          So, just to let you know.

18          MR. BUNIN:  I mentioned to Mr. Schneiderman on the

19   phone yesterday that now that Eric Schneiderman has filed

20   papers in the case it's probably good in a sense that the other

21   Schneiderman is gone and we only have one Schneiderman to deal

22   with.

23          MR. NEIER:  And it's really great that the Department

24   of Labor is asking for $12.3 million in admin and priority

25   claims and the plan is sponsored by DASNY.  So we're really in

1    great shape, Your Honor.

2              THE COURT:  I will make no comment on that.

3              All right, folks, thank you.

4                        * * * * *

# C E R T I F I C A T I O N

\* \* \* \* \*

    I certify that the foregoing is a transcript from an electronic sound recording of the proceedings in the above-entitled matter.


  <u>S/ Carla Nutter</u>

CARLA NUTTER


Dated:  February 15, 2011

**A**

ability 19:9
  37:19
able 18:23
  28:21 31:14
about 11:5
  13:1,13 19:2
  20:22 21:12
  22:12 24:20
  25:13,22,23
  26:25 27:11
  27:12 30:13
  34:10 37:4
  37:19 41:2
  41:23
above 44:6
absolutely
  6:22 8:5
  13:18,18
  23:4 36:13
accept 11:7
accepted 10:25
accordance
  40:15
accounting
  36:9
accrued 26:21
accurate 36:13
accusations
  36:16
action 14:2
  21:2 34:25
  37:3,10,11
  37:13
actual 21:8
  27:9
actually 6:16
  29:19 33:3
add 29:2
additional 7:5
  24:20 25:24
  27:15,21
address 7:1,2
  35:3
addressing
  28:18
adjourned
  42:10

adjusting 14:8
admin 12:11,12
  12:25 13:2
  13:14 34:18
  40:19 42:24
administra...
  14:11 19:22
  24:19 38:17
advantage
  25:20
adversary 1:12
  3:8,21,23
  4:21 7:20
advise 25:5
after 13:12
  19:13 20:14
  35:23 36:2
  37:5 41:4,10
  41:22 42:14
  42:15
afternoon
  39:23
again 19:8
against 15:23
  29:23 32:13
  32:17 36:16
ago 4:19
agree 23:13
  27:18,23,24
  29:7 30:11
agreed 42:3
agreement 5:6
  7:22 26:9
agrees 34:1
Ah 3:2
ahead 24:17
  29:3
al 1:6
Albany 12:22
  19:25 37:19
allow 18:11
  19:11 20:6
almost 6:23
already 5:12
  9:24 21:5,19
  22:10
Alston 1:19
alternative
  18:21

although 3:11
  17:25 37:19
  38:22
always 3:24
  6:23,23
  27:20
amended 6:7
among 37:5
  39:5 41:2
amount 4:10
  9:14 10:9
  13:14 16:25
  19:6 37:18
analysis 40:24
Andrea 2:9
  14:12
another 13:12
anybody 29:22
  34:1
anything 7:6
  11:5 42:7
anyway 26:7
apologize
  17:18
appear 7:23
appearance
  42:13
Appearances
  1:14,23 2:1
appears 17:4,9
  28:21
applicant
  22:25
application
  20:10 21:7,8
  21:11 27:8
  31:1 40:14
applications
  17:22
appointing
  14:22 15:1
appointment
  18:6 20:6
appreciate
  24:10,18
  34:17 37:20
appropriate
  23:5 37:3
  41:24

approving
  21:16 42:1
apps 37:22
argument 10:21
arise 18:25
around 20:12
arrive 28:1
aside 10:13
asked 14:19
  33:4
asking 42:24
Assistant 2:10
assume 12:5,6
  41:22
assumed 6:19
assuming 13:9
  22:2 39:18
attempt 40:10
attending
  41:12
attention 20:8
attorneys
  24:21
Auth 1:21
authority 1:9
  18:8
available
  15:17 19:13
  20:17
Avenue 1:19,22
  1:25
aware 16:22

**B**

back 20:25
  22:9 25:7
  29:18
ballots 11:13
  11:14
BANKRUPTCY 1:1
  1:13
based 26:25
basically 29:5
  31:21
basis 14:6
  18:1,2 27:16
  29:25 31:4
BATES 9:3,10
Battery 2:5

**battle** 29:21
**because** 6:4
  7:4 9:2
  11:17 13:2
  13:24 14:19
  16:12 17:20
  22:12 26:3
  28:1,20
  29:10 31:20
  32:13 33:4
  33:21 37:1
  39:1
**before** 1:13
  21:12 23:8
  23:23 34:1
  34:11 36:7
**behalf** 4:3
  33:13
**being** 26:2
  31:14,23
  32:13 34:23
**believe** 33:14
  33:21 38:18
**believes** 16:2
**beneficiaries**
  13:7
**benefit** 15:4
  18:13 23:11
  23:24 26:12
**best** 28:1
**better** 42:14
**between** 17:5
  23:18 39:2
**beyond** 10:15
  13:11
**big** 8:21
**bigger** 42:14
**Bird** 1:19
**bit** 5:12 17:20
**Bolk** 9:22 10:1
**Boston** 8:21
**both** 4:18
  11:14 29:21
  41:9
**bound** 7:11 9:2
**Bowling** 1:3
**boxes** 8:23
**bridge** 31:6
**brief** 5:4 6:17

**briefing** 4:18
  4:20
**briefly** 14:24
**briefs** 7:5,9
**bring** 19:9
  20:8,15
**budget** 26:17
**Bunin** 1:18
  3:20 5:2
  10:19,20,24
  11:1,8,12,22
  12:2 19:23
  24:25 35:9
  35:10,10,15
  35:20,22,25
  36:6,21,23
  40:24 41:4,8
  41:22 42:18
**burden** 24:19
  25:23
**business** 4:12
**by-hand** 38:21

**C**
**call** 25:14
  31:14
**called** 25:3
  29:17
**calling** 25:18
**calls** 11:1
**camp** 42:5
**can't** 27:20
  36:3
**cap** 26:23 27:7
  27:11 31:3,5
**capable** 30:16
**care** 3:16
  24:16
**Carey** 29:18
  31:16,17
**Carla** 1:24
  44:9,10
**carried** 11:18
**case** 5:23 6:4
  6:23 14:10
  15:4 16:3
  17:21,21,24
  18:10 20:18
  26:10 28:7,9

  28:10 29:19
  31:16,24
  33:1 34:20
  36:8 42:13
  42:20
**cases** 17:24
**CEO** 7:21
**ceremony** 39:24
  39:25
**certain** 28:18
**certainly** 7:1
  35:4 37:11
**certify** 44:5
**chambers** 15:11
  15:20 17:6
  34:2
**change** 25:4
**changed** 3:2
**changes** 25:6
  39:22
**CHAPMAN** 1:13
**characterize**
  36:16
**choice** 29:6
**chooses** 26:6
**Christmas**
  21:12
**circulated**
  39:21
**claim** 13:12
  17:12
**claims** 12:11
  12:12,21,25
  13:2 14:11
  19:22 34:18
  38:17 40:19
  42:25
**class** 11:6
**Clay** 31:20
**clear** 15:11
  38:11
**Clearly** 31:15
**client** 25:5,8
**closed** 22:7
**Code** 36:11
**cognizant** 27:5
  31:3
**come** 12:24
  14:16,19

  19:16 22:9
  23:25 27:20
  29:17 33:5
**comfortable**
  3:14
**coming** 16:1
  30:17
**Comm** 1:18
**comment** 11:3
  16:7 43:2
**commenting**
  34:17 36:12
**comments** 25:1
  40:11 41:5
**committee** 1:5
  4:4 5:3
  10:20 12:3
  13:13 15:15
  15:17 35:11
  35:12 37:11
  37:14 41:11
  41:21
**committee's**
  7:10 9:22
**communication**
  19:25
**comparing**
  30:16
**compelling** 7:6
  29:24
**compendium**
  8:12,13
**compensate**
  18:3
**compensated**
  26:14,19
  36:19
**competing**
  29:21,25
**completed**
  41:23
**completely**
  34:15
**complicated**
  39:5
**concept** 41:1
**concern** 40:5
**concerned** 16:6
  24:20 25:13

25:23
**concerns** 15:12
**conclude** 27:17
**concluded** 25:4
**conclusion**
  27:20 30:18
  36:5
**conclusions**
  15:24 27:17
  36:18
**conduct** 18:5,6
  18:7
**conducting**
  29:23
**conference**
  1:12 3:8
  14:17 15:10
  15:20 17:6
  34:3 41:4
  42:1
**confirmable**
  14:10
**confirmation**
  10:8,18,21
  12:2,4,9
  13:20 16:3
  17:20 19:10
  19:24 28:7
  28:10 29:24
**confirmed**
  20:18
**confirming**
  4:13
**conjunction**
  19:10
**connection**
  17:3 31:8
**consider** 7:18
  16:11 20:10
**consideration**
  25:2
**constraints**
  31:23
**consulted** 7:18
**contact** 15:13
  17:5 28:21
**contacted**
  24:25
**contain** 28:18

**containing**
  38:21
**contemplated**
  4:23 41:14
**contested**
  29:20
**context** 26:6
**continue** 17:17
**continued** 1:23
  2:1
**continuing**
  12:23
**conversation**
  13:1
**conversations**
  23:10 25:1
  36:7 41:10
**cooperative**
  24:23 25:14
  25:20,25
**copies** 9:9
**copy** 14:14
  40:3
**correct** 8:16
  10:3 17:2
  35:8 38:15
  38:18 39:13
  39:16
**correctly**
  35:17
**correspond...**
  14:1
**cost** 18:4,9
**could** 10:13
  14:9 15:13
  23:25 28:11
  28:14,18
  34:18
**couldn't** 11:15
**counsel** 17:4
  32:18
**counterpro...**
  19:3
**countersug...**
  19:8
**counter-de...**
  8:2
**couple** 6:7
  24:8

**course** 9:1
  34:25
**court** 1:1,24
  3:1,5,10,16
  3:20,23 4:2
  4:5,7,11,13
  4:16 5:1,9
  5:14,16,20
  5:24 6:1,6,9
  6:12,15,19
  6:25 7:3,9
  7:16,24 8:1
  8:5,8,10,13
  8:17,22,24
  9:4,7,11,15
  9:20,23 10:2
  10:4,7,14,17
  10:23,25
  11:6,11,16
  11:21,23
  12:5,12,16
  13:3,5,8,9
  13:21 14:18
  14:23 15:3,6
  15:9,15,20
  16:8,13,15
  16:17,19,20
  16:24 17:2,8
  17:17,19
  18:13,17,20
  18:22 19:2,5
  19:17 20:24
  21:4,6,9,11
  21:14,16,18
  21:24 22:6
  22:13,16,19
  22:23 23:3
  23:11,16,20
  23:22 24:3,7
  24:9,14,16
  25:8,10 26:1
  27:4,8 28:3
  28:6,8,13,16
  28:23 29:1,3
  29:9,15,15
  29:18 30:1,2
  30:4,6,11,13
  30:16,20
  31:9,13,19

  31:22 32:4,7
  32:11,12,16
  32:21,22,25
  33:8,10,10
  33:15,17,20
  33:25 34:4
  34:10,14,20
  35:4,6,9,14
  35:19,21,24
  36:1,13,22
  36:25 37:16
  37:23 38:3,6
  38:8,16,20
  38:24 39:3,6
  39:9,14,17
  39:25 40:6,9
  40:12,17,21
  40:24 41:7
  41:13,16,17
  41:20,25
  42:6,9,12
  43:2
**courtroom**
  14:17
**courts** 7:2
**Court's** 18:23
**covered** 26:10
**credit** 34:16
**creditor** 11:14
**creditors** 1:6
  1:18 11:2,4
  35:10 37:13
**critical** 34:22
**cross** 10:5
  31:6
**cut** 15:23
**cuts** 26:24

          **D**
**Daniel** 7:21
**DASNY** 12:20
  42:25
**DASNY's** 41:18
**date** 5:15,21
  19:7 20:6
  39:17,19
**Dated** 44:12
**DAVID** 1:21
**day** 10:10,13

10:16,18
33:18 34:7
**days** 4:12
21:12
**deadline** 19:10
19:19 20:2,4
28:19,20
34:1
**deal** 31:9
42:21
**dear** 33:1
**debt** 5:5
**debtor** 1:4,15
7:21 41:20
**debtors** 12:20
19:20
**debtor's** 17:4
**decision** 30:22
**decisions**
34:23
**declarations**
9:23,24
**deem** 37:3
**defendant** 1:11
3:24 9:19
**defer** 41:16
**defray** 18:4,9
**delay** 17:10,15
40:19
**Department**
42:23
**deposing** 25:17
**deposition**
7:14,19,20
7:20 8:12
12:3
**designations**
8:1
**determines**
35:22
**didn't** 19:14
22:10 31:20
34:15
**difference**
11:16,17,25
**different** 9:19
36:19,20
**diligently**
15:5

**direct** 9:25
**direction**
18:24 40:16
**directives**
16:4
**disagreement**
12:18
**disapproving**
42:2
**discharge** 16:7
18:11 20:9
28:11,14,17
30:23 37:24
**discharged**
29:20,22
30:24 31:7
34:24 35:1
35:18
**discharging**
18:22
**discovery**
29:23 31:15
**discretion**
29:15.
**discuss** 3:13
37:2
**discussed**
33:22
**discussion** 6:2
27:9,25
41:23
**disgorge** 21:3
22:2
**disgorgement**
14:8 18:3
19:1 20:17
**disgorgements**
26:15
**dismiss** 1:12
4:24
**displeasure**
15:21
**dispute** 26:6
**disputes** 36:18
**disputing**
22:25
**DISTRICT** 1:1
**docket** 3:12
16:12,13,16

35:7 38:13
**documentary**
22:7
**documentation**
7:12 8:25
20:7
**documents** 8:14
9:9,12,13
15:23 20:3
22:20 23:1
26:5 27:15
39:20 40:25
41:2
**doesn't** 6:2
23:23 35:12
**done** 20:10
38:8,16
40:24 41:3
**don't** 3:6,16
4:13,21,24
5:16,16,18
5:20 6:16
7:4,5 9:17
10:11,15
11:3,22 12:6
14:3 22:24
23:5,7,18,21
26:3 29:9
30:5,8,9,12
32:14 33:21
37:20,21,23
37:24 39:4
**door** 6:17
**Dormitory** 1:9
1:21
**down** 14:25
16:1 33:19
**Dowsky** 5:23,25
**Dr** 7:21
**draft** 40:3
**dragged** 26:19
**draw** 8:14
**due** 30:7
**duplicated**
25:18
**duplication**
25:24 27:12
**during** 17:5
28:22

|              E              |
| --- |
**each** 12:7
**earlier** 34:18
**early** 15:6
**easier** 9:5
**economic** 28:3
28:4
**Edelbaum** 42:15
**effect** 6:5,10
**efficient** 28:2
**effort** 12:1
25:19 27:13
34:10 37:20
**Eisen** 42:15
**either** 23:21
26:13,15
**electronic**
44:6
**else** 39:10
42:7
**enable** 14:10
**encourage** 37:4
**end** 5:4 6:17
17:21 18:11
33:18
**endeavor** 40:4
**endeavoring**
9:1
**enough** 42:6
**Enron** 36:8
**enter** 21:14
28:11,14
30:25 38:25
39:18
**entered** 14:21
14:25
**entire** 10:13
10:17
**entirely** 17:12
**entitled** 29:12
44:7
**Eric** 42:19
**Erin** 1:15
33:12
**ESQ** 1:15,18,18
1:21 2:9
**essence** 24:4
**estate** 18:3

24:20 25:24 26:11,14 34:16 37:13
**estimate** 10:8
**et** 1:6
**eventually** 26:15
**every** 9:9
**everybody** 34:13
**everything** 4:17 39:10
**evidentiary** 18:24
**exactly** 12:20
**examination** 10:6
**examiner** 3:13 13:23,25 14:16,22 15:1,2,5,13 15:17 16:5,6 16:23 17:5 17:15 18:1,4 18:6,7,9,11 18:22,23 19:15 20:5 22:4,17,21 23:2,9,9,23 26:12 29:17 29:20,22,22 29:23,24 30:3 31:14 32:23 33:4 34:23 35:3 35:13 36:15 38:1,4
**examiners** 36:12
**examiner's** 14:4 15:24 18:8,13 23:6 23:15 26:9 26:13,15 29:16 30:9 34:11 36:10
**except** 17:6
**excerpts** 7:15 8:11

**excess** 21:18 26:23
**exclusivity** 39:11
**excuse** 17:15 29:2
**exercise** 36:19
**exhibits** 7:10 7:10,11 8:15 8:17,19,20 8:20 9:10
**exist** 29:25
**existing** 40:25
**exists** 26:2
**expect** 4:21
**expectation** 38:14
**expected** 33:1
**expecting** 40:14
**expended** 17:2 17:3
**expenses** 26:22 27:9 31:2
**expert** 9:22
**explore** 13:15
**expressed** 32:22
**extend** 19:10
**extended** 19:15 20:6
**extension** 39:12
**extent** 10:6 13:25 14:3,4 27:15,19 29:11 30:14 36:15 37:9
**e-mail** 41:8
**e-mails** 7:12

**F**
**fact** 5:12 12:22 15:13 15:18 16:12 17:13 18:7 19:24 32:17
**fail** 37:20
**fair** 4:10 22:6

37:18 42:6
**fairness** 33:7
**far** 9:21 12:21 16:5
**Fay** 17:24
**February** 1:4 15:2,18 36:8 44:12
**fee** 17:22 20:10,12,25 21:7,8,11 24:12 26:6,9 26:20 27:8 31:1 37:22
**feel** 7:6,7
**feels** 38:12
**fees** 14:6 17:23 18:2 18:25 19:1,6 20:15,17 21:5,16 24:14,15,16 24:20 26:10 26:13,15,21 27:9 31:2,2 37:4 38:11
**few** 4:12 20:22
**fiduciary** 37:12
**fifteen** 23:8
**figure** 20:13 36:3
**figuring** 10:10
**file** 15:22 17:11,23 19:11,11 20:9 22:2,2 25:16 26:3,3 27:21 28:24 28:25 29:6 34:6 35:6,18 35:22 36:17 37:22
**filed** 3:11 15:19 16:12 16:13 17:14 25:2 36:9 38:13 42:19
**filing** 10:20

17:15 36:11 38:16 39:20
**final** 20:9,14
**fine** 5:19 8:8 8:10 33:2
**firing** 26:2
**firm** 5:20 19:18 26:21 32:8,18,19 34:8,9,9 36:9,17 40:15
**first** 3:17,23 3:25 4:2 21:2 29:14 34:16
**fitting** 26:16
**flooded** 4:9
**folks** 4:22 13:3,6 23:10 42:10 43:3
**follow** 23:2
**forbid** 29:22
**foregoing** 44:5
**forget** 32:17
**forgive** 14:24
**form** 18:1 36:5 38:5,13
**former** 7:21
**forth** 27:16 34:25
**fortunately** 37:21
**forward** 18:14 27:7 29:16
**found** 18:5,7 23:1
**foundation** 23:14
**frame** 12:10 16:22 28:22
**frankly** 22:9 27:5
**free** 7:7 11:24 30:23 34:24
**from** 5:2,2 8:7 8:11,14,18 8:19 10:1 11:1 17:9

19:5,6,13
20:25 21:8
24:2,6 25:6
25:11,24
26:7 27:10
29:13,23
31:4 33:12
34:21 44:5
**full** 23:24
**functions**
29:16
**fund** 13:7,12
**funds** 12:25
13:4,11,15
14:9 16:25
20:17
**furnished** 41:8
**further** 14:5
18:2 20:7
23:9 26:3,4
31:9 37:2

**G**
**gap** 20:16
**gave** 25:5
**Gen** 8:21
**General** 1:3,6
33:13
**getting** 38:5
40:20
**give** 19:18
29:5,18
40:10
**given** 25:19
27:6 32:25
**go** 3:7,24 9:5
10:15 12:10
12:12 13:14
13:17 24:17
25:13 29:3
34:21
**going** 3:18
6:24 8:1 9:8
9:20,24
11:25 12:10
13:17,19
16:9 19:11
19:12,13,15
20:25 23:9

23:14,15
24:16 25:24
26:7,10,13
26:14,24,25
27:7 29:9,10
29:16 32:5
34:24 35:1
35:16 36:24
37:7 38:13
38:14 40:1
41:16,20
**gone** 42:21
**Gonzalez** 36:8
**good** 3:1,6 4:5
24:5,7 27:12
42:20
**gotten** 12:21
12:22 39:10
**grant** 39:6
**great** 41:13
42:23 43:1
**Green** 1:3
**guess** 3:10 5:1
11:4 24:12
**guessing** 17:22
**guided** 35:13

**H**
**half** 10:10
**hallway** 3:19
**hand** 36:14
**handful** 9:13
**hands** 19:23,24
38:10
**hang** 20:12
**happen** 17:20
23:6
**happened** 18:4
**happens** 38:11
**happy** 3:24
4:25 5:11
7:25 17:12
31:22
**hard** 34:9
**hasn't** 16:12
**haven't** 12:21
37:14,24
**head** 19:9
20:15 36:3

**hear** 17:9 19:5
19:6 24:2
26:7 29:13
**heard** 20:2
25:11,21
**hearing** 6:20
10:18 20:12
24:10 29:19
29:24
**hearsay** 8:6
**heart** 33:1
**Heavens** 8:22
**heavily** 40:18
**help** 14:9
20:18
**helpful** 4:25
7:9 23:11
**Hepner** 13:1,17
**here** 13:22,22
14:17 15:11
17:7 22:1,12
24:4 27:14
27:25 28:19
32:1,8,13,19
32:23 33:2,2
33:4,5 34:23
37:1 40:25
**he'd** 34:5
**he's** 14:17
19:11,12
20:10 29:9
29:10 31:23
32:23 33:2,4
42:13
**hold** 32:13
**holding** 32:16
**Honor** 3:4,6
4:3,8,15,23
5:8,11,15,19
5:22 7:18
8:3,16 10:1
10:3 11:9,22
12:17,20
14:14,21,21
15:10 16:10
16:11,22
21:21 23:17
24:5,18
26:24 27:3,7

27:24 28:11
28:19,20,22
29:2 31:25
32:9,10,20
33:3,7 34:19
35:10,13
38:2,7,18
39:1,8,16,21
40:3,13 41:5
42:5,11 43:1
**HONORABLE** 1:13
**Honor's** 8:7
16:4,4 18:16
38:23 40:15
**hook** 22:8
**hope** 13:14
**hoped** 3:13
**hopeful** 12:24
**HOSPITAL** 1:3,6
**hours** 3:12
**Hubbard** 2:4
24:6
**Hughes** 2:4
24:6
**hurdle** 13:16

**I**
**identified**
18:1
**identify** 33:10
41:14
**imagine** 32:4
**important** 6:3
22:1
**impression**
33:22
**inclined** 20:1
20:11 22:7
**including**
26:19
**inconsiste...**
41:2
**incurred** 19:7
31:3
**indicated** 11:2
15:21
**individually**
32:18
**information**

25:15
**initial** 24:24
**innovative**
  13:16
**input** 27:21
  41:18,21
**integrity** 16:2
**intended** 34:22
**intends** 14:2
**intention**
  15:22 26:18
**interest** 37:12
**interested** 5:2
  5:9 6:20
**interesting**
  6:13 27:25
**interests**
  34:16
**interns** 13:13
**invitation**
  19:15,17
**invited** 32:2
  41:11
**inviting** 30:19
  30:20
**invoke** 24:24
**involved** 40:18
**Island** 5:25
**isn't** 24:3
**issue** 4:19,20
  5:1 14:3,9
  15:2 20:15
  24:12,21,22
  25:3 26:1
  31:8 37:16
**issued** 15:6,8
**issues** 10:8
  11:12 15:18
  17:20 20:14
  23:18 24:12
  27:1 35:13
  37:9 40:5
**it's** 4:24 6:3
  6:7,10,12
  10:11 11:2
  11:20,25
  19:12,22,24
  20:20 21:22
  22:12 23:23

24:23 26:12
27:25 31:20
33:2,12
34:15 36:17
38:12 42:20
42:23
**I'd** 6:20 22:6
  26:24 30:22
  34:2 41:18
  41:19
**I'll** 5:16
  10:19 12:17
  13:25 25:14
  25:14,15,15
  25:16 38:10
  39:6,18
**I'm** 4:8 9:1,8
  9:18 12:23
  13:21,24
  16:10 17:14
  17:22 20:11
  20:20,25
  22:7 23:2,13
  24:3 25:13
  25:23 26:24
  26:25 27:5,6
  27:11,14
  30:13,16,22
  31:16 32:12
  32:22 34:22
  36:3 39:9
  41:16
**I've** 7:18
  13:17 23:6,6
  24:13 25:21
  34:20 39:10

**J**

**January** 14:22
  14:25 15:8
**job** 31:21,23
**Johnson** 1:18
  4:3,3,6,8,12
  4:15 5:8,11
  5:15,19,22
  6:4,22 7:1,8
  7:14,17,25
  8:3,6,9,11
  8:16 10:3,5

10:12,15,19
**join** 3:18
**Judge** 1:13
  29:18 31:16
  31:16 36:6,8
  36:21 41:4
**judgment** 27:18
**just** 3:8 4:13
  5:17 6:3 8:1
  9:2,13 10:7
  11:4,9 12:7
  12:25 14:24
  16:6 17:17
  17:19 19:4
  22:12 24:18
  27:2,6,11
  29:2,14,17
  31:17,25
  32:12,22
  33:23 34:2
  35:2,15 36:6
  36:20,23
  38:5 39:9
  40:3 42:4,17

**K**

**keeping** 19:25
**kind** 13:16
  17:19 26:11
**know** 3:7 4:21
  5:3,17,23
  6:16,22 8:21
  9:21 11:14
  11:22,24
  12:7,9,22
  16:3,21
  19:14 23:14
  24:20 26:2
  27:4,4 28:9
  28:17,20
  29:23 31:3
  32:11,25
  37:5,13,24
  37:24 42:17
**known** 32:1,23
**knows** 6:4

**L**

**Labor** 42:24

**Lane** 1:16
**large** 5:6
  11:18
**largely** 7:11
  19:23,24
**largest** 13:12
**last** 3:12
  34:12 40:25
  41:4 42:13
**later** 15:1
  20:15
**latest** 14:1
**law** 32:18,19
**lawyers** 32:17
**leading** 14:7
**leads** 39:19
**learned** 34:20
**least** 10:1
  11:13 12:24
  16:18 23:14
**leave** 5:16
  38:10
**left** 13:11,14
  26:17
**lending** 6:23
**lengthy** 5:6
**Leslie** 17:24
**letter** 14:14
  14:15 16:9
  16:11 33:5
  33:15 34:25
**let's** 20:22
  29:1 31:4
**lien** 6:24
**light** 11:17
  33:5 37:17
**limitations**
  4:18
**limited** 16:25
**line** 13:10
  26:2
**lines** 19:25
**liquidating**
  41:15,17,24
**listen** 20:7
  25:14 29:6
**listened** 24:13
**listening**
  24:19

litigate 29:7
    29:10
litigation
    25:17,25
    26:16,19
litigious
    25:21
little 5:12
    17:19 20:20
live 7:23 9:15
    9:16,17 10:5
LLP 1:19
loan 7:11 8:25
long 9:18
    10:11
look 20:12
    34:20 36:4
    40:4
looked 7:12
looking 11:12
    23:3 38:5
lot 6:2
loud 27:14

M
made 15:17
    34:23 36:16
    37:2,17
Madison 1:25
Maher 25:8,9
make 4:16
    11:16,25
    19:2 23:23
    27:18 30:14
    30:15,15
    35:16 36:23
    39:22 41:20
    43:2
makes 20:20
making 27:12
    36:11
mal 11:6
MALE 3:19,22
    4:1
man 29:13
March 12:10
    39:2
margin 11:18
mark-up 41:10

MARTIN 1:18
Marty 35:10
Marx 1:16
    13:22 14:2,7
    17:23 18:14
    20:3,4 21:8
    21:19 25:11
    26:4 27:15
    28:24 29:5
    30:14,23
    31:8 33:9,13
    34:24 35:6
    35:18 36:2
    38:12
matter 24:17
    44:7
matters 3:12
    18:24 19:20
    20:8 26:20
may 11:25 12:3
    14:4,5,9
    18:1 22:4
    25:20 29:11
    31:5 37:10
    37:11,13
    40:19
mean 7:3 10:11
    23:14 25:8
    27:25 28:14
    32:15 37:8
    37:11,14
    41:25
mechanically
    7:17
mechanism
    20:14
med 11:6
meet 25:15
meeting 20:4
mentioned 36:7
    42:18
merely 34:17
    37:17
MICHAEL 1:18
middle 12:7
might 9:5,19
    37:3
Mike 4:3
million 12:19

    12:19 21:18
    42:24
mind 5:15
minutes 23:8
misconduct
    17:25
Mittendorf
    1:16
modified 39:20
Monday 34:6
money 29:13
    31:23 37:18
    37:19
monthlies
    21:10
monumental
    34:10
morning 3:1,6
    4:5,9 15:18
    24:5,7,11,13
    24:19
mortgage 6:4
    6:24
motion 1:12
    4:24 18:25
    21:3 22:2,2
    22:3 38:20
    38:22 39:6
moved 16:3
movie 23:8
moving 42:13
much 6:20 7:4
    21:12 34:18
    42:10
multiple 15:16

N
near 33:1
necessary 10:6
    12:24 25:4,6
    25:16
necessitated
    18:6
need 10:9 12:6
    13:18,19
    19:5,6 22:4
    24:1 26:7
    37:6,8 41:13
needed 17:11

needless 11:23
needs 37:25
    38:12
Neier 1:21 3:4
    3:5,6,20,24
    4:23 5:4,23
    5:25 6:2,7
    6:10,14,16
    7:18,22 8:17
    8:19,23,25
    9:5,8,12,17
    9:21 10:1,10
    11:9,20 12:9
    12:14,17
    13:4,6,9
    19:23,24
    29:12,14
    30:2,5,7,19
    31:10,20,25
    32:6,10,12
    32:14,20,22
    34:1,5,19
    38:18,21
    39:1,4,8,21
    40:1,18,23
    41:15,16
    42:4,23
Neier's 37:17
new 1:1,4,4,10
    1:17,17,20
    1:20,22,22
    2:6,6,12,12
    41:15
next 1:23 5:17
    39:19
night 34:7
nobody 12:23
    32:2
non-party 7:19
    7:19
normal 18:10
North 1:3,6
    33:13
note 16:10
    36:6
noted 10:25
    36:8
nothing 25:11
    34:21

notice 11:14
  39:10,11
now 16:18
  18:11 25:13
  26:21 28:15
  31:6 37:9,10
  38:16 39:2
  42:19
nowhere 12:22
number 3:11
  8:23 24:25
  25:1 27:1
numbered 9:3
numbers 12:19
numerosity
  11:18
numerous 17:11
Nutter 1:24
  44:9,10
NYS 1:21

O

objected 34:18
objecting 14:6
  36:11
objection
  10:21 17:23
  18:2,25 22:3
  39:14,18
objections
  12:21 13:10
  17:11,13
  19:22 34:6,8
  38:17
obligated 31:7
obligation
  37:12,12
observation
  37:17 41:25
observations
  23:11 24:8
  41:1
obtained 26:16
obviously 9:8
  9:18 24:22
  31:11 35:3
  37:8
occasions
  15:16

occurred 18:5
  18:7
office 2:8
  19:16 30:8
  32:2 40:5
official 1:5
  9:2
officially 9:9
often 32:17
Oh 16:14 23:13
  42:12
okay 3:10,20
  4:7,15 5:14
  5:22 7:8,16
  8:3,9,11,13
  8:17,24 9:7
  9:11 10:2,4
  10:7,14,23
  14:18 16:14
  18:17,20
  20:24 21:20
  22:6 25:10
  30:1 33:17
  33:20 35:14
  36:22,25
  38:3,6,8
  39:3 40:6,12
  40:17,21,23
  41:13,25
  42:6,9
once 31:7
one 1:3 2:5
  5:1 7:17,19
  11:9,9,13
  12:2 17:17
  20:9 22:9
  24:12,21
  25:3 29:4,20
  36:7,10
  42:12,21
only 22:11
  37:7 42:21
Onward 42:9
open 7:4 19:25
opportunity
  25:5,19 35:3
  35:18
oral 29:18
order 14:21,25

  15:1 16:4,7
  16:21 18:3
  18:22,23
  21:2,14 22:1
  22:3 27:3
  28:14,17
  30:25 37:24
  38:5,23
originally
  28:22
other 5:20
  9:12 10:8
  11:3 12:7
  17:24 18:4
  19:20,21
  21:3,25
  28:21 29:4
  34:23 36:14
  39:20 42:20
otherwise
  26:11
outline 41:5
overall 28:9

P

package 38:21
page 1:23 9:9
  39:23,25
  40:7 41:1,12
  41:22
paging 39:9
paid 21:5,19
  26:13
paper 4:10
papers 42:20
paperwork 9:14
Park 1:19,22
  2:5
part 8:12 14:7
  16:11,18
  21:1 23:15
  25:17 29:7
participate
  18:23 40:7
particular
  40:5
particularly
  7:6 9:18
  19:19 40:4

parties 15:11
  26:9 27:10
  28:21 37:4
  39:22 41:23
party 15:12
  22:15
party-in 37:11
party-in-i...
  23:4
past 4:12
pay 12:25
payment 18:2
pension 13:4,7
  13:11,15
percent 13:2
  13:10,13
  18:15
perfectly
  30:16
perhaps 37:1
period 17:5
person 41:18
  41:24
personally
  12:9
perspective
  8:7 25:6
pertaining
  3:12 19:20
phone 42:19
pick 19:8
picking 41:17
  42:2,15
place 5:6 20:2
  22:10 33:24
Plaintiffs 1:7
plan 29:21
  39:11,20
  41:2,11
  42:25
planning 4:22
  12:8
plans 29:25
play 17:19
  18:10,12,12
Plaza 2:5
please 3:1
  33:11
plenty 39:2

54

**point** 5:4,7,13
6:3,13 11:22
13:24 17:4
19:21 21:21
21:22 22:11
24:1 30:22
32:15 34:2
**points** 27:11
27:12 31:25
**position** 17:10
22:25 23:15
26:5 31:5
35:12
**possibility**
29:4 34:17
**possible** 12:3
**potential** 11:8
14:7 18:25
**potentially**
25:22
**precedent**
20:19 30:2
**precisely**
23:20,22
**prejudge** 14:3
**prejudging**
37:16
**prejudice**
23:16
**prepare** 17:11
**prepared** 27:6
**preparing**
24:24
**prerogative**
25:12
**presentment**
39:11,17
**preserving**
19:9
**president** 7:21
**pressed** 19:19
**pre-trial** 1:12
3:8,17 14:16
33:23
**priority** 12:11
12:25 13:2
13:14 40:19
42:24
**probably** 20:19

42:20
**problem** 8:6
22:11
**proceed** 4:9
26:7
**proceeding**
1:12 3:8
7:20
**proceedings**
31:9 44:6
**process** 14:20
16:2 18:16
24:22,23,23
25:14,20,21
25:25,25
30:5,8
**produce** 15:22
20:3
**produced** 22:21
22:21
**produces** 26:4
**production**
20:2
**prohibition**
36:15
**proofs** 17:11
**Properties**
5:25
**propose** 39:22
**proposed** 16:7
**prosecute** 22:1
22:3
**prosecution**
19:22
**provide** 14:5,9
18:22
**provided** 16:21
27:3
**provides** 15:1
**provision**
36:10,14
**provisions**
28:18
**prudent** 3:7
**pursuant** 26:20
**pursue** 34:24
**put** 8:20 9:8
26:2 27:8
31:4 34:16

42:4
**puts** 18:14
**putting** 27:19

**Q**

**quality** 21:12
21:15
**question** 34:12
**questions**
14:20 15:12
30:21 36:4
**quickly** 15:5
**quite** 11:18,18
29:20

**R**

**raised** 5:4
28:19
**raises** 26:20
**raising** 27:12
**rather** 7:22
10:12 20:15
41:18,19
**read** 23:6,6
**reading** 36:2
**real** 8:21
**realize** 20:19
**really** 7:5
10:10,11
12:10,14
13:6 21:22
33:18,23
42:23,25
**reason** 6:3
13:24 17:10
**recall** 41:5
**receive** 4:21
**received** 14:1
16:9 33:5
**recharacte...**
4:20
**recharacte...**
5:5
**recollection**
15:21 27:2
**record** 16:12
16:19 22:7
36:9
**recording** 44:6

**recovery** 11:2
**redirect** 10:6
**reduce** 26:25
**reflecting**
31:2
**refresh** 27:2
**regard** 10:8
19:20 23:12
31:5 37:4
41:10
**Regency** 1:24
**relating** 5:4
**relevant** 9:1
**relief** 27:10
31:4
**relitigate**
23:18
**rely** 7:25 9:24
23:14 29:11
29:12
**replies** 4:22
**reply** 4:23 5:2
5:10 6:21
7:7 15:22
36:2
**report** 14:4
15:2,6,8,13
15:19,22
16:23 18:8
20:9,14 23:6
23:7,15
24:24,25
25:2,4,16
27:22 28:25
29:7,8,18
30:9,9,17
34:11 35:5
37:17
**reporter** 33:10
**Reporting** 1:24
**reports** 36:10
36:12
**representa...**
25:22 32:7
**represents**
8:13 32:14
**request** 14:15
**requested**
12:20

**requesting** 25:7
**research** 5:13
**reserve** 31:11 31:17
**reserving** 36:3
**residents** 13:13
**resolution** 14:9
**respect** 10:22 11:13 12:2,4 14:1,10,20 15:12 16:1,5 18:18,24,25 19:1,21,23 22:4 23:1,8 24:2 26:21 28:25 30:7 31:12,15,18 35:12 36:9 37:2,15 38:11 40:2 40:14
**respond** 31:7 38:14 39:2
**responded** 34:11
**responds** 30:3
**response** 3:15 17:15 18:13 27:19 30:10 30:19,20 33:15 36:9 42:8
**responses** 36:11
**review** 20:7
**revised** 25:2 37:25
**Richard** 2:3 24:5
**right** 3:10,16 3:20 6:1,6,9 6:19,25 7:3 7:16,24 9:4 9:15,20,23 10:4 11:7,11 11:23 12:5

12:13,16 13:5,8,21 14:23 15:3,6 15:7,9,25 16:8,17,20 17:8 19:14 21:4,6,13,14 21:17,20,24 21:25 22:13 22:23 23:3 23:16,22 26:1 28:3,8 28:13,16 29:1 30:6 31:13,19 32:9 33:25 35:4,6,21 36:17,25 37:16,21,23 38:6,7,8,14 38:20 39:6 39:17 40:9 40:21 41:7 41:15,25 42:7 43:3
**rights** 20:2 31:12,18 36:4
**ripe** 21:22 37:9
**role** 42:1
**round** 14:1 22:9
**rule** 13:10
**ruled** 31:17,17
**rules** 12:20
**running** 14:25
**rushing** 6:17

**S**
**safe** 10:12
**said** 6:16 22:8 25:7 30:4,12 34:5
**same** 23:18 25:14 42:5
**saying** 20:21 21:21 23:2 23:17 32:12

34:22
**says** 19:11,12 19:12
**SCC** 1:2
**schedule** 20:5
**scheduled** 39:23
**Schneiderman** 42:18,19,21 42:21
**Schneiderm...** 42:13
**Schwartz** 2:9 3:18 14:2,12 14:12,19,24 15:4,8,10,16 15:25 16:10 16:14,16,18 16:21,25 17:3,8,16,18 18:15,18,21 19:4,14 20:11,22,25 21:5,7,10,13 21:15,17,20 21:25 22:11 22:14,17,20 22:24 23:13 23:17,21 24:1 25:22 27:2,23,24 28:4,7,9,14 28:17,24 30:12 31:11 31:14 32:9 32:14,16 33:3 37:5,7 37:21 38:1,4 38:10,15 40:22 42:11
**scratching** 36:2
**seated** 3:1
**second** 17:17 24:22
**secured** 6:23
**security** 5:5
**see** 11:17 13:19 14:21

16:3 31:4 33:1 41:9
**seen** 37:24 40:22
**segway** 13:23
**segwaying** 13:24
**selected** 41:5
**selecting** 41:18 42:2
**selection** 41:21
**send** 38:22
**sending** 33:14
**sense** 20:20 23:23 25:19 42:20
**sensitive** 31:23
**sent** 3:9 16:6 33:19 40:3
**separate** 20:23 22:15
**separately** 41:8
**serious** 36:16
**served** 42:14
**service** 19:20
**serving** 25:17
**set** 7:5,9 10:13 28:19 28:22 34:25
**sets** 27:16
**shape** 43:1
**SHELLEY** 1:13
**She's** 3:19
**short** 12:18,18 12:19 16:22 37:18
**shorten** 38:20 38:22 39:7
**shortly** 40:14
**should** 10:15 31:1 34:11 38:25 40:13
**shouldn't** 32:12
**side** 10:12
**sides** 29:21

**significant** 31:24

**Similarly** 25:2

**Simpson** 3:2,7
13:22 15:21
17:9 18:12
19:11 20:8
22:8 23:10
24:3 26:4
32:1,5,15,17
33:14 34:5
34:22 37:1
41:9

**Simpson's**
14:14,15
16:9 33:5
34:9

**since** 3:7
19:19

**single** 10:16
11:9

**situation**
13:24 26:11

**skepticism**
37:18

**slight** 12:18

**small** 8:22

**somebody** 12:24

**sooner** 20:15

**sorry** 13:21
24:3,15

**sort** 6:24 7:1

**sound** 44:6

**SOUTHERN** 1:1

**so-to-speak**
26:13

**speak** 4:2
10:19 17:7
37:8

**specified** 11:3

**spent** 21:11

**spoken** 37:14

**sponsored**
42:25

**stamp** 9:3

**stamped** 9:10

**stands** 17:14

**start** 4:13
25:17

**started** 5:12
41:1,1

**STATE** 1:9

**stated** 35:5

**States** 1:1,13
2:8,10 14:6
14:12 16:5

**statute** 4:18

**stay** 5:6 29:6

**steps** 20:23

**Stern** 2:3
14:16 17:7,9
19:5,6 20:6
20:9,11,14
22:8 23:24
24:2,5,5,7,8
24:10,15,18
25:9,11
26:23 27:5
28:22 29:1,2
29:4 30:21
30:23,24
31:1,22 32:2
35:1,17,22
36:4,7 38:7
38:14

**Stern's** 20:5
30:17

**still** 6:5,10
9:14 12:17
38:4

**stop** 12:23

**story** 36:19,20

**Strawn** 1:21

**Street** 1:16
2:11

**strong** 17:25

**subject** 18:8
20:1,5

**submission**
30:15,15,16
30:17

**submissions**
36:5,11

**submit** 9:13
31:1 37:23
38:1

**submits** 27:15
27:16

**submitted** 4:19

**submitting**
4:22 30:20

**subpoena** 31:8

**subpoenaing**
7:22

**subpoenas**
25:18

**subsequent**
33:14

**substantial**
9:14

**suggest** 28:20
29:14,17

**suggestion**
19:4 37:2

**suggests** 31:10

**supplement**
15:19 26:3,4
35:23,24,25
36:1,1

**supplemental**
23:7 24:25
25:16 27:22
29:6 40:14

**supplementary**
20:14

**supplemented**
14:5

**supported**
27:17

**suppose** 7:4
27:14,20

**sure** 4:8,16
5:11 16:11
17:14 23:13
24:9 31:16
35:16 36:23

**surprised** 33:4

**T**

**take** 3:16 9:18
12:3 14:2
21:2 25:20
26:24 27:6
35:12 37:10
37:11,13
40:4

**taken** 22:10

24:16

**takes** 26:5

**taking** 17:10
33:24

**talk** 20:22
25:5,22 37:4
37:6

**talked** 25:3

**talking** 21:12
22:12

**target** 39:19

**tell** 12:17

**tentatively**
39:23

**terminate** 30:3

**terms** 9:15
19:6,25
41:17

**testify** 29:22
29:24

**testimony** 9:16
9:17 22:4

**thank** 8:22
38:7 39:8
42:10,11
43:3

**Thanks** 36:21

**that's** 4:20
5:23 6:12,20
6:24 8:8,10
8:16 10:3
17:12,25
21:17 22:5,6
22:7 23:20
23:22 24:21
26:16 32:9
33:18 34:14
36:13 37:10
38:7,18

**there's** 6:23
7:5,17 8:6
11:13 18:8
20:13,19
29:21 31:4
32:7 36:14
36:14 39:2
39:11,14

**they're** 9:2,3
13:6 29:12

32:18
**thing** 7:17
21:25 37:7
37:20 41:3
42:12
**things** 3:11
8:22 28:18
30:3 35:16
42:14,15
**think** 3:6 4:9
4:20,25 6:3
6:12,19,20
8:25 9:18
10:11,15,17
11:3,20 12:9
13:18 15:25
17:16,21
18:7 19:15
21:18,20,25
23:17,22
24:1 26:1
27:7 28:1
29:9,12,25
30:5,8,9,12
30:13,22
31:19,20,22
32:1,6,14
35:2 36:4,13
36:17 38:4
38:11 39:1,4
41:14 42:2
**thinking** 27:11
27:14 30:13
**thinks** 23:5
34:10
**thought** 3:7
16:8 18:16
18:18 22:10
33:23
**Thursday** 16:6
34:3 39:23
41:11
**tight** 28:20
**time** 4:19 5:17
5:17 10:9
12:10 16:22
17:5 20:6
21:12 24:4
28:22 30:24

31:2 39:2
**times** 6:7
24:25
**timing** 14:8,8
**Tittle** 9:22
**today** 13:22
14:16 22:12
24:4 29:19
33:22 34:23
38:25
**together** 12:6
**told** 12:23
13:17 32:3
**tomorrow** 19:13
33:16 34:2
**totally** 30:11
**towards** 13:15
16:3
**train** 18:16
**Transcriber**
1:24
**transcript**
1:12 7:14
44:5
**transcripts**
7:19 9:2
**trial** 8:14,20
8:20 9:10
**Tribune** 29:19
31:16
**tried** 24:23
**true** 17:12
21:15
**trust** 41:15
**trustee** 2:8,10
3:22 14:6,13
16:1,5 17:23
20:13 21:21
22:14,18,21
23:4 26:6,20
29:10,11
31:5 37:3,6
37:8,10
41:15,17,19
41:24
**Trustee's** 2:8
25:21 30:8
32:2
**truth** 28:6

**try** 12:23
**trying** 11:15
13:15 28:1
34:12 42:4
**turn** 39:23,25
40:8 41:1
**turner** 41:12
41:22
**two** 5:17 7:11
9:21 21:12
23:18 24:12
31:25 36:5

**U**
**ultimate** 13:7
**ultimately**
20:16
**under** 33:22
**understand**
3:11 7:3
15:13,16,18
32:4 34:14
35:16,17
39:14
**understand...**
34:15
**understood**
22:19 34:14
36:23
**undertook** 26:8
**unhappiness**
32:23,25
**unhappy** 32:5
**union** 13:11
**unique** 29:5
**United** 1:1,13
2:8,10 14:6
14:12 16:5
**universe** 8:14
**unless** 13:18
**unorthodox**
20:20
**unsecured** 1:5
11:1,4
**unsecureds**
10:25
**until** 16:9
**upward** 42:9
**U.S** 2:8 3:22

15:25 17:23
20:13 21:21
22:14,18,21
23:3 25:21
26:6,20
29:10,11
30:7 31:5
32:2 37:3,6
37:8,9

**V**
**various** 12:21
28:18
**vein** 28:11
**verbal** 3:15
42:8
**version** 38:22
**view** 22:25
26:12 36:18
**viewed** 42:1
**VOICE** 3:19,22
4:1
**volumes** 7:11
9:2
**voluminous**
15:23
**vote** 11:9,10
11:14,15

**W**
**wait** 21:22,24
**walk** 23:7
**want** 3:22 7:4
7:5 11:24
14:3 16:10
22:24 23:5,7
23:18 28:25
30:19 31:20
35:15,15
37:20
**wanted** 29:21
36:23
**wants** 4:2 16:2
16:11 22:9
30:14,24
35:19,20
41:17
**wasn't** 5:6
11:19 16:16

**way** 13:16 28:2 31:17 32:16
**Wednesday** 34:7
**week** 34:12,13 39:19
**weekend** 34:7
**weeks** 5:18
**West** 1:16
**Westin** 19:19 25:3 39:21 40:3,15,18 41:3,9
**Westin's** 34:8 40:15 41:10
**We'd** 5:11 21:24
**we'll** 9:10 13:19 14:5 25:13 31:11 31:17 35:13 40:4 41:12
**we're** 4:25 5:8 11:12,15 12:14,17,18 12:19,22 13:15,17 22:12 23:13 26:7,23,24 27:25 28:1 33:3 38:8,11 40:1 42:10 42:25
**we've** 5:12 12:22 19:19 40:22
**what's** 10:8
**Whitehall** 2:11
**whole** 13:23 14:7 27:21 36:19,20
**wide** 29:15
**Windels** 1:16 13:22 14:2,7 17:23 18:14 20:3,4 21:8 21:19 25:11 26:4 27:15 28:24 29:5 30:14,23

31:8 33:9,13 34:24 35:2,6 35:18 36:2 38:12
**Winston** 1:21
**wish** 12:3
**wishes** 20:3,4 20:8
**witness** 25:18 25:23 29:17
**witnesses** 9:15 9:21
**wondering** 11:2
**word** 17:25 38:22
**words** 15:23 18:5
**work** 5:3 12:23 13:25 22:17 26:18 29:11
**worked** 15:5 34:7,9
**working** 12:6 41:3
**worth** 11:25
**wouldn't** 26:11
**writing** 27:16
**written** 5:10
**wrong** 26:5 27:17

**Y**

**year** 42:14
**yesterday** 14:15 16:14 17:6 33:6 42:19
**York** 1:1,4,4 1:10,17,17 1:20,20,22 1:22 2:6,6 2:12,12
**you'd** 7:6
**you'll** 5:3 12:7 41:13
**you're** 9:20 11:24 12:8 26:19 27:11 27:12 29:12

31:3,7,7
**you've** 3:2 4:9 12:5 40:24 41:3

**Z**

**Zavalkoff** 33:12
**ZAVALKOFF-...** 1:15 3:3,9 33:7,9,12,18 33:21 35:2,5 35:8 39:13 39:16 40:2,7 40:10,13

**$**

**$1.3** 21:18
**$100,000.00** 27:3,6
**$12.3** 42:24
**$150,000.00** 26:25
**$3** 12:19
**$4** 12:19

**1**

**10th** 12:10 15:2,19 36:8 39:2
**10-04205** 1:5
**10-13553** 1:2
**100** 18:15
**10004** 2:6,12
**10019** 1:17
**10166** 1:22
**11042** 1:20
**151** 1:4 44:12
**156** 1:16
**16** 11:20
**18th** 39:18
**1989** 6:4 9:1
**1998** 9:1

**2**

**200** 1:22
**2003** 9:1
**2011** 1:4 44:12
**24** 3:12

**25th** 41:14

**3**

**31st** 15:8
**33** 2:11

**5**

**52** 11:20
**56th** 1:16
**575** 1:25

**6**

**6th** 14:22,25

**8**

**87** 13:2,10

**9**

**90** 1:19
**95** 13:13

# EXHIBIT 3

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

NORTH GENERAL HOSPITAL, et al.,

Debtors.

Chapter 11

Case No.: 10-13553 (SCC)

(Jointly Administered)

## <u>ORDER TERMINATING APPOINTMENT OF AND DISCHARGING EXAMINER</u>

WHEREAS, on January 4, 2011, the United States Trustee filed a motion seeking entry of an order directing the appointment of a chapter 11 examiner in these chapter 11 cases (Docket No. 419); and

WHEREAS, on January 6, 2011, the Court issued an order directing the United States Trustee to appoint a chapter 11 examiner in these chapter 11 cases (Docket No. 427); and

WHEREAS, on January 10, 2011, the United States Trustee filed a notice stating that Richard Stern, Esq. had been appointed as chapter 11 examiner (the "Examiner") (Docket No. 430); and

WHEREAS, on January 10, 2011, the United States Trustee filed an application seeking an order approving the appointment of the Examiner (Docket No. 431); and

WHEREAS, on January 10, 2011, the Court entered an order approving the appointment of the Examiner (the "Appointment Order")(Docket No. 432) and directing the filing of a report no later than February 10, 2011; and

WHEREAS, on January 11, 2011, the Examiner filed an application seeking an order approving the retention and employment of Hughes Hubbard & Reed LLP ("Hughes Hubbard") as his counsel <u>nunc pro tunc</u> as of January 10, 2011 (Docket No. 440); and

WHEREAS, on January 31, 2011, the Examiner filed his report (Docket No. 488) (the "Report"); and

WHEREAS, on February 1, 2011, the Court entered an order approving the retention and employment of Hughes Hubbard as counsel to the Examiner nunc pro tunc as of January 10, 2011 (Docket No. 492)(the "Retention Order"); and

WHEREAS, on February 10, 2011, the Examiner filed a letter that modified and supplemented the Report (Docket No. 522); and

WHEREAS, the Examiner has fulfilled his responsibilities under the Appointment Order.

NOW THEREFORE, it is hereby

ORDERED, that the appointment of the Examiner is terminated and the Examiner and his attorneys are discharged from any further obligations, duties or responsibilities except as otherwise set forth in this Order; and it is further

ORDERED, that the Examiner and his professionals shall cooperate with any reasonable requests from the United States Trustee and, if requested by the Court, shall address any further responses to the Report filed by any party in interest; and it is further

ORDERED, that the Examiner and Hughes Hubbard are released from any and all liability with respect to any act or omission, statement, or representation arising out of, relating to, or involving in any way, the Examiner's investigation, the Report, the supplement to the Report or other writing filed by the Examiner in connection with these cases, except in the case of gross negligence or willful misconduct; and it is further

ORDERED, that the Examiner and Hughes Hubbard are relieved from any formal or informal discovery process and no party-in-interest in these cases shall issue or serve any discovery request upon the Examiner or his professionals, except as authorized by this Court

upon notice of motion to, and an opportunity to object by, the Examiner, the Debtors, the

Creditors' Committee, the United States Trustee and other parties-in-interest; and it is further

ORDERED, that the Examiner and Hughes Hubbard shall submit by no later than

March 1, 2011, an application for award of compensation for fees and reimbursement of

expenses incurred through and including February 15, 2011 (the "Fee Application"), which

application shall comply with Bankruptcy Code sections 330 and 331, the Bankruptcy Rules, the

Local Bankruptcy Rules, the Order Establishing Procedures for Monthly Compensation and

Reimbursement of Expenses of Professionals, dated December 21, 2010 (General Order M-412),

the Amended Guidelines for Fees and Disbursements for Professionals in the Southern District

of New York, dated November 25, 2009 (General Order M-389), the United States Trustee Fee

Guidelines effective January 30, 1996 and any other Orders of the Court and may include fees

and expenses incurred in connection with its preparation and filing and the Examiner and Hughes

Hubbard shall not be required to file interim fee statements; and it is further

ORDERED, that the Examiner and Hughes Hubbard may supplement the Fee

Application with a request for payment by the Debtors of any reasonable fees and expenses

incurred by either of them in connection with addressing any further responses to the Report

filed by any party in interest, in responding to any requests from the United States Trustee or in

responding to or complying with any discovery requests made pursuant to this Order; and it is

further

ORDERED, that a hearing on the Fee Application and any supplement thereto shall be held on March 31, 2011 at 10 a.m.

Dated: February 16, 2011
      New York, New York

/S/ Shelley C. Chapman
HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT 4

# Zavalkoff-Babej, Erin

| | |
|---|---|
| **From:** | Zavalkoff-Babej, Erin |
| **Sent:** | Tuesday, June 29, 2010 6:41 PM |
| **To:** | 'john.maher@ngsc.org' |
| **Subject:** | I updated the background in the prepetition wage motion as per our discussion. It is attached |
| **Attachments:** | 10439073.DOC |

**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
(212) 237-1000
Charles E. Simpson (csimpson@windelsmarx.com)

Proposed Attorneys for North General Service Corporation,
North General Hospital and North General Diagnostic and Treatment Center
Debtors-in-Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re                                    :
                                         :
                                         :
NORTH GENERAL SERVICE CORPORATION,       :        Chapter 11
                                         :        Case No. 10-
           Debtor                        :
                                         :
------------------------------------------------------------x

In re                                    :
                                         :
NORTH GENERAL HOSPITAL,                   :        Chapter 11
                                         :        Case No. 10-
           Debtor.                       :
                                         :
------------------------------------------------------------x
In re                                    :
                                         :
NORTH GENERAL DIAGNOSTIC AND             :        Chapter 11
TREATMENT CENTER,                        :        Case No. 10-
                                         :
           Debtor.                       :
                                         :
------------------------------------------------------------x

## DEBTORS' MOTION FOR AN ORDER (A) (i) AUTHORIZING BUT NOT REQUIRING PAYMENT OF PRE-PETITION WAGES AND RELATED OBLIGATIONS, (ii) AUTHORIZING REIMBURSEMENT OF PRE-PETITION EMPLOYEE BUSINESS EXPENSES, AND (iii) HONORING OF OTHER PRE-PETITION EMPLOYEE BENEFITS; (B) AUTHORIZING PAYMENT OF OBLIGATIONS RELATED TO MEDICAL PROVIDERS; AND (C) AUTHORIZING AND DIRECTING BANKS TO HONOR CHECKS WITH RESPECT THERETO

North General Service Corporation ("Corporation"), (North General Hospital ("North

General") and North General Diagnostic Treatment Center ("D&TC"), as debtors and debtors-in-possession (collectively the "Debtors"), by and through their undersigned counsel, hereby move this Court for entry of an order, pursuant to §§ 105, 363(b), 507(a)(4), 507(a)(5), and 507(a)(8) of title 11, United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), (a) authorizing, but not requiring the Debtors, in their sole discretion, to (i) honor and pay accrued but unpaid prepetition wages, salaries, commissions, bonuses, withholding taxes, garnishments and employee benefits to, or on behalf of, the Employees (defined below) in accordance with existing company policies and practices established before the Petition Date (defined below), (ii) reimburse pre- Petition Date Employee business expenses (including tuition reimbursement) and (iii) perform and honor all other obligations, practices and policies relating to their Employees (collectively, the "Employee Obligations"); (b) authorizing, but not requiring the Debtors, in their sole discretion, to pay the accrued but unpaid Medical Provider Obligations (as defined below); and (c) authorizing and directing the Debtors' financial institutions (the "Banks") to receive, process, honor and pay checks presented for payment or electronic payment from Debtors' payroll account and granting authority to re-issue any dishonored checks relating to the Employee Obligations and with respect thereto (the "Motion"). In support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION; VENUE; STATUTORY BASES FOR RELIEF

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C §§ 157 and 1334 and the Standing Order of Referral of Cases to Bankruptcy Judges of the District Court for the Southern District of New York, dated July 19, 1984 (Ward, Acting C.J.). This is a core proceeding pursuant to 28 U.S.C § 157(b). Venue of this case and proceeding is proper in this district pursuant to 28 U.S.C §§ 1408 and 1409.

2. The relief sought in this Motion is based upon the Bankruptcy Code §§ 105(a), 363(b), 507(a)(4), 507(a)(5) and 507(a)(8).

## BACKGROUND

3. On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief Chapter 11 of the Bankruptcy Code. The Debtors have requested that the cases be jointly administered for procedural purposes only.

4. The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108. No trustee, examiner, or official committee of unsecured creditors has been appointed.

5. Corporation, a not-for-profit, tax-exempt entity is the parent corporation of North General. North General is a not-for-profit 200 -bed community hospital located in upper Manhattan that has serviced the communities of East and Central Harlem since the 1970s. D&TC is a not-for-profit, tax-exempt entity, wholly dependent on and supported by North General. D&TC operates at North General. It was established to deliver enhanced outpatient primary care services for adults and children, as well as programs and services specializing in diabetes treatment, pediatric weight management, cardiovascular services, a women's health center, a school-based health program and an alcohol treatment center.

6. East and Central Harlem are economically poor and working class communities populated primarily by Latinos and African-Americans. Relative to the rest of New York City, East and Central Harlem is inhabited by traditionally underserved populations living at higher levels of poverty who suffer disproportionately from increased rates of mortality due to common illnesses and treatable diseases. Residents in these communities rank among the bottom ten New York City neighborhoods and experience below average scores for general health, maternal and

child health, infectious disease (including pneumonia, influenza and HIV/AIDS) and chronic disease (including heart disease, diabetes and lung diseases). The Debtors' existence has been vital to providing the residents of Harlem with the health services they critically require

7.      From its inception North General faced a systemic problem of undercapitalization and is burdened with a debt-load vastly disproportionate to its ability to service such debt. North General is simply too small and its inpatient volumes too low for it to carry the financial obligations it has incurred.

8.  As of May 31, 2010, North General's total assets equal approximately $67 million of which approximately $22 million is current, $12 million is limited noncurrent, $2 million is other long term and $31 million is property, plant and equipment-net.

9.  Moreover, as of May 31, 2010, North General's obligations include $135 million of mortgage debt, which is categorized as a current liability, $55 million in restructuring loans and $103 million of other obligations which includes $19 million of interest on capital indebtedness. Total outstanding liabilities at May 31, 2010 are approximately $293 million. The Debtors' net asset deficiency at May 31, 2010 is approximately $226 million.

10.      Detailed information regarding the Debtors' history, business, capital structure, finances, and the circumstances leading to these Chapter 11 filings is set forth in the Affidavit of Dr. Samuel J. Daniel M.D. pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York ("Local Bankruptcy Rules") in Support of First Day Motions and Applications, filed contemporaneously herewith (the "Daniel Affidavit").

## WAGES AND SALARIES

11.  As of the Petition Date, the Debtors employed approximately 1,000 employees,

comprised of approximately 916 full-time and 84 part-time workers[1] and the independent contractors that provide medical, security and other services to the Debtors' patients.

12.    . The union employees are paid weekly and the non-union employees are paid bi-weekly, with each payroll being made five (5) days after the end of its respective pay period [UPDATE]. The average weekly payroll for the union employees is approximately $      , and the average bi-weekly payroll for the non-union employees is approximately $      . In addition, certain management personnel are paid bi-weekly with the average payroll being $      . Thus, the aggregate amount of wages paid to union employees, non-union employees and certain management personnel (collectively, the "Employees") is approximately $_____ every two (2) weeks. The last payroll for union employees and management personnel covered salaries and wages through _____, 2010 and the last payroll for non-union employees covered wages through _____, 2010. Consequently, as of the Petition Date, the only wage and salary obligations owed by the Debtors to the Employees would be amounts owed on account of services provided by the Employees since _____ and _____, 2010, in the aggregate amount of approximately $_____.

13.    It is also possible that checks that have been previously issued to the Employees on account of Employee Obligations may have not yet been presented for payment or may have not yet cleared through the banking system. Thus, the Debtors request that they be authorized, in their sole discretion, to pay the aggregate amount of accrued wages and salaries that have not yet been paid to the Employees for periods prior to the Petition Date, and that the Debtors' bank be authorized and directed to honor or send all checks or wire transfers, as the case may be, for all prepetition wages that have either already been sent on behalf of the Employees but not yet

---

[1] Approximately 70% of the Debtors' employees belong to the local chapter of the Service Employees International Union ("Local 1199"), and approximately 5% belong to the Committee of Interns and Residents/SEIU ("CIR")

presented for payment or have yet to clear through the banking system.

## PAYROLL WITHHOLDINGS

14.     The Debtors are required by law to withhold from their Employees' wages all applicable federal, state, and local income taxes, state unemployment taxes, and social security and Medicare taxes, and in certain instances, to pay expenses related thereto (collectively, the "Trust Fund Taxes"). The Debtors also are required to remit the Trust Fund Taxes to the appropriate taxing authorities. In addition, the Debtors make deductions from the Employees' paychecks for garnishments, support payments, and other similar programs, and to make payments on behalf of the Employees for parking and to various benefit providers including, among others, Transitchek, and the 1199 Credit Union for savings programs, insurance and tax-deferred annuity plans, 403(b) retirement plan, union benefits and uniform allowances (collectively, the "Deductions" and together with the Trust Fund Taxes, the "Withholdings"). The Debtors transfer such Deductions to the appropriate government agencies and/or employee benefit providers in accordance with the payment schedules established by such agencies and/or providers.

15.     For union employees and management, approximately $_____ in the aggregate is withheld and then transferred to the appropriate governmental agencies and/or benefit providers. For non-union employees, approximately $_____ in the aggregate is withheld and then transferred to the appropriate governmental agencies and/or benefit providers. As of the Petition Date, the Debtors have not yet transferred all Withholdings, and some transfers made may be currently outstanding or may have not yet cleared through the banking system. Because the Withholdings are not property of the Debtors' estates, but rather of each individual Employee, by this Motion, the Debtors request that they be authorized but not required to (a)

transfer any Withholdings relating to the period prior to the Petition Date to the appropriate agencies and/or benefit providers in the ordinary course of business, and (b) continue to withhold the Withholdings in the ordinary course of business and make the required transfers of such Withholdings to the appropriate agencies and/or benefit providers on a going-forward basis.

## EMPLOYEE REIMBURSEMENTS

16.     The Debtors customarily reimburse their Employees for business expenses incurred in connection with services rendered for the benefit of the Debtors, including, without limitation, those relating to meals, travel, and other ordinary course reimbursable employee business expenses. Expense reimbursement requests for prepetition business expenses may be currently outstanding or may have been made but have not yet been processed. The Debtors estimate that approximately $_____ of such business expenses remain unpaid. The Debtors respectfully request that they be authorized, in their sole discretion, to pay such amounts in the ordinary course of business.

## EMPLOYEE BENEFITS

17.     Like most major businesses, the Debtors provide their Employees with certain general welfare benefits, including, without limitation, medical, dental, vision, life insurance and other insurance coverage. These additional benefits are an integral and important part of each Employee's total compensation package. Interruption of such additional benefits would seriously disrupt the morale of the Employees and would undermine the Debtors' efforts through the Chapter 11 process. Thus, the Debtors request authority to pay, in their sole discretion, certain prepetition amounts attributable to such benefits from time to time, as and when such amounts become due in the ordinary course of business.

18.     With respect to their medical insurance, the Debtors are self-insured and utilize _____ for their non-union Employees [UPDATE]. With respect to their dental benefits, the Debtors use _____ and _____ for non-union employees [UPDATE]. The Debtors also provide vision coverage for non-union employees through a self administered/self insured plan and group life insurance to all non-union employees through _____ [UPDATE]. The Debtors and their non-union employees contribute to the annual premiums for certain of the medical insurance and dental plans. Medical, vision, dental and life insurance benefits for union employees represented by Local 1199, CIR/SEIU are administered by union affiliated welfare plans. The Debtors also provide optional short term disability insurance through _____, and optional long-term disability through _____ for both union and non-union employees [UPDATE]. The total average monthly premium and payments that the Debtors pay on behalf of their Employees for the foregoing benefits and into the applicable benefit plans is approximately $___ million [UPDATE]. Accordingly, by this Motion, the Debtors request authority, in their sole discretion, to pay, from time to time, as and when due, covered benefits premiums and expenses on account of prepetition claims covered by the foregoing medical plans and insurance policies.

## VACATION AND OTHER LEAVE

19.     Under the Debtors' existing vacation policy, Employees are generally eligible for two (2) to six (6) weeks of vacation per year based on the length of their tenure with the Debtors. Vacation time is accrued by Employees over the course of each year. [UPDATE]  Employees may use accrued vacation time during the year, at which point the Employee is paid during such vacation period. Employees who have accrued vacation time are not entitled to receive the cash value except that Employees are generally entitled to compensation for earned vacation time

when such time is taken, and upon termination of employment, voluntary resignation or retirement, subject to policy limits. The Debtors believe it is appropriate to allow the Employees to take vacation accrued as of the Petition Date and thereafter in the ordinary course and in accordance with the Debtors' policies and practices established prior to the Petition Date.

20.     The Debtors are not seeking authorization to pay accrued vacation time to employees that leave the Debtors during these Chapter 11 cases.

21.     Sick time and personal time are accrued by Employees over the course of each year. An Employee can use accrued sick time and/or personal time during the year, at which point the Employee is paid during such period. Employees who have accrued sick time and/or personal time are not entitled to receive the cash value except that Employees are generally entitled to compensation for earned sick time and/or personal time when such time is taken. The Debtors believe it is appropriate to allow the Employees to take sick time and/or personal time accrued as of the Petition Date, and thereafter in the ordinary course and in accordance with the Debtors' policies and practices established prior to the Petition Date.

## BANK ACCOUNTS AND ADP

22.     Prior to the Petition Date, the Debtors issued payroll checks drawn from _____'s payroll accounts at _____ Bank [UPDATE]. The Debtors' payroll is processed internally with the exception of certain management payroll, which is administered by Automatic Data Processing, Inc. ("ADP"). In order to give effect to the requested relief, the Debtors request that the Court provide specific authorization to the Bank and ADP to honor and fund, as the case may be, payroll checks, expense checks, medical claims, and all payroll related wire payments drawn on the Debtors' accounts or otherwise. The Debtors have sufficient funds in their respective accounts to enable them to pay in full the Employee Obligations for which authorization is

sought herein. Accordingly, the Bank will not be prejudiced by the entry of an order directing them to honor checks or fund transfer requests to pay such amounts.

## MEDICAL PROVIDER OBLIGATIONS

23.     To supplement their respective workforce, the Debtors utilize the services of certain doctors and other medical providers (the "Medical Providers") who are not considered employees of the Debtors, to provide necessary services relating to the operation of the Debtors' businesses. These Medical Providers provide essential and critical medical services related to among others, neurology, neurosurgery, gastroenterology, dermatology, ophthalmology, anesthesia, obstetrics, pediatrics, geriatrics, radiology, emergency room, physical therapy, and family practice. Payment to each of the Medical Providers, and/or their related professional corporations varies according to the terms of each Medical Provider's contract with the Debtors.

24.     It would be difficult, time-consuming, and expensive to replace these Medical Providers who work closely with the Debtors' Employees and are considered an important part of the Debtors' team due to their knowledge of the Debtors' operations and patients. The Debtors estimate that, as of the Petition Date, their accrued and unpaid obligations to the Medical Providers total approximately $265,000 [UPDATE] (the "Medical Provider Obligations"). The Debtors believe that it is critical that they receive authority to pay the Medical Provider Obligations because the services that the Medical Providers provide are vital to the Debtors' continued ability to offer competent medical care to the communities they serve and are essential to the Debtors' continued operation.

25.     It is possible that checks that have been previously issued to Medical Providers may be currently outstanding or may have not yet cleared through the banking system. The Debtors therefore request that they be authorized to, in their sole discretion, honor and pay in full

the accrued but unpaid Medical Provider Obligations, and that the Bank be authorized and directed to honor or send all checks or wire transfers, as the case may be, for all Medical Provider Obligations that have either already been sent on behalf of the Medical Providers but not yet presented for payment or have yet to clear through the banking system.

## BASIS FOR RELIEF REQUESTED

26.     Bankruptcy Code § 507(a)(4) grants a priority claim of up to $10,000 for wages, salaries, or commissions, including vacation, severance, and sick leave pay, earned by an individual within the 180 days prior to the filing of a bankruptcy petition. In addition, Bankruptcy Code § 507(a)(5) grants a priority claim for contributions to employee benefit plans arising from services rendered within the 180 days before filing of the petition to the extent that the $10,000 ceiling per employee on priority wage claims is not reached.

27.     Bankruptcy Code § 363(b)(1) provides that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). And section Bankruptcy Code § 105(a) empowers the court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Accordingly, because most (if not all) such priority claims may be paid in full under a plan of reorganization, unless the holders otherwise agree, this Court is authorized to grant the relief requested.

28.     The Employees and Medical Providers are essential to the continued operation of the Debtors' businesses and successful reorganization thereof. The Employees' morale directly affects their effectiveness and productivity. Consequently, it is critical that the Debtors continue, in the ordinary course, those personnel policies, programs, and procedures that were in effect prior to the Petition Date with respect to the Employee Obligations. If the checks issued and

electronic fund transfers requested in payment of any of the Employee Obligations have been or are dishonored, or if such obligations are not timely paid post-petition, the Debtors believe that many of the Employees will suffer extreme personal hardship and may be unable to pay their daily living expenses. These circumstances undoubtedly will adversely affect their performance and similarly impact the Debtors' ability to provide necessary and quality medical care and their reorganization efforts to the detriment of all parties in interest.

29.     In addition, it would be inequitable to require the Debtors' Employees and Medical Providers to bear personally the cost of any business expenses they incurred prepetition, for the benefit of the Debtors, with the understanding that they would be reimbursed. The Debtors submit that it is critical that they be permitted to continue their pre-petition policies of allowing their Employees to incur reasonable and necessary business-related expenses and seek reimbursement therefore by submitting appropriate requests for cash disbursements and receipts evidencing such out-of-pocket disbursements.

30.     Payment of all Employee Obligations in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors' estates, their creditors, and all parties in interest and will enable the Debtors to continue to operate their businesses in an economic and efficient manner without disruption. The Employees and Medical Providers are central to the Debtors' operations and are vital to their restructuring. The total amount sought herein to be paid is relatively modest in comparison to the size of the Debtors' overall business and the importance of the Employees and Medical Providers to the Debtors' reorganization efforts.

31.     The Debtors believe that, as of the Petition Date, they do not owe more than $10,000 [UPDATE] in salary or wages to any of their Employees and, by this Motion, the

Debtors are not requesting authority to pay salary or wages in excess of $10,000 [UPDATE].[2] Accordingly, the Debtors believe that, substantially all, if not all, of the Debtors' obligations with respect to the Employee Obligations constitute priority claims. The Debtors submit that payment of the outstanding Employee Obligations at this time is necessary and appropriate and is authorized under section 105(a) pursuant to the "necessity of payment" doctrine, under which courts often allow the immediate payment of pre-petition claims where the payments are essential to the debtor's continued operations even though the Bankruptcy Code may not explicitly authorize payment. *See In re Chateaugay Corp.*, 80 B.R. 279, 285-287 (S.D.N.Y. 1987); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); *see also, e.g., In re Just for Feet Inc.*, 242 B.R. 821, 824 (D. Del. 1999); *In re Columbia Gas System, Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (noting that a debtor may pay a class of prepetition creditors in advance of a confirmed plan if essential to the continued operation of the business).

32.     Courts have recognized that invocation of the "necessity of payment" doctrine is particularly appropriate where a debtor's employees must be paid on time to assure their continued service and loyalty during a Chapter 11 proceeding. Numerous bankruptcy courts, including many in this circuit, have approved payment of prepetition claims for compensation, benefits, and expense reimbursements. *See e.g., In re Saint Vincents Catholic Medical Centers of New York d/b/a Saint Vincent Catholic Medical Centers, et al.*, Case No. 05-14945 (PCB) (Bankr. S.D.N.Y. July 5, 2005); *In re Winn-Dixie, Inc., et al.*, Case No. 05-11063 (RDD) (Bankr. S.D.N.Y. March 15, 2005); *In re Tower Automotive, Inc.*, Case No. 05-10578 (ALG) (Bankr.

---

[2] A few Employees may be owed amounts above the statutory cap when the cash value of accrued but unused vacation, sick and personal time is added to the salary and wages owed to such Employees. As stated above, however, the Debtors do not seek to make lump sum payments on account of such time but rather the Debtors seek to allow the Employees to continue to take such time in the ordinary course. This necessity of payment doctrine, first articulated by the United States Supreme Court in *Miltenberger v. Logansport, C&SW.R. Co.*, 106 U.S. 286, 311-312 (1882), recognizes the existence of judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor.

S.D.N.Y. Feb. 3, 2005); *In re Loral Space & Communications Ltd., et al.*, Case No. 03-41710 (RDD) (Bankr. S.D.N.Y. July 15, 2003); *In re Recoton Corp., et al.*, Case No. 03-12180 (ALG) (Bankr. S.D. N.Y. April 10, 2003); *In re Metro Affiliates, Inc., et al.*, Case No. 02-42560 (PCB) (Bankr. S.D.N.Y. Aug. 16, 2002); *In re Formica Corporation, et al.*, Case No. 02-10969 (BRL) (Bankr. S. D.N.Y. March 5, 2002).

33.     With respect to the Trust Fund Taxes, the payment of such taxes will not prejudice the estates' other creditors because the relevant taxing authorities would hold priority claims under Bankruptcy Code § 507(a)(8). Furthermore, the monies payable for Trust Fund Taxes are not property of the Debtors' estates, and as such, the Bankruptcy Code does not prohibit the Debtors from paying such taxes. *See Begier v. Internal Revenue Serv.*, 496 U.S. 53, 59 (1990).

34.     It is respectfully submitted that any delay in paying the compensation and reimbursement owed to Employees and Medical Providers, or providing them with any of the other above-described benefits, such as medical and related benefits, would severely disrupt the Debtors' relationships with their Employees and Medical Providers, irreparably impairing their morale at the very time when their dedication, confidence, and cooperation are most critical to the Debtors.

35.     For the reasons stated, the Debtors submit that authorization of the payments sought herein is in the best interests of the Debtors, their creditors, and all parties in interest. Accordingly, the Debtors respectfully request that the Court grant the relief requested herein.

36.     The Debtors' request for authority to pay the Employee Obligations is not to be deemed an assumption or adoption of any agreements or policies providing for such Employee Obligations. The Debtors are in the process of reviewing these matters and reserve all of their

rights with respect to the assumption or rejection of any executory contracts.

## NOTICE

37.    Notice of this Motion has been given via facsimile, hand delivery, electronic mail, or overnight mail to: (a) the Office of the United States Trustee; (b) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (c) the Debtors' six (6) largest secured creditors on a consolidated basis; (d) counsel for the Debtors' proposed post-petition lender; (e) the Office of the United States Attorney; (f) the Dormitory Authority of the State of New York; (g) the Office of New York State Attorney General; (h) the New York State Department of Health; (i) the Internal Revenue Service, (j) the Department of Law, City of New York, and (k) all those who have entered an appearance in this case pursuant to Bankruptcy Rule 2002. The Debtors submit that under the circumstances no other notice need be given.

## WAIVER OF MEMORANDUM OF LAW

38.    Pursuant to Local Bankruptcy Rule 9013-1 (b), because there are no novel issues of law presented herein, the Debtors respectfully request that this Court waive the requirement that the Debtors file a memorandum of law in support of this Motion. The Debtors reserve the right, however, to file a memorandum in response to any objection that may be filed.

39.    No prior request for the relief sought herein has been made to this or any other Court.

**WHEREFORE**, the Debtors respectfully request that this Court enter an order, substantially in the form attached hereto as Exhibit "A", (a) authorizing, but not requiring, the Debtors, in their sole discretion, to (i) honor and pay accrued but unpaid pre-petition wages, salaries, bonuses, commissions, withholding taxes, garnishments and employee benefits to, or on behalf of, their Employees in accordance with existing company policies and practices

established prior to the Petition Date; (ii) reimburse prepetition Employee business expenses; and (iii) perform and honor all other obligations, practices, and policies relating to their Employees established prior to the Petition Date; (b) authorizing (but not directing) the Debtors, in their sole discretion, to pay the accrued but unpaid Medical Provider Obligations; (c) authorizing and directing the Banks to honor checks with respect thereto; and (d) granting such other and further relief as may be just and proper.

Dated: New York, New York
      May    , 2010

**WINDELS MARX LANE & MITTENDORF, LLP**

By: _____
      Charles E. Simpson (csimpson@windelsmarx.com)
      **A Member of the Firm**

      156 West 56th Street
      New York, New York 10019
      (212) 237-1000

      Proposed Attorneys for North General Hospital and
      North General Diagnostic and Treatment Center
      Debtors-in-Possession

# EXHIBIT 5

**Zavalkoff-Babej, Erin**

| | |
|---|---|
| **From:** | Vitale-Rullo, Maria |
| **Sent:** | Tuesday, February 01, 2011 6:17 PM |
| **To:** | Zavalkoff-Babej, Erin |
| **Subject:** | FW:Information |

-----Original Message-----
From: john.maher@ngsc.org [mailto:john.maher@ngsc.org]
Sent: Friday, June 25, 2010 6:22 PM
To: Lisa Hackett
Cc: Samuel Daniel; Simpson, Charles E.
Subject: Re: Information

That's not correct.
 I need all contacts for individuals on payroll such as Daniel, Maher, Jeter, Kirton, Hackett, anyone who exceeds the 10K limit and any other with a severance obligation. I need the documents tomorrow.
Pls call for any clarification.
------Original Message------
From: Lisa Hackett
To: John P Maher
To: Samuel Daniel
ReplyTo: Lisa Hackett
Subject: Information
Sent: Jun 25, 2010 6:08 PM

John: Dr. Daniel stated that you need specific contracts to be forwarded to Eisen at Garfunkel Wild.  Provide the list to me by e-mail and I will e-mail them to you.

Lisa Hackett
Senior Counsel


Sent from my Verizon Wireless BlackBerry

Maria Vitale-Rullo | Legal Secretary | Windels Marx Lane & Mittendorf, LLP | 156 West 56th Street, New York, New York 10019 | Direct Dial: 212.237.1071 | General Fax: 212.262.1215 | mvitale-rullo@windelsmarx.com | www.windelsmarx.com

1

**EXHIBIT 6**

# Zavalkoff-Babej, Erin

**From:** Zavalkoff-Babej, Erin
**Sent:** Wednesday, June 30, 2010 3:35 PM
**To:** 'mmuise@hmsconsultants.com'; 'john.maher@ngsc.org'
**Subject:** Language for the Wages Motion

Hi

Below is some suggested language for the prepetition wages motion.

The Debtors believe that the Employee Obligations qualify as priority claims under section 507(a)(4). The Debtors submit, however, that to the extent any Employee is owed in excess of $10,950 on account of Employee Obligations for Prepetition Compensation, payment of such amounts is necessary and appropriate and is authorized under both section 363(b) and section 105(a) pursuant to the "necessity of payment" doctrine, which "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor."

Let me or Derek know if you have any questions.

Erin

3/1/2011

# EXHIBIT 7

# ADDENDUM A:
# ENGAGEMENT LETTER

CUSHMAN &
WAKEFIELD.

John A. Katinos, MAI
Senior Director



**Cushman & Wakefield, Inc.**
1290 Avenue of the Americas, 9th Floor
New York, NY 10104
212 841-5081 Tel
212 479-1920 Fax
john.a.katinos@cushwake.com

10-12003-9325

July 29, 2010

Mr. John Maher
EVP/CFO
NORTH GENERAL HOSPITAL
1879 Madison Avenue
New York, NY 10035

Re:   **North General Hospital and Annex Building**
      **1879 and 1824 Madison Avenue**
      **New York, New York  10035**

Dear Mr. Maher:

Thank you for requesting our proposal for appraisal services.  This proposal letter will become, upon your acceptance, our letter of engagement to provide the services outlined herein.

**TERMS OF ENGAGEMENT**

**I. PROBLEM IDENTIFICATION**

| | |
|---|---|
| **The Parties To This Agreement:** | The undersigned Cushman & Wakefield affiliated company and NORTH GENERAL HOSPITAL (herein at times referred to as "Client") |
| **Intended Users:** | The Client, Dormitory Authority of the State of New York (DASNY)/New York State Department of Health (NYS DOH), and Health and Hospitals Corporation-City of New York (HHC) are the only Identified Intended Users of the appraisal. The appraisal may not be distributed to or relied upon by other persons or entities. |
| **Intended Use:** | Internal review by the Client for internal business decisions. |
| **Type of Opinion and Rights Appraised:** | Market value of the Fee Simple Interest based on the properties' highest and best use. We will also estimate the going concern and alternative medical use value for the Hospital building. |
| **Date Of Value:** | • Date of Inspection |
| **Subject of the Assignment and Relevant Characteristics:** | The two properties to be appraised are; North General Hospital, a 9-story 280,000 square foot building with approximately 200 beds, and the Annex Building, a 30,000 square foot medical office building. The properties are located in New York, New York. |
| **Assignment Conditions:** | The assignment will not incorporate any extraordinary assumptions or hypothetical conditions. |

## II. ANTICIPATED SCOPE OF WORK

**USPAP Compliance:** The undersigned Cushman & Wakefield affiliated company and/or its designated affiliate or subsidiary (herein at times "C&W") will develop an appraisal in accordance with USPAP and the Code of Ethics and Certification Standards of the Appraisal Institute.

**General Scope of Work:**

- Property Inspection to the extent necessary to adequately identify the real estate

- Research relevant market data, in terms of quantity, quality, and geographic comparability, to the extent necessary to produce credible appraisal results

- Consider and develop those approaches relevant and applicable to the appraisal problem. Based on our discussions with the Client, we anticipate developing the following valuation approaches:

- Sales Comparison Approach

- Income Capitalization Approach

## III. REPORTING AND DISCLOSURE

**Scope of Work Disclosure:** The actual Scope of Work will be reported within the report.

**Reporting Option:** The appraisal will be communicated in a Self-Contained report.

**Fee:** $25,000. The entire fee is due in advance. The Client shall be solely responsible for C&W's fees. Acknowledgement of this obligation is made by the countersignature to this agreement by an authorized representative.

**Additional Expenses:** Fee quoted is inclusive of expenses related to the preparation of the report.

**Report Copies:** The final report will be delivered in electronic format. Up to three hard copies will be provided upon request.

**Start Date:** The appraisal process will initiate upon receipt of signed agreement, applicable retainer, and the receipt of the property specific data.

**Acceptance Date:** This proposal is subject to withdrawal if the engagement letter is not executed by the Client within four (4) business days.

**Draft Report Delivery:** Within thirty (30) days of receipt of your written authorization to proceed, assuming prompt receipt of necessary property information. Payment of the fee shall be due in advance.

**Changes to Agreement:** The identity of the Client, intended users, or intended use; the date of value; type of value or interest appraised; or property appraised cannot be changed without a new agreement.

## II. ANTICIPATED SCOPE OF WORK

**USPAP Compliance:** The undersigned Cushman & Wakefield affiliated company and/or its designated affiliate or subsidiary (herein at times "C&W") will develop an appraisal in accordance with USPAP and the Code of Ethics and Certification Standards of the Appraisal Institute.

**General Scope of Work:**
- Property Inspection to the extent necessary to adequately identify the real estate
- Research relevant market data, in terms of quantity, quality, and geographic comparability, to the extent necessary to produce credible appraisal results
- Consider and develop those approaches relevant and applicable to the appraisal problem. Based on our discussions with the Client, we anticipate developing the following valuation approaches:
- Sales Comparison Approach
- Income Capitalization Approach

## III. REPORTING AND DISCLOSURE

**Scope of Work Disclosure:** The actual Scope of Work will be reported within the report.

**Reporting Option:** The appraisal will be communicated in a Self-Contained report.

**Fee:** $25,000. The entire fee is due in advance. The Client shall be solely responsible for C&W's fees. Acknowledgement of this obligation is made by the countersignature to this agreement by an authorized representative.

**Additional Expenses:** Fee quoted is inclusive of expenses related to the preparation of the report.

**Report Copies:** The final report will be delivered in electronic format. Up to three hard copies will be provided upon request.

**Start Date:** The appraisal process will initiate upon receipt of signed agreement, applicable retainer, and the receipt of the property specific data.

**Acceptance Date:** This proposal is subject to withdrawal if the engagement letter is not executed by the Client within four (4) business days.

**Draft Report Delivery:** Within thirty (30) days of receipt of your written authorization to proceed, assuming prompt receipt of necessary property information. Payment of the fee shall be due in advance.

**Changes to Agreement:** The identity of the Client, intended users, or intended use; the date of value; type of value or interest appraised; or property appraised cannot be changed without a new agreement.

| | |
|---|---|
| **Prior Services Disclosure:** | The engaging or principal appraiser has not performed a previous appraisal of the subject property involving the subject property within the three years prior to this assignment. |
| **Conflicts of Interest:** | C&W adheres to a strict internal conflict of interest policy. If we discover in the preparation of our appraisal a conflict with this assignment we reserve the right to withdraw from the assignment without penalty. |
| **Further Conditions of Engagement:** | The Conditions of Engagement attached hereto are incorporated herein and are part of this letter of engagement. |

Thank you for calling on us to render these services and we look forward to working with you.

**CUSHMAN & WAKEFIELD, INC.**

John A. Katinos, MAI
Senior Director

cc: Matthew Mondanile
Robert Nardella
John Busi
Brian Corcoran
Gerald Rasmussen

**AGREED:**
**CLIENT: NORTH GENERAL HOSPITAL**

By: _____       Date: _____

Mr. John Maher

Title: _____       EVP/CFO

E-mail Address/Phone & Fax Nos.: _____

## CONDITIONS OF ENGAGEMENT

1) The Client and any Intended Users identified herein should consider the appraisal as only one factor together with its independent investment considerations and underwriting criteria in its overall investment decision. The appraisal cannot be used by any party or for any purpose other than as specified in this engagement letter.

2) Federal banking regulations require banks and savings and loan associations to employ appraisers where a FIRREA compliant appraisal must be used in connection with mortgage loans or other transactions involving federally regulated lending institutions, including mortgage bankers/brokers. Because of that requirement, this appraisal, if ordered independent of a financial institution or agent, may not be accepted by a federally regulated financial institution. This appraisal will be prepared in accordance with the Uniform Standards of Professional Appraisal Practice of The Appraisal Foundation, the Standards of Professional Practice and the Code of Ethics of the Appraisal Institute.

3) The appraisal report will be subject to our standard Assumptions and Limiting Conditions, which will be incorporated into the appraisal. All users of the appraisal report are specifically cautioned to understand any Extraordinary Assumptions and Hypothetical Conditions which may be employed by the appraiser and incorporated into the appraisal.

4) The appraisal report or our name may not be used in any offering memoranda or other investment material without the prior written consent of C&W, which may be given at the sole discretion of C&W. Any such consent, if given, shall be conditioned upon our receipt of an indemnification agreement from a party satisfactory to us and in a form satisfactory to us. Furthermore, Client agrees to pay the fees of C&W's legal counsel for the review of the material which is the subject of the requested consent. If the appraisal is referred to or included in any offering material or prospectus, the appraisal shall be deemed referred to or included for informational purposes only and C&W, its employees and the appraiser have no liability to such recipients. C&W disclaims any and all liability to any party other than the party which retained C&W to prepare the appraisal.

5) In the event the Client provides a copy of this appraisal to, or permits reliance thereon by, any person or entity not an identified Intended User at the time of the assignment and authorized by C&W in writing to use or rely thereon, Client hereby agrees to indemnify and hold C&W, its affiliates and the respective shareholders, directors, officers and employees, harmless from and against all damages, expenses, claims and costs, including attorney's fees, incurred in investigating and defending any claim arising from or in any way connected to the use of, or reliance upon, the appraisal by any such unauthorized person or entity.

6) The balance of the fee for the appraisal will be due upon delivery of a report. Payment of the fee is not contingent on the appraised value, outcome of the consultation report, a loan closing, or any other prearranged condition. Additional fees will be charged on an hourly basis for any work, which exceeds the scope of this proposal, including performing additional valuation scenarios, additional research and conference calls or meetings with any party, which exceed the time allotted by C&W for an assignment of this nature. If we are requested to stop working on this assignment, for any reason, prior to our completion of the appraisal, C&W will be entitled to bill the Client for the time expended to date at C&W's hourly rates for the personnel involved.

7) If C&W or any of its affiliates or any of their respective employees receives a subpoena or other judicial command to produce documents or to provide testimony involving this assignment in connection with a lawsuit or proceeding, C&W will use reasonable efforts to notify the Client of our receipt of same. However, if C&W or any of its affiliates are not a party to these proceedings, Client agrees to compensate C&W or its affiliate for the professional time and reimburse C&W or its affiliate for the actual expense that it incurs in responding to any such subpoena or judicial command, including attorneys' fees, if any, as they are incurred. C&W or its affiliate will be compensated at the then prevailing hourly rates of the personnel responding to the subpoena or command for testimony.

8) By signing this agreement Client expressly agrees that its sole and exclusive remedy for any and all losses or damages relating to this agreement or the appraisal shall be limited to the amount of the appraisal fee paid by the Client. In the event that the Client, or any other party entitled to do so, makes a claim against C&W or any of its affiliates or any of their respective officers or employees in connection with or in any way relating to this engagement or the appraisal, the maximum damages recoverable from C&W or any of its affiliates or their respective officers or employees shall be the amount of the monies actually collected by C&W or any of its affiliates for this assignment and under no circumstances shall any claim for consequential damages be made.

9) It is acknowledged that any opinions and conclusions expressed by the professionals of C&W or its affiliates during this assignment are representations made as employees and not as individuals. C&W's or its affiliate's responsibility is limited to the Client, and use of our product by third parties shall be solely at the risk of the Client and/or third parties.

10) The fees and expenses shall be due C&W as agreed in this letter. If it becomes necessary to place collection of the fees and expenses due C&W in the hands of a collection agent and/or an attorney (whether or not a legal action is filed) Client agrees to pay all fees and expenses including attorney's fees incurred by C&W in connection with the collection or attempted collection thereof.

# EXHIBIT 8

# Vitale-Rullo, Maria

| | |
|---|---|
| **From:** | Wick, Rosemarie [wick@hugheshubbard.com] |
| **Sent:** | Monday, March 14, 2011 12:33 PM |
| **To:** | marty.bunin@alston.com; tracy.davis@usdoj.gov; andrea.b.schwartz@usdoj.gov; Simpson, Charles E.; bweston@garfunkelwild.com |
| **Subject:** | Letter from Richard Stern |

**Attachments:** DOC-01.PDF

Please see the attached re: North General Hospital.

Regards,

**Hughes Hubbard**

**Rosemarie Wick** | *Assistant to Richard Stern*
Hughes Hubbard & Reed LLP | One Battery Park Plaza | New York, NY 10004-1482
Office 212-837-6362 | Fax 212-299-6362
wick@hugheshubbard.com

*********************************************************************
This email and any files transmitted with it may contain privileged or confidential information. Use, disclosure, copying or distribution of this message by anyone other than the intended recipient is strictly prohibited. If you have received this email in error please notify the sender by reply email and destroy all copies of this message in your possession, custody or control.
*********************************************************************

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Fax: 212-422-4726
hugheshubbard.com

Richard Stern
Direct Dial: 212-837-6210
Direct Fax: 212-299-6210
sternr@hugheshubbard.com

March 14, 2011

<u>BY HAND</u>

Mr. John Maher
North General Hospital
1879 Madison Avenue
New York, New York  10035

Dear Mr. Maher:

      Thank you for sending us a check in the amount of $144,846.80 in connection with our services as the Examiner and counsel to the Examiner in the North General Hospital chapter 11 cases.  I am returning the check to you, as our fees have not yet been approved by the Bankruptcy Court.

Sincerely,

*Richard Stern*

Richard Stern

RS:rw

Enclosure

cc:    Martin Bunin, Esq.
      Tracy Hope Davis, Esq.
      Andrea Schwartz, Esq.
      Charles Simpson, Esq.
      Burton Weston, Esq.

# EXHIBIT 9

# Zavalkoff-Babej, Erin

| | |
|---|---|
| **From:** | Vitale-Rullo, Maria |
| **Sent:** | Tuesday, February 01, 2011 6:25 PM |
| **To:** | Zavalkoff-Babej, Erin |
| **Subject:** | FW:10579987(2) 20100812 1810 |
| **Attachments:** | 10579987(2) 20100812 1810.docx |

**From:** John Maher [mailto:John.Maher@NGSC.ORG]
**Sent:** Thursday, August 12, 2010 6:13 PM
**To:** Zavalkoff-Babej, Erin
**Cc:** Etheridge, Derek; Simpson, Charles E.
**Subject:** 10579987(2) 20100812 1810

We should review certain items tomorrow AM...

Maria Vitale-Rullo | Legal Secretary | Windels Marx Lane & Mittendorf, LLP | 156 West 56th Street, New York,
New York 10019 | Direct Dial: 212.237.1071 | General Fax: 212.262.1215 | mvitale-rullo@windelsmarx.com |
www.windelsmarx.com

<u>**Supplier Questions**</u>

<u>**General Questions**</u>

1. **What is Chapter 11?**

   Chapter 11 of the U.S. Bankruptcy Code is a legal mechanism for court supervised reorganization for restructuring of the hospital's obligations. It also provides a mechanism for the orderly liquidation or transfer of the hospital's assets and affiliated operations.

2. **Why did Hospital and the Diagnostic and Treatment Center (the Hospital) file to reorganize under Chapter 11 of the U.S. Bankruptcy Code?**

   The Hospital is taking this action because there are no viable resources for the additional funding required to maintain the hospital and meet operating costs. The hospital also tried several times to partner with third parties in an attempt to reorganize their operations and stave off bankruptcy however, these third party proposals that were unsuccessful.

   The Hospital took this step only after very careful consideration and consultation with experienced financial and legal experts. The Hospital decided that this would be the most effective path for Hospital to transfer its facilities to another entity and for that new entity to establish a health care facility that would continue to provide medical services to the East and Central Harlem communities.

   **Deleted:**

3. **Does this mean that the Hospital is going out of business?**

   Yes, North General and its Emergency Room were closed as of July 10, 2010

   **Does the Hospital have enough cash to stay in business?**

   No, however, North General lined up and received final approval of its Debtor-in-Possession loan, which will be available to fund the North General's Closure Plan and provide for the orderly and efficient closure and or transfer of the hospital's facilities and operations. A final order approving the DIP Facility was entered by the Bankruptcy Court on August 3, 2010.

   **Deleted:** has
   **Deleted:** has
   **Deleted:** interim
   **Deleted:** financing facility

   **How long will the bankruptcy process take?**

   There is no way to predict today with certainty how long the process will ultimately take, though cases frequently range from one to two years.

4. **Which entities are included in the filing?**

**Deleted:** {10579987:3}

{10579987:4}

Please refer to the Hospital's restructuring website at: *http://chap11.epiqsystems.com/NGH/Project* .

5. **Where can I find Chapter 11 case information?**

Please refer to the Hospital's restructuring website at: *http://chap11.epiqsystems.com/NGH/Project* .

Deleted: *http://chap11.epiqsystems.com*

## Supplier Specific Questions

6. **Will suppliers continue to be paid for goods and services they provide to the Hospital?**

The Hospital intends to pay suppliers under normal terms for goods received and services rendered after July 2, 2010 (the Petition Date). Any claims for goods received or services rendered after the filing date are considered "administrative claims", which receive a priority status. At the First Day hearing held on July 7, 2010, the Court granted the Hospital interim approval to access up to $4.5 million of the DIP financing. Then on August 3, 2010, the Bankruptcy Court gave the hospital final approval to access up to $14 million of DIP Financing. A Portion of this amount will be used to pay suppliers for post-Petition Date goods and services

Deleted: . A

Deleted: portion

Suppliers who provided goods or rendered services to the Hospital prior to the Petition Date) may have what are referred to as "pre-petition claims." These claims cannot be paid at this time and will be addressed through a Chapter 11 plan of reorganization (liquidation) that will be filed later in the case. If you have such pre-petition claims, you will receive additional information from the Hospital's claims agent at a later date. The Hospital sincerely regrets the hardship or inconvenience that this may cause.

7. **I have unpaid invoices dated before the bankruptcy date (i.e., pre-petition invoices). What should I do?**

Once the Bankruptcy Court has confirmed the procedures and deadlines for filing claims, you will receive a proof-of-claim form and instructions on how to file the form.

8. **Will I need a claim form, or will I automatically be paid for the outstanding, pre-petition amount owed to me?**

At some point in the case, every creditor will receive a copy of a Bar Date Notice which will be accompanied by a proof of claim form with instructions as to deadlines, etc. If you have any questions regarding filing a claim, please seek legal counsel.

9. **Why can't the Hospital pay me what I am owed?**

Deleted: {10579987:3}

United States bankruptcy laws generally prohibit the payment of all unpaid invoices incurred before the hospital filed for relief under Chapter 11 of the Bankruptcy Code. The Hospital sincerely regrets the hardship or inconvenience that this may cause you.

10. **Why should I continue to provide the Hospital with goods and services if I have pre-petition claims?**

There is priority status of post-petition claims - Amounts owed for goods or services delivered after the bankruptcy filing are deemed "administrative liabilities." The Judge overseeing the case requires the Hospital to pay all administrative liabilities under the terms and conditions governing the transaction. Simply stated, the Hospital must pay for goods and services that it receives in the ordinary course of business after the filing. Also, it is important to understand that pursuant to the United States Bankruptcy Code, suppliers are required to fulfill all contractual obligations to the Hospital.

11. **What is my current balance? What is my pre-petition balance?**

The Hospital cannot provide current balances outstanding at this point because the Hospital is in the process of reviewing all of its records and separating pre- and post-petition invoices. However, within the next few days, the Hospital will be filing a "Schedule of Assets and Liabilities." In this document, the Hospital will list balances it believes are owed to its creditors. If you have further questions about this, please contact your attorney.

12. **Can't you just give me some idea of how much I will get paid on the past bills?**

While the Hospital cannot promise what the amount of payout will be on your claims, you can be sure that the Hospital will do everything it can to achieve the maximum recovery for all creditors. The Hospital sincerely regrets the hardship and inconvenience that this may cause you.

13. **Is it true that suppliers with outstanding pre-petition claims only get a few cents on the dollar for unpaid invoices?**

At this time, the Hospital is not able to estimate what value a general unsecured claim will have in its Chapter 11 cases. The Hospital sincerely regrets the hardship and inconvenience that this may cause you.

14. **If the Hospital can't pay me for pre-petition invoices, what assurances can be provided that I will be paid for post-petition goods and services?**

Under U.S.Bankruptcy Law, all claims for goods and services delivered on or after the filing date (the Petition Date) are considered administrative claims against the Hospital's bankruptcy estate. This means that the Hospital is allowed—and indeed obligated—to pay you in full and according to normal terms. The Hospital will be generating some cash flow through its collection on its patients' receivables and has also lined up and

{10579987:4}

received approval for a "DIP" financing facility ,with a $14 million loan commitment. These funds will be available to satisfy obligations associated with conducting the Hospital's businesses, including payment under normal terms for goods and services provided after the filings.

**Deleted:** with an initial loan commitment of $ 4.5 million. The Debtors will be seeking the Bankruptcy Court's approval for a subsequent loan commitment of $9.5 million at a hearing on August 2, 2010

**15. Will the Hospital attempt to negotiate new terms now that it has filed?**

The Hospital will continue to review the benefits and opportunities it has to improve its overall supplier relationships in the normal course of business. This will depend on the goods or services individual suppliers provide and the terms in place at the time of filing. The Hospital would anticipate that all supplier terms will be at normal market levels.

**16. Given the uncertainties of the situation, can I renegotiate my terms with the Hospital?**

The Hospital cannot pay more for goods and/or services at this time.

**17. When will I receive payment for goods and services delivered after the bankruptcy date?**

All goods and services delivered after July 2, 2010 will be paid according to established terms.

**18. What if I only want to be paid cash on delivery?**

The Hospital will continue to pay supplier invoices under customary terms. The Hospital believes it is in the best interests of its suppliers to maintain business as usual.

**19. Can I take back my goods?**

No. The Hospital understands your frustration, but bankruptcy law prohibits a seller from repossessing goods after a purchaser has filed for bankruptcy protection. The Hospital recommends that you consult with your legal counsel before taking any such action.

**20. Can I raise my product prices?**

The automatic stay provision associated with Chapter 11 filings prevents you from raising your prices in an effort to recoup pre-petition claims. Should you have a business reason to raise prices other than the Hospital's filing itself, you can communicate with your usual contact at the Hospital who will collect the requisite information from you and determine if a price change can be approved.

**Comment [I2]:** Is this Garfunkel?

**Deleted:** <#>I understand that companies that file for Chapter 11 are able to put some suppliers on a "Critical Vendors List" that allows them to continue to be paid under normal terms. even for invoices that are unpaid at the time of the filing. How can I get on that list? ¶
<#>A motion will be filed seeking to pay the prepetition claims of certain vendors. Although the Hospital feels as if all of its suppliers are "critical." the courts have placed very strict parameters on those vendors that can be paid at this time. If you feel as if you meet these parameters you should contact your legal counsel and they should write a letter to the Hospital's General Counsel explaining why you think you qualify. Please note that due to the fact that the hospital is now closed there will likely be very few vendors that qualify as "critical" under the Bankruptcy Code. ¶

**Formatted:** Bullets and Numbering

**Deleted:** normal

**Deleted:** {10579987:3}

## Utility Specific Questions

### 21. Do you intend to pay my pre-petition balance?

Unfortunately, federal bankruptcy laws generally prohibit the Hospital to pay outstanding invoices for goods and services received before the Petition Date. The hospital sincerely regrets the hardship this may present you.

### 22. If you don't pay my balance, the Utility Company will discontinue services.

The Hospital filed a motion in the Bankruptcy Court addressing how to provide utilities with adequate assurance to ensure continued service. A copy of the motion is available via a link at *http://chap11.epiqsystems.com/NGH/Project* .

**Deleted:** The Bankruptcy Code prohibits utilities from discontinuing service within the first 20 days of a bankruptcy.

**Deleted:** has

## Contract Labor Specific Questions

### 23. I provide contract employees to the hospital. Will I get paid?

Payment of your pre-petition amounts may be covered under the wage motion. A copy of the motion is available at the Hospital's restructuring website at: *http://chap11.epiqsystems.com/NGH/Project*. The Hospital expects you to honor your contract and continue to provide the employees and services provided pre-petition. [ THIS IS NOT ACCURATE PLEASE CONFIRM]

## What it Means for Employees

### 24. Will there be layoffs as a result of the filings? Will any departments be closed?

Yes, North General has provided WARN (Worker Adjustment and Retraining Notification) notices to a total of 941 of Hospital employees informing them that they will be laid off.

### 25. Should I keep coming to work as usual? Does this mean that my work schedule will change?

For those employees who did not receive a termination notice, you should keep working according to your usual schedule.

### 26. Have any special trustees, receivers or other third parties been added to the Board as a result of the filing?

No.

**Deleted:** There have been no changes in the Hospital's Board of Directors as a result of the filings

### 27. Where should employees go for information about the reorganization?

**Deleted:** {10579987:3}

Information about the reorganization is posted on the following web site (*http://chap11.epiqsystems.com/NGH/Project*).

28. **I am a temporary employee. Will I still get paid?**

The Hospital plans to continue paying those temporary employees it continues to retain in the postpetition period as usual.

29. **I am a contractor. Will I still get paid?**

The Hospital plans to continue paying those independent contractors it continues to retain, in the postpetition period as usual.

30. **I am a consultant. Will I still get paid? Will I be treated as a temporary employee or as a vendor?**

Consultants will be paid as usual for all post-petition work performed. Regarding any outstanding fees that have not been paid, information for general unsecured creditors is available on the Hospital's restructuring website at *http://chap11.epiqsystems.com/NGH/Project*.

## Wages and Benefits

31. **Does the Hospital have enough cash to meet its payroll and benefit obligations?**

Yes, the Hospital plans to continue paying post-petition wages and benefits for worked time.

32. **Will there be any changes in employee pay going forward?**

The Hospital expects that the proceedings will not affect its current pay policies.

33. **Will overtime still be offered?**

In some cases, overtime may be offered.

34. **Can I still file my medical and dental insurance claims?**

Yes. You can and should file your claims as you normally would.

35. **I am a U.S. employee, will COBRA benefits still be provided to employees if they are separated from the hospital after the filing?**

[10579987:4]

Comment [I3]: Delete entire section.

Deleted: <#>This website will be updated regularly. The Hospital will also communicate with you directly when there are significant developments to report. If you have any further questions, please call          at 212

Formatted: Bullets and Numbering

Deleted: its

Deleted: its

Comment [I4]: ???? SPEAK TO DEREK ABOUT THIS

Deleted: ¶

Formatted: Font: Not Bold

Formatted: Indent: Left: 0.25"

Comment [I5]: ??? My answer would be "Yes, payroll will end on X"

Deleted: Payroll will terminate on       , 2010

Comment [I6]: ??? My answer would be No.

Deleted: Yes, as required. As is typical in Chapter 11 cases, the Hospital expects that the proceedings will not affect its current compensation policies

Deleted: No.

Comment [I7]: Was this discussed at hearing??? DISCUSS WITH DEREK

Comment [I8]: ????

Deleted: <#>Will the filings affect employee health care benefits (such as medical, vision or dental plans) and employee life insurance or disability benefits for U.S. employees? ¶
<#>The Hospital asked and received Bankruptcy Court for approval to continue its current policies with respect to these matters. If the Hospital makes changes to such policies these changes will be announced through the normal communication channels.¶

Formatted: Bullets and Numbering

Comment [I9]: ?????

Formatted: Bullets and Numbering

Deleted: [10579987:3]

Yes.  The Hospital expects that COBRA continuation coverage will continue.

## Paychecks and Expense Claims

36. **Am I going to be paid as usual now that the Hospital has made these filings?**

The Hospital plans to continue providing all wages.

37. **When will I next be paid?**

There will be no delay in your next paycheck or direct deposit, and expense reimbursement will be made as usual.

38. **Will there be anything different about Hospital's paychecks as a result of the filings?**

No

39. **Will my bank/credit union still accept my paycheck or direct deposit?**

Every paycheck issued or direct deposit made by the Hospital should be honored. However, if you experience any problems cashing your paycheck or having an institution honor your direct deposit, please contact the Human Resources Department at 212 423-2363

40. **Can I continue to charge my business expenses?**

Yes.  You may do so as you have in the past, following the same procedures for submitting any qualified business expenses in accordance with hospital policy.

## Retirement Benefits/Hospital 403(b) Plan

41. **Are the assets in 403(b) plans for employees protected from creditors' claims in the bankruptcy proceedings?**

Yes.  Federal law protects the funds in 403(b) savings plans from the claims of a hospital's creditors.  All individual 403(b) accounts are set up in the individual employee's name.  This means that the Hospital cannot use these assets to meet its other obligations or to pay its debts.

41. **What happens to the accounts of employees who are participants in the 403(b) Plan?**

The assets in its 403(b) plans are held in a trust.  These assets are protected under federal law against the claims of the Hospital's creditors, which means that the Hospital can't use any of these assets to meet other obligations or to pay its debts.  While the Hospital could make changes to such a plan during the reorganization proceedings, those changes would

{10579987:4}

Comment [I10]: DE suggested on Fri, 7/2 that last paychecks were going out on 7/2.

Comment [I11]: ???

Formatted: Bullets and Numbering

Comment [I12]: ????

Formatted: Bullets and Numbering

Formatted: Bullets and Numbering

Deleted: Yes. the words (or letters) "Debtor In Possession" (or DIP) may appear on your check (s).

Formatted: Bullets and Numbering

Formatted: Bullets and Numbering

Comment [jm13]: Yes, it is still accurate.

Deleted:  [ IS THIS ACCURATE]

Deleted: ¶

Formatted: Bullets and Numbering

Deleted: {10579987:3}

only affect future contributions to the plan, not past contributions. Irrespective of the filings, all investments contained in an individual's 403(b) account are subject to some level of market risk.

42. **Now that the Hospital has made these filings, can employees access their 403(b) account funds before retirement without incurring penalties?**

No. The IRS rules for 403(b) withdrawals remain in place and will not change as a result of the Hospital's filings.

43. **Will the Hospital continue to make the hospital match contribution for the 403(b) plans?**

The Hospital intends to continue the Hospital's contributions for those 403(b) plans that currently have such a match.

44. **Are the assets in Hospital's pension plans protected from creditors' claims in bankruptcy proceedings?**

Yes. Federal law protects the assets in qualified defined pension plans from the claims of a hospital's creditors. The assets are held in trust. This means that the Hospital cannot use these assets to meet its other obligations.

45. **Is it true the pension plan is underfunded? As a result, will the PBGC (Pension Benefit Guaranty Corp.) take over the plan?**

At this point it is likely that the PBGC will take over the pension plan.

46. **Is it true that if the PBGC takes over my qualified defined benefit pension plan, I may receive a smaller pension than I am entitled to?**

The Pension Benefits Guaranty Corporation has a web site that explains what happens when they assume responsibility for a qualified defined benefit pension plan.

## Miscellaneous Policies and Practices

47. **Will employees continue to receive disability, holidays and vacation pay?**

Yes.

## Unions

48. **What happens now with the unions' collective bargaining agreements? Will you begin negotiations to change them?**

The current collective bargaining agreements will **more than likely be renegotiated.**

Formatted: Bullets and Numbering

Comment [jm14]: Confirm

Formatted: Bullets and Numbering

Comment [jm15]: Confirmed to pay match.

Comment [16]: JOHN CONFIRM STATUS .

Formatted: Bullets and Numbering

Formatted: Bullets and Numbering

Formatted: Bullets and Numbering

Comment [17]: No.

Formatted: Bullets and Numbering

Formatted: Indent: Left: 0.5", No bullets or numbering

Deleted: The Hospital has asked for court approval to continue its current policies with respect to these matters. As is customary in similar cases, the Hospital fully expects the Court to approve its request. If the Hospital makes changes to such policies in connection with cost-reduction efforts, any changes would be announced through its normal communication channels.Not

Comment [18]: How do we want to answer this? I think we are contemplating applying for modifications to our union contracts sometime in the future of this process, but do we want to let them know now?

Formatted: Bullets and Numbering

Deleted: I

Deleted: {10579987:3}

**Have you spoken to our major unions about this action?  What did they say?**

Comment [I19]: ????

The Hospital has discussed the current situation with the leadership of the Hospital's unions.  The Hospital is committed to keeping them informed of events and actions as it goes through the process.

## Inactive Employees

Comment [I20]: Need to confer with client on these issues.

Formatted: Bullets and Numbering

49. **I am on a leave of absence.  Before beginning my leave, my supervisor told me that when I returned, I would be reinstated to the job I previously held, or if that position were eliminated, that I would be reinstated in a similar position.  Now that Hospital has made these filings, does that still apply?**

   No. The hospital has ceased operating and has been closed since July 10, 2010

Deleted: The hospitasl has permanently

   **I am receiving severance from the Hospital.  How are my severance payments affected by the filings?**

   The Hospital plans to honor CBA-related payment of severance wages to Union employees.

## Retiree Questions

Comment [I21]: We need to confer with the client on these issues.

Formatted: Bullets and Numbering

50. **Will I continue to receive my monthly pension check from the Bank of New York?**

   As a member of either the Hospital Pension Plan for Salaried Employees or the Hospital Pension Plan for Hourly Employees, you will continue to receive your monthly pension check as usual at this time.  The Bank of Bank of New York will continue to mail your check directly to your home or deposit the sum directly into your bank account.

Formatted: Bullets and Numbering

51. **Is it possible that the Hospital's qualified defined benefit pension plan could be changed or terminated as a result of the Chapter 11 filing?**

   Yes. it is possible that changes to the Plan may occur.

   While U.S. federal law protects qualified defined benefit pension plans from retroactive changes to plan benefits, it is possible that there could be changes to the qualified defined benefit pension plan in the future.  Any such changes would be announced as appropriate.  In the U.S., the Pension Benefit Guaranty Corporation also provides protection for qualified defined benefit pension programs.

Formatted: Bullets and Numbering

52. **What happens if a qualified defined benefit pension plan is terminated?**

   If a qualified defined benefit pension plan is terminated, the liabilities of the plan are determined and the assets of the plan are used to satisfy those liabilities.  If it is determined that the plan has sufficient assets, then all plan benefits are paid in accordance

Deleted: {10579987:3}

{10579987:4}

with the plan terms and the Employee Retirement Income Security Act of 1974 (ERISA). In the event that there are insufficient assets to pay all approved benefits, then the plan will be administered by the Pension Benefit Guaranty Corporation (PBGC), which is an independent agency chartered under federal law.

The rules governing distribution of plan assets are complex. Generally speaking, however, all reasonable administrative expenses are paid by the plan first. Then the plan's remaining assets would be distributed in accordance with guidelines of ERISA.

For more information about the PBGC insurance protections and its limitations, go to *www.pbgc.gov.*

53. **Are the assets in the Hospital's 403(b) plans for retirees protected from creditors' claims in the bankruptcy proceedings?**

Yes. Federal law protects the funds in 403(b) savings plans from the claims of a hospital's creditors. All individual 403(b) accounts are set up in the individual retiree's name. This means that the Hospital cannot use these assets to meet its other obligations or to pay its debts.

54. **What happens to the accounts of retirees who are participants in the 403(b) plan?**

The assets in its 403(b) plans are held in a trust, which is separate from the hospital. These assets are protected under U.S. federal law against the claims of the Hospital's creditors, which means that the hospital can't use any of these assets to meet other obligations or to pay its debts. While the Hospital could make changes to such a plan during the reorganization proceedings, those changes would only affect future hospital contributions to the plan, not past contributions. Irrespective of the filings, all investments contained in an individual's 403(b) account are subject to some level of market risk.

55. **Will there be any impact on retiree medical benefits as a result of the filings?**

There will be no changes to the retiree medical benefits as a result of the filing. [CONFIRM]

56. **Where should retirees go for information about the reorganization?**

Information about the reorganization is posted on the external web site, (*http://chap11.epiqsystems.com/NGH/Project* . and these will be updated regularly. The Hospital will also communicate with you directly when there are significant developments to report.

## Patient Questions

57. **How can I get additional information?**

Further information will be posted as available on the Hospital's restructuring website *http://chap11.epiqsystems.com*/NGH/Project

The hospital has provided contact phone numbers for various inquiries on its website at http://www.northgeneral.org/

Formatted: Underline

Deleted: {10579987:3}

# EXHIBIT 10

**Zavalkoff-Babej, Erin**

| | |
|---|---|
| **From:** | Zavalkoff-Babej, Erin |
| **Sent:** | Monday, July 12, 2010 6:12 PM |
| **To:** | 'Marianne Muise' |

**Subject:** NGH

Hi Marianne,

John said you were the person I should reach out to to get some vendor-related information.  If possible can you send me a list of your critical vendors and how much you owe these critical vendors (prepetition amounts that have not been paid).  Basically, these are vendors that NGH will still need to deal with (until operations cease) and who would otherwise not provide NGH goods and services until they are paid these prepetition amounts that are due and owing.

Let me know if you have any questions.

Erin

# EXHIBIT 11

# Zavalkoff-Babej, Erin

| | |
|---|---|
| **From:** | Monica Terrano [Monica.Terrano@NGSC.ORG] |
| **Sent:** | Wednesday, July 14, 2010 11:35 AM |
| **To:** | Zavalkoff-Babej, Erin |
| **Cc:** | Marianne Muise; John Maher |
| **Subject:** | critical vendors |
| **Attachments:** | vendor_required_after_bankrupcy07142010submitted.xlsx |

Erin,

Attached is last of vendors that North General will need along with their owed balances. Please let me know if anything further is required.

| Vendors that need to Continue | Amount owed Pre-Petition as of 7/13/2010 Accounts | Estimated Amount Owed | Grand Total | Classification | Description of Vendor Services | Comments |
|---|---|---|---|---|---|---|
| Burns Security | 363,310 | 140,000.00 | 503,309.61 | Critical | Outsourced Security Services | |
| Iron Mountain | 18,849.32 | 20,000.00 | 38,849.32 | Critical | Record Storage | |
| Physician Reciprocal Insurance | | 20,000.00 | 20,000.00 | Critical | Malpractice Insurance | |
| Public Goods Pool | | 134,799.00 | 134,799.00 | Critical | NYS Bad Debt Pools; must pay in order to receive monthly distribution | Payments will be offset by Revenue |
| Statewide Assessment Pool | | 120,000.00 | 120,000.00 | Critical | NYS Assessment; must pay in order to receive monthly distribution | Payments will be offset by Revenue |
| 3M Health Information | | 70,000.00 | 70,000.00 | Ordinary Course | DRG & coding software | |
| ACME Fire Alarm & Fire Systems | | 45,000.00 | 45,000.00 | Ordinary Course | Fire Alarm Maintenance & Repairs | |
| ADT Security | | 1,000.00 | 1,000.00 | Ordinary Course | Security & Alarm system Maintenance & repairs | |
| AFCO Insurance | | 65,000.00 | 65,000.00 | Ordinary Course | Financing for insurance premiums | |
| American Appraisal | 11,476.00 | 48,500.00 | 59,976.00 | Ordinary Course | Property appraisal services | |
| AT&T | | 150.00 | 150.00 | Ordinary Course | Back up telephone line | |
| Atlantic Business | 334.22 | | 334.22 | Ordinary Course | Copier lease | |
| Distinctive Personnel | | 1,000.00 | 1,000.00 | Ordinary Course | Temporary employment agency | |
| Door Automation | 2,298.00 | | 2,298.00 | Ordinary Course | Maintenance & Repairs | |
| Federal Express | 941.80 | 200.00 | 1,141.80 | Ordinary Course | Overnight shipping | |
| First Insurance | | 9,870.00 | 9,870.00 | Ordinary Course | Malpractice Insurance | |
| Harley Construction Management Corp | | 64,000.00 | 64,000.00 | Ordinary Course | Construction company | Payments will be offset by Revenue |
| Integro Insurance | 32,253.67 | | 32,253.67 | Ordinary Course | General Liability Insurance | |
| Joele Frank | | 12,000.00 | 12,000.00 | Ordinary Course | Property appraisal services | |
| LDI Colored Toolbox | | 2,500.00 | 2,500.00 | Ordinary Course | Copier maintenance | |
| NYC Fire Department | 935.00 | 2,985.00 | 3,920.00 | Ordinary Course | Fire saftey & permits | |
| Pitney Bowes | | 10,000.00 | 10,000.00 | Ordinary Course | Postage machines | |
| System Maintenance Services | | 2,000.00 | 2,000.00 | Ordinary Course | Software & licenses & maintenance | |
| United Parcel Services | 131.05 | 200.00 | 331.05 | Ordinary Course | Overnight Shipping | |
| Vital Network | | 10,000.00 | 10,000.00 | Ordinary Course | Software & licenses & maintenance | |
| Deloitte Tax | 160,750.00 | | 160,750.00 | Professional | Independent Audit firm (year end tax issues) | |
| Emdeon Corp | 18,834.30 | 6,300.00 | 25,134.30 | Professional | Revenue cycle services (billing & collection) | |
| Epiq Systems | | 55,000.00 | 55,000.00 | Professional | Bankruptcy claim service | |
| Garbarini & Scher | | 25,000.00 | 25,000.00 | Professional | Malpractice Attorneys | |
| Healthcare Management Solutions | | 31,000.00 | 31,000.00 | Professional | Finance, Reimbursement & Revenue Cycle consultants | |
| Milliman USA | 45,318.00 | 39,000.00 | 84,318.00 | Professional | Pension actuary | |
| BDO Seidman | | 55,000.00 | 55,000.00 | Professional | Independent Audit firm (year end audit, pension audits, grant audits) | |
| **Total** | **655,430.97** | **990,504.00** | **1,645,934.97** | | | |

# EXHIBIT 12

**Zavalkoff-Babej, Erin**

| | |
|---|---|
| From: | Zavalkoff-Babej, Erin |
| Sent: | Wednesday, July 14, 2010 10:35 AM |
| To: | 'Marianne Muise' |
| Subject: | RE: NGH |

Ok
Just remember these are "critical vendors" not every vendor. There should not be that many critical vendors for a hospital that is closing down. Usually an ongoing business has a number of critical vendors. let me know if you have any questions.

Erin

**From:** Marianne Muise [mailto:mmuise@hmsconsultants.com]
**Sent:** Wednesday, July 14, 2010 10:19 AM
**To:** Zavalkoff-Babej, Erin
**Subject:** Re: NGH

Erin: we finished late last night, and have one or two questions for John; he should sign off on it by 11:30

MLM
Marianne L. Muise, FHFMA
Principal
Healthcare Management Solutions LLC
voice: 845-497-1312
efax: 888-307-6949
mmuise@hmsconsultants.com
www.hmsconsultants.com

This e-mail message and any attachment is intended solely for the
The message and/or attachment may contain confidential informatio
If you are not the intended recipient of this message, you must n
disseminate the information. Instead, please notify the sender an
and any attachment from your system. Thank you for your cooperati

On July 13, 2010 at 9:27 PM "Zavalkoff-Babej, Erin" <ebabej@windelsmarx.com> wrote:

> Did you forget me?
> Erin Zavalkoff-Babej
>
> **From:** Marianne Muise <mmuise@hmsconsultants.com>
> **To:** Zavalkoff-Babej, Erin
> **Sent:** Tue Jul 13 15:34:25 2010
> **Subject:** RE: NGH
>
> Erin: what if we are missing invoices.
> one example is EPIQ, we only have the May invoice,
> how do we handle that, if this motion is to set an amount not to exceed??
> we might not have all the invoices for these critical vendors, and I don't want to be short
>
> MLM
> Marianne L. Muise, FHFMA
> Principal
> Healthcare Management Solutions LLC
> voice: 845-497-1312
> efax: 888-307-6949
> mmuise@hmsconsultants.com
> www.hmsconsultants.com
>
> This e-mail message and any attachment is intended solely for th
> The message and/or attachment may contain confidential informati
> If you are not the intended recipient of this message, you must
> disseminate the information. Instead, please notify the sender a
> and any attachment from your system. Thank you for your cooperat
>
> On July 13, 2010 at 1:26 PM "Zavalkoff-Babej, Erin" <ebabej@windelsmarx.com>

3/1/2011

wrote:

don;t need addresses at this point just the total amount you need to pay for all prepetition amounts due to your critical vendors. Name and kind of service they are providing

**From:** Marianne Muise [mailto:mmuise@hmsconsultants.com]
**Sent:** Tuesday, July 13, 2010 1:16 PM
**To:** Zavalkoff-Babej, Erin
**Subject:** Re: NGH

Erin: also, do you need utility suppliers identified, or was that included in another motion?

MLM
Marianne L. Muise, FHFMA
Principal
Healthcare Management Solutions LLC
voice: 845-497-1312
efax: 888-307-6949
mmuise@hmsconsultants.com
www.hmsconsultants.com

This e-mail message and any attachment is intended solely for the addressee.
The message and/or attachment may contain confidential information.
If you are not the intended recipient of this message, you must not read, use, retain or
disseminate the information. Instead, please notify the sender and delete the message
and any attachment from your system. Thank you for your cooperation.

On July 12, 2010 at 6:12 PM "Zavalkoff-Babej, Erin" <ebabej@windelsmarx.com> wrote:

Hi Marianne,
John said you were the person I should reach out to to get some vendor-related information. If possible can you send me a list of your critical vendors and how much you owe these critical vendors (prepetition amounts that have not been paid). Basically, these are vendors that NGH will still need to deal with (until operations cease) and who would otherwise not provide NGH goods and services until they are paid these prepetition amounts that are due and owing.
Let me know if you have any questions.
Erin
Erin Zavalkoff-Babej | Windels Marx Lane & Mittendorf, LLP | 156 West 56th Street, New York, New York 10019 | Direct Dial: 212.237.1176 |
General Fax: 212.262.1215 | ebabej@windelsmarx.com | www.windelsmarx.com

IRS Circular 230 Disclosure: As required by Federal Regulations, we inform you that any tax advice contained herein was not written or intended to be used (and cannot be used) for the purpose of avoiding federal tax penalties, or for the purpose of promoting, marketing, or recommending any transaction or matter to another party.

This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, regardless of whether you are a named recipient, please notify the sender by reply e-mail and delete the message and any attachments.

Erin Zavalkoff-Babej | Windels Marx Lane & Mittendorf, LLP | 156 West 56th Street, New York, New York 10019 | Direct Dial: 212.237.1176 | General Fax: 212.262.1215 | ebabej@windelsmarx.com | www.windelsmarx.com

IRS Circular 230 Disclosure: As required by Federal Regulations, we inform you that any tax advice contained herein was not written or intended to be used (and cannot be used) for the purpose of avoiding federal tax penalties, or for the purpose of promoting, marketing, or recommending any transaction or matter to another party.

This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, regardless of whether you are a named recipient, please notify the sender by reply e-mail and delete the message and any attachments.

Erin Zavalkoff-Babej | Windels Marx Lane & Mittendorf, LLP | 156 West 56th Street, New York, New York 10019 | Direct Dial: 212.237.1176 | General Fax: 212.262.1215 | ebabej@windelsmarx.com | www.windelsmarx.com

IRS Circular 230 Disclosure: As required by Federal Regulations, we inform you that any tax advice contained herein was not written or intended to be used (and cannot be used) for the purpose of avoiding federal tax penalties, or for the purpose of promoting, marketing, or recommending any transaction or matter to another party.

This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, regardless of whether you are a named recipient, please notify the sender by reply e-mail and delete the message and any attachments.

3/1/2011

# EXHIBIT 13

**Zavalkoff-Babej, Erin**

| | |
|---|---|
| **From:** | Marianne Muise [mmuise@hmsconsultants.com] |
| **Sent:** | Wednesday, July 21, 2010 2:22 PM |
| **To:** | Zavalkoff-Babej, Erin |
| **Cc:** | Maher John; Etheridge, Derek |
| **Subject:** | RE: Critical Vendor list Updated 7-21-2010 |

Erin: in response to your questions:

**Physicians Reciprocal Insurance** is malpractice insurance for Physicians.

**Public Good Pools** are the indigent care pool funding mechanism of NYS. we must pay this, and the monthly assessments and gross receipts tax to be eligible for the state funding. our distributions from the pool far exceed our payments to the pools (and assessment and gross receipts tax)

**Milliman** provides pension actuary services. they also estimate pension benefits as individuals retire.

we are not adding **Dell/Perot** to the list because they are a new vendor, and do not have any pre-petition invoices. HMS? Is this **Healthcare Waste Solutions**? if so, same as Dell, no prepetition invoices. if you mean my firm HMS, we are included on the list, Healthcare Management Solutions

let me know if you need anything else


MLM
Marianne L. Muise, FHFMA
Principal
Healthcare Management Solutions LLC
voice: 845-497-1312
efax: 888-307-6949
mmuise@hmsconsultants.com
www.hmsconsultants.com

This e-mail message and any attachment is intended solely for the
The message and/or attachment may contain confidential informatio
If you are not the intended recipient of this message, you must n
disseminate the information. Instead, please notify the sender an
and any attachment from your system. Thank you for your cooperati

On July 21, 2010 at 1:16 PM "Zavalkoff-Babej, Erin" <ebabej@windelsmarx.com> wrote:

> Hi
> Thanks so much for this. A couple of quick questions. Can you provide me a short blurb on the
> following entities just so I can explain the importance of these entities and why they should be
> included in the critical vendor motion.
>
> Physicians Reciprocal Insurance
> Public Goods Pool
> Milliman USA
>
> Also are we adding Perot? and HMS?
>
> Thanks so much
>
> Erin
>
> **From:** Marianne Muise [mailto:mmuise@hmsconsultants.com]
> **Sent:** Wednesday, July 21, 2010 1:02 PM
> **To:** Zavalkoff-Babej, Erin
> **Cc:** Maher John; Etheridge, Derek
> **Subject:** Critical Vendor list Updated 7-21-2010
>
> Erin: attached is corrected copy of the critical vendor list.
> (we corrected the description on a few vendors)
>
> please let me know if you have any questions.

MLM
Marianne L. Muise, FHFMA
Principal
Healthcare Management Solutions LLC
voice: 845-497-1312
efax: 888-307-6949
mmuise@hmsconsultants.com
www.hmsconsultants.com

This e-mail message and any attachment is intended solely for the addressee.
The message and/or attachment may contain confidential information.
If you are not the intended recipient of this message, you must not read, use, retain or
disseminate the information. Instead, please notify the sender and delete the message
and any attachment from your system. Thank you for your cooperation.

Erin Zavalkoff-Babej | Windels Marx Lane & Mittendorf, LLP | 156 West 56th Street, New York, New York 10019 | Direct Dial: 212.237.1176 | General
Fax: 212.262.1215 | ebabej@windelsmarx.com | www.windelsmarx.com

IRS Circular 230 Disclosure: As required by Federal Regulations, we inform you that any tax advice contained herein was not written or intended to be used (and cannot be used) for the purpose of
avoiding federal tax penalties, or for the purpose of promoting, marketing, or recommending any transaction or matter to another party.

This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, regardless of whether you are a named recipient, please
notify the sender by reply e-mail and delete the message and any attachments.

3/1/2011

**Zavalkoff-Babej, Erin**

| | |
|---|---|
| **From:** | Marianne Muise [mmuise@hmsconsultants.com] |
| **Sent:** | Wednesday, July 21, 2010 1:02 PM |
| **To:** | Zavalkoff-Babej, Erin |
| **Cc:** | Maher John; Etheridge, Derek |
| **Subject:** | Critical Vendor list Updated 7-21-2010 |
| **Attachments:** | vendor_required_after_bankrupcy07142010 Revised 7-21-2010.xlsx |

Erin: attached is corrected copy of the critical vendor list.
(we corrected the description on a few vendors)

please let me know if you have any questions.


MLM
Marianne L. Muise, FHFMA
Principal
Healthcare Management Solutions LLC
voice: 845-497-1312
efax: 888-307-6949
mmuise@hmsconsultants.com
www.hmsconsultants.com

This e-mail message and any attachment is intended solely for the
The message and/or attachment may contain confidential informatio
If you are not the intended recipient of this message, you must n
disseminate the information. Instead, please notify the sender an
and any attachment from your system. Thank you for your cooperati

NORTH GENERAL
CRITICAL VENDORS (GOODS & SUPPLIES)

| Vendors that need to Continue | Amount owed Pre-Petition as of 7/13/2010 Accounts | Estimated Amount Owed | Grand Total | Classification | Description of Vendor Services | Comments |
|---|---|---|---|---|---|---|
| Burns Security | 363,310 | 140,000.00 | 503,309.61 | Critical | Outsourced Security Services | |
| Iron Mountain | 18,849.32 | 20,000.00 | 38,849.32 | Critical | Record Storage | |
| Physician Reciprocal Insurance | | 20,000.00 | 20,000.00 | Critical | Malpractice Insurance | |
| Public Goods Pool | | 134,799.00 | 134,799.00 | Critical | NYS Bad Debt Pools; must pay in order to receive monthly distribution | Payments will be offset by Revenue |
| Statewide Assessment Pool | | 120,000.00 | 120,000.00 | Critical | NYS Assessment; must pay in order to receive monthly distribution | Payments will be offset by Revenue |
| 3M Health Information | | 70,000.00 | 70,000.00 | Ordinary Course | DRG & coding software | |
| ACME Fire Alarm & Fire Systems | | 49,000.00 | 49,000.00 | Ordinary Course | Fire Alarm Maintenance & Repairs | |
| ADT Security | | 1,000.00 | 1,000.00 | Ordinary Course | Security & Alarm system Maintenance & repairs | |
| AFCO Insurance | | 65,000.00 | 65,000.00 | Ordinary Course | Financing for insurance premiums | |
| American Appraisal | 11,476.00 | 48,500.00 | 59,976.00 | Ordinary Course | Property appraisal services | |
| Distinctive Personnel | | 1,000.00 | 1,000.00 | Ordinary Course | Temporary employment agency | |
| Door Automation | 2,298.00 | | 2,298.00 | Ordinary Course | Maintenance & Repairs | |
| First Insurance | | 9,870.00 | 9,870.00 | Ordinary Course | Malpractice Insurance | |
| Harley Construction Management Corp | | 64,000.00 | 64,000.00 | Ordinary Course | Construction company | Payments will be offset by Revenue |
| Integro Insurance | 32,253.67 | | 32,253.67 | Ordinary Course | Insurance Brokers | |
| Joele Frank | | 12,000.00 | 12,000.00 | Ordinary Course | Public Relations | |
| LDI Colored Toolbox | | 2,500.00 | 2,500.00 | Ordinary Course | Copier maintenance | |
| NYC Fire Department | 935.00 | 2,985.00 | 3,920.00 | Ordinary Course | Fire saftey & permits | |
| Piney Bowes | | 10,000.00 | 10,000.00 | Ordinary Course | Postage machines | |
| System Maintenance Services | | 2,000.00 | 2,000.00 | Ordinary Course | Software & licenses & maintenance | |
| Vital Network | | 10,000.00 | 10,000.00 | Ordinary Course | Computer Network maintenance | |
| Epiq Systems | | 55,000.00 | 55,000.00 | Professional | Bankruptcy claim service | |
| Garbarini & Scher | | 25,000.00 | 25,000.00 | Professional | Malpractice Attorneys | |
| Healthcare Management Solutions | | 31,000.00 | 31,000.00 | Professional | Finance, Reimbursement & Revenue Cycle consultants | |
| Milliman USA | 45,318.00 | 39,000.00 | 84,318.00 | Professional | Pension actuary | |
| BDO Seidman | | 55,000.00 | 55,000.00 | Professional | Independent Audit firm (year end audit, pension audits, grant audits) | |
| **Total** | 474,439.60 | 987,654.00 | 1,462,093.60 | | | |

# EXHIBIT 14

# Zavalkoff-Babej, Erin

**From:** Etheridge, Derek
**Sent:** Wednesday, March 02, 2011 11:35 AM
**To:** Zavalkoff-Babej, Erin
**Subject:** FW:North General - Critical Vendor Motion

---

**From:** Schwartz, Andrea B. (USTP) [mailto:Andrea.B.Schwartz@usdoj.gov]
**Sent:** Friday, July 23, 2010 5:35 PM
**To:** Etheridge, Derek
**Cc:** Simpson, Charles E.
**Subject:** North General - Critical Vendor Motion

Here are our issues:

1. Why is the motion necessary in light of the fact that all of the patients were discharged from the hospital as of July 11, 2010? The motion says only that it is necessary to pay "critical vendors" (i) to implement the Closure Plan and (ii) safeguard the patients and the residents. Without explanation, it does not appear to be necessary.
2. The motion includes a blank for the "Critical Vendor Cap."??
3. The motion does not include a list of the "critical vendors" to be paid. We request seeing the list, and the amounts being sought to be paid.

Andrea B. Schwartz, Esq.
Trial Attorney
U.S. Department of Justice
Office of the United States Trustee
*Southern District of New York*
33 Whitehall Street, 21st Floor
New York, NY 10004
(212) 510-0500 (Tel.)
(212) 668-2255 (Fax)

Derek Etheridge | Windels Marx Lane & Mittendorf, LLP | 156 West 56th Street, New York, New York 10019 | Direct Dial: 212.237.1073 | General Fax: 212.262.1215 | detheridge@windelsmarx.com | www.windelsmarx.com

# EXHIBIT 15

**Zavalkoff-Babej, Erin**

| | |
|---|---|
| **From:** | Vitale-Rullo, Maria |
| **Sent:** | Tuesday, February 01, 2011 6:50 PM |
| **To:** | Zavalkoff-Babej, Erin |
| **Subject:** | FW:Payment Analysis |

-----Original Message-----
From: John Maher [mailto:John.Maher@NGSC.ORG]
Sent: Sunday, January 23, 2011 11:27 AM
To: Simpson, Charles E.
Cc: John Maher
Subject: RE: Payment Analysis

The payments in question had to do with the physicians' contracts, specifically Pathology
and Urology. Other payments, based on the original pre-petition wage motion had to do with
commitments that he and the Board made at the Town Hall meeting.

-----Original Message-----
From: Simpson, Charles E. [mailto:csimpson@windelsmarx.com]
Sent: Sunday, January 23, 2011 8:39 AM
To: John Maher
Subject: Fw: Payment Analysis

----- Original Message -----
From: Simpson, Charles E.
Sent: Saturday, January 22, 2011 07:19 PM
To: 'john.maher@ngsc.com' <john.maher@ngsc.com>
Subject: Payment Analysis

John, how many of the payments Huebscher and Bunin complained about were made at the
direction of Dr. Daniel before he resigned and while he was CEO? I remember your coming
to me after he authorized the payment of vacation and severance to inquire of the
propriety of those payments.
Were there other payments like that?

Charles E. Simpson | Windels Marx Lane & Mittendorf, LLP | 156 West 56th Street, New York,
New York 10019 | Direct Dial: 212.237.1070 | General
Fax: 212.262.1215 | csimpson@windelsmarx.com | www.windelsmarx.com

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

IRS Circular 230 Disclosure: As required by Federal Regulations, we inform you that any
tax advice contained herein was not written or intended to be used (and cannot be used)
for the purpose of avoiding federal tax penalties, or for the purpose of promoting,
marketing, or recommending any transaction or matter to another party.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
This message is sent by a law firm and may contain information that is privileged or
confidential. If you received this transmission in error, regardless of whether you are a
named recipient, please notify the sender by reply e-mail and delete the message and any
attachments.

Maria Vitale-Rullo | Legal Secretary | Windels Marx Lane & Mittendorf, LLP | 156 West 56th
Street, New York, New York 10019 | Direct Dial: 212.237.1071 | General Fax: 212.262.1215 |
mvitale-rullo@windelsmarx.com | www.windelsmarx.com